**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**
**SYRACUSE DIVISION**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| NORTH STAR HEALTH ALLIANCE, INC., *et al*,[1] | : | Case No. 26-60099 |
| | : | Main Case |
| Debtors. | : | Joint Administration Being |
| | : | Requested |

-------------------------------------------------------------------x

### MOTION FOR INTERIM AND FINAL ORDERS
### AUTHORIZING USE OF CASH COLLATERAL

North Star Health Alliance, Inc. ("North Star"), Carthage Area Hospital, Inc. ("Carthage"),

Claxton-Hepburn Medical Center, Inc. ("Claxton"), and Meadowbrook Terrace, Inc.

("Meadowbrook"), the above-captioned debtors and debtors-in-possession (collectively, the

"Debtors"), by and through their undersigned counsel, hereby move this Court for entry of an

interim order, the proposed form of which is attached hereto as **Exhibit A** (the "Interim Order"),

pursuant to Sections 361 and 363 of Title 11 of the United States Code (as amended, the

"Bankruptcy Code") and Fed. R. Bankr. P. ("Bankruptcy Rules") 4001: (i) authorizing the

Debtors' use of cash collateral to maintain ongoing operations and avoid immediate and irreparable

harm to the Debtors' estates pending a final hearing; (ii) determining that the Debtors' prepetition

secured creditors' interests in cash collateral are adequately protected; (iii) scheduling a final

hearing in connection with the relief sought in this Motion; and (iv) granting such other and further

relief as the Court deems appropriate (the "Motion"). In support of this Motion, the Debtors submit

as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).

## JURISDICTION, VENUE AND BASIS FOR RELIEF

1.     The Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by the Bankruptcy Court.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested herein are Sections 361 and 363(a) and (c)(2) of the Bankruptcy Code and Bankruptcy Rule 4001(b).

## CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001(b)(1)(B)

3.     This Motion seeks authorization for the Debtors to use cash collateral (as defined below) to maintain the Debtors' ordinary course business operations – primarily meeting payroll obligations to their employees and paying vendors and other expenses necessary to maintain the delivery of healthcare services.  The proposed terms of usage are set forth in detail in the Interim Order and the Budget (as that term is defined below).  The proposed Interim Order provides the Debtors' secured creditors who may have an interest in the Cash Collateral, with protections, including the following:

- expiration of the authority to use cash collateral on the date of the final hearing, unless extended by further order of the Court;

- a rollover lien to the same extent and validity of their pre-petition interest in the Debtors' assets; and

- an allowed superpriority claim pursuant to 11 U.S.C. §507(b) to the extent of any diminution in the value of each creditor's cash collateral, as applicable.

## BACKGROUND

### A.    The Chapter 11 Cases

4.      On February 10, 2026 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of their properties and are operating and managing their businesses, as debtors-in-possession, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No request for the appointment of a trustee, examiner or patient care ombudsman has been made in these Chapter 11 Cases and no statutory committees have been appointed or designated.

### B.    The Debtors' Corporate Structure and Operations

6.      North Star Health Alliance, Inc. was established in September 1993 and incorporated in the State of New York as a not-for-profit corporation.  North Star is the umbrella organization within which Carthage, Claxton, Meadowbrook and related affiliates coordinate governance, strategy, and shared services under what is referred to as the Transformation Plan.[2] North Star is a passive parent entity that does not itself exercise financial control over each member organization; rather, it serves as a platform for alignment and operational integration, including shared leadership and centralized administrative functions (e.g., finance, human resources, information technology, compliance, revenue cycle coordination, and cash planning) that are

---

[2] Beginning in or about August 2022, North Star pursued a complex transition (the "Transformation Plan") designed to preserve access to acute care and behavioral health services in the North Country while addressing Claxton's unsustainable legacy cost and reimbursement structure as a Sole Community Hospital. The Transformation Plan involved coordinated planning among North Star member organizations, engagement with DOH and OMH, and stepwise regulatory actions. On October 23, 2024, DOH and OMH issued operating certificates that reorganized Claxton into two distinct hospital entities: (i) a standalone inpatient psychiatric hospital (CHMC) and (ii) a separate acute-care campus operated by Carthage under a shared operating certificate (the Claxton Campus).

critical to sustaining rural healthcare delivery across multiple campuses. The North Star system as a whole employs approximately 1,600 employees. Carthage was established in November 1921 and incorporated in the state of New York as a not-for-profit corporation.  Carthage operates a 25-bed Critical Access Hospital in Carthage, New York serving a large, rural tri-county area. Carthage holds a New York State Department of Health operating certificate (No. 2238700C; Facility ID/PFI 379) for primary care hospital-critical access hospital services located at 1001 West Street, Carthage, New York 13619, and it also operates a second 25 bed acute-care campus located at 214 King Street, Suite A, Ogdensburg, New York 13669 (the "Claxton Campus") under the same operating certificate (Facility ID/PFI 15684). The Claxton Campus is the former acute-care component of Claxton that is now operated by Carthage under a shared operating certificate as part of the Transformation Plan. While the New York State Department of Health ("DOH") issued the operating certificate reflecting this configuration, Centers for Medicare & Medicaid Services ("CMS") processes to recognize and operationalize the Claxton Campus as a critical access hospital (including surveys, enrollment steps, and related notifications) have involved additional steps and timing considerations.

7.      Claxton-Hepburn Medical Center, Inc. was established in December 1916 and incorporated in January 1917 in the state of New York as a not-for-profit corporation.  Following the implementation of the Transformation Plan, Claxton now operates exclusively as a standalone Article 31 Inpatient Psychiatric Hospital licensed by the New York State Office of Mental Health under Operating Certificate No. 8231002, located at 214 King Street, Suite B, Ogdensburg, New York 13669. Claxton is the designated "9.39" hospital for the area and provides acute inpatient behavioral health services for adults (28 beds) and children/adolescents (12 beds), including the region's only acute inpatient unit dedicated to children and adolescents. Claxton also leads the

Pathways to Recovery Peer Coaching program and has been planning to establish the region's first Comprehensive Psychiatric Emergency Program.

8.      Meadowbrook Terrace, Inc. was established in December 2011 and incorporated in the state of New York as a not-for-profit corporation.  Meadowbrook is a 60-bed assisted living facility (58 ALP beds and 2 Adult Home) that provides assisted living services for seniors in the North Country region. Meadowbrook is a key part of the Debtors' care continuum for elderly and medically fragile patients, supporting safe discharge planning and community-based care.

9.      Through this bankruptcy proceeding, the Debtors intend to continue to fulfill their mission by operating their facilities to deliver quality health care in their communities.

### SECURED CREDITORS WITH INTERESTS IN CASH COLLATERAL

10.      Prepetition, the Debtors entered into various loan and other financial agreements with related security agreements (collectively, the "Agreements") with the parties identified on **Exhibit B** who may claim an interest in the cash generated by the Debtors' operations (collectively, the "Cash Collateral Secured Creditors").

11.      At the initial interim hearing on the Debtors' use of Cash Collateral set for February 12, 2026, the Debtors will request a further interim hearing date regarding the Debtors' use of Cash Collateral, before and at which hearing the Debtors intend to provide more information regarding its analysis of the extent and priority of liens the that may be claimed in Cash Collateral by the Cash Collateral Secured Creditors.

### RELIEF REQUESTED

12.      By this Motion the Debtors seek entry of the Interim Order pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b):  (i) authorizing the Debtors to use cash that may otherwise serve as collateral security for the amounts owed to the Cash

Collateral Secured Creditors (the "Cash Collateral"), pursuant to the budget set forth in **Exhibit C** annexed hereto (the "Budget"), as working capital to purchase goods and services and pay operating expenses related to the Debtors' ordinary course business operations, including payroll, and in order to preserve the value of the Debtors' estates, including without limitation, using Cash Collateral per the Budget for a brief interim period to satisfy (a) any vital prepetition operating and other expenses that may be approved by the Court (*e.g.*, unpaid prepetition employee wages), (b) obligations incurred in the ongoing post-petition operations of the Debtors, and (c) any and all non-professional administrative costs and expenses arising in the ordinary course of business in connection with the Debtors' post-petition operation of their hospitals and medical care facilities, on an interim basis and pending a final hearing; (ii) determining that the Cash Collateral Secured Creditors interests in Cash Collateral are adequately protected; and (iii) scheduling a final hearing on the Motion to consider entry of a Final Order granting the relief requested herein.

<u>ARGUMENT</u>

13.    The Debtors should be granted use of Cash Collateral in accordance with the proposed Budget because:

- The Debtors' access to the Cash Collateral is absolutely necessary for the Debtors to preserve the value of their businesses and Cash Collateral Secured Creditors' collateral during the pendency of the Debtors' Chapter 11 cases, and

- The proposed use of Cash Collateral is modest in scope and primarily designed to satisfy payroll and to maintain critical operations pending a final hearing.

Accordingly, the proposed use of Cash Collateral is necessary and appropriate under Section 363 of the Bankruptcy Code and the Cash Collateral Secured Creditors' interests in such will be adequately protected.

**A.      Debtors' Need to Use Cash Collateral**

14.      To the extent the Debtors' cash on hand constitutes Cash Collateral, and the Debtors believe it does, it is subject to the use restriction set forth in Section 363(c)(2) of the Bankruptcy Code.  Without authorization from the Court for the Debtors to use the Cash Collateral in accordance with Section 363(c)(2)(B) of the Bankruptcy Code, the Debtors will be left without a source of working capital and will be unable to operate their hospitals and medical care facilities, making it impossible to preserve the existing value of their estates for the benefit of their creditors. The ability of the Debtors to preserve their hospitals and medical care operations and assets, along with the *value* of those operations and assets, and ultimately to reorganize, depends on the Debtors being permitted to use the Cash Collateral to fund their daily healthcare operations.

15.      In sum, without the ability to fund the Debtors' current operations on an interim basis, the value of the Debtors' assets will be irreparably harmed because, among other things,[3] the Debtors' hospitals and medical care operations are likely to close if Cash Collateral use is not permitted.

---

[3] In addition to the precipitous drop in Debtors' revenue that would accompany the Debtors' cessation of providing healthcare services to its communities, the Debtors' contract counterparties (e.g., doctors, nurses, vendors) would likely assert claims against the Debtors in connection with the Debtors' non-operational status.  If the Debtors are not authorized to access to Cash Collateral, the Debtor will cease generating revenue and the amount of claims asserted against the Debtors will increase.  Allowing the Debtors to operate, first on an interim cash collateral basis, will preserve the status quo while the Debtors pursue a plan to maximize recovery for all their constituencies.

**B.    Adequate Protection**

16.    Pursuant to Section 363(c)(2) of the Bankruptcy Code, a debtor-in-possession may not use cash collateral without the consent of the secured party or approval by the Court.  By obtaining approval to use cash collateral, a debtor can continue to operate its business and maintain and enhance the value of its lenders' collateral.  *See, e.g., In re Megan Racine Associates Inc.*, 202 B.R. 660, 663 (Bankr. N.D.N.Y. 2002); *In re Constable Plaza Assocs., L.P.,* 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991).  Section 363(e) of the Bankruptcy Code provides that on request of an entity that has an interest in property used or proposed to be used by the debtor, the Court shall prohibit or condition such use as is necessary to provide "adequate protection" of that interest.  11 U.S.C. §363(e); s*ee Zink v. Vanmiddlesworth*, 300 B.R. 394, 402-03 (N.D.N.Y. 2003) (burden is on creditor to show collateral value decline in order to justify provision of adequate protection or additional adequate protection).

17.    What constitutes "adequate protection" must be decided on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985).  The adequate protection requirement is meant to prevent the diminution in the value of the secured creditors' interests in their collateral during the reorganization process.  *See Megan Racine, supra* (*citing, In re Gallegos Research Group Corp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995) (*citing in turn, United Savings Ass'n of Texas v. Imwood Forest Assoc., Ltd.*, 484 U.S. 365 (1988) ("[T]o determine whether an entity is entitled to adequate protection and the type and amount of adequate protection required, a court must determine the value of the collateral, the creditor's interest in the collateral and the extent to which that value will decrease during the course of the bankruptcy case"); *In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990) (permitting bank to receive adequate protection only where value of lender's entire property

interest, not just its interest in the cash sought to be used, is declining); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (focus is on protection of the secured creditor from diminution in value of its collateral during reorganization process).  Where a lien is placed on the debtor's cash and used to enhance a secured creditor's collateral value and to increase the value of collateral, such use demonstrates the existence of adequate protection.  *In re 499 W. Warren Street Associates Ltd. Partnership*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992).

18.    In these cases, where the Budget is designed to maintain the Debtors' critical operations, the proposed Cash Collateral usage allows the generation of additional receivables, and maintains the value of the Cash Collateral Secured Creditors' collateral.  This Court has previously determined that a Debtor may use cash collateral even where the debtor's sole asset is the collateral, and the creditor is undersecured:

> **Additionally, the creditor's interest in the rental income generated by the property is adequately protected when a portion of the rents is reinvested in the property for operational expenses and maintenance**. Funds so utilized contribute to the generation of additional rents upon which that creditor's security interest subsequently attaches. *See in re Cardinal Industries Inc., supra*, 118 Bankr. at 981. *See also in re Pine Lake Village Apartment Co.*, 19 Bankr. 819, 826 (Bankr. S.D.N.Y. 1982) ("Pine Lake II") (value of the property securing the creditor's claim increases to the extent of unspent rental income accumulating in the segregated cash collateral account). . . .

> **The foregoing use of [a corporate debtor's postpetition income] is not proscribed where the debtor's sole asset is the collateral, and the creditor is undersecured**. *See Pine Lake I, supra*, 16 Bankr. at 750. In that case, the debtor's principal asset was a single apartment building and the mortgagee was vastly undersecured. *See also Pine Lake II, supra*, 19 Bankr. at 819, 828 (dictum) (secured interest may be adequately protected by maintenance of the status quo, notwithstanding debtor's lack of equity in the property); *In re Marion Street Partnership*, 108 Bankr. 218 (Bankr. D.Minn. 1989) (single asset debtor where creditor is undersecured in the real estate by approximately 10% of the amount of indebtedness); *In re Willowood*, supra, 114 Bankr. at 145 (creditor undersecured).

*In re 499 W. Warren St. Assoc., Ltd. Partnership*, 142 B.R. 53, 57 (Bankr. N.D.N.Y. 1992).

19.    Because the Debtors' operations generate a continuous stream of income, the fact

that the Debtors use some of that money to operate and maintain their business operations, does

not dimmish the value of their cash collateral.  *See In re Megan-Racine Assoc.*, 202 B.R. 660, 663

(Bankr. N.D.N.Y. 1996) ("As long as there was a continuous income stream being generated by

the Debtor, the fact that the Debtor consumed a portion of those monies to operate and maintain

the Facility each month did not diminish the value of the FDIC's interest in the Collateral.").

20.    Without the use of Cash Collateral, the Debtors will not operate, and Cash

Collateral will no longer be generated for the benefit of secured creditors.  It is in the interests of

the Cash Collateral Secured Creditors (as well as all of the Debtors' creditors) to maintain

operations at their hospitals and medical facilities, while the Debtors work on their reorganization.

21.    Further, the Debtors will suffer great harm if they are not authorized to use the Cash

Collateral, as the Debtors presently have no alternate source of working capital to support their

daily healthcare operations, which again, are all preservative of, and of direct benefit to, the value

of the Cash Collateral Secured Creditors' collateral.  The Debtors will not be able to pay suppliers,

employees or other ordinary course obligations if they are not allowed to use Cash Collateral per

the Budget and to use it with appropriate flexibility as set forth in the Interim Order.  Failure to

approve the use of the Cash Collateral as requested herein will lead to disastrous consequences not

only for the Debtors, but for all parties in interest, including the Cash Collateral Secured Creditors,

other creditors, patients and the communities served by the Debtors.

## C.    The Need for Immediate Relief

22.    Pursuant to Bankruptcy Rule 4001(b)(2), a final hearing on a motion for the use of

cash collateral may not be commenced earlier than fourteen (14) days after service of that motion.

However, the court may conduct an interim hearing before the expiration of the 14-day period and

authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

23.     Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited interim hearing on or prior to **February 12, 2026 at noon EST**, pending any hearing to be held to consider the final relief requested by this Motion.  In connection with such interim hearing, and the pendency period thereafter to any final hearing set by the Court, the Debtors request that the Court authorize the Debtors to use such Cash Collateral as is essential to make their payrolls and pay their vendors, to ensure the maintenance of ongoing operations, and to avoid immediate and irreparable harm to their estates -- all as reflected in the line items of the Budget.

24.     Without the Court's authorization to use the Cash Collateral on an interim basis pending a final hearing on this Motion, the Debtors' estates will be imminently and irreparably harmed.  Employees will not be paid and, as discussed above, the Debtors will not be able to operate without the use of Cash Collateral, resulting in adverse consequences not only for the Debtors, but also for the Cash Collateral Secured Creditors, other creditors, patients, employees, local suppliers, the community served by the Debtors' operations, and all parties in interest.  Under the circumstances, the interim use of the Cash Collateral by the Debtors is appropriate in this case.

## NOTICE

25.     Notice of this Motion has been provided, via first class mail, overnight delivery, ECF notification and/or email to:  (i) the Office of the United States Trustee; (ii) counsel to the Cash Collateral Secured Creditors, or such creditors if no counsel has been identified; (iii) the New York State Department of Health; (iv) the creditors holding the 20 largest unsecured claims against each of the Debtors' estates, as identified in the Debtors' Chapter 11 petitions; and (v) any persons

that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002. The Debtors submit that no other or further notice need be provided under the circumstances.

## NO PRIOR REQUEST

26.    No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order: (i) authorizing the Debtors to use cash that may otherwise serve as Cash Collateral pursuant to the Budget for the period specified in the Interim Order; (ii) determining that the Cash Collateral Secured Creditors' interests in Cash Collateral are adequately protected; (iii) scheduling hearings in connection with the relief sought in the Motion; and (iv) granting such other and further relief as the Court deems appropriate.

Dated: February 11, 2026
          New York, New York

**BARCLAY DAMON LLP**
*Proposed Counsel for Debtors and*
*Debtors-in-Possession*

By:    */s/Janice Grubin*
Janice B. Grubin
Ilan Markus (*pro hac vice* admission to be submitted)
1270 Avenue of the Americas, Suite 2310
New York, New York 10020
Telephone:  (212) 784-5810
jgrubin@barclaydamon.com
imarkus@barclaydamon.com

# **<u>EXHIBIT A</u>**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
SYRACUSE DIVISION

-------------------------------------------------------------------x

In re                                             :    Chapter 11
                                                  :
NORTH STAR HEALTH ALLIANCE, INC., *et al*,[1]     :    Case No. 26-_____
                                                  :    Main Case
                           Debtors.               :    Jointly Administered
                                                  :

-------------------------------------------------------------------x

## INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL

This matter having come before the Court on February 12, 2026 for a hearing on the

application (the "Motion") of North Star Health Alliance, Inc. ("North Star"), Carthage Area

Hospital, Inc. ("Carthage"), Claxton-Hepburn Medical Center, Inc. ("Claxton"), and

Meadowbrook Terrace, Inc. ("Meadowbrook"), the above-captioned debtors and debtors-in-

possession (collectively, the "Debtors") for authority to use Cash Collateral[2].  The Debtors seek

entry of an order authorizing the use of Cash Collateral.  The Debtors have represented to the Court

that:

A.        Prior to the Petition Date, the Debtors entered into the various loan and other

financial agreements with related security agreements (collectively, the "Agreements") with the

parties that are identified on **Exhibit B** to the Motion that may claim an interest in the Cash

Collateral (collectively, the "Cash Collateral Secured Creditors").

B.        As security for Debtors' performance of its obligations under the Agreements, the

Debtors agreed to grant the Cash Collateral Secured Creditors valid and binding liens (the "Pre-

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).
[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

Petition Liens") on Debtors' present and future Cash Collateral, as such term is defined in Section 363 of the Bankruptcy Code.

C.      The Cash Collateral Secured Creditors may assert that the Debtors may not use Cash Collateral unless the interests of the Secured Creditor are adequately protected.

D.      The Debtors provided notice of the Motion to the Cash Collateral Secured Creditors, the Office of the U.S. Trustee, the New York Department of Health, each of the Debtor's twenty largest unsecured creditors, and all parties requesting notice.

E.      The continued operation of the Debtors' businesses is dependent upon the ability to use Cash Collateral.  There is an immediate need for entry of an order authorizing use of Cash Collateral, and, absent entry of such an order, the Debtors' estates will be irreparably harmed.

Based upon the foregoing, the statements of counsel for the parties and all others matters heard by the Court, THE COURT HEREBY ORDERS:

1.      Attached hereto is an interim cash flow projection (collectively, the "Budget"), which has been prepared by Debtors.  The Debtors are authorized to use Cash Collateral as set forth in the Budget, except as limited herein, from February 12, 2026 through February _____, 2026, the date of the next scheduled hearing on the Motion (the "Next Hearing Date"), in an aggregate amount equal to the amounts in the Budget with a variance of 10% of gross disbursements; provided that such use of Cash Collateral shall be exclusively in the ordinary course of the Debtors' businesses and only for those items set out in the Budget.  At least two (2) business days before the Next Hearing Date, the Debtors shall file with the Court an updated Budget and a report reconciling the Debtors' actual post-Petition Date performance to Budget. Notwithstanding this authorization, the Debtors shall not use Cash Collateral for the payment or

satisfaction of any expense that will result in the Debtors spending more than 110% of the cumulative gross monthly disbursements.

2.        The Debtors shall not (a) take any action outside the ordinary course of their businesses, including without limitation the settlement of accounts receivable for less than face value except as is customary and in conformance with its past business practice, without the prior approval of the Court, or (b) grant, permit or suffer to exist any lien upon or security interests in its assets (other than liens and security interests in existence on the Petition Date) during the term of this Order unless agreed to by the Cash Collateral Secured Creditors or authorized by the Court.

3.        No Cash Collateral may be used to: (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of the pre-petition indebtedness or liens held by any Cash Collateral Secured Creditor or the liens or claims granted under this order; (b) assert any claims and defenses against any Cash Collateral Secured Creditor or its agents, affiliates, representatives, attorneys or advisors; or (c) seek to modify any of the rights granted to the Cash Collateral Secured Creditors hereunder.

4.        Pursuant to Sections 361(2), 363(e) and 506 of the Bankruptcy Code, in order to provide adequate protection of the Cash Collateral Secured Creditors' interests under applicable law in the Cash Collateral against diminution in the value of their collateral ("Collateral Diminution") caused by the Debtors' use of Cash Collateral pursuant to this Order, the Debtors grant, and the Cash Collateral Secured Creditors are hereby granted, roll-over security interests in the Debtors' post-petition acquired assets of the same type, and to the same extent, validity and priority as each Cash Collateral Secured Creditor holds on the Petition Date (other than any avoidance actions under Sections 547, 548 or 549 of the Bankruptcy Code) (the "Roll-Over Liens"), such Roll-Over Liens shall be (i) in addition to all security interests, liens and rights of

setoff existing in favor of the Cash Collateral Secured Creditors on the Petition Date, (ii) valid, perfected, enforceable liens and effective as of the Petition Date without any further action by the Debtors or the applicable Cash Collateral Secured Creditors and without the execution, filing or recordation of any document otherwise required under applicable law for granting and perfecting security interests and liens, and (iii) security for the use of Cash Collateral and as protection against Collateral Diminution.  The security interests and liens granted pursuant to this Order shall be binding upon the Debtors, any successor in interest to the Debtors or their assigns, and creditors who have or may hereafter extend credit to the Debtors or their estates.  The Roll-Over Liens shall have the same extent and validity as the Cash Collateral Secured Creditors' pre-petition liens.  No other liens or claims are or will be prior to or on parity with the liens or claims of the Cash Collateral Secured Creditors with respect to the Roll-Over Liens (unless authorized by the Court).

5.      Nothing herein shall be deemed to prevent the Cash Collateral Secured Creditor from seeking to terminate the use of Cash Collateral for any breach by the Debtors of the terms hereof or to obtain relief from the automatic stay or to assert any other rights, claims, remedies, or defenses available to them, nor shall anything contained herein deprive the Debtors or any other party in interest of the right to oppose any such action.

6.      Any reversal, modification, or vacation of this Order shall not affect the validity or priority of any obligation of the Debtors to the Cash Collateral Secured Creditors incurred or arising by operation of law, or any security interest or lien granted to the Cash Collateral Secured Creditors under this Order, before the effective date of such reversal, modification, or vacation.  Notwithstanding the entry of any subsequent stay or any such reversal, modification, or vacation, all uses of the Cash Collateral, and the security interests and liens granted to the Cash Collateral Secured Creditors by the Debtors under this Order before the effective date of such stay, reversal,

modification, or vacation, shall be governed in all respects by the original provisions of this Order and the Cash Collateral Secured Creditors shall be entitled to all the rights, privileges, and benefits with respect to all such uses, obligations, security interests, and liens.

7.     Nothing herein shall preclude the Secured Creditor from asserting that it is not adequately protected, requesting additional adequate protection or making any contention respecting valuation of collateral or the amount of their claims.

8.     A further interim hearing on the Motion will be held on _____. **2026** at **__:__ a.m. EST** before the Court at the James M. Hanley U.S. Courthouse and Federal Building, 100 South Clinton Street, Syracuse, New York.

9.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this order are immediately effective and enforceable upon its entry.

* * *

# **<u>EXHIBIT B</u>**

<u>**EXHIBIT B**</u>

The following is a list of potential Cash Collateral Secured Creditors that may claim an interest in one or more of the Debtors' bank accounts, as set forth below:

<u>**North Star**</u>
-   Northern Federal Credit Union

<u>**Claxton-Hepburn**</u>
-   Northern Federal Credit Union
-   NBT Bank
-   SBA
-   DASNY
-   McKesson Corporation

<u>**Carthage**</u>
-   Northern Federal Credit Union
-   SBA
-   DASNY
-   M&T Bank
-   ASD Specialty Healthcare LLC

<u>**Meadowbrook**</u>
-   M&T Bank

The Debtors are still in the process of analyzing all of the potential Cash Collateral Secured Creditor claims and intend to file with the Court an updated analysis in advance of the second interim hearing on the Motion.

# **<u>EXHIBIT C</u>**

**CARTHAGE AREA HOSPITAL**

13-Week Cash Flow Projection

| | WE 2/13/26 | | WE 2/20/26 | | WE 2/27/26 | |
|---|---|---|---|---|---|---|
| | Budget | Actual | Budget | Actual | Budget | Actual |
| **RECEIPTS** | | | | | | |
| **Operating** | | | | | | |
| Net Patient Service Revenue | 2,484,935 | - | 2,484,935 | - | 2,532,566 | - |
| Other Recurring Operating Revenue | - | - | - | - | - | - |
| GPO | - | - | - | - | - | - |
| **Non Operating** | | | | | | |
| VAPAP | - | - | - | - | - | - |
| VAP | - | - | - | - | - | - |
| FY25 DPT - Actual | - | - | - | - | - | - |
| FY26 DPT - Actual | - | - | - | - | - | - |
| Stimulus | - | - | - | - | - | - |
| Intercompany Transfers In | - | - | 87,095 | - | - | - |
| Other Cash In-Flows | - | - | - | - | - | - |
| **Total Receipts** | 2,484,935 | - | 2,572,030 | - | 2,532,566 | - |
| Variance - Cumulative | 2,484,935 | - | 5,056,965 | - | 7,589,531 | - |
| Variance - % - Cumulative | | | | | | |
| | | | | | | |
| **EXPENSES** | | | | | | |
| Salaries & Wages | - | - | 3,418,556 | - | - | - |
| Payroll Taxes | - | - | 283,183 | - | - | - |
| Fringe Benefits | 414,152 | - | 386,900 | - | 758,085 | - |
| Leased Employees - Ogdensburg (inc. all associated costs) | - | - | 2,600,000 | - | - | - |
| Physician Fees | 612,700 | - | 602,000 | - | 160,000 | - |
| Purchased Services | 267,188 | - | 69,000 | - | 75,000 | - |
| Medical Supplies | 152,040 | - | 104,500 | - | - | - |
| Pharmacy Supplies | 406,090 | - | 311,700 | - | - | - |
| Insurance | 164,437 | - | 116,267 | - | - | - |
| Utilities | - | - | - | - | - | - |
| Other Operating Expenses | 84,500 | - | 48,000 | - | - | - |
| Bankruptcy - Legal Expense | - | - | - | - | - | - |
| Bankruptcy - CRO and FA | - | - | - | - | 240,000 | - |
| Bankruptcy - Debtor Professionals | - | - | - | - | - | - |
| Bankruptcy - Lender Professionals | - | - | - | - | - | - |
| Bankruptcy - Committee Professionals | - | - | - | - | - | - |
| Interest | - | - | - | - | - | - |
| Equipment - Leases | 104,000 | - | - | - | - | - |
| Loans / Debt Pincipal Payments | - | - | - | - | - | - |
| Capital Purchases | - | - | - | - | - | - |
| Intercompany Transfers Out | - | - | - | - | - | - |
| **Total Cash Out** | 2,205,108 | - | 7,940,106 | - | 1,233,085 | - |
| Variance - Cumulative | 2,205,108 | - | 10,145,214 | - | 11,378,299 | - |
| Variance - % - Cumulative | | | | | | |
| | | | | | | |
| **Net Cash Flow** | 279,827 | - | (5,368,076) | - | 1,299,481 | - |
| | | | | | | |
| **Cash Balance - Beginning of Period** | 2,310,316 | - | 2,590,143 | - | (2,777,933) | - |
| **Cash Balance - End of Period** | 2,590,143 | - | (2,777,933) | - | (1,478,452) | - |

**Notes:**

To address the projected shortfall, NSHA is pursuing the following three options to reduce cash demand on combined organizat

   1. Seeking VAPAP funding from the NY DOH

   2. Pursuing DIP financing to address cash shortfall

3. Evaluating organizaitonal downsizing to reduce cash demands on organization.

**NORTH STAR HEALTH ALLIANCE**

13-Week Cash Flow Projection

| | WE 2/13/26 | | WE 2/20/26 | | WE 2/27/26 | |
|---|---|---|---|---|---|---|
| | Budget | Actual | Budget | Actual | Budget | Actual |
| **RECEIPTS** | | | | | | |
| **Operating** | | | | | | |
| Net Patient Service Revenue | - | - | - | - | - | - |
| Other Recurring Operating Revenue | - | - | - | - | - | - |
| GPO | - | - | - | - | - | - |
| **Non Operating** | | | | | | |
| VAPAP | - | - | - | - | - | - |
| VAP | - | - | - | - | - | - |
| FY25 DPT - Actual | - | - | - | - | - | - |
| FY26 DPT - Actual | - | - | - | - | - | - |
| Stimulus | - | - | - | - | - | - |
| Intercompany Transfers In | - | - | - | - | - | - |
| Other Cash In-Flows | - | - | - | - | - | - |
| **Total Receipts** | - | - | - | - | - | - |
| **Variance - Cumulative** | - | - | - | - | - | - |
| **Variance - % - Cumulative** | | | | | | |
| | | | | | | |
| **EXPENSES** | | | | | | |
| Salaries & Wages | - | - | - | - | - | - |
| Payroll Taxes | - | - | - | - | - | - |
| Fringe Benefits | - | - | - | - | - | - |
| Leased Employees - Ogdensburg (inc. all associated costs) | - | - | 16,500 | - | - | - |
| Physician Fees | - | - | - | - | - | - |
| Purchased Services | - | - | - | - | - | - |
| Medical Supplies | - | - | - | - | - | - |
| Pharmacy Supplies | - | - | - | - | - | - |
| Insurance | - | - | - | - | - | - |
| Utilities | - | - | - | - | - | - |
| Other Operating Expenses | - | - | - | - | - | - |
| Bankruptcy - Legal Expense | - | - | - | - | - | - |
| Bankruptcy - CRO and FA | - | - | - | - | - | - |
| Bankruptcy - Debtor Professionals | - | - | - | - | - | - |
| Bankruptcy - Lender Professionals | - | - | - | - | - | - |
| Bankruptcy - Committee Professionals | - | - | - | - | - | - |
| Interest | - | - | - | - | - | - |
| Equipment - Leases | - | - | - | - | - | - |
| Loans / Debt Pincipal Payments | - | - | - | - | - | - |
| Capital Purchases | - | - | - | - | - | - |
| Intercompany Transfers Out | - | - | - | - | - | - |
| **Total Cash Out** | - | - | 16,500 | - | - | - |
| **Variance - Cumulative** | - | - | 16,500 | - | 16,500 | - |
| **Variance - % - Cumulative** | | | | | | |
| | | | | | | |
| **Net Cash Flow** | - | - | (16,500) | - | - | - |
| | | | | | | |
| **Cash Balance - Beginning of Period** | 25,387 | - | 25,387 | - | 8,887 | - |
| **Cash Balance - End of Period** | 25,387 | - | 8,887 | - | 8,887 | - |

**Notes:**

To address the projected shortfall, NSHA is pursuing the following three options to reduce cash demand on combined organization:

1. Seeking VAPAP funding from the NY DOH

2. Pursuing DIP financing to address cash shortfall

3. Evaluating organizaitonal downsizing to reduce cash demands on organization.

**CLAXTON-HEPBURN MEDICAL CENTER**

13-Week Cash Flow Projection

| | WE 2/13/26 | | WE 2/20/26 | | WE 2/27/26 | |
|---|---|---|---|---|---|---|
| | Budget | Actual | Budget | Actual | Budget | Actual |
| **RECEIPTS** | | | | | | |
| **Operating** | | | | | | |
| Net Patient Service Revenue | 168,826 | - | 168,826 | - | 160,928 | - |
| Other Recurring Operating Revenue | - | - | - | - | - | - |
| Leased Employees Revenue - Ogdensburg | - | - | - | - | - | - |
| GPO | - | - | - | - | - | - |
| **Non Operating** | | | | | | |
| VAPAP | - | - | - | - | - | - |
| VAP | - | - | - | - | - | - |
| FY25 DPT - Actual | - | - | - | - | - | - |
| FY26 DPT - Actual | - | - | - | - | - | - |
| Stimulus | - | - | - | - | - | - |
| Intercompany Transfers In | - | - | 2,616,500 | - | - | - |
| Other Cash In-Flows | - | - | - | - | - | - |
| **Total Receipts** | 168,826 | - | 2,785,326 | - | 160,928 | - |
| **Variance - Cumulative** | 168,826 | - | 2,954,152 | - | 3,115,080 | - |
| **Variance - % - Cumulative** | | | | | | |
| | | | | | | |
| **EXPENSES** | | | | | | |
| Salaries & Wages | - | - | 2,632,537 | - | - | - |
| Payroll Taxes | - | - | 218,071 | - | - | - |
| Fringe Benefits | 386,617 | - | 245,324 | - | 665,000 | - |
| Physician Fees | - | - | - | - | - | - |
| Purchased Services | 78,107 | - | 37,771 | - | - | - |
| Medical Supplies | 42,885 | - | 22,000 | - | - | - |
| Pharmacy Supplies | - | - | 33,520 | - | - | - |
| Insurance | - | - | - | - | - | - |
| Utilities | - | - | - | - | - | - |
| Other Operating Expenses | 7,500 | - | - | - | - | - |
| Bankruptcy - Legal Expense | - | - | - | - | - | - |
| Bankruptcy - CRO and FA | - | - | - | - | - | - |
| Bankruptcy - Debtor Professionals | - | - | - | - | - | - |
| Bankruptcy - Lender Professionals | - | - | - | - | - | - |
| Bankruptcy - Committee Professionals | - | - | - | - | - | - |
| Interest | - | - | - | - | - | - |
| Equipment - Leases | - | - | 9,000 | - | - | - |
| Loans / Debt Pincipal Payments | - | - | - | - | - | - |
| Capital Purchases | - | - | - | - | - | - |
| Intercompany Transfers Out | - | - | - | - | - | - |
| **Total Cash Out** | 515,109 | - | 3,198,224 | - | 665,000 | - |
| **Variance - Cumulative** | 515,109 | - | 3,713,332 | - | 4,378,332 | - |
| **Variance - % - Cumulative** | | | | | | |
| | | | | | | |
| **Net Cash Flow** | (346,283) | - | (412,898) | - | (504,072) | - |
| | | | | | | |
| **Cash Balance - Beginning of Period** | 837,725 | - | 491,442 | - | 78,545 | - |
| **Cash Balance - End of Period** | 491,442 | - | 78,545 | - | (425,527) | - |

**Notes:**

To address the projected shortfall, NSHA is pursuing the following three options to reduce cash demand on combined organization:

  1. Seeking VAPAP funding from the NY DOH

  2. Pursuing DIP financing to address cash shortfall

  3. Evaluating organizaitonal downsizing to reduce cash demands on organization.

**MEADOWBROOOK TERRACE INC.**

13-Week Cash Flow Projection

| | WE 2/13/26 | | WE 2/20/26 | | WE 2/27/26 | |
|---|---|---|---|---|---|---|
| | Budget | Actual | Budget | Actual | Budget | Actual |
| **RECEIPTS** | | | | | | |
| **Operating** | | | | | | |
| Net Patient Service Revenue | 39,086 | - | 39,086 | - | 39,086 | - |
| Other Recurring Operating Revenue | - | - | - | - | - | - |
| GPO | - | - | - | - | - | - |
| **Non Operating** | | | | | | |
| VAPAP | - | - | - | - | - | - |
| VAP | - | - | - | - | - | - |
| FY25 DPT - Actual | - | - | - | - | - | - |
| FY26 DPT - Actual | - | - | - | - | - | - |
| Stimulus | - | - | - | - | - | - |
| Intercompany Transfers In | - | - | - | - | - | - |
| Other Cash In-Flows | - | - | - | - | - | - |
| **Total Receipts** | 39,086 | - | 39,086 | - | 39,086 | - |
| **Variance - Cumulative** | 39,086 | - | 78,172 | - | 117,258 | - |
| **Variance - % - Cumulative** | | | | | | |
| | | | | | | |
| **EXPENSES** | | | | | | |
| Salaries & Wages | - | - | - | - | - | - |
| Payroll Taxes | - | - | - | - | - | - |
| Fringe Benefits | - | - | - | - | - | - |
| Leased Employees - Carthage (inc. all associated costs) | - | - | 87,095 | - | - | - |
| Physician Fees | - | - | - | - | - | - |
| Purchased Services | - | - | - | - | - | - |
| Medical Supplies | - | - | - | - | - | - |
| Pharmacy Supplies | - | - | - | - | - | - |
| Insurance | - | - | - | - | - | - |
| Utilities | - | - | 8,891 | - | - | - |
| Other Operating Expenses | - | - | - | - | - | - |
| Bankruptcy - Legal Expense | - | - | - | - | - | - |
| Bankruptcy - CRO and FA | - | - | - | - | - | - |
| Bankruptcy - Debtor Professionals | - | - | - | - | - | - |
| Bankruptcy - Lender Professionals | - | - | - | - | - | - |
| Bankruptcy - Committee Professionals | - | - | - | - | - | - |
| Interest | - | - | - | - | - | - |
| Equipment - Leases | - | - | - | - | - | - |
| Loans / Debt Pincipal Payments | - | - | - | - | - | - |
| Capital Purchases | - | - | - | - | - | - |
| Intercompany Transfers Out | - | - | - | - | - | - |
| **Total Cash Out** | - | - | 95,986 | - | - | - |
| **Variance - Cumulative** | - | - | 95,986 | - | 95,986 | - |
| **Variance - % - Cumulative** | | | | | | |
| | | | | | | |
| **Net Cash Flow** | 39,086 | - | (56,900) | - | 39,086 | - |
| | | | | | | |
| **Cash Balance - Beginning of Period** | 104,641 | - | 143,727 | - | 86,827 | - |
| **Cash Balance - End of Period** | 143,727 | - | 86,827 | - | 125,913 | - |

**Notes:**

To address the projected shortfall, NSHA is pursuing the following three options to reduce cash demand on combined organization:

   1. Seeking VAPAP funding from the NY DOH

   2. Pursuing DIP financing to address cash shortfall

   3. Evaluating organizaitonal downsizing to reduce cash demands on organization.