**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
In re                                                          :    Chapter 11
                                                               :
NORTH STAR HEALTH ALLIANCE, INC., *et al*,[1]                  :    Case No. 26-60099-5-wak
                                                               :    Main Case
                                Debtors.                       :    Jointly Administered
                                                               :    Case No. 26-30078
                                                                    Case No. 26-30079
                                                                    Case No. 26-60100

-------------------------------------------------------------------x

## MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO PAY PRE-PETITION OBLIGATIONS OF CRITICAL VENDORS, (II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS, AND (III) GRANTING RELATED RELIEF

North Star Health Alliance, Inc. ("North Star"), Carthage Area Hospital, Inc. ("Carthage"), Claxton-Hepburn Medical Center, Inc. ("Claxton"), and Meadowbrook Terrace, Inc. ("Meadowbrook"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"),   hereby move this Court (the "Motion") for interim and final orders, in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (11 U.S.C. §§ 101 *et al*., the "Bankruptcy Code"), (i) authorizing, but not directing, the Debtors to pay pre-petition obligations of Critical Vendors, (ii) authorizing and directing financial institutions to honor and process related checks and transfers, and (iii) granting related relief.  In addition, the Debtors requests that the Court schedule a final hearing within approximately twenty-five (25) days of the filing of this Motion to consider

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).

approval of this Motion on a final basis.  In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION, VENUE, AND BASIS FOR RELIEF

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion are proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are §§ 105(a) and 363(b) of the Bankruptcy Code.

## BACKGROUND

### A.  The Chapter 11 Cases

3.      On February 10, 2026 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of their properties and are operating and managing their businesses, as debtors-in-possession, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No request for the appointment of a trustee or examiner has been made in this Chapter 11 Case and no statutory committee has yet to been appointed.

### B.  The Debtors' Business

5.      North Star Health Alliance, Inc. was established in September 1993 and incorporated in the State of New York as a not-for-profit corporation.  North Star is the umbrella organization within which Carthage, Claxton, Meadowbrook and related affiliates coordinate

governance, strategy, and shared services under what is referred to as the Transformation Plan.[2] North Star is a passive parent entity that does not itself exercise financial control over each member organization; rather, it serves as a platform for alignment and operational integration, including shared leadership and centralized administrative functions (e.g., finance, human resources, information technology, compliance, revenue cycle coordination, and cash planning) that are critical to sustaining rural healthcare delivery across multiple campuses. The North Star system as a whole employs approximately 1,600 employees.

6.        Carthage was established in November 1921 and incorporated in the state of New York as a not-for-profit corporation.  Carthage operates a 25-bed Critical Access Hospital in Carthage, New York serving a large, rural tri-county area. Carthage holds a New York State Department of Health operating certificate (No. 2238700C; Facility ID/PFI 379) for primary care hospital-critical access hospital services located at 1001 West Street, Carthage, New York 13619, and it also operates a second 25 bed acute-care campus located at 214 King Street, Suite A, Ogdensburg, New York 13669 (the "Claxton Campus") under the same operating certificate (Facility ID/PFI 15684). The Claxton Campus is the designated "9.39" hospital for the area and is the former acute-care component of Claxton that is now operated by Carthage under a shared operating certificate as part of the Transformation Plan. While the New York State Department of Health ("DOH") issued the operating certificate reflecting this configuration, Centers for Medicare & Medicaid Services ("CMS") processes to recognize and operationalize the Claxton Campus as

---

[2] Beginning in or about August 2022, North Star pursued a complex transition (the "Transformation Plan") designed to preserve access to acute care and behavioral health services in the North Country while addressing Claxton's unsustainable legacy cost and reimbursement structure as a Sole Community Hospital. The Transformation Plan involved coordinated planning among North Star member organizations, engagement with DOH and OMH, and stepwise regulatory actions. On October 23, 2024, DOH and OMH issued operating certificates that reorganized Claxton into two distinct hospital entities: (i) a standalone inpatient psychiatric hospital (CHMC) and (ii) a separate acute-care campus operated by Carthage under a shared operating certificate (the Claxton Campus).

a critical access hospital (including surveys, enrollment steps, and related notifications) have involved additional steps and timing considerations.

7.      Claxton-Hepburn Medical Center, Inc. was established in December 1916 and incorporated in January 1917 in the state of New York as a not-for-profit corporation.  Following the implementation of the Transformation Plan, Claxton now operates exclusively as a standalone Article 31 Inpatient Psychiatric Hospital licensed by the New York State Office of Mental Health under Operating Certificate No. 8231002, located at 214 King Street, Suite B, Ogdensburg, New York 13669. Claxton provides acute inpatient behavioral health services for adults (28 beds) and children/adolescents (12 beds), including the region's only acute inpatient unit dedicated to children and adolescents. Claxton also leads the Pathways to Recovery Peer Coaching program and has been planning to establish the region's first Comprehensive Psychiatric Emergency Program.

8.      Meadowbrook Terrace, Inc. was established in December 2011 and incorporated in the state of New York as a not-for-profit corporation.  Meadowbrook is a 60-bed assisted living facility (58 ALP beds and 2 Adult Home) that provides assisted living services for seniors in the North Country region. Meadowbrook is a key part of the Debtors' care continuum for elderly and medically fragile patients, supporting safe discharge planning and community-based care.

9.      Through this bankruptcy proceeding, the Debtors intend to continue to fulfill their mission by operating their facilities to deliver quality health care in their communities.

## RELIEF REQUESTED

10.     The Debtors seeks authority, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to pay some or all of the pre-petition obligations of certain of its vendors, suppliers, service providers, and similar entities that are essential to maintaining the going concern

50088523.1

value of the Debtors' businesses (whose pre-petition claims shall be defined as the "Critical Vendor Claims").

11.     The Debtors also requests that the Court authorize and direct the banks and other financial institutions at which the Debtors maintains disbursement accounts (the "Banks"), at the Debtors' direction, to receive, process, honor, and pay, to the extent of availability of funds, any and all checks drawn or electronic fund transfers requested or to be requested by the Debtors relating to the Critical Vendor Claims.  Additionally, the Debtors' seek authority to issue new post-petition checks, or effect new electronic fund transfers, on account of the Critical Vendor Claims to replace any pre-petition checks or electronic fund transfer requests that may have been lost, dishonored, or rejected as a result of the commencement of the Debtors' Chapter 11 Case.

## A.  The Debtors' Critical Vendors

12.     As described above, the Debtors operate a number of health care facilities in Northern New York.  Certain vendors are critical to the operation of the businesses due to factors including the vendor's  geographic location, its status as the only vendor of a particular product, and/or its familiarity with the Debtors' systems, businesses or regulatory structures.

13.     For these reasons, the Debtors believe that being authorized, but not required, to pay some or all of certain vendors' pre-petition claims, is necessary and beneficial to the estate.

14.     In exchange for paying some or all of a Critical Vendor's pre-petition claim, the Debtors would require that Critical Vendor to provide the Debtors with the most favorable credit terms provided by such Critical Vendor to the Debtors within 12 months prior to the Petition Date.

15.     Importantly, if the Debtors are authorized to continue to pay the Critical Vendors in the ordinary course of business, the Debtors are likely to actually save money as compared to having to pre-pay for inventory and supplies.

50088523.1

16.     The Critical Vendors are essential to the Debtors' businesses and the lack of each of their particular services or product, would likely disrupt the Debtors' operations and negatively impact the Debtors' viability.  Any disruption in the availability of product or the services that enable the Debtors to operate, would negatively impact the Debtors' financial performance and value.  This harm and disruption is likely to far outweigh the cost of proposed payments to the Critical Vendors.

17.     Accordingly, as discussed further below, it is in the best interests of the estate and creditors to permit the Debtors to continue to remit the regularly scheduled payments to some or all of the Critical Vendors.

## B.  Estimated Critical Vendor Amount

18.     The Debtors seeks authority to pay, in their sole discretion and business judgment, some or all of the pre-petition obligations of Critical Vendors that are essential to their ongoing operations and reorganization efforts.  As set forth above, the goods and services provided by the Critical Vendors are an essential component to the Debtors' ability to provide health care services to its patients and clients.  The Debtors estimate that the aggregate amount owed to Critical Vendors for goods delivered or services provided during the period before the Petition Date, by Debtor is approximately:

| | |
|---|---|
| Carthage: | $18,095,391.60 |
| Claxton: | $11,109,207.23 |
| Meadowbrook: | $      18,069.44 |
| Total: | $29,222,668.27[3] |

(the "Estimated Critical Vendor Amount).  As mentioned above, payment of the Estimated Critical Vendor Amount is not expected to have any significant effect on the Debtors' cash flow.  Rather,

---

[3] North Star does not owe any money to Critical Vendors.

the Critical Vendor Amount is expected to be approximately the same amount or less as would otherwise be expended for cash on delivery or cash before delivery requirements for the same services or product, if those services or products were otherwise available from the Critical Vendors.

## C. Proposed Conditions to Receiving Payment

19.     To minimize the amount of payments required, the Debtors request authority to identify Critical Vendors in the ordinary course of its business.  Identifying the Critical Vendors now, publicly, would likely cause additional vendors to demand payment of their pre-petition claims in full.  When determining whether a creditor is a Critical Vendor, the Debtors will consider, among other things:  (i) whether the goods or services the vendor provides could be replaced without interruption to the Debtors' operations; (ii) whether failure to pay the claim would result in the Debtors paying substantially more for the same goods or services elsewhere; and (iii) whether failure to pay the claim would interrupt the Debtors' operations.

20.     The Debtors propose to pay all or part of the Critical Vendor Claim of each Critical Vendor that agrees, to the Debtors' satisfaction, to continue to supply goods or services to the Debtors on terms similar to those in effect prior to the Petition Date, or on such other terms individually agreed to between the Debtors and such Critical Vendor that the Debtors deems acceptable.

21.     The Debtors further propose that if a Critical Vendor fails to continue to supply goods or services as agreed, then the Debtors may, in their discretion, and without further order of the Court, declare that: (i) the payment of the Critical Vendor's Critical Vendor Claim is a voidable post-petition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtor may recover from the Critical Vendor in cash or in goods (including by setoff against post-petition

obligations); or (ii) the Critical Vendor shall immediately return the Debtors' payment of the claim of the Critical Vendor Claim without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the claim of the Critical Vendor shall be reinstated in an amount that will restore the Debtors and the Critical Vendor to their original positions as if the payment of the claims of the Critical Vendors had not been made.

22.    The Debtors propose to maintain a matrix summarizing (i) the name of each Critical Vendor paid; (ii) the amount paid to each Critical Vendor on account of the Critical Vendor's claim; and (iii) the type of goods or services provided by that Critical Vendor.  This matrix will be provided upon request to the Office of the United States Trustee for the Northern District of New York and counsel for any official committee of unsecured creditors appointed by the Court.

**D.  <u>Applicable Authority</u>**

23.    The Court has authority pursuant to sections 363(b) and 105(a) of the Bankruptcy Code to authorize the Debtor to pay all or part of the claims of the Critical Vendors.

24.    A Court may authorize a debtor to pay certain pre-petition obligations pursuant to section 363(b) of the Bankruptcy Code.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  Section 363(b) provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  To approve the use of a debtor's assets outside the ordinary course of business pursuant to section 363(b), a Court must find that a "good business reason" exists for the use of such assets.  *See, e.g., Official Comm. of Unsecured Creditors v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 27-28 (S.D.N.Y. 2005) (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)).

25.     The business judgment rule is satisfied where "'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).   "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).   Courts have consistently declined to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions are attributable to any "'rational business purpose.'" *Integrated*, 147 B.R. at 656 (quoting *CRTF Corp. v. Federated Dep't Stores*, 683 F. Supp. 422, 436 (S.D.N.Y. 1988)).

26.     In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the Debtors to pay any amounts that may be owed to Critical Vendors because such payments are necessary for the Debtors to carry out its fiduciary duties.  Section 1107(a) Bankruptcy Code of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "protect and preserve the estate, including an operating business' going-concern value," on behalf of a debtor's creditors and other parties in interest.  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232-33 (Bankr. S.D.N.Y. 1998) ("upon filing its petition, the debtor became debtor in possession and, through its management . . . was

9

burdened with the duties and responsibilities of a bankruptcy trustee"). Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a); *see Schwartz v. Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.)*, 352 F.3d 671, 680 (2d Cir. 2003) ("it is axiomatic that bankruptcy courts are 'courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process'") (*quoting In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994)).

27.     In a long line of well-established cases, courts consistently have permitted post-petition payment of pre-petition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g., Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of [crucial] business relations"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of pre-petition claims beyond railroad reorganization cases), *cert. denied* 325 U.S. 873 (1945); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of pre-petition wages, salaries, expenses, and benefits).

28.     This "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the Court can exercise its equitable power to allow payment of critical pre-petition claims not explicitly authorized by the Bankruptcy Code. *See In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing "existence of a judicial power to authorize trustees . . . to pay claims [for] goods and services indispensably necessary" to debtor's continued operation); *In re Fin. News Network Inc.*, 134 B.R. 732, 735-36 (Bankr. S.D.N.Y. 1991) (holding that the "doctrine of necessity" stands for the principle that a bankruptcy court may allow pre-plan

10

payments of pre-petition obligations where such payments are critical to the debtor's reorganization); *In re Structurelite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) ("a *per se* rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code"). The rationale for the doctrine of necessity is consistent with the paramount goal of chapter 11 – "facilitating the continued operation and rehabilitation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).

29.    Courts have routinely authorized payments to critical vendors on account of pre-petition claims. *See, e.g., In re Metro Mattress Corp.*, Case No. 24-30773 (WAK) (Bankr. N.D.N.Y Sept. 9, 2024) (authorizing payment of pre-petition claims of critical vendors); *In re Benitago Inc.*, Case No. 23-11394 (SHL) (Bankr. S.D.N.Y. Oct. 11, 2023) (authorizing payment of pre-petition claims of critical vendors, lien claimants, and foreign vendors); *In re Vice Group Holding Inc.*, Case No. 23-10738 (JPM) (Bankr. S.D.N.Y July 16, 2023) (authorizing payment of pre-petition claims of critical vendors, among others); *In re GTT Communications, Inc.*, Case No. 21-11880 (MEW) (Bankr. S.D.N.Y. Nov. 30, 2021) (authorizing payment of pre-petition trade claims of suppliers, foreign vendors, lien claimants, and other operational partners); *In re Frontier Communications Corp.*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. June 19, 2020) (authorizing payment of pre-petition claims of critical vendors and other similar claimants).

**E.  Payment of Pre-Petition Critical Vendor Claims Is Necessary for the Debtors' Reorganization Efforts**

30.    The Debtors submit that payment of the claims of the Critical Vendors is necessary to preserve operations and successfully reorganize. The need for flexibility to pay the Critical Vendor claims is particularly acute during the initial stages of the case. During this period, Critical Vendors may attempt to assert their leverage and deny goods and services going forward, suddenly

11

and without notice, in an attempt to cripple operations and coerce payment.  Replacing these Critical Vendors is either not feasible at all, particularly under the circumstances the Debtors find themselves in, or it would be too costly or cause undue delay that effectively would hinder the Debtors' ability to successfully reorganize.

31.     In sum, the need to pay Critical Vendors is self-evident.  The Critical Vendors provide goods and services that are essential to the Debtors' operations, and any inability or delay in obtaining the same will have adverse consequences to the detriment and prejudice of all interested parties.

**F.  The Court Should Authorize and Direct Banks and Other Financial Institutions to Honor and Pay Checks Issued and Make Other Transfers to Pay Critical Vendors**

32.     The Debtors request that the Court also authorize and direct the Debtors' Banks and other financial institutions at which the Debtors maintain disbursement accounts, at the Debtors' direction, to receive, process, honor, and pay, to the extent of available funds, any and all checks drawn or electronic fund transfers requested or to be requested by the Debtors relating to the payment of Critical Vendor claims.  The Debtors also seeks authority to issue new post-petition checks, or effect new electronic fund transfers, on account of the Critical Vendor claims to replace any pre-petition checks or electronic fund transfer requests that may have been lost, dishonored, or rejected as a result of the commencement of these Chapter 11 Cases.

**RESERVATION OF RIGHTS**

33.     Nothing in this Motion shall be construed as a request for authority to assume any executory contract under section 365 of the Bankruptcy Code.  As such, the Debtors reserve their rights to assume or reject any contract with a Critical Vendor in accordance with the applicable provisions of the Bankruptcy Code.

50088523.1

34.     Nothing in this Motion shall be construed as impairing the Debtors' rights to contest the validity or amount of any claim of a Critical Vendor, and the Debtors reserves the right to contest any amount claimed to be due by any of the Critical Vendors.

## THE DEBTOR HAS SATISFIED BANKRUPTCY RULE 6003

35.     Bankruptcy Rule 6003(b) provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty-one (21) days after the Petition Date.  Fed. R. Bankr. P. 6003.  As described herein, the Debtors' operations are highly dependent on the goods and services provided by the Critical Vendors and, therefore, it is essential that the delivery of these goods and services not be disrupted.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## WAIVER OF NOTICE AND STAY REQUIREMENTS

36.     The Debtors requests that the Court enter interim and final orders providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the fourteen (14) day stay period under Bankruptcy Rule 6004(h).

## NOTICE AND NO PRIOR RELIEF SOUGHT

37.     Notice of this Motion has been provided to:  (i) the Office of the United States Trustee for the Northern District of New York, (ii) the Debtors' secured creditors, and (iii) the holders of the 20 largest unsecured claims of the Debtors.  In light of the nature of the relief requested herein, the Debtors submit that no further notice is required.

50088523.1

38.     No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully requests that the Court enter interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the relief requested herein and such other and further relief as is just and proper.


Dated:  February 13, 2026
        New York, New York                    **BARCLAY DAMON LLP**
                                              *Proposed Counsel for Debtors and*
                                              *Debtors-In-Possession*

                                              By:    */s/Janice B. Grubin*
                                              Janice B. Grubin
                                              Jeffrey A. Dove
                                              Ilan Markus (*pro hac vice* admission to be sought)
                                              1270 Avenue of the Americas, Suite 2310
                                              New York, New York 10020
                                              Janice B. Grubin:
                                              (212) 784-5808; jgrubin@barclaydamon.com
                                              Jeffrey A. Dove:
                                              (315) 413-7112; jdove@barclaydamon.com
                                              Ilan Markus:
                                              (203) 672-2661; imarkus@barclaydamon.com

14

# **<u>EXHIBIT A</u>**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| NORTH STAR HEALTH ALLIANCE, INC., *et al*,[1] | : | Case No. 26-60099-5-wak |
| | : | Main Case |
| Debtors. | : | Jointly Administered |
| | : | Case No. 26-30078 |
| | | Case No. 26-30079 |
| | | Case No. 26-60100 |

-------------------------------------------------------------------x

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b)**
**(I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO PAY**
**PRE-PETITION OBLIGATIONS OF CRITICAL VENDORS,**
**(II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS**
**TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS,**
**AND (III) GRANTING RELATED RELIEF**

Upon the Motion, dated February 13, 2026 (the "Motion"),[2] of North Star Health Alliance,

Inc. ("North Star"), Carthage Area Hospital, Inc. ("Carthage"), Claxton-Hepburn Medical Center,

Inc. ("Claxton"), and Meadowbrook Terrace, Inc. ("Meadowbrook"), the above-captioned debtors

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).
[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

1

and debtors-in-possession (collectively, the "Debtors"), pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), for entry of interim and final orders (i) authorizing, but not directing, the Debtors to pay prepetition obligations of Critical Vendors, (ii) authorizing and directing financial institutions to honor and process related checks and transfers, and (iii) granting related relief; and this matter having come before the Court for hearing on February 18, 2026 for interim relief; and based on the pleadings filed, the appearances of the parties through counsel, and the stipulations spread on the record by counsel, (the terms of which are incorporated herein), the Court finds that:  it has jurisdiction over the matters raised in the Motion pursuant to 27 U.S.C. §§ 157 and 1334; this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); venue is properly before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; due and proper notice of the Motion has been provided and it appearing that no other or further notice need be provided; the relief requested in the Motion is in the best interests of the Debtors, their estates, and their creditors; and the Court having found and determined that the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, their creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted on an interim basis to the extent set forth herein; and it is further

ORDERED that, pursuant to section 105(a) of the Bankruptcy Code, and subject to the limitations set forth below, the Debtors ae authorized, but not directed, in the reasonable exercise of its business judgment, to pay some or all of the Critical Vendor Claims, upon such terms and in

2

the manner provided in this Order and the Motion; provided, however, that prior to the further

Final Hearing on _____, 2026, and absent further order of the Court, the amount paid with

respect to Critical Vendor Claims shall not exceed the following amounts, by Debtor:

| | |
|---|---|
| Carthage: | $18,095,391.60 |
| Claxton: | $11,109,207.23 |
| Meadowbrook: | $     18,069.44 |
| Total: | $29,222,668.27 |

and it is further

**ORDERED** that the Debtors shall maintain a matrix summarizing (i) the name of each

Critical Vendor paid; (ii) the amount paid to each Critical Vendor for its Critical Vendor Claim;

and (iii) the type of goods or services provided by each Critical Vendor.  This matrix shall be

provided upon request to the Office of the United States Trustee for the Northern District of New

York and counsel for the Official Committee of Unsecured Creditors; and it is further

**ORDERED** that if a Critical Vendor has received payment of its Critical Vendor Claim

and later refuses to continue supplying goods or services on the terms as were individually agreed

to between the Debtors and such Critical Vendor, the Debtors may, in their discretion, declare that

(i) the payment of the Critical Vendor's Critical Vendor Claim is a voidable postpetition transfer

pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods

from such Critical Vendor (including by setoff against postpetition obligations); or (ii) the Critical

Vendor shall immediately return the payment of its Critical Vendor Claim without giving effect to

alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the

Critical Vendor Claim shall be reinstated in such an amount so as to restore the Debtors and the

Critical Vendor to their original positions as if no payment of the Critical Vendor Claim had been

made, provided, however, that notwithstanding the foregoing, nothing herein is intended to provide

3

50099453.1

any rights to the Debtors or any other party in interest to seek recoupment of monies paid under this Order from the Debtors' banks; and it is further

**ORDERED** that the banks and other financial institutions at which the Debtors maintain their disbursement accounts are authorized and directed at the Debtors' direction, to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks drawn or electronic fund transfers requested or to be requested by the Debtors in respect of the Critical Vendor Claims; and it is further

**ORDERED** that the Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic fund transfers, on account of the Critical Vendor Claims to replace any prepetition checks or electronic fund transfer requests that may have been lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases; and it is further

**ORDERED** that nothing herein or in the Motion shall constitute an assumption, adoption, or rejection by the Debtors of any executory contract or agreement between the Debtors and any third party, or to require the Debtors to make any of the payments authorized herein; and it is further

**ORDERED** that nothing herein or in the Motion shall be construed (i) to limit, or in any way affect, the Debtors' ability to dispute any Critical Vendor Claim, or (ii) as a waiver by the Debtors of their rights to contest any invoice or other claim of a Critical Vendor under applicable law; and it is further

**ORDERED** that any payment made pursuant to this Order is not, and shall not be, deemed an admission to the validity of the underlying obligation or waiver of any rights the Debtors may have to subsequently dispute such obligation; and it is further

4

**ORDERED** that notwithstanding entry of this Order, the Debtors' rights to enforce the automatic stay provisions of section 362 of the Bankruptcy Code with respect to any creditor who demands payment of its prepetition claims as a condition to doing business with the Debtors postpetition are preserved; and it is further

**ORDERED** that notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any party; and it is further

**ORDERED** that Bankruptcy Rule 6003(b) has been satisfied; and it is further

**ORDERED** that the requirements set forth in Bankruptcy Rule 6004(a) are waived; and it is further

**ORDERED** that, pursuant to Bankruptcy Rule 6004(h), the terms and provisions of this Order shall be effective and enforceable immediately upon its entry; and it is further

**ORDERED** that within two (2) business days of the entry of this Order, the Debtors shall serve a copy of this Order upon the: (i) Office of the United States Trustee for the Northern District of New York, (ii) the Debtors' secured creditors or their counsel, (iii) the Debtors' banks, and (iv) the holders of the 20 largest unsecured claims of the Debtors; and it is further

**ORDERED** that a further Final Hearing concerning the relief requested in the Motion shall be held before this Court on _____, **2026 at** _____ **(EST)**, or as soon thereafter as counsel may be heard. Any party in interest may object to the entry of the Final Order in accordance with the provisions of Local Rules. This Order shall remain in effect notwithstanding any objection until further Order of this Court. The modification or vacation of this Order shall not impair any action taken pursuant to it prior to its modification or vacation; and it is further

50099453.1

**ORDERED** that this Order is effective only from the date of entry through this Court's disposition of the Motion by further order; *provided, however*, that the Court's ultimate disposition of the Motion on the final basis shall not impair or otherwise affect any action taken pursuant to this Order; and it is further

**ORDERED** that the Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# # #

# **<u>EXHIBIT B</u>**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| NORTH STAR HEALTH ALLIANCE, INC., *et al*,[1] | : | Case No. 26-60099-5-wak |
| | : | Main Case |
| Debtors. | : | Jointly Administered |
| | : | Case No. 26-30078 |
| | | Case No. 26-30079 |
| | | Case No. 26-60100 |

------------------------------------------------------------------x

### FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO PAY PRE-PETITION OBLIGATIONS OF CRITICAL VENDORS, (II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS, AND (III) GRANTING RELATED RELIEF

Upon the Motion, dated February 13, 2026 (the "Motion"),[2] North Star Health Alliance,

Inc. ("North Star"), Carthage Area Hospital, Inc. ("Carthage"), Claxton-Hepburn Medical Center,

Inc. ("Claxton"), and Meadowbrook Terrace, Inc. ("Meadowbrook"), the above-captioned debtors

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).
[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

1

and debtors-in-possession (collectively, the "<u>Debtors</u>"), pursuant to sections 105(a) and 363(b) of

title 11 of United States Code (the "<u>Bankruptcy Code</u>"), for entry of interim and final orders

(i) authorizing, but not directing, the Debtors to pay prepetition obligations of Critical Vendors,

(ii) authorizing and directing financial institutions to honor and process related checks and

transfers, and (iii) granting related relief; and the Court having jurisdiction to consider the Motion

and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration

of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C.

§ 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

due and proper notice of the Motion having been provided, and it appearing that no other or further

notice need be provided; and an interim hearing having been held on February 18, 2026 (the

"<u>Interim Hearing</u>"); and a final hearing to consider the relief requested in the Motion having been

held on _____, 2026 (the "<u>Final Hearing</u>"); and upon the record of the Interim Hearing and

the Final Hearing and all of the proceedings had before the Court; and all objections to the Motion

having been withdrawn, resolved, or overruled; and the Court having found and determined that

the relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and

all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause

for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it

is

      **ORDERED** that the Motion is granted on a final basis as set forth herein; and it is further

      **ORDERED** that, pursuant to section 105(a) of the Bankruptcy Code, the Debtors are

authorized, but not directed, in the reasonable exercise of its business judgment, to pay some or all

of the Critical Vendor Claims, upon such terms and in the manner provided in this Order and the

Motion; *provided, however,* that the amount paid with respect to Critical Vendor Claims shall not

50099478.1

exceed the aggregate monthly amount of $_____, absent further order of the Court; and it is further

**ORDERED** that the Debtor shall maintain a matrix summarizing (i) the name of each Critical Vendor paid; (ii) the amount paid to each Critical Vendor for its Critical Vendor Claim; and (iii) the type of goods or services provided by each Critical Vendor. This matrix shall be provided upon request to the Office of the United States Trustee for the Northern District of New York and counsel for any committee of unsecured creditors appointed by the Court; and it is further

**ORDERED** that if a Critical Vendor has received payment of its Critical Vendor Claim and later refuses to continue supplying goods or services on the terms as were individually agreed to between the Debtors and such Critical Vendor, the Debtors may, in its discretion, declare that (i) the payment of the Critical Vendor's Critical Vendor Claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Critical Vendor (including by setoff against post-petition obligations); or (ii) the Critical Vendor shall immediately return the payment of its Critical Vendor Claim without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the Critical Vendor Claim shall be reinstated in such an amount so as to restore the Debtor and the Critical Vendor to their original positions as if no payment of the Critical Vendor Claim had been made; and it is further

**ORDERED** that nothing herein or in the Motion shall constitute an assumption, adoption, or rejection by the Debtors of any executory contract or agreement between the Debtors and any third party, or to require the Debtors to make any of the payments authorized herein; and it is further

50099478.1

**ORDERED** that nothing herein or in the Motion shall be construed (i) to limit, or in any way affect, the Debtors' ability to dispute any Critical Vendor Claim, or (ii) as a waiver by the Debtors of their rights to contest any invoice or other claim of a Critical Vendor under applicable law; and it is further

**ORDERED** that any payment made pursuant to this Order is not, and shall not be, deemed an admission to the validity of the underlying obligation or waiver of any rights the Debtors may have to subsequently dispute such obligation; and it is further

**ORDERED** that notwithstanding entry of this Order, the Debtors' rights to enforce the automatic stay provisions of section 362 of the Bankruptcy Code with respect to any creditor who demands payment of its pre-petition claims as a condition to doing business with the Debtors post-petition are preserved; and it is further

**ORDERED** that notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any party; and it is further

**ORDERED** that the requirements set forth in Bankruptcy Rule 6004(a) are waived; and it is further

**ORDERED** that, pursuant to Bankruptcy Rule 6004(h), the terms and provisions of this Order shall be effective and enforceable immediately upon its entry; and it is further

**ORDERED** that within two (2) business days of the entry of this order, the Debtors shall serve a copy of this Order upon the:  (i) Office of the United States Trustee for the Northern District of New York, (ii) the Debtors' secured creditors or their counsel, (iii) the Debtors' banks, and (iv) the holders of the 20 largest unsecured claims of the Debtors; and it is further

4

**ORDERED** that the Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# # #

50099478.1