**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x

| | |
|---|---|
| In re | : Chapter 11 |
| | : |
| NORTH STAR HEALTH ALLIANCE, INC., *et al*,[1] | : Case No. 26-60099-5-wak |
| | : Main Case |
| Debtors. | : Jointly Administered |
| | : Case No. 26-30078 |
| | : Case No. 26-30079 |
| | : Case No. 26-60100 |

-----------------------------------------------------------------------x

### DECLARATION OF ROB BLOOM, CHIEF RESTRUCTURING OFFICER OF NORTH STAR HEALTH ALLIANCE, IN SUPPORT OF CHAPTER 11 PETITIONS

1.       I am the Chief Restructuring Officer ("CRO") of North Star Health Alliance, Inc. ("North Star") and its affiliated debtor and non-debtor entities.  North Star 's debtor affiliates are: Carthage Area Hospital, Inc. ("CAH"); Claxton-Hepburn Medical Center, Inc. ("CHMC"); and Meadowbrook Terrace Assisted Living Inc. ("Meadowbrook"); (individually each a "Debtor," or collectively, the "Debtors") and its non-debtor affiliates include [2] : Claxton-Hepburn, P.C. ("CHPC"); North Country Orthopaedic Group PC ("NCOG"); North Country Realty, LLC ("NCR"), Comprehensive Women's Health Services, PLLC ("CWHS")(individually each a "Non-debtor Affiliate" or collectively, the "Non-debtor Affiliates").

2.       I have served as CRO since January 15, 2026, through a contract between North Star and Wintergreen Inc. ("Wintergreen")(the "2026 Wintergreen Contract"). [3]     The 2026

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).

[2] Additional Affiliated Non-debtors are:1) the Claxton-Hepburn Medical Center Foundation, Inc.; 2) the Carthage Area Hospital Foundation, Inc.; 3) the Claxton-Hepburn Medical Center Auxiliary; 4) the Carthage Area Hospital Auxiliary; 5) Claxton Medical PC; 6) Claxton-Hepburn Medical Campus; 7) North Country Orthopeadic Ambulatory Surgical Center, LLC.

[3] Wintergreen is a rural healthcare financial advisory firm and strategic planning company in which I have been a principal since early 2023. Wintergreen works with over 300 hospitals and clinics in over 40 states.   Wintergreen focuses on Critical Access Hospitals and Rural Health Clinics which is the predominant structure of the North Star Health Alliance.

50125455.1

Wintergreen Contract also includes other members of my firm to assist North Star and replaced the 2023 Wintergreen Contract (defined below). Previously, I had been engaged by Carthage Area Hospital, and Claxton-Hepburn Medical Center as a consultant, commencing in January, 2023, through Wintergreen, and then was asked to serve as, and accepted, the role of advisory Chief Financial Officer, through Wintergreen, in February of 2025, both roles pursuant to a consulting agreement[4]. I was previously employed as the Chief Financial Officer of Carthage Area Hospital from October of 2014 until December of 2022.

3. As CRO, I oversee or coordinate the Debtors' and Non-debtor Affiliates' restructuring efforts, including short-term liquidity management, stabilization planning, stakeholder engagement, and the Debtors' Chapter 11 strategy. I work closely with the Debtors' management, board(s), internal finance, revenue cycle teams, and outside advisors.

4. I submit this declaration ("Declaration") in support of the Debtors' voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors filed these Chapter 11 cases to prevent the disorderly disruption of essential healthcare services, and to provide a supervised and coordinated process to stabilize operations while the Debtors and the Non-debtor Affiliates pursue and implement restructuring strategies. This Declaration supports various presently filed, and to be filed, requests for relief in the form of motions and applications. As well, it is intended to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of these Chapter 11 cases. I have reviewed the pending motions and applications, or they have otherwise been explained to me,

---

[4] Wintergreen contracts include: the 2023 financial advisory consulting agreement with amendments; the 2024 financial advisory/advisory CFO agreement with 2025 amendment changing to Rob Bloom supported by Jonathan Pantenburg and the 2026 financial advisory/CRO agreement. An application for retention of Wintergreen as Financial Advisor including CRO to the Debtors will be filed shortly with the Court

50125455.1

and it is my belief that the relief sought therein is essential to allow for the continued operation, and reorganization, of the Debtors.

5.      Unless otherwise indicated, I make this Declaration based on my personal knowledge, my work as CRO, and my review of the Debtors' books and records and other documents maintained in the ordinary course, including correspondence with governmental agencies, payer enrollment and denial reports, cash forecasts, board and management materials, and advice provided by the Debtors' professionals. If called as a witness, I could and would testify competently to the facts and matters stated herein.

## I.      THE CHAPTER 11 BANKRUPTCY TO DATE, AND PENDING COURT MATTERS

6.       North Star differs from other commercial enterprises because it must operate continuously. Patient needs, including emergency needs, do not stop because reimbursement is delayed or vendors tighten terms. For that reason, patient safety, continuity of care, and regulatory compliance have guided the Debtors' decision-making and the decision to seek Chapter 11 relief.

7.      On February 10, 2026, the Debtors each filed Chapter 11 voluntary petitions in the United States Bankruptcy Court for the Northern District of New York.  A list of Debtors' Identifiers is attached hereto at Exhibit "A"

8.      To minimize disruption to patient care and to preserve value for stakeholders, the Debtors requested and will request customary initial relief to allow continuation of payroll and employee benefits, uninterrupted supply chain and utility services, maintenance of existing cash management, and protection of patient and resident information in claims administration.

9.      To continue operating and to protect continuity of care during these Chapter 11 cases, the Debtors must have reliable access to operating liquidity to fund payroll, benefits,

50125455.1

supplies, pharmaceuticals, contracted clinical services, utilities, and other ordinary-course expenses essential to patient care.

10.     The Debtors intend to use cash collateral to finance operations in Chapter 11 and make necessary expense reductions to achieve positive cash flow.  A revised budget similar to that filed with the Debtor's "First Day" Cash Collateral Motion is attached hereto as Exhibit "B" in support of the Second Interim Cash Collateral Order. The necessary cash to maintain operations and proceed with this reorganization will come primarily from the accumulated accounts receivable.   It is anticipated that additional funding may come from the New York State Department of Health (the "DOH") and debtor-in-possession financing, which the Debtors are exploring.

11.     The Debtors' working capital needs are heightened by the revenue cycle disruption described below. Delayed payer recognition, claim rejections, denial rework, and timely filing denials have increased the gap between service delivery and cash collection.

12.     On February 11, 2026, the Debtors filed:

a)      Motion for Interim and Final Orders Authorizing Use of Cash Collateral (CM/ECF Main Debtor Docket Number ("Dkt No.") 13);[5]

b)      Motion of Debtors and Debtors-In-Possession for an Order Directing the Joint Administration of Their Chapter 11 Cases (Dkt No. 14);

c)      Debtors' Motion for an Order (I) Waiving the Requirement that Each Debtor File a List of Creditors and Authorizing Preparation of a Consolidated List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (II) Authorizing the Debtors to Redact and File Under Seal Certain Personally Identifiable Information on the Consolidated Creditors List (Dkt No. 15);

d)      Debtors' Motion for Entry of an Order (I) Extending the Time to File (A) Schedules of Assets and Liabilities and Statements of Financial Affairs and

---

[5] All Docket references herein are to the docket in the jointly administered docket, North Star Health Alliance, Inc. Case No. 26-60099, and can be found at https://cases.omniagentsolutions.com/?clientId=3776

50125455.1

(B) Rule 2015-3 Financial Reports and (II) Granting Certain Related Relief (Dkt No. 16); and

e)    Order Reducing Time for Notice of Hearing to Consider Various "First Day Motions" (Dkt No. 19).

13.    By Orders dated February 12. 2026, all related Debtor cases were transferred to the Syracuse Division, under the consolidated main case number 26-60099 (Dkt No. 24).

14.    "First Day" hearings were conducted by the Honorable Wendy A. Kinsella, U.S.B.J in Syracuse on February 12, 2026, resulting in the following "First Day" Orders:

a)    Interim Order Authorizing Use of Cash Collateral (CM/ECF Main Debtor Docket Number ("Dkt No.") 31);

b)    Order granting Motion of Debtors for Joint Administration of Their Chapter 11 Cases (Dkt No. 25 in main case, and separate Orders in the related cases);

c)    Order granting Debtors' Motion for an Order (I) Waiving the Requirement that Each Debtor File a List of Creditors and Authorizing Preparation of a Consoli-dated List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (II) Authorizing the Debtors to Redact and File Under Seal Certain Personally Identifiable Information on the Consolidated Creditors List (Dkt No. 26); and

d)    Order granting Debtors' Motion for Entry of an Order (I) Extending the Time to File (A) Schedules of Assets and Liabilities and Statements of Financial Affairs and (B) Rule 2015-3 Financial Reports and (II) Granting Certain Related Relief (Dkt No. 27).

15.    On February 13, 2026, the Debtors filed the following "Second Day" motions and application, which are returnable February 18, 2026 at 10:00 am before Judge Kinsella in Syracuse pursuant to the February 13th Order Reducing Time (Dkt No. 19):

a)    Motion of the Debtors and Debtors In Possession Pursuant to 11 U.S.C. Sections 105, 507(a)(4), and 507(a)(5) and the "Doctrine of Necessity" for an Order Authorizing them to Pay: (A) Prepetition Employee Wages, Salaries, and Related Items; (B) Prepetition Employee Business Expenses; (C) Prepetition Contributions to and Benefits Under Employee Benefit Plans; (D) Prepetition Employee Payroll Deductions and Withholdings; and (E) All Costs and Expenses Incident to the Foregoing Payments and Contributions (the "Pre-petition Wage Motion") (Dkt No. 30)

5

b) Application to Employ Omni Agent Solutions, Inc. as Claims and Noticing Agent - Application for Appointment of Omni Agent Solutions as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date. (Dkt No. 32)

c) Motion of the Debtors for Entry of Order Pursuant to 11 U.S.C. Sections 105(a) and 363(b) (I) Authorizing, But Not Directing, the Debtors to Pay Pre-petition Obligations of Critical Vendors, (II) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief. (Dkt No. 34)

16. In support of the Debtors' Pre-Petition Wage Motion, in addition to the updated Budget attached at Exhibit "B," the Debtors also attach hereto as Exhibit "C" a pre- and postpetition payroll chart.

17. the Debtors attach hereto as Exhibit "C" a listing of critical vendors sought to be approved as set forth in their motion.

18. The Debtors assert that the above motions and applications are necessary for the continued operations and reorganization of the Debtors.

19. The Debtors rely on integrated cash management systems to receive reimbursements and pay essential obligations. The Debtors maintain bank accounts used to receive Medicare, Medicaid, and commercial payer reimbursements and to pay payroll, benefits, vendors, and taxes. Continuity of cash management is necessary to avoid interruptions in patient care.

20. The Debtors request authority to continue using existing cash management systems and bank accounts, to honor prepetition checks and electronic transfers in the ordinary course as appropriate, and to maintain patient privacy protections in creditor communications and claims administration to reduce disruption and administrative cost.

21. The Debtors are heavily regulated. Nearly every aspect of hospital operations, including clinical services, staffing, medical records, and billing and collections, is subject to rules and regulations promulgated by the DOH, Centers for Medicare and Medicaid Services ("CMS"),

50125455.1

New York State Office of Mental Health (the "OMH"), and other federal and state agencies. Maintaining compliance requires stable staffing, stable vendor support, and the ability to continue paying for necessary supplies and services.

22.     The Debtors' restructuring decisions must be made with patient safety and continuity of care as the overriding considerations. The Debtors' Chapter 11 strategy is therefore focused on stabilization and an orderly process that protects patients, residents, and communities. Debtors' Schedules and Statement of Financial Affairs when filed will, among other things, list all material executory contracts and unexpired leases (including payer contracts, physician employment and coverage contracts, IT and EHR contracts, and supply and service agreements).

## II.     PRE-PETITION BACKGROUND – HISTORY, OPERATIONS AND ROOT CAUSES OF DISTRESS

23.     The remainder of this Declaration is organized as a practical roadmap as follows: II(A) Debtor Background and Operations; II(A)(i) Summary of Each Debtor Entity; II(A)(ii) Core Operating Metric and Workforce; II(B) Overview of the Transition; II(B)(i) Transition Workstreams Causing Cashflow Problems; II(B)(ii) Revenue Cycle Disruption: New Identifier, Enrollment, Credentialing, and Timely Filing; II(B)(iii) Financial Profile and Liquidity Deterioration; II(B)(iv) Efforts to Avoid Bankruptcy During Transition and Alternatives Considered; III. Rural Healthcare, Geographic and Climactic Conditions in Upstate New York That Frame These Cases and That Made the Transition Cashflow Sensitive and Conclusion[6].

24.     This Declaration is not intended to be a complete history of the Debtors, or an exhaustive recitation of every communication with regulators, payers, vendors, or other

---

[6] As described in the Debtors' Transition dossier and related records, including email communications, consisting of approximately 14,000 pages and spanning 2022-2025.

stakeholders. Rather, it, among other things, summarizes principal circumstances that made the Chapter 11 filings necessary.

## A.  DEBTORS BACKGROUND AND OPERATIONS

25.     A basic premise for the Court, the State of New York, creditors and all affected stakeholders (including most importantly the citizens of the North Country) to know is that the Debtors' and Affiliated Non-debtors embarked upon the Transition[7] in 2022 not just to save comprehensive healthcare in the North Country, but to improve it – make it better, more resilient, self-sustaining and ultimately, long-term sustainable.  Failure has not been an option for the Debtors' staff and all of the people that support the Debtors  These bankruptcy filings are not evidence of a failure – but indicia of unforeseen cash-flow related setbacks that should not be held as an impediment to the Transition and the goal of long-term, high quality, system based healthcare for the North Country.  The Debtors would obviously have preferred to complete the Transition outside of Chapter 11.  Cash-flow issues largely stemming from the complex and sequential regulatory steps required to achieve the Transition, and almost entirely beyond the control of the Debtors, led to this filing – but nothing should be seen as an impediment to the ultimate completion of the transformation (of which the elements of the Transition were the initial hurdles) – with the belief that, if completed, residents of the North Country may know that their parents, and children, will have the kind of healthcare system that they have worked for and deserve.

26.     North Star is the passive parent organization for an integrated set of healthcare and related service entities serving the North Country region of New York. Although each Debtor and Affiliated Non-Debtor has a separate legal identity, the Debtors and the Affiliated Non-debtors

---

[7]  As discussed herein, beginning in or about August 2022, North Star pursued a complex transition (the "Transition") designed to preserve access to acute care and behavioral health services in the North Country while addressing Claxton's unsustainable legacy cost and reimbursement structure as a Sole Community Hospital.

8

50125455.1

operate as a coordinated regional healthcare system, through strategically planned and executed changes to the respective operating and regulatory environments.

27.     The Debtors' mission is to provide essential access to hospital, physician, specialty, and assisted living services in a rural region where patients face long travel distances and limited transportation alternatives. In this rural setting, maintaining local access points for emergency and inpatient services is determinative of patient outcomes, particularly for medically fragile patients.

28.     The Debtors' operations are interconnected - hospital-based services (emergency department, inpatient services, imaging, laboratory, pharmacy, and ancillary services) are coordinated with physician and specialty practices. Assisted living operations serve residents whose care coordination depends on access to local clinical resources, within the Debtors' system.

29.     The Debtors' care continuum includes, among other things: (i) emergency services; (ii) inpatient and observation services; (iii) outpatient diagnostics and therapy; (iv) physician and specialty services including orthopedics and women's health; and (v) assisted living services. The below organizational chart is instructive as to the services, Debtor and Affiliated Non-debtor

9

50125455.1

entities and care continuum provide:



The above chart is also attached hereto as Exhibit "D."

30.     The Debtors' patient population includes local residents and vacationing visitors, active duty U.S. military personnel, and their associated families and dependents associated with Fort Drum (and who rely upon the Debtors full range of services because Fort Drum does not operate a military hospital – unlike most other military bases), veterans, elderly and medically fragile individuals, patients with chronic conditions, and individuals who rely on Medicaid or other public programs. High public payer reliance affects both margins and cash-flow resilience. The region's residents, visitors, industries and employers rely on the comprehensive medical and behavioral services provided by the Debtors. The region's economy, and its military-civilian healthcare integration, depends on the continued viability of the Debtors.

50125455.1

31.     The Debtors employ clinicians and support staff, in addition to contracting with physicians and other practitioners. Rural workforce recruitment and retention challenges have increased costs and reduced operational flexibility, especially with turnover in key clinical and administrative roles.

32.     The Debtors' cash flow is driven primarily by reimbursement timing. The Debtors must meet payroll and pay essential vendors on fixed schedules, while reimbursements are received on a lag after claims are submitted and adjudicated. When the claims cycle slows or claim acceptance is interrupted, liquidity deteriorates quickly.

33.     The Debtors' business model is sensitive to small fluctuations in volume and payer behavior. During the Transition, certain operational and regulatory steps caused disruption to the revenue cycle and cash collections, at the same time that Transition spending and administrative burden increased.  Many factors set forth herein led the Debtors to where they are today – but disruption in cash-flow due to the Transition process has been the single most aggravating factor.

### i) Summary of Each Debtor Entity and Key Affiliated Non-Debtors

34.      Healthcare systems like North Star rely on shared services and intercompany arrangements to support operations efficiently. North Star's integrated model includes shared services, allocation mechanisms, and cross-entity operational dependencies. A schedule of Debtor and Affiliated Non-Debtor executives, titles and salaries is attached hereto at Exhibit "E."

35.     The Debtor North Star is an integrated rural healthcare system including two acute hospital campuses, an inpatient psychiatric facility, physician and specialty practices, provider-based clinics, rural health clinics, and assisted living services, with approximately 1,600 employees system-wide. Thus, North Star is the umbrella organization within which Carthage Area Hospital, Claxton-Hepburn Medical Center, and related affiliates coordinate governance,

50125455.1

strategy, and shared services. In 2015, North Star began to create a collaborative framework among its member organizations (including CHMC, CAH, NCOG, and Meadowbrook). As a passive parent entity, North Star does not itself exercise financial control over each member organization; rather, it serves as a platform for alignment and operational integration, including shared leadership and centralized administrative functions (e.g., finance, human resources, information technology, compliance, revenue cycle coordination, and cash planning) that are critical to sustaining rural healthcare delivery across multiple campuses. North Star handles these significant administrative tasks with ten (10) staff members. Each of the North Star affiliated Debtors continues to maintain an active, independent and engaged Board of Directors comprised of local residents.

36.    The affiliated Debtor Carthage Area Hospital (CAH) operates a 25-bed fully accredited acute-care hospital, formally designated as a Critical Access Hospital in 2014, at 1001 West Street, Carthage, New York[8] (the "Carthage Critical Access Hospital"). The Carthage Critical Access Hospital serves a large, rural, tri-county region containing approximately 83,000 residents in Jefferson, northern Lewis, and southern St. Lawrence counties, for primary care hospital and critical access hospital services.   In 2024 CAH reported approximately 17,938 emergency department visits, 247,028 laboratory tests, and 27,802 radiology procedures.

37.    Today, CAH also operates a second fully accredited 25 bed acute-care campus, formally designated a Critical Access Hospital in December 2025, at 214 King Street, Suite A, in Ogdensburg, New York (the "Claxton Campus")[9]. The Claxton Campus occupies a part of the building at 214 King Street in Ogdensburg, New York (the "Ogdensburg Location"). The Claxton Campus is the former acute-care component of Claxton-Hepburn Medical Center, that is now

---

[8] under DOH operating certificate (No. 2238700C; Facility ID/PFI 379)

[9] under DOH operating certificate (No. 2238700C; Facility ID/PFI 15684), the same as the Carthage Critical Access Hospital.

12

operated by CAH under a shared DOH operating certificate. CAH operating the Claxton Campus, and approval of the Claxton Campus as a Critical Access Hospital, was a key element of the Transition. The DOH issued the operating certificate reflecting this configuration, and CMS separately processed recognition and operationalization of the Claxton Campus at the Ogdensburg Location as a Critical Access Hospital (including surveys, enrollment steps, and related notifications). DOH and CMS approvals, recognition and operationalization both involved additional steps and timing considerations discussed below that complicated the Transition. In 2024 the Claxton Campus reported approximately 13,200 emergency department visits, 5,757 medical/surgical patient days, 1,475 ICU patient days, 49,443 radiology procedures, and 297,546 laboratory tests. Furthermore, the Claxton-Hepburn Medical campus is the designated "9.39" hospital for St. Lawrence County operating in conjunction with and supported by Claxton-Hepburn Medical Center.

38. CAH also has a large clinic footprint throughout Jefferson County including primary care, specialty, walk-in and school-based clinics. As part of the Transition, five rural health clinics were transferred from CHMC to CAH through a CMS change of ownership in December of 2023, to preserve established upper payment limits historically located in Ogdensburg, Waddington, Hammond, Canton, and Madrid. This was an essential step in the Transition plan as those clinics have a quasi cost-based rate that can no longer be recreated due to the 2021 Consolidated Appropriations Act which set the payment limit for Rural Health Clinics at the 2020 cost-based rate trended, forward based on the Medicare Economic Index.

39. The affiliated Debtor Claxton-Hepburn Medical Center, Inc. (CHMC), which was established in 1885 as the first hospital in the North Country, historically operated as a 127-bed Sole Community Hospital at the Ogdensburg Location, with a mix of inpatient medical/surgical

13

services, intensive care, maternity services, and both adult and child/adolescent inpatient mental health units (with beds), provider-based clinics, and rural health clinics.

40. The historic operations of CHMC at Ogdensburg had become economically unsustainable for a number of reasons described herein. As part of the Transition, acute inpatient services at the Ogdensburg Location are now provided at the Claxton Campus at the Ogdensburg Location, which is an acute care hospital licensed for 25 beds (17 medical/surgical beds, 6 ICU beds, and 2 maternity beds) that is operated by CAH (as described above). For the Claxton Campus, the Critical Access Hospital designation deeming survey was passed in June of 2025, and the Medicare tie-in letter was received in December of 2025, representing completion of the last major regulatory impediment to the Transition.

41. Inpatient behavioral health services exclusively provided to the region by CHMC were preserved through CHMC's establishment of a standalone Article 31 inpatient psychiatric hospital licensed for 40 beds (12 children and adolescent mental health beds and 28 adult mental health beds) at the Ogdensburg Location.

42. Thus, following the Transition, CHMC now operates exclusively as a standalone 40 bed Article 31 Inpatient Psychiatric Hospital licensed by the OMH[10], located at the Ogdensburg Location at 214 King Street, Suite B, Ogdensburg, New York. CHMC supports the designated "9.39" hospital for the area, and it provides acute inpatient behavioral health services for adults (28 beds) and children/adolescents (12 beds), including the region's only acute inpatient unit dedicated to children and adolescents. CHMC also leads the Pathways to Recovery Peer Coaching program and plans to establish the region's first Comprehensive Psychiatric Emergency Program

---

[10] under Operating Certificate No. 8231002

14

("CPEP").  CHMC reported 9,038 adult inpatient patient days and 3,213 child/adolescent inpatient patient days in 2024.

43.      Meadowbrook is a 60-bed assisted living facility (58 ALP beds and 2 Adult Home) servicing seniors in the North Country. Meadowbrook is a key part of the Debtors' care continuum for elderly and medically fragile patients, supporting safe discharge planning and community-based care.

44.      The Affiliated Non-debtor Claxton-Hepburn, P.C. (CHPC) is a professional corporation providing physician services that support continuity of care.  In this rural setting, physician practices are operationally interdependent with the hospitals, because of shared staffing, referral patterns, and on-call coverage models. Credentialing and payer enrollment timelines have materially affected practice cash flow.

45.      The Affiliated Non-debtor North Country Orthopaedic Group PC (NCOG) provides orthopedic specialty services, which are critical in this rural setting where specialty practice access is limited. As a specialty practice, NCOG is sensitive to payer credentialing and billing identifier changes, and delayed recognition has slowed high-dollar surgical and procedural reimbursement.

46.      The Affiliated Non-debtor North Country Realty, LLC (NCR) holds and manages certain real estate leases used in the Debtors' healthcare operations. Real estate stability is important because clinical operations depend on compliant physical space, utilities, and regulatory readiness at each campus and clinic location.

47.      The Affiliated Non-debtor Comprehensive Women's Health Services, PLLC (CWHS) provides women's health services in Watertown, NY. This is a single physician office. In rural regions with limited specialty coverage, continuity of women's health services is

15

particularly important. As a specialty practice, CWHS is sensitive to the payer credentialing and billing disruptions experienced by all of the Debtors and Affiliated Non-debtors.

### ii). Core Operating Metrics and Workforce

48. The Debtors' workforce includes employed clinicians, nursing and allied health professionals, administrative staff, and support services personnel. The Debtors also rely on medical staff physicians and advanced practice providers ("APPs") through W-2 employment and/or 1099 contractual relationships. Healthcare delivery depends on a large workforce distributed across campuses. CAH employs more than 700 individuals; the Ogdensburg Location operations (the Claxton Campus and CHMC) support over 700 healthcare jobs; and the system also relies on several traveling and locum providers to maintain essential coverage across both campuses.

49. The North Star system as a whole employs and contracts approximately 1,600 people. Workforce stability is material not only to patient safety but also to revenue cycle performance, because staffing disruptions affect volumes, documentation, coding, and timely billing. The Debtors have used premium labor and/or agency staffing in certain clinical areas as needed to maintain coverage. The Debtors' restructuring plans include targeted reductions in premium labor where feasible and sustainable, while maintaining required clinical coverage.

50. Certain portions of the workforce are represented by labor unions, including the New York State Nurses Association ("NYSNA") and United Healthcare Workers East 1199SEIU ("1199"). The Debtors monitor labor costs and staffing models closely as part of stabilization planning and to ensure safe staffing levels.

16

| Category | CAH | CHMC | MBT | NSHA |
|---|---|---|---|---|
| Total Headcount (employees) | 782 | 719 | 35 (CAH) | 13 |
| Physicians (employed) | 24 | 23 | 0 | 0 |
| Advanced Practice Providers (APPs) | 30 | 23 | 0 | 0 |
| Union Representation | NYSNA / 1199 | NYSNA / 1199 | 1199 | NA |
| Premium Labor Profile (agency/travel) | 3 provider 2 ER RN's | 2 ER RN's 2 RT's | 0 | 0 |

51.     The Debtors' revenue cycle operations include registration, insurance verification, coding, billing, claim submission, payment posting, denial management, and collections. The Transition affected each of these components by changing provider identities and requiring payer enrollment and system configuration work. A significant portion of the Debtors' revenue cycle is outsourced and the subject of upcoming motions before this Court.  Debtors attach hereto as Exhibit "F" – a chart of Pre-petition Funded Debt and Other Material Liabilities.  Debtors attach hereto as Exhibit "G" – a chart of Payer Enrollment, Credentialling, and Denials.

**B.      Overview of the Transition**

52.     Beginning in August of 2022, North Star initiated a complex Transition designed to preserve access to acute care and behavioral health services in the North Country, while addressing CHMC's unsustainable legacy cost and reimbursement structure as a Sole Community Hospital. The Transition involved coordinated planning among North Star member organizations, engagement with DOH, OMH and CMS, and sequential regulatory actions. Attached hereto as Exhibit "H" is a summary of Key Regulatory Filings and Approvals.

53.     By 2022, the need for moving forward with the Transition plan was clear. CHMC experienced compounding financial pressures, including labor and supply inflation, workforce

50125455.1

shortages, increased reliance on premium locum and traveler staffing, and reimbursement headwinds. These pressures were exacerbated by the geography of the North Country because the broad area of coverage and low population density adds to cost of service in a number of key ways, including but not limited due to the challenges of recruiting and retaining clinicians in this rural setting. Even before the COVID-19 Pandemic, CHMC reported operating at a loss of approximately $4.9 million in 2019.

54.    During the COVID-19 Pandemic and its immediate aftermath, CHMC reported losses of $448,000 in 2020 and thereafter, losses of $13.7 million in 2021, $10.9 million in 2022, $17.5 million in 2023 (excluding VAPAP support), and $30 million in 2024 (excluding VAPAP support). At the same time, higher reliance on premium labor in the post-pandemic period led to an increase in staffing-agency costs from approximately 8 percent of salaries in 2019 to approximately 18 percent in 2021.  Even before the COVID-19 pandemic, CHMC's historic acute-care average daily census was approximately 25 to 30 patients, while its inpatient psychiatric units typically operated at or near capacity.

55.    Against that backdrop, the North Star, CAH, and CHMC Transition model sought to preserve essential services in Ogdensburg and surrounding communities by, among other things, revising operations so that (i) a 25-bed Critical Access Hospital and (ii) a 40-bed inpatient psychiatric hospital could be maintained at the existing Ogdensburg Location.

56.    The Debtors described the approach at the Ogdensburg Location as "one campus, two critical missions."  This aspect of the Transition was arrived at specifically to keep emergency and inpatient services available locally in Ogdensburg, while enabling cost-based reimbursement features of the Critical Access Hospital model for acute care, and allowing the behavioral health

18

50125455.1

hospital to operate under a separate OMH framework that is also cost based for Medicaid under New York Article 31.

57.     This is a complicated way of saying that, due to new statutory payer and operational restrictions imposed on what became termed as "Critical Access Hospitals,"  by 2022 North Star determined that the only way forward on a financial and regulatory basis was for a Transition where CAH would operate a Critical Access Hospital at the former CHMC, while CHMC would continue to operate the behavioral health hospital.

58.     On October 23, 2024, DOH and OMH operating certificates reorganized CHMC into two distinct hospital entities: (i) a standalone inpatient psychiatric hospital (today's CHMC) and (ii) a separate acute-care campus (the Claxton Campus) operated by CAH. One physical site with two distinct hospitals - to preserve critical services and reduce duplicative fixed costs.

59.     The Transition model required careful and coordinated regulatory design due to complex state and federal rules.  As a result, the Transition thus resulted in: CHMC (40 bed IPF) and the Claxton Campus (25 bed Critical Access Hospital) operated by CAH.  The CHMC Behavioral Health Facility and the Claxton Campus Critical Access Hospital operated by CAH, are separate facilities each with separate dedicated entrances and signage, and separate internal pathways (including separate elevators and corridors) to maintain the operational separation as required by law.

60.     As noted above, implementing the Transition required a series of interrelated regulatory filings and approvals, including:

> a)     CHMC's submission of a closure plan for its legacy Article 28 acute-care operating certificate;
>
> b)     CHMC's application to OMH to convert its inpatient mental health beds into a standalone Article 31 inpatient psychiatric hospital; and

50125455.1

c)      CAH's application to DOH (including a Certificate of Need) to operate a 25-bed critical access hospital at the Ogdensburg Location (the Claxton Campus) under CAH's operating certificate.

61.     DOH and OMH then issued operating certificates reflecting this reorganization.[11]

62.     Certain key regulatory milestones during the Transition did not occur upon the planned Transition dates. For example, the transformation Certificate of Need for Ogdensburg was submitted on June 7, 2023 and PHHPC approval was obtained on June 20, 2024.  DOH issued the operating certificate dated October 23, 2024, and CMS recognized the new campus on December 24, 2024. The delay in the issuance of these certificates and the variance in effective dates contributed to the billing and operational disruptions during the Transition are what bring us before this Court today.

63.     The Transition required facility modifications and operational readiness work to comply with life safety and licensing requirements for the two distinct Article 28 and Article 31 hospitals at the Ogdensburg Location.  As noted, this included physical separation of units, new or modified entrances, distinct wayfinding and signage, dedicated pathways for patients and visitors, and the planning necessary to ensure emergency preparedness, infection control, pharmacy continuity, and other functions were appropriate for each separately licensed facility.

64.     The Transition required coordination with multiple regulators, accrediting bodies, and payer systems, including, as already mentioned, CMS, DOH and OMH, but also the Public Health and Health Planning Council, and the accrediting organizations like DNV healthcare accreditation.

65.     These regulatory tracks are interdependent and in many cases sequential - thus even though, for instance, a State operating certificate had been obtained, additional surveys,

---

[11] including CHMC's OMH operating certificate (No. 8231002) and CAH's updated DOH operating certificate (No. 2238700C) reflecting the additional CAH operations at the Claxton Campus.

50125455.1

enrollment, and CMS actions were required before the newly configured facility could bill for the services they were actively providing. Thus, one delay at an early stage in this process could, and did, cascade into a waterfall of subsequent, related delays.

66.     The sequencing and timing of required surveys and federal enrollment steps materially affected billing and payer enrollment, requiring CAH to contract with DNV.  These elongated sequencings and timings in turn delayed Medicare enrollment, commercial payer enrollment, and delayed Critical Access Hospital designation, with associated reimbursement impacts.

67.     PHHPC granted its approval in June 2024 for key elements of the Transition. Final federal regulatory notification, the Medicare Tie-in Letter, needed to bill, was received on December 2, 2025.

68.     The Transition required new or modified Medicare and Medicaid enrollment, issuance or updating of CMS certification numbers ("CCNs"), payer credentialing, clearinghouse electronic data interchange ("EDI") enrollment (including with CMS contractors), and extensive system configuration and testing.

### i) Transition Workstreams Causing Cashflow Problems

69.     The Transition required simultaneous execution of multiple workstreams. Preparing PHHPC and DOH submissions, OMH conversion materials, and CON filings required dedicated internal time and external professional support. In addition to State approvals, the Debtors also had to plan for and complete accrediting surveys and CMS processes (including DNV surveys and CMS notifications) to enable Medicare participation and reimbursement under the new configuration.

21

70. Establishing safe staffing models during the Transition required cross-campus coordination, recruitment, retention efforts, and the use of traveling and locum providers to maintain essential coverage. Because CHMC became a standalone inpatient psychiatric hospital while the Claxton Campus became an acute-care campus operated by CAH, the Transition required re-aligning clinical leadership, physician coverage plans, nursing staffing, and on-call arrangements to fit the new licensure and service configurations. Additionally, to ensure CAH was able to staff the new acute care campus, CAH and CHMC entered into an employee lease arrangement whereby CAH leased the CHMC employees that had previously staffed CHMC's acute care departments. This was done in an effort to avoid both the potential workforce loss of a major layoff and rehiring exercise, as well as limiting the cash strain for paying terminal benefits in a mass layoff.

71. The Transition also required IT work across EHRs, clinical systems, and financial systems. Two now main EMRs had to be erected under a short implementation timeline along with multiple ancillary EMRs to support the system moving forward. Among other things, the Debtors had to configure distinct facility and provider identifiers, rebuild charge masters, update interfaces, and ensure that claims and remittances could be correctly routed and posted for the correct entity and campus.

72. In mid-August 2024 VAPAP financial support was interrupted. This led North Star to reduce services through cash constraints which resulted in several build issues that it is still working to correct.

73. The Debtors had to coordinate new payer enrollments, credentialing, and contracting steps; update provider directories; establish or update electronic data interchange ("EDI") connections (including with CMS contractors); and test claim submission and remittance

22

50125455.1

workflows.  Ultimately, CMS and EDI/NGS enrollment delays and payer system recognition issues materially affected the timing of reimbursements during the Transition. Delays in required surveys and enrollment steps also delayed Medicare enrollment and commercial payer enrollment for the Claxton Campus; and that operating certificate timing contributed to periods in which billing was frozen or claims processing was impaired, which in turn increased administrative rework and delayed cash collections.

74.    The Transition required cash forecasting and bridge planning to cover payroll and essential vendors during reimbursement lags.  During the conversion of the Claxton Campus from a Sole Community Hospital to a Critical Access Hospital, the system faced one-time costs, revenue dislocation, and increased pharmacy expenses associated with temporary loss of 340B Drug Pricing Program eligibility for certain services (including high-cost specialty medications).  The Debtors are actively moving towards restoration of 340B eligibility given the completion of the Critical Access Hospital designation. These factors increased the need for liquidity during the Transition period.

75.    The complexity of the Transition created confusion within the marketplace and negative mis-information within the community that Northstar attempted to address with extensive meetings, town halls and other forms of communication. To that end, North Star leadership spent (and spends) extensive time messaging with patients, employees, community leaders and their constituencies, local government, EMS, and referral partners to maintain confidence and avoid volume loss during this time of uncertainty and change.

### ii) Revenue Cycle Disruption: New Identifier, Enrollment, Credentialing, and Timely Filing

76.     The Transition required establishing new Medicare-certified provider entities and related billing identifiers, including new billing identifiers (including NPIs) and associated payer

enrollment, contracting, and electronic claims routing updates, which in practical effect were the equivalent of establishing two new hospitals, The Transition was premised on certain estimated timelines that were not met, causing further revenue cycle disruption.

77. The National Provider Identifier ("NPI") is the HIPAA standard identifier for covered healthcare providers and must be used in HIPAA standard transactions. When a provider identity changes, payers generally must update their internal systems to recognize NPIs, service locations, taxonomy/specialty, provider or facility type, tax identification numbers, and contract terms before claims can be accepted and paid.

78. Establishing new billing identities requires multiple interdependent steps: (i) issuance of new identifiers; (ii) Medicare and Medicaid enrollment steps; (iii) credentialing of facilities and clinicians with commercial payers; (iv) confirmation of effective dates; (v) updates to electronic data interchange (EDI) routing for claims and remittances; (vi) updates to payer directories; and (vii) internal EHR and RCM system build and testing.

79. Even when each step is executed diligently, delays can occur and cascade. A payer may not complete EDI routing until contracting is finalized; contracting may not be finalized until credentialing is complete; and credentialing may not be complete until rosters and supporting documents are verified. This was a complex Transition, and in some cases cycles extended materially beyond operational go-live dates.

80. Commercial insurer credentialing and network enrollment processes proved slow relative to the Transition schedule. Third party multiple payers refused to recognize or adjudicate claims for services provided before credentialing was completed and effective dates were established.

24

81.     As a result, the Debtors experienced periods in which services were rendered but claims were rejected, denied, or held without adjudication, creating a practical billing blackout for certain payers. These issues extended accounts receivable days and reduced near-term cash collections at the time Transition-related expenses were elevated.

82.     The Debtors also experienced significant "timely filing" denials. Medicare fee-for-service claims are generally subject to a 12-month timely filing limit after the date of service. When claim submission is delayed by credentialing, enrollment, claim rejections, or resubmission cycles, providers can face denials that are difficult to recover.  Denied and rejected claims require rework: correction, resubmission, and/or appeal. This rework consumes scarce administrative resources. In a rural system already managing deliverables and staffing pressures, diversion of revenue cycle staff time materially affected the Debtors' ability to accelerate collections and stabilize cash.[12]

### iii) Financial Profile and Liquidity Deterioration

83.     The Debtors' liquidity crisis was the result of a convergence of factors including: (i) persistent thin operating margins typical of rural hospitals; (ii) cost inflation for labor, drugs, supplies, and energy; (iii) front-loaded Transition costs and administrative burden; and (iv) revenue cycle disruption and payer denials that delayed and reduced cash collections.

84.     Liquidity indicators that the Debtors anticipate providing include: (i) unrestricted cash on hand; (ii) weekly net cash flow; (iii) accounts receivable aging and days; (iv) denial rates and trends; (v) payroll obligations; and (vi) key vendor payables and payment terms. These

---

[12] The statewide context underscores the significance of denials as a cash-flow stressor. HANYS reported that respondents' revenue losses from claims denials were conservatively estimated at over $3 billion for 2025. The Debtors' experience during the Transition aligns with this broader pattern: denial volume and claim rework increased at the same time the Debtors' resources were constrained.

50125455.1

indicators help frame the Debtors' near-term liquidity constraints and the operational impact of reimbursement delays.

85.     The Debtors faced a working capital squeeze because payroll and essential vendors continued on fixed schedules while reimbursements slowed. This mismatch is particularly acute when payers refuse to recognize claims until credentialing is complete or when claims must be resubmitted multiple times.

86.     Additionally the North Star organization experienced 100 percent turnover in accounting and finance personnel during the Transition.  This turnover reduced the Debtors' ability to accelerate collections, generate responsive forecasts and deliverables, and manage vendor payment plans, thereby compounding the working capital squeeze. Systemwide, turnover was further exacerbated by the imminent payroll risks that began occurring in December, 2025.

87.     As of December 3, 2025, North Star and its affiliates faced an imminent payroll risk absent immediate support. North Star requested that DOH authorize tranche-based VAPAP[13]) funding while reconciliations were completed to prevent payroll disruption, vendor attrition, and service contraction.  The DOH funded $2.05 million at the end of December, 2025.[14].

88.     Healthcare providers must also maintain vendor continuity for pharmaceuticals, medical and surgical supplies, contracted services, and utilities. Rural supply chains can be fragile, and payment uncertainty can cause vendors to tighten terms, which may threaten access to critical items needed for patient care. Growth in accounts payable aged beyond 120 days began accelerating in May of 2025.

---

[13] Vital Access Provider Assurance Program
[14] DOH funded $2.5 million on February 6, 2026 and $2.6 million on February 17, 2026.

50125455.1

**iv.       Efforts to Avoid Bankruptcy During Transition and Alternatives Considered**

89.      During the Transition, and prior to filing these Chapter 11 cases, the Debtors pursued numerous measures to stabilize operations and avoid bankruptcy. These efforts included:

a) continued engagement with DOH and other stakeholders;

b) transparency with staff and local authorities;

c) implementation of internal operating and revenue cycle initiatives, and

d) evaluation of additional financing alternatives.

90.      The Debtors evaluated cost containment measures, staffing and scheduling adjustments, vendor negotiations, and prioritization of critical expenditures intended to preserve patient care while conserving cash. Cost measures were evaluated carefully because reductions undermine staffing and service availability, thereby further reducing volume and reimbursement.

91.      The Debtors focused on accelerating collections by correcting claim rejections, appealing denials, tracking payer credentialing status, and prioritizing high dollar claim resolution. However, many payers refused to recognize claims until credentialing and effective dates were established, thus the Debtors' ability to accelerate collections depended in part on payer processing timelines outside the Debtors' control.

92.      Despite these efforts, the Debtors' liquidity position continued to deteriorate. The convergence of Transition-related spending, revenue cycle disruption, payer credentialing delays, cost inflation, and administrative turnover left the Debtors without a feasible out-of-court path to stabilize within the time available.

93.      Financial projections prepared by the Debtors in 2024 during the Transition period contemplated that VAPAP funding would decrease to approximately $2 million in SFY 2026 and be eliminated by SFY 2027, assuming the CAH critical access hospital and the  CHMC Article 31

50125455.1

inpatient psychiatric hospital in Ogdensburg were operational for a full year and billing and collections were functioning under enhanced reimbursement rates. Those assumptions were contingent on timely issuance of operating certificates, payer enrollment, and related certifications.

94.    In addition to VAPAP relief, in September 2024, North Star sought funding from New York State Safety Net Transformation Program (Public Health Law section 2825-i) to provide support needed to preserve continuity of care during the Transition. CHMC and CAH applied as co-applicants, with CHMC as the safety-net applicant and CAH as the organizational partner. They described a multi-year post Transition and transformation plan. The application requested operating support of approximately $68.2 million and a requested capital support amount of approximately $22.3 million, to address transition-related working capital and operational stabilization needs, and to fund capital projects necessary to sustain services.

95.    The Debtors also identified capital and grant applications intended to support the Transition, including Office of Mental Health awards for expansion of children's inpatient behavioral health capacity and establishment of a comprehensive psychiatric emergency program, and Department of Health transformation funding applications related to cybersecurity, telehealth, and facility infrastructure. Attached hereto as Exhibit "I" is a summary of Capital and Grant Applications.

96.    In practice, the Debtors faced a broad set of Transition complications. These complications included delayed claim submission and payment because of enrollment and credentialing timing, payer refusal to recognize claims prior to completion of credentialing, the need to configure and test revenue cycle systems for new provider identities, and, during the interim CAH conversion period, increased pharmacy expenses associated with temporary loss of

50125455.1

340B eligibility for certain services. These operational realities contributed to a working-capital squeeze even while the Debtors continued to provide essential services.

97.    Absent the Transition, CHMC believes that it would have required approximately $22.6 million of supplemental operating support annually to achieve cashflow breakeven if it remained open as a 127-bed Sole Community Hospital.

98.    The Debtors' liquidity position continued to deteriorate in late 2025 and early 2026, leaving the Debtors without a feasible out-of-court path to stability.

### III.    RURAL HEALTHCARE, GEOGRAPHIC AND CLIMATIC CONDITIONS IN UPSTATE NEW YORK THAT FRAME THESE CASES AND THAT MADE THE TRANSITION CASHFLOW SENSITIVE[15]

99.    The geographic and climatic realities of the Debtor' service area include long travel distances, limited transportation alternatives, and severe winter weather that can make travel to alternative hospitals difficult. In that context, maintaining local access points for both acute care and behavioral health is a material patient-safety issue.

100.    Rural demographics and geography in the North Country materially affect healthcare access and the economics of healthcare delivery. Rural counties have low population density over large geographic areas and, in this region, limited public transportation, which increases reliance on local access points for care.

---

[15] Additional information can be found at the following public sources:
[1] Office of the New York State Comptroller, "The Doctor is Out: Shortages of Health Professionals in Rural Areas" (Aug. 2025) (the "Comptroller Report").
[2] Healthcare Association of New York State (HANYS), "New York State Hospitals Fiscal Survey Report: Bracing for Impact" (Nov. 2025) (the "HANYS Report").
[4] Medicaid.gov FAQ, "What is Medicare's general timely filing period?" (Sept. 11, 2014).
[5] Centers for Medicare & Medicaid Services, "National Provider Identifier Standard (NPI)" (page last modified Sept. 10, 2024).
[6] Centers for Medicare & Medicaid Services, "Organization PECOS Overview" (PDF) (processing timeframes).

50125455.1

101.    The Comptroller Report noted that 16 rural counties contain approximately 748,093 people (about 3.8 percent of New York's population) but over 37 percent of the State's land area. That dispersion increases travel distances for patients and complicates workforce recruitment and vendor logistics for providers.

102.    Workforce shortages are acute in rural New York. The Comptroller Report identified shortfalls in primary care, pediatrics, obstetrics/gynecology, dentistry, and mental health professionals. The same report found that that several rural counties have no pediatricians and that four of the studied counties have no obstetrics/gynecology physicians at all, increasing emergency department utilization and complicating patient transfers and discharge planning. For the Debtors, these shortages translate into recruitment challenges, retention pressures, and increased reliance on overtime or premium staffing, and obvious negative impact on patient care for the community when presented with limited primary care access shifting demand to hospitals and increasing the acuity of delayed presentations.

103.    In mental health, the Comptroller Report stated that all 16 rural counties studied are designated mental health professional shortage areas ("MHPSAs") for at least some populations, and that approximately 41 percent of the population in those counties live within designated MHPSAs. Behavioral health shortages drive emergency department utilization and prolong inpatient length of stay for patients awaiting placement or services.

104.    According to the Comptroller Report, as of May 2025, approximately 27 percent of the population in the studied rural counties was enrolled in Medicaid. This high Medicaid reliance has constrained Debtors' margins and limited their ability to build cash reserves and to absorb operational shocks – such as the Transition.

105.    The HANYS Report noted that:

30

50125455.1

a) New York hospitals projected a breakeven median operating margin of 0.1 percent for 2025;

b) that most hospitals lack the operating margins needed to maintain and improve access to patient care;

c) significant cost increases since 2022, including labor spending increases and large increases in drug and supply costs; and

d) payer denials are a major financial stressor – New York hospitals conservatively estimated revenue losses from claims denials at over $3 billion for 2025.

106. All of this matters, because it explains why rural hospitals frequently, and the Debtors' hospitals in particular, have been forced to operate with razor thin margins, and without a meaningful financial cushion. The Debtors' Transition unfolded within this statewide and rural context, and was in many ways, exacerbated by it.

107. The core driver is a timing mismatch between fixed expenses (payroll, benefits, utilities, and essential vendors) and delayed reimbursements that depend on claim acceptance, adjudication, and payment cycles. Even in stable conditions, there is a normal lag between the date of service and cash collection. During the Transition, new billing identifiers, new payer enrollment, and new payer system builds were required, which sharply and abruptly widened the payer gap, which in a thin-margin environment created an unfolding liquidity crisis.

108. The Transition created front-loaded costs: professional fees (legal, regulatory, IT, revenue cycle), training costs, system build and testing costs, construction costs and vendor conversion work, as well as additional overtime or temporary staffing. All of these costs were required to be incurred before any operational benefits and reimbursement stabilization occurred. Attached hereto as Exhibit "J" is a summary of Selected 2024 Utilization.

31

**CONCLUSION**

109.    Chapter 11 provides the Debtors with a structured forum to stabilize operations, continue to provide quality health-care, preserve continuity of patient care, and address creditor and stakeholder claims in an orderly manner. Without Chapter 11, the Debtors face a disorderly cascade of collection actions and employee, product and service terminations that could disrupt essential healthcare services in the North Country.

110.    These Chapter 11 filings were necessary to avoid the disorderly disruption of critical healthcare services and to maximize value for creditors and other stakeholders, while preserving patient access to care in a rural region already experiencing documented healthcare shortages and fiscal stress.

111.    During the pendency of the bankruptcy cases, the Debtors will continue to maintain the strongest lines of communication possible with all stakeholders, including the DOH and other governmental stakeholders, and continue working tirelessly with the interests of patient-care at the fore in a transparent, good-faith manner to address the liquidity and operational issues they face in this challenging environment.  Debtors, through their Boards, management and advisors, have developed a collaborative relationship with DOH at multiple levels, and their sincere wish is to grow those close relationships in the coming weeks and months. Communication must continue at this critical time and North Star is committed to making this happen. To that end, the Debtors are working on a proposed pre-bankruptcy plan arrangement which they will be presenting to the DOH towards the end of February so that their organization can proceed with stability through the bankruptcy process, maintain quality health care and preserve estate value for the benefit of all stakeholders.

50125455.1

## VERIFICATION

## PURSUANT TO 28 U.S. CODE § 1746

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on, and

Dated: February 17, 2026

__/s/ Rob Bloom_____
Rob Bloom
Chief Restructuring Officer
North Star Health Alliance

50125455.1