UNITED STATES BANKRUPTCY COUT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

In re:

                                              Chapter 11

                                              Case No. 26-60099 (main case)

NORTH STAR HEALTH ALLIANCE,         Jointly Administered
INC. et al.,

                                              Case No. 26-30078
                   Debtors.[1]           Case No. 26-30079
                                                Case No. 26-60100

------------------------------------------------------------

### MOTION OF CHART RISK RETENTION GROUP FOR RELIEF FROM THE AUTOMATIC STAY

CHART Risk Retention Group, through its attorneys Lemery Greisler LLC, as and for its motion for relief from the automatic stay pursuant to 11 U.S.C. §362(d)(1), respectfully states as follows:

### INTRODUCTION

1.      CHART Risk Retention Group ("CHART") is a member owned medical malpractice risk retention group. Its members are owners and share in the profits and, as may occur, losses of CHART. CHART Services, Inc. is CHART's attorney in fact that provides services to CHART in the nature of administration, claims processing and the like.

2.      CHART operates as an insurance reciprocal which is a member-owned insurance structure where the subscribers are also policy holders under traditional insurance policies and CHART collects premiums to provide medical malpractice and general liability insurance coverage for each subscriber's risks. The reciprocal is not operated on a for profit basis and is generally managed for the subscribers' mutual benefit by an attorney-in-fact.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).

{LG 00924428 1 }

3. CHART is headquartered in Pennsylvania but is domiciled in and regulated under the laws of the State of Vermont.

4. This motion seeks stay relief for two purposes. First, to allow CHART the flexibility to offset liabilities owed by the Debtor against the capital accounts of the Debtor held by CHART. Second, to obtain a comfort order of the Court confirming that CHART may make actuarially required annual adjustments to the internal accounts of its members that, necessarily, impact the Debtor's capital accounts in CHART.

## JURISDICTION

5. Debtors filed their Chapter 11 cases in this Court on February 10, 2026. Their cases are jointly administered.

6. The Court has jurisdiction over this case and this motion, which is a core proceeding, pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(b)(2)(G).

## FACTUAL BACKGROUND

7. To become a member of CHART, each member enters into a Subscriber Agreement and Application for Insurance Coverage and Power of Attorney. Exhibit "A" to Declaration of Chad Cicconi ("Cicconi Declaration").

8. Claxton Hepburn Health Systems, Inc. became a subscriber of CHART in February 2011. By Amendment dated in March 2018, North Star Health Alliance, Inc., as successor-in-interest to Claxton Hepburn Health Systems, Inc. became the subscriber.

9. Effective as of January 1, 2025, North Star Health Alliance, Inc. withdrew as a subscriber. Cicconi Declaration Exhibit "B."

10. Importantly, at §4 of the Subscriber Agreement, each subscriber acknowledges that it has read CHART's Rules and Regulations.

{LG 00924428 1 }

11.    CHART's Rules and Regulations of Community Hospital Alternative for Risk Transfer (A Reciprocal Risk Retention Group) (Amended as of May 4, 2024) (the "CHART's Rules"), have several provisions that are relevant to the Court's consideration of this motion. Cicconi Declaration, Exhibit "C."

12.    Article II, Section 6 of CHART's Rules provides for the right of offset as follows:

> Upon noncompliance by any Subscriber with these Rules & Regulations, the Subscriber's Agreement, a deposit agreement, a policy of insurance issued by the Reciprocal or any policies and procedures adopted by the Subscribers' Advisory Committee, the RECIPROCAL shall have the power and authority to do any one or combination of the following:

> b. <u>Offset, at any time, any amounts which the Subscriber owes to the RECIPROCAL against any amounts due from the RECIPROCAL to or payable on behalf of the Subscriber. The RECIPROCAL's right of offset shall include, but shall not be limited to, offset against a Subscriber's Paid- in Surplus Account, Paid-in Surplus Subaccount, Surplus Capital Account, Subscriber's Savings Account, any distributions which may be declared from time to time by the RECIPROCAL's Subscribers' Advisory Committee,</u> and any amounts received by the Reciprocal under a deposit agreement based on (a) any unpaid portion of a Subscribers' premium previously contracted for, (b) any amount paid by the RECIPROCAL with respect to any state tax (other than Vermont premium tax) on premiums attributable to a Subscriber's policy or policies, (c) any losses paid on a Subscriber's behalf by the RECIPROCAL within the Subscriber's deductible, (d) any self-insured retention of the Subscriber, (e) any unreimbursed amounts advanced by the RECIPROCAL on behalf of a Subscriber for assessments under MCARE, (f) any outstanding amounts required under a deposit agreement, which amounts shall include, but not be limited to, the initial deposit amount, replenishment amounts and any incremental deposit resulting from termination of coverage, and (g) any interest to which the RECIPROCAL is entitled under a policy or these Rules & Regulations.

Cicconi Declaration Exhibit "B" (emphasis added).

13. Article XI, §1 of CHART's Rules defines the various accounts that each subscriber has at CHART.

> The surplus accounts maintained by the RECIPROCAL shall include (a) an unassigned surplus account ("Unassigned Surplus"), (b) a paid-in surplus account ("Paid-In Surplus Account") for each Subscriber that contributes surplus to the RECIPROCAL, (c) a paid in surplus subaccount ("Paid-In Surplus Subaccount") for each Subscriber that elects to contribute dividends paid to its Paid-In Surplus Subaccount, (d) a surplus capital account ("Surplus Capital Account") for each Subscriber that elects to convert amounts allocated to its Subscriber's Savings Account to its Surplus Capital Account, and (d) a Subscriber's Saving Account ("SSA") for each Subscriber.

Cicconi Declaration Exhibit "C."

14. CHART also has Standards and Formulas for Surplus Allocations and Distributions (as amended September 7, 2017) ("CHART's Standards") which set forth the standards for the handling of the subscriber capital accounts. Cicconi Declaration Exhibit "D".

15. At §1, CHART's Standards define the subscriber's various accounts which CHART maintains. For purposes of this case, those accounts are: (i) a Paid in Surplus Account; (ii) a Surplus Capital Account); and (iii) a Subscriber's Savings Account.

16. As set forth in the Cicconi Declaration, as of the end of CHART's fiscal year 2025 (ending 12/31/25), the Debtor had the following amounts in CHART Accounts: (i) $200,000.00 in its Paid in Surplus Account; (ii) $1,584,246.00 in its Surplus Capital Account; and (iii) $0 in its Subscriber Savings Account. CHART is permitted to hold the capital accounts of a departed subscriber for between three and five years (depending on the type of account) prior to distribution of the capital account balance to the departed member. As Debtor departed CHART membership effective January 1, 2025, CHART currently holds the above-referenced accounts on Debtor's behalf pending the date(s) of distribution pursuant to CHART's governing standards.

17.   Pursuant to CHART's Rules, Article XI at §3(c) no interest is payable on these amounts. Cicconi Declaration Exhibit "C."

18.   In addition, as of year-end 2025, Debtor owed CHART $233,293.91 for unpaid premiums, penalties and other charges.  See Cicconi Declaration at Exhibit "E."

19.   Importantly, as set forth below CHART's Standards at §2 thereof require that CHART allocate its profits and any necessary reserve adjustments to members' capital amongst its subscribers for the preceding calendar year by March 15 of each succeeding year.  CHART's Rules and Regulations also require that any adjustments to subscribers' capital accounts required by actuarial or other review must be made before March 15 of the succeeding year (See Rules and Regulations, article XI, section 2).  This requirement is driven by actuarial analyses based upon annual audits and must be done to keep CHART in compliance with sound insurance requirements.

> Annual Allocation of Reciprocal's Profits and Losses. Net income of the Reciprocal (determined using GAAP) for each calendar year shall be allocated by the SAC as follows. Allocations for a calendar year must be made no later than March 15 of the following calendar year, and unless otherwise designated by the SAC, any allocations made between January 1 and March 15 shall be presumed to relate to the prior calendar year. In no event shall such allocations exceed current statutory earnings or exceed the allocations allowable under Section 832(f) of the Internal Revenue Code, as interpreted by IRS regulations and rulings.

Cicconi Declaration Exhibit "D."

20.   Chart's Standards allow the adjustment of capital accounts in the name of withdrawn subscribers.

> Return of SSAs Upon Withdrawal or Expulsion of a Subscriber.
> Upon written withdrawal or expulsion of a Subscriber from the Reciprocal, any amounts in such Subscriber's SSA shall be paid promptly in accordance with applicable IRS regulations; provided, however, that such payment may be deferred for a period not to exceed thirty-six months following the effective date of a Subscriber's termination so that the Committee shall have the opportunity to determine the Reciprocal's liability for coverages previously provided by the Reciprocal during the period of time in which the withdrawing Subscriber

participated in the program. The Committee may direct that such liabilities be established by an independent actuarial certification. If a confidence level within the actuary's range of recommendations is not achieved, the SSAs and/or SCAs of all Subscribers may at the Committee's discretion be adjusted pro rata based upon the ratio that each Subscriber's Surplus bears to Total Subscriber Surplus to accomplish that level of funding and the remaining portion of the SSA shall then be promptly paid to the departing Subscriber. No interest will be paid on amounts due to a Subscriber pursuant to this paragraph. Further, the withdrawing Subscriber shall have no liability with respect to events and claims arising after cancellation of its insurance coverages

Cicconi Declaration Exhibit "D" at §4.

21. Based on CHART's 2025 actuarial audit, a reserve adjustment requiring an adjustment to all subscriber capital accounts is required. The proportional amount that must be deducted from Debtor's Surplus Capital Account based on its ownership share of CHART is $110,936.255 (carried out to the third decimal point). Cicconi Declaration Exhibit "F." In proportion to their respective interests, similar adjustments are being made to all other subscribers' Surplus Capital Accounts.

22. Finally, §§s 5 and 6 of CHART's Standards govern when CHART must return amounts in its subscribers capital accounts. For purposes of this case the Paid in Surplus Account need not be paid before 5 years from the subscriber's termination, and the Surplus Capital Account likewise need not be paid before that same 5 year mark. Cicconi Declaration Exhibit "D."

<strong><u>THE COURT SHOULD GRANT STAY RELIEF</u></strong>

<strong>a. <u>The Right of Offset</u></strong>

23. Pursuant to 11 U.S.C. §362(d)(1) the Court may grant relief from the automatic stay for cause.

24. The moving party bears the initial burden of showing "cause" for relief, but once a *prima facie* case has been established, the debtor has the ultimate burden of proof to show that

cause does not exist to grant relief from the stay. *In re Montague Pipeline Technologies Corp.*, 209 B.R. 295, 305 (Bankr. E.D.N.Y. 1997).

25. Here CHART has shown cause for the relief it seeks.

26. With respect, to the ability to offset the amounts owed by Debtor ($233,203.91) against its Paid in Surplus Account ($200,000.00) and its Subscriber Savings Account ($1,584,246.00), CHART has that right under Article II, Section 6 of CHART's Rules cited above. In addition, the Bankruptcy Code expressly recognizes and preserves the right to offset a prepetition obligation owed by a creditor to a debtor against a debt owed by the creditor to that debtor. "Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case…." 11 U.S.C. §553(a). None of the exceptions to this right apply in this situation.

27. Should the Court grant this Motion, Chart does not necessarily intend to offset immediately. Rather, the granting of the Motion would allow Chart the flexibility to offset should the parties in this case (the Debtors and their creditors) seek an early distribution from Debtor's capital accounts. Should that come to pass as part of a confirmed plan or other Court approved resolution, Chart will necessarily need to recalculate the total amount of the offset in order to account for the present value of such distributions which, normally, would not be paid out for several more years.

28. With regard to CHART making its accounting adjustment to Debtor's accounts as its Standards require, CHART is simply seeking to continue actuarial-driven accounting practices which are required by the need to follow sound insurance practices. Doing so will not harm the

{LG 00924428 1 }

Debtor as is simply reflects continued accounting practices which the Debtor agreed to when it became a subscriber. And, in any event, the required capital adjustment also can be viewed as an offset, or true up, that is allowable under Code §553(a).

29.     With respect to both matters, CHART has shown "cause" sufficient for the Court to grant relief from the automatic stay.

WHEREFORE it is respectfully requested that the Court grant CHART's motion and such other and further relief as may be deemed just, necessary and proper.

Dated: February 25, 2026                     Respectfully submitted,


LEMERY GREISLER LLC


_____

Paul A. Levine, Esq.
plevine@lemerygreisler.com
NDNY Bar Roll No. 103758
Attorneys for CHART Risk Retention Group
677 Broadway, 8th Floor
Albany, New York 12207
(518) 433-8800

{LG 00924428 1 }