UNITED STATES BANKRUPTCY COUT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

In re:

|  |  |
|---|---|
|  | Chapter 11 |
|  |  |
|  | Case No. 26-60099 (main case) |
| NORTH STAR HEALTH ALLIANCE, INC. et al., | Jointly Administered |
|  |  |
|  | Case No. 26-30078 |
| Debtors.[1] | Case No. 26-30079 |
|  | Case No. 26-60100 |

------------------------------------------------------------

## DECLARATION OF CHAD CICCONI IN SUPPORT OF MOTION OF CHART RISK RETENTION GROUP FOR RELIEF FROM THE AUTOMATIC STAY

Chad Cicconi, declares under pain and penalty of perjury as follows:

1. I am General Counsel and Chief Claims Officer of CHART Risk Retention Group ("CHART").

2. This declaration is made on based on my personal knowledge.

3. The documents attached to this declaration are true and accurate copies of CHART's business records maintained in the ordinary course of its business.

4. Through its attorney in fact CHART Services, Inc., CHART operates as an insurance reciprocal which is a member-owned insurance structure where the subscribers are also policy holders under traditional insurance policies and CHART collects actuarially-determined premiums to provide medical malpractice and general liability insurance coverage for each subscriber's risks. The reciprocal is not operated on a for profit basis and is generally managed for the subscribers' mutual benefit by an attorney-in-fact.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).

{LG 00924471 1}

5.    CHART is headquartered in Pennsylvania but is domiciled and regulated under the laws of the State of Vermont.

6.    Attached as Exhibit "A" is the Subscriber Agreement and Application for Insurance Coverage and Power of Attorney entered into by Claxton Hepburn Health Systems, Inc. which became a subscriber of CHART in February 2011. By Amendment dated in March 2018, North Star Health Alliance, Inc., as successor-in-interest to Claxton Hepburn Health Systems, Inc. became the subscriber.

7.    Effective as of January 1, 2025, North Star Health Alliance, Inc. withdrew as a subscriber. Exhibit "B."

8.    CHART's general governing rules and regulations/by-laws are set forth in a document entitled "Rules and Regulations of Community Hospital Alternative for Risk Transfer (A Reciprocal Risk Retention Group) (Amended as of May 4, 2024)"(the "CHART's Rules"), and are attached as Exhibit "C."

9.    CHART's governing standards applicable to the handling of members' capital accounts are set forth in a document entitled "Standards and Formulas for Surplus Allocations and Distributions" (as amended September 7, 2017), and are attached as Exhibit "D".

10.    As of the end of CHART's fiscal year 2025 (ending 12/31/25), the Debtor had the following amounts in CHART Accounts: (i) $200,000.00 in its Paid in Surplus Account; (ii) $1,584,246.00 in its Surplus Capital Account; and (iii) $0 in its Subscriber Savings Account. Pursuant to the aforementioned Rules and Regulations and Standards and Formulas governance documents, CHART is permitted (and required) to hold withdrawn members' capital accounts for between three and five years after a members' withdrawal from CHART, after which they are to be distributed to the withdrawn subscriber/member.  As such, CHART is currently

maintaining the above-referenced capital accounts on behalf of Debtor, pending the date(s) of required distribution to Debtor.

11. In addition, as of year-end 2025, Debtor owed CHART $233,293.91 for unpaid premiums, penalties and other charges. An itemized statement of these amounts is attached as Exhibit "E." Should the parties in this case (the Debtors and their creditors) seek an early distribution from Debtor's capital accounts as part of a confirmed plan or other Court approved resolution, Chart will necessarily need to recalculate the total amount of the offset in order to account for the present value of such distributions which, normally, would not be paid out for several more years.

12. Pursuant to CHART's Rules and Regulations and Standards and Formulas, CHART is required to allocate any profits (positive adjustment) or actuarially-determined reserve increases (negative adjustment) to the capital accounts of all members and departed members which it holds, in proportion to the relative ownership shares of each member/departed member. Based on CHART's 2025 actuarial audit, a reserve adjustment resulting in a an aggregate deduction to the members' capital accounts was required. The proportional amount that must be deducted from Debtor's Surplus Capital Account is $110,936.255 (carried out to the third decimal point) as reflected on Exhibit "F" which has been redacted to protect confidential financial information of CHART's other members. In proportion to their respective interests, similar adjustments are being made to all other subscribers' Surplus Capital Accounts. In accordance with CHART's Standards, this adjustment must be made by March 15th.

13. The provision in Chart's Rules that allow Chart to make an adjustment to the accounts of departed subscribers reads as follows:

<u>Return of SSAs Upon Withdrawal or Expulsion of a Subscriber</u>.

Upon written withdrawal or expulsion of a Subscriber from the Reciprocal, any amounts in such Subscriber's SSA shall be paid promptly in accordance with applicable IRS regulations; provided, however, that such payment may be deferred for a period not to exceed thirty-six months following the effective date of a Subscriber's termination so that the Committee shall have the opportunity to determine the Reciprocal's liability for coverages previously provided by the Reciprocal during the period of time in which the withdrawing Subscriber participated in the program. The Committee may direct that such liabilities be established by an independent actuarial certification. If a confidence level within the actuary's range of recommendations is not achieved, the SSAs and/or SCAs of all Subscribers may at the Committee's discretion be adjusted pro rata based upon the ratio that each Subscriber's Surplus bears to Total Subscriber Surplus to accomplish that level of funding and the remaining portion of the SSA shall then be promptly paid to the departing Subscriber. No interest will be paid on amounts due to a Subscriber pursuant to this paragraph. Further, the withdrawing Subscriber shall have no liability with respect to events and claims arising after cancellation of its insurance coverages

Exhibit "D" §4.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

February 25, 2026

_____
Chad Cicconi

# EXHIBIT "A"

<u>(DEPOSIT FUND REQUIRED)</u>

<u>DOCUMENT NO. 2</u>

SUBSCRIBERS AGREEMENT

and

**Application for Insurance Coverage and Power of Attorney**

The undersigned, **Claxton Hepburn Health System, Inc.**, having its principal place of business in the State of __New York__ (the "Subscriber") agrees with the other Subscribers of Community Hospital Alternative For Risk Transfer (A Reciprocal Risk Retention Group), a Vermont captive reciprocal insurer having its principal place of business at 8 Countryside Drive, Essex Junction, Vermont (the "Reciprocal") and with Chart Services, Inc. ("Chart"), a Vermont Corporation, having its principal place of business at 8 Countryside Drive, Essex Junction, Vermont (the "Attorney-In-Fact"), as follows:

1.  <u>Application.</u>  For and in consideration of the benefits to be derived there from, the Subscriber hereby applies for subscribership in the Reciprocal and for insurance coverage to be issued by the Reciprocal. In furtherance of such application, the undersigned hereby agrees to provide such additional information as may be required or appropriate and authorizes representatives of the Reciprocal and the Attorney-In-Fact to use such information and to conduct an investigation as they may deem relevant in connection therewith.

2.  <u>Appointment of Attorney-In-Fact.</u>  The Subscriber hereby appoints the Chart as its attorney-in-fact for the purposes contemplated herein, and authorizes Chart on its behalf to exchange contracts of insurance and indemnity with other Subscribers of the Reciprocal, subject to the applicable laws of the State of Vermont, and to perform every act necessary to manage and conduct the business of the Reciprocal consistent with the Power of Attorney and Management Services Agreement ("Power-Of-Attorney") by and between Chart and the Reciprocal.

3.  <u>Subscribers' Financial Liability Limited.</u>  The Reciprocal shall at all times operate as a non-assessable insurer, and the liability of the Subscriber shall be limited to premiums payable in return for insurance coverage and other obligations arising under an insurance policy issued by or reinsured by the Reciprocal, reimbursement of the Reciprocal for any other amounts paid on behalf of the Subscriber and the maintenance of a deposit with the Reciprocal to secure any obligations of the Subscriber to the Reciprocal, and the Subscriber shall have no contingent assessment liability.

4.  <u>Acknowledgments and Covenants.</u>

    A.    The Subscriber acknowledges that it has been provided with and has read and been given an opportunity to ask questions regarding the Reciprocal's Business Plan,

*v.12.17.09*                                          1

Rules & Regulations and Power of Attorney. The Subscriber further acknowledges that it is aware of and agrees to the role of the Subscribers' Advisory Committee as the governing body of the Reciprocal and as representatives of the Subscribers, and agrees to be bound by the decisions thereof. The Subscriber further acknowledges that the Attorney-In-Fact has authority as provided under Vermont law and the Power of Attorney, including the authority to accept service of process on behalf of the Reciprocal and its Subscribers.

B.      The Subscriber expressly agrees that any person, persons, firm, corporation or other entity that is or has been involved with introducing the undersigned to the Reciprocal, facilitating conversations with the Reciprocal, advising the undersigned on insurance related matters including, but not limited to, the Reciprocal (said person or entity hereinafter referred to as the "Subscriber Representative") is the agent/representative of the undersigned Subscriber and not the agent/representative of the Reciprocal. It is understood that the Subscriber Representative is the agent/representative of the undersigned Subscriber, and not the agent/representative of the Reciprocal, irrespective of the fact that the Subscriber Representative may provide ongoing service with respect to policies of insurance issued by the Reciprocal. The undersigned hereby accepts full responsibility for the payment of any commissions or other fees and charges of the Subscriber Representative and agrees to pay the same. It is understood that the Subscriber Representative shall not be deemed the agent, express or implied, of the Reciprocal and that the Reciprocal is not legally bound by the representations, acts or omissions of the Subscriber Representative. The undersigned agrees and covenants not to assert the existence of an agency relationship between the Reciprocal and the Subscriber Representative, express or implied, in any legal or other proceeding. It is expressly understood that the Subscriber Representative has no authority to modify any insurance agreement underwritten by the Reciprocal and further has no authority to waive any of the Reciprocal's rights or requirements.

C.      Each person admitted as a Class A and Class C Subscriber hereby agrees to (i) execute and deliver to the Reciprocal a deposit agreement in a form approved by the Subscribers' Advisory Committee, and (ii) maintain a deposit with the Reciprocal in accordance with the terms and conditions of the deposit agreement.

5.      Representations and Warranties. The Subscriber hereby represents and warrants that it has full power and authority to execute, deliver and perform this Agreement to participate in the Reciprocal as a Subscriber, and to execute, deliver and perform any other documents referred to and/or contemplated by this Agreement. The execution, delivery and performance of this Agreement have been authorized by all necessary actions of the Subscriber and this Agreement, and any agreements referred to herein or contemplated hereby will, when executed and delivered, be valid and binding obligations of the Subscriber.

6.      Compliance. The Subscriber hereby agrees to be bound by and comply with all applicable provisions of the Rules & Regulations, the Power of Attorney, this Agreement,

and any policy issued to it or reinsured by the Reciprocal, as each may be amended from time to time.

7.     Allocations and Distributions. The Subscriber agrees that matters relating to contributions of surplus, allocation of the Reciprocal's surplus, allocations to subscribers' savings accounts ("SSAs"), payment of dividends and return of surplus accounts shall be as provided in the Rules & Regulations or in formulas or standards adopted by the Subscribers' Advisory Committee pursuant to authority granted by the Rules & Regulations.

8.     Risk Factors. The Subscriber acknowledges that it has carefully reviewed the Risk Factors associated with participation in the Reciprocal's insurance program. These Risk Factors are attached hereto and made a part hereof as Appendix A.

9.     Effectiveness of Agreement. This Agreement becomes effective as of the date written below, and will remain in effect so long as Subscriber has in force insurance coverage issued or reinsured by the Reciprocal and until the Subscriber voluntarily withdraws from the Reciprocal or is terminated in accordance with the Rules & Regulations. Following termination, the Subscriber's right to vote as a subscriber shall terminate, but the Subscriber shall remain bound by the Rules & Regulations, the Subscribers' Advisory Committee's formulas and standards then in effect with respect to the return of Subscriber's SSA and paid-in surplus account, and the deposit agreement between the Subscriber and the Reciprocal.

10.     Miscellaneous. This Agreement shall be governed by Vermont law and may be amended only by the joint agreement of the Attorney-In-Fact and the Subscribers' Advisory Committee. No such amendment shall be effective retroactively nor as to any insurance contract issued prior thereto.

IN WITNESS WHEREOF, the Subscriber hereby executes this instrument as of the 21st

day of February , 2011.

By: ~Mark Webster~
      Its Duly Authorized Representative

Name:    Mark Webster
Title:    Chief Executive Officer
Address:   Claxton Hepburn Health System, Inc.
         214 King Street
         Ogdensburg, NY 13669

Accepted by: COMMUNITY HOSPITAL ALTERNATIVE FOR
       RISK TRANSFER (A RECIPROCAL RISK RETENTION
       GROUP) BY CHART SERVICES. INC., ITS
       ATTORNEY-IN-FACT

By: ~signature~
      Duly Authorized Representative of
      Chart Services, Inc.

Name: ~signature~

M01313-00008\Doc #: 5

## OMNIBUS AMENDMENT TO SUBSCRIBERS AGREEMENT, DEPOSIT AGREEMENT, AND MCARE ASSESSMENT REIMBURSEMENT AGREEMENT

The following Omnibus Amendment is agreed upon between CHART RRG, CHART Services, Inc., and Claxton-Hepburn Health Systems (Member or Subscriber).

**WHEREAS,** the undersigned parties hereto are also the parties to a certain Subscribers Agreement (dated February 21, 2011) and a Deposit Agreement (dated April 1, 2011); and

**WHEREAS** the parties wish to amend each of the referenced agreements to include a mandatory arbitration clause.

**NOW, THEREFORE,** the parties agree to amend each of the referenced Agreements to include the following language:

**Section A1:    Arbitration:**

The parties hereto agree to submit to binding arbitration any and all disagreements arising out of, relating to, or in any way connected with their rights with respect to any business dealing relating in whole or in part to the Reciprocal or the Attorney-in-fact, including, but not limited to, any policy of insurance issued or procured for Member by the Reciprocal or claims handled thereunder, including but not limited to all disputes regarding the validity, formation, applicability, interpretation, breach or enforcement of the policy and its coverages as well as all disputes regarding the handling of claims, including allegations of bad faith and extra-contractual damages. In addition, disagreements arising out of the Subscriber Agreement, disputes over decisions of the Subscribers' Advisory Committee, disputes regarding allocations or distributions, or any agreements made incident to or in connection with the Subscribers Agreement, including the Power of Attorney and Management Services Agreement, the Rules and Regulations, the Standards and Formulas for Surplus Allocations and Distributions, and the Deposit Agreement will also be submitted to binding arbitration.

Any arbitration hereunder shall take place in Pittsburgh, Pennsylvania, and shall be filed with and administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, before three arbitrators. A judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

This Agreement and the rights of the parties hereunder shall be governed by and construed in accordance with the laws of the State of Vermont, exclusive of conflict or choice of law rules.

The parties acknowledge and agree that this Agreement evidences a transaction involving interstate commerce. Notwithstanding the provision in the preceding paragraph with respect to applicable substantive law, any arbitration conducted pursuant to the terms of this Agreement shall be governed by the Federal Arbitration Act, 9 U.S.C. § 1-16, *et seq.*

The parties acknowledge that arbitration is the exclusive means of dispute resolution and that each party shall bear its own attorneys' fees and costs with respect to proceeding in arbitration. In the event the Reciprocal or Attorney-in-fact must defend itself in any action before a court of law, whether such action is initiated by the member or other third party claiming rights under the policy, Member agrees to indemnify and hold harmless the Reciprocal or Attorney-in-fact from and against any and all attorneys' fees and costs ("Indemnity Costs") resulting from such court proceedings.

ACKNOWLEDGMENT OF ARBITRATION.
Subscriber acknowledges that this agreement contains an agreement to arbitrate. After signing this document, Subscriber understands that it will not be able to bring a lawsuit concerning any dispute that may arise, unless it involves a question of constitutional or civil rights. Instead, it agrees to submit any such dispute to an impartial arbitrator.

Subscriber Signature.


Acknowledged and agreed:


CHART, RRG, by                                CHART Services, Inc., by


_____                     _____
Name                                          Name


3/17/17                                       3/17/17
_____                     _____
Date                                          Date


Claxton-Hepburn Health Systems, by:

_____
Name  Kelley M. Tiernan, CFO

3/16/17
_____
Date

2

## AMENDMENT TO SUBSCRIBERS AGREEMENT AND DEPOSIT AGREEMENT

The undersigned, being parties to a Subscribers Agreement dated February 21, 2011, as amended by an Omnibus Amendment dated March 16, 2017 (collectively attached hereto as Exhibit A), and a Deposit Agreement dated April 1, 2011, as amended by an Omnibus Amendment dated March 16, 2017 (collectively attached hereto as Exhibit B), ("the Agreements") agree to the following Amendment to said Agreements:

**WHEREAS**: the corporate name of the party identified as "Subscriber" in said agreements, Claxton Hepburn Health System, Inc., was changed, effective January 1, 2018, to "North Star Health Alliance, Inc.", and;

**WHEREAS**: North Star Health Alliance, Inc. is the direct corporate successor-in-interest to Claxton Hepburn Health System, Inc.

**NOW, THEREFOR**, The parties to said Agreements wish the agreement to remain in effect, and agree as follows:

All references identifying the subscriber in said Agreements and their Omnibus Amendments, which refer to to "Claxton Hepburn Health System, Inc." or "Claxton Hepburn Health System" shall be deleted and changed to refer to "North Star Health Alliance, Inc." In all other respects, the Agreements and their Omnibus Amendments shall remain unchanged and in full force and effect.

AGREED TO AND ATTESTED:

CHART, RRG, by its Duly Authorized Representative

Name: _____

Title: _____General Counsel_____

Date: _____March 26, 2018_____

North Star Health Alliance, Inc., as successor-in-interest to
Claxton Hepburn Health System, Inc., by its Duly
Authorized Representative

Name: _____    Nathan Howell

Title: _____President and CEO_____

Date: _____March 21, 2018_____

1

# EXHIBIT "B"

214 King Street | Ogdensburg, New York 13669

315.713.5237

December 19, 2024

Judy Nicklas
Underwriting Director
CHART
2551 Washington Road
810 Summerfield Commons
Upper St. Clair, PA 15241

CC: Chad Cicconi, General Counsel

Judy,

This letter is to serve notice that North Star Health Alliance (NSHA) will have their current policies expire on January 1, 2025. CHART has been a valued partner in NSHA's evolution. As the NSHA moves forward and continues to grow, we are working toward consolidating functions and suppliers in an effort to save money and boost productivity.

We appreciate your support through the evaluation process. We will work directly with Chad Cicconi and others at CHART to make this transition as smooth as possible.

Richard Duvall
President and CEO
North Star Health Alliance

# EXHIBIT "C"

<u>DOCUMENT NO. 1</u>

## RULES & REGULATIONS

### OF

## COMMUNITY HOSPITAL ALTERNATIVE FOR RISK TRANSFER
## (A RECIPROCAL RISK RETENTION GROUP)

### AMENDED MAY 4, 2024

### Article I - Name, Location, Purposes, Non-Assessability

1. The name of the RECIPROCAL is Community Hospital Alternative For Risk Transfer (A Reciprocal Risk Retention Group) (the "RECIPROCAL").

2. The principal office of the RECIPROCAL shall be located in Vermont at a specific location designated by the Subscribers' Advisory Committee.

3. The purposes of the RECIPROCAL are to provide liability insurance, reinsurance, risk management services and other benefits to its Subscribers, as permitted for a "risk retention group" as defined in 15 U.S.C. § 3901(4) and 8 V.S.A. § 6001(9)(B), and in accordance with policies and guidelines adopted by the Subscribers' Advisory Committee.

4. The RECIPROCAL shall at all times operate as a non-assessable insurer, and the Subscribers shall have no contingent assessment liability. If the RECIPROCAL has its authority to issue non-assessable policies revoked or modified, based on impairment of its surplus or otherwise, then the RECIPROCAL shall immediately cease issuing policies of insurance or providing reinsurance until such authority has been restored.

### Article II - Subscribers

1. "Subscriber" means an entity insured by the RECIPROCAL in accordance with eligibility and underwriting criteria established from time to time by the Subscribers' Advisory Committee. Subscribership shall become effective upon execution of a Subscriber's Agreement and commitment by the Subscriber for the payment of its first year's premium in return for insurance coverage provided to the Subscriber by the RECIPROCAL. Subject to the terms of the Subscriber's Agreement, no Subscriber may resign from the RECIPROCAL except by canceling or otherwise terminating all insurance coverage obtained from the RECIPROCAL in accordance with the provisions of any policy, and subscribership shall automatically terminate at such time as insurance coverage of such Subscriber is

1

cancelled or otherwise terminated for any reason, and shall not continue during any extended discovery or reporting period following cancellation or termination.

2    Each Subscriber shall (a) pay all premiums in accordance with the terms of the Subscriber's policy or policies within the time specified in any notice or invoice therefor, (b) reimburse the RECIPROCAL for any amount paid by the RECIPROCAL with respect to any state tax (other than Vermont premium tax) on premiums attributable to the Subscriber's policy or policies, (c) reimburse the RECIPROCAL for any losses paid by the RECIPROCAL within the Subscriber's deductible, (d) pay to the RECIPROCAL any unreimbursed amounts advanced by the RECIPROCAL on behalf of a Subscriber for assessments under The Medical Care Availability and Reduction of Error Fund ("MCARE"), (e) pay to the RECIPROCAL any amounts required under a deposit agreement to secure the Subscriber's obligations to the RECIPROCAL, which amounts shall include, but shall not be limited to, the initial deposit amount, replenishment amounts and any incremental deposit resulting from termination of coverage, and (f) comply with these Rules & Regulations, the Subscriber's Agreement, the standards and formulas adopted by the Subscribers' Advisory Committee, the terms of any applicable policy of insurance and any policies and procedures adopted by the Subscribers' Advisory Committee.

Each Class A, Class B and Class C Subscriber shall, if requested by the RECIPROCAL, execute and deliver to the RECIPROCAL a deposit agreement in a form approved by the Subscribers' Advisory Committee. Each Class A, Class B and Class C Subscriber who has executed a deposit agreement shall comply with the terms and conditions of the deposit agreement as a condition of membership in the RECIPROCAL.

3.    Subscribers shall be divided into three classes, Class A, Class B and Class C, which shall have the relative rights and preferences as set forth in these Rules & Regulations and standards and formulas adopted by the Subscribers' Advisory Committee.

(a)    As a general rule, Class A Subscribers are institutions that have been offered Class A membership and have delivered the full amount of their paid in surplus contribution to the RECIPROCAL in an amount determined by the RECIPROCAL.

(b)    Class B Subscribers shall be comprised of either individuals or organizations which have been offered Class B membership and who have delivered the full amount of their paid in surplus contribution to the RECIPROCAL in an amount determined by the RECIPROCAL. Class B Subscribers are not entitled to and shall not participate in any allocation of the RECIPROCAL'S net income to Subscribers' Savings Accounts Class B Subscribers, jointly, are entitled to elect one (1) member of the Subscribers' Advisory Committee. The Subscribers' Advisory Committee

2

shall have sole and complete discretion to assign either individuals or entities to Class B.

(c)     Class C Subscribers shall be institutions That have been offered a Class A membership but have elected to deliver their required paid in surplus contribution in installments. Effective as of the date that the RECIPROCAL has received in cash the entire amount of a Class C Subscriber's required paid in surplus contribution (excluding any amounts secured by a letter of credit), such Class C Subscriber shall automatically be converted to and deemed a Class A Subscriber.

(d)     In addition, Class A, Class B and Class C Subscribers voting together shall elect one at large Member of the Subscribers' Advisory Committee, who is a resident of the State of Vermont.

4.      (a)     Each Subscriber shall be entitled to vote at all meetings of Subscribers. The number of votes to which a Subscriber shall be entitled are as follows:

(i)     One Hundred (100) votes for each Class A Subscriber.

(ii)    One (1) vote for each Class B Subscriber.

(iii)   One Hundred (100) votes for each Class C Subscriber.

Unless otherwise provided for in these Rules & Regulations or Vermont law, all Subscribers shall vote together as a single class on all matters submitted to the Subscribers for action. Class A and Class C Subscribers shall vote jointly as a single class on the election of Subscribers' Advisory Committee members, other than the Class B and At-Large members referenced in sections 3(b) and 3(d) herein.

(b)     Subscribers may vote either in person, through an authorized representative or by written proxy dated not more than six months before the meeting named therein, which proxy shall be filed with the Attorney or other person responsible for recording the proceedings of the meeting before being voted. Unless otherwise specifically limited by its terms, such proxy shall entitle the holder or holders thereof to vote at any adjournment of the meeting but the proxy shall terminate after the final adjournment of such meeting.

5.      Every Subscriber must maintain in force hospital professional or medical professional liability insurance issued by the Reciprocal, as appropriate, as a condition of membership in the Reciprocal. Any Subscriber who cancels, non-renews or otherwise terminates all hospital professional or medical professional liability insurance policies issued to such Subscriber by the Reciprocal shall not be entitled to purchase or maintain in force any other policies of insurance issued by the Reciprocal covering any risks of such Subscriber following the

3

effective date of such cancellation, non-renewal or termination. In addition, a Subscriber shall cease to be a Subscriber upon cancellation, termination or nonrenewal for any reason of all hospital professional or medical professional liability insurance policies issued by the RECIPROCAL held by the Subscriber notwithstanding election by the Subscriber to obtain extended discovery or reporting under the policy subsequent to its cancellation or termination ("Withdrawal"). A withdrawing Class A and Class C Subscriber must give written notice of withdrawal to the Reciprocal, by registered or certified mail, no later than 120 days before the end of the calendar year in which such withdrawal occurs. A withdrawing Class B Subscriber must give written notice of withdrawal in accordance with the terms of the policy of insurance issued by the RECIPROCAL to such Class B Subscriber. Any such Withdrawal shall be effective at the end of the policy year in which proper notice is given. Upon Withdrawal from the RECIPROCAL, any return of a Class A or Class C Subscriber's Paid-in Surplus Account, Paid-in Surplus Subaccount, Surplus Capital Account and Subscribers' Savings Account, as such terms are defined in Article XI shall be as provided in these Rules & Regulations, or in standards or formulas adopted by the Subscribers' Advisory Committee pursuant to authorization contained in these Rules & Regulations.

Withdrawal shall not discharge a Subscriber's obligation to (a) pay any unpaid portion of its premium previously contracted for, (b) reimburse the RECIPROCAL for any amount paid by the RECIPROCAL with respect to any state tax (other than Vermont premium tax) on premiums attributable to the Subscriber's policy or policies, (c) reimburse the RECIPROCAL for any losses paid on the Subscriber's behalf by the RECIPROCAL within the Subscriber's deductible, (d) reimburse the RECIPROCAL for any self-insured retention of the Subscriber, (e) pay to the RECIPROCAL any unreimbursed amounts advanced by the RECIPROCAL on behalf of a Subscriber for assessments under MCARE, (f) pay to the RECIPROCAL any amounts required under a deposit agreement, which amounts shall include, but not be limited to, the initial deposit amount, replenishment amounts and any incremental deposit resulting from termination of coverage, and (g) pay any interest or other amounts to which the RECIPROCAL is entitled under a policy or these Rules & Regulations.

If a Class A or Class C Subscriber cancels, terminates or non-renews its insurance with the RECIPROCAL at any time, such Subscriber shall pay to the RECIPROCAL an amount equal to twelve percent (12%) of such Subscriber's annual premium for the last policy year in which the Subscriber was insured by the RECIPROCAL. If a Subscriber provides 120 days or greater advance written notice of termination, cancellation or non-renewal of its insurance with the RECIPROCAL, the payment required under this paragraph shall equal ten percent (10%) of such Subscriber's annual premium for the last policy year in which the Subscriber was insured by the RECIPROCAL. A Subscriber shall pay any amounts owed to the RECIPROCAL pursuant to this paragraph no later than ninety (90) days after the effective date of such Subscriber's termination. The RECIPROCAL

4

shall have the right to deduct any unpaid balance of any amounts owed by a Subscriber to the RECIPROCAL pursuant to this paragraph from amounts credited to such Subscriber's Paid-in Surplus Account, Paid-in Surplus Subaccount, Surplus Capital Account and Subscriber's Savings Account.

In the event that Subscriber cancels or terminates insurance prior to the expiration of the then-current policy year, the RECIPROCAL shall also have the right to calculate any return premiums in accordance with the short-rate premium rules or schedules in effect at the time of cancellation or termination.

6. Upon noncompliance by any Subscriber with these Rules & Regulations, the Subscriber's Agreement, a deposit agreement, a policy of insurance issued by the Reciprocal or any policies and procedures adopted by the Subscribers' Advisory Committee, the RECIPROCAL shall have the power and authority to do any one or combination of the following:

(a) Expel the Subscriber from subscribership in the RECIPROCAL, thereby excluding such Subscriber from insurance coverage provided by the RECIPROCAL, after providing reasonable notice and the right to cure the noncompliance within a reasonable period and subject to such other procedural requirements as are set forth in the Rules & Regulations or the Subscriber's policy. Expulsion shall not discharge a Subscriber's obligation to pay any unpaid portion of any amounts owing with respect to the items described in Section 2 or 5 of this Article II.

(b) Offset, at any time, any amounts which the Subscriber owes to the RECIPROCAL against any amounts due from the RECIPROCAL to or payable on behalf of the Subscriber. The RECIPROCAL's right of offset shall include, but shall not be limited to, offset against a Subscriber's Paid-in Surplus Account, Paid-in Surplus Subaccount. Surplus Capital Account, Subscriber's Savings Account, any distributions which may be declared from time to time by the RECIPROCAL's Subscribers' Advisory Committee, and any amounts received by the Reciprocal under a deposit agreement based on (a) any unpaid portion of a Subscribers' premium previously contracted for, (b) any amount paid by the RECIPROCAL with respect to any state tax (other than Vermont premium tax) on premiums attributable to a Subscriber's policy or policies, (c) any losses paid on a Subscriber's behalf by the RECIPROCAL within the Subscriber's deductible, (d) any self-insured retention of the Subscriber, (e) any unreimbursed amounts advanced by the RECIPROCAL on behalf of a Subscriber for assessments under MCARE, (f) any outstanding amounts required under a deposit agreement, which amounts shall include, but not be limited to, the initial deposit amount, replenishment amounts and any incremental deposit resulting from termination of coverage, and (g) any interest to which the RECIPROCAL is entitled under a policy or these Rules & Regulations.

5

(c)    Accrue and charge interest at a reasonable rate on any amounts which the Subscriber owes to the RECIPROCAL.

(d)    Impose any reasonable penalties, but only to the extent that any financial penalty imposed approximates the actual monetary loss suffered by the RECIPROCAL as a result of the Subscriber's noncompliance.

7.    All applications for subscribership in the RECIPROCAL shall be reviewed by the Underwriting Subcommittee in accordance with the RECIPROCAL'S underwriting policy. The Underwriting Subcommittee shall make a recommendation to the Committee in connection with any application for Class A, Class B or Class C subscribership; provided that there shall be no obligation that the Committee approve individuals seeking to become Class B Subscribers. The Committee may accept such recommendation consistent with it meeting the standards set forth in Article V, paragraph 3 of the Rules & Regulations.

8.    Subscriberships are not transferable and may not be assigned, pledged or otherwise hypothecated other than a transfer of membership only to a parent organization, subject to approval by the SAC.

## Article III - Meetings of the Subscribers

1.    Meetings of the Subscribers, including the annual meeting, shall be held at such place within or without the State of Vermont and at such time as stated in the notice of said meeting.

2.    Meetings of the Subscribers may be called by the President of the Subscribers' Advisory Committee, the Attorney, a majority of the Subscribers' Advisory Committee members, or upon written application of Subscribers holding a majority of the total votes of all Subscribers. The Committee may fix a record date for any meeting of Subscribers which shall be not more than fifty (50) or less than five (5) days prior to the date of the meeting (the "Record Date"). If no such Record Date is fixed, the Record Date for the meeting shall be the day prior to the day on which notice of the meeting is sent to Subscribers.

3.    A written notice of each meeting of Subscribers, stating the place, day and hour thereof and the purpose or purposes for which the meeting is called, shall be given by the Attorney not less than five (5) nor more than fifty (50) days before the meeting to each Subscriber as of the Record Date in person, electronically, by facsimile or by mailing it, postage prepaid and addressed to such Subscriber at its address as it appears in the records of the RECIPROCAL. If notice is sent by electronic mail, such notice shall be effective when the Attorney receives an electronic mail delivery receipt or otherwise verifies that such notice was received by the Subscriber either by electronic mail response from the Subscriber or telephone call made to the Subscriber. Notice of the time, place or purpose of the

6

annual or any special meeting of the Subscribers may be waived in writing by any Subscriber before or after the meeting and shall be deemed waived by any Subscriber attending in person or by proxy, unless such attendance is for the sole purpose of objecting to the holding of the meeting.

4. Except as otherwise specifically required by law or by these Rules & Regulations, the presence, in person or by proxy, of Subscribers holding greater than 50% of the total voting power of the Subscribers shall constitute a quorum at any meeting of the Subscribers. When a quorum is present at any meeting, a majority of the votes cast shall, except where a larger vote is required by law or these Rules & Regulations, decide any question brought before such meeting. A majority of votes present at any meeting, though less than a quorum, may adjourn the meeting from time to time and such a meeting may be held as adjourned without further notice.

5. Any action permitted or required to be taken at a meeting of Subscribers may be taken without a meeting if the action is taken by at least a majority of the total voting power of the Subscribers, and each Subscriber is given at least one (1) day prior notice of the action proposed to be taken. Each action so taken must be evidenced by one or more written consents describing the action taken and signed by Subscriber(s) representing at least a majority of the total voting power of all of the Subscribers. Such consent shall be treated for all purposes as a vote at a meeting.

## Article IV - Subscribers' Advisory Committee

1. The "Subscribers' Advisory Committee" (or "Committee") shall consist of not less than seven (7) or more than twenty (20) persons, the exact number to be fixed from time to time by the Committee.

Committee Members shall thereafter be divided into three classes, each class to be comprised of approximately one-third (1/3) of the Committee Members. The terms of Committee Members in Class 1 shall expire at the first annual Subscribers' meeting after their election, the terms of the second class shall expire at the second annual Subscribers' meeting after their election, and the terms of the third class shall expire at the third annual Subscribers' meeting after their election. At each annual Subscribers' meeting held thereafter, Committee Members shall be elected for a term not to exceed three years to succeed those Committee Members whose terms expire. For purposes of representation, Class A and Class C Subscribers shall be divided into two groups based upon Net Patient Revenue ("NPR") with Group 1 being those institutions with NPR greater than the annual median NPR of all Class A and Class C Subscriber institutions, and Group 2 being those Class A and Class C institutions with NPR less than or equal to the annual median NPR of all Class A and Class C Subscriber institutions. In electing Committee members, if the Committee at any time consists of more than ten (10) members who are representatives of Class A and Class C Subscriber institutions, at least three (3) members shall be representatives of institutions from Group 1 and at least three (3)

7

members shall be representatives of institutions from Group 2. If at any time the Committee consists of less than ten (10) members who are representatives of Class A and Class C Subscriber institutions, then at least twenty-five (25) percent of the members of the Committee directly representing Class A and Class C institutions shall be representing each respective group based upon NPR. Further, not more than three (3) Committee members shall, at any time, be Committee members who are not representatives of Subscribers of the RECIPROCAL, regardless of whether or not a Committee member was a representative of a Subscriber at the time that he or she was elected as a Committee member; provided, however, that the Vermont resident Committee Member, the President *ex officio* and the Class B SAC Committee member shall be excluded for purposes of determining the number of Committee members who are not representatives of subscribers pursuant to this section. At least one Committee member shall be a resident of the State of Vermont. Not less than two-thirds (2/3rds) of the total number of Committee members shall be representatives of Subscribers of the RECIPROCAL.

2. Any Committee member may resign by delivering his written resignation to the Attorney or the Committee at the principal office of the RECIPROCAL. Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event, and acceptance thereof shall not be necessary to make it effective unless it so states. A Committee member shall automatically be deemed to have resigned as a Committee member effective at the time that such Committee member ceases to be a representative of a Class A or Class C Subscriber; provided, that the Committee may vote to reinstate such Committee member for a period not to exceed such Committee member's unexpired term of office.

3. A Committee member may be re-elected to serve up to three consecutive three-year terms of office as a Committee member. This limitation shall begin with the first Committee member election taking place after November, 2010, with each Committee member's first term beginning after that time being considered his or her first term for purposes of this limitation. A Committee member who has served three consecutive three-year terms may be nominated for election as a Committee member not earlier than at the next annual Subscribers' meeting following the expiration of such Committee member's last term as a Committee member. Notwithstanding anything set forth in this section, the Subscribers Advisory Committee shall have the discretion to waive, amend, or modify the term limits as they apply to any SAC member.

4. A Committee member may be suspended or removed, with cause, after reasonable notice and opportunity to be heard, by vote of the Subscribers or by a vote of a majority of the Committee members then in office.

5. Vacancies, which exist or occur on the Subscribers' Advisory Committee, may be filled by a majority of the Committee members then in office, even if less than a quorum. If a Committee member is so appointed to fill a vacancy caused by death, incapacity, retirement, resignation, or removal, the successor Committee member shall complete the term of his or her predecessor, until his or her successor is chosen and qualified or until he or she is disqualified or resigns. Any Committee member

8

appointed by the Committee to fill a vacancy may be nominated for election at the expiration of his or her term. If such Committee member is elected to a three year term by Subscribers, such term shall be considered the member's first term for purposes of the limitation set forth in section 3 of this Article IV.

6.    The Subscribers' Advisory Committee shall have general supervision and control over the activities of the Attorney and the property and affairs of the RECIPROCAL in accordance with 8 V.S.A. § 4847, as amended. The Committee members may establish policies and procedures for the accomplishment of the purposes of the RECIPROCAL, and shall determine the compensation and direct the activities of the Attorney.

7.    The officers of the Subscribers' Advisory Committee shall consist of a Chairperson, Vice Chairperson(s), President Secretary, Treasurer, and such other officers as the Committee shall deem advisable. All officers shall be elected to serve for a    three (3) year term by the Committee. The Committee may elect such officers as the Committee shall deem advisable at any time. Any vacant office may be filled for the unexpired term by the Committee or until their successors are elected and qualify. The officers shall have such duties as may from time to time be established by the Subscribers' Advisory Committee or by the President, subject to the following limitations:

(i)    The Chairperson shall preside at all Subscribers' Advisory Committee and Executive Committee meetings and shall be a member of the Executive Committee. The Chairperson shall also be responsible for supervision of the President and, in that regard, shall communicate with him concerning implementation of the policies established for the RECIPROCAL by the Subscribers' Advisory Committee.

(ii)    The Vice Chairperson(s) shall be members of the Executive Committee and shall carry out the duties of the Chairperson in his absence.

(iii)    The President shall be an *ex officio* voting member of both the Subscribers' Advisory Committee and the Executive Committee and have general authority over the ordinary course of the business of the RECIPROCAL. The President shall report to Chairperson.

(iv)    Any Vice-President, or Vice-Presidents, shall have such powers and duties as shall be assigned to them by the Subscribers Advisory Committee or the President.

(v)    The Secretary shall, in addition to any duties imposed upon that office pursuant to Vermont law or these Rules & Regulations, keep an attested copy of these Rules & Regulations with a reference on the margin of said Rules & Regulations to all amendments thereof, all of which documents and books shall be kept at the registered office of the Attorney or at the   office

9

of the Secretary. The Secretary shall also keep a record of the meetings of the Subscribers' Advisory Committee. The Secretary shall give or cause to be given such notice as may be required of all meetings of Subscribers and all meetings of the Subscribers' Advisory Committee. Any Assistant Secretary shall have such powers and duties as the Subscribers' Advisory Committee or the President may delegate to such office.

(vi)    The Treasurer shall, subject to the direction and under the supervision of the Subscribers' Advisory Committee, have: general charge of the financial concerns of the RECIPROCAL; care and custody of the funds and valuable papers of the RECIPROCAL, except the Treasurer's own bond, if any; authority to endorse for deposit or collection all notes, checks, drafts and other obligations for the payment of money payable to the RECIPROCAL or to its order, and to accept drafts on behalf of the RECIPROCAL; and shall keep, or cause to be kept, accurate books of account, which shall be the property of the RECIPROCAL. If required by the Subscribers' Advisory Committee, the Treasurer shall give bond for the faithful performance of the Treasurer's duties in such form, in such sum, and with such sureties as the Subscribers' Advisory Committee shall require. Any Assistant Treasurer shall have such powers and duties as the Subscribers' Advisory Committee or the President may delegate to such office.

### Article V - Meetings of the Subscribers' Advisory Committee

1.    Regular meetings of the Subscribers' Advisory Committee may be held at such places and at such times as the Committee members may determine. Notice of regular meetings of the Subscribers' Advisory Committee need not be given. At least one meeting of the Committee shall be held within the State of Vermont each year.

2.    Special meetings of the Subscribers' Advisory Committee may be held when called by the Chairperson, the Executive Committee or three or more Committee members. Notice of the time, date and place of all special meetings of the Subscribers' Advisory Committee shall be given to each Committee member by the Attorney. Notice shall be given to each Committee member in person, electronically, by facsimile or by telephone call made to his or her business or home address at least Twenty-Four (24) hours in advance of the meeting, or by written notice mailed to his business or home address at least seventy-two (72) hours in advance of the meeting. Notice need not be given to any Committee member if a written waiver of notice executed by him or her before or after the meeting is filed with the records of the meeting. Further, no notice of a special meeting need    be

10

given to any Committee member who attends the meeting without protesting prior thereto or at its commencement the lack of notice. A notice or waiver of notice of a special meeting of the Subscribers' Advisory Committee need not specify the purposes of the meeting.

3. Except as otherwise specifically required by law or these Rules & Regulations, a majority of the entire Subscribers' Advisory Committee shall constitute a quorum, except that in regard to any decision related to the admission of a new Class A, Class B or Class C Subscriber, a quorum shall be constituted by at least three Committee members and a decision concerning such admission may be made by a majority of the quorum. When there is a quorum in attendance at a meeting, a majority of those present shall determine all matters brought before the meeting. A majority of those present at any meeting, though less than a quorum, may adjourn the meeting from time to time and such meeting may be held as adjourned without further notice.

4. Any action required or permitted to be taken at any meeting of the Committee members may be taken without a meeting if all of the Committee members consent to the action in writing and the written consents are filed with the records of the meetings of the Committee members. Such consents shall be treated for all purposes as a vote at a meeting.

5. Committee members may participate in meetings by conference telephone or other communications equipment by means of which all persons participating can hear all other persons participating. Participation in such manner shall constitute presence in person at such meeting.

6. Committee members shall be entitled to receive for their services such amounts, if any, as the Committee members may from time to time determine. Said amounts may include expenses of attendance at meetings. Committee members shall not be precluded from serving the RECIPROCAL in any other capacity and from receiving compensation for any such services.

### Article VI - Subcommittees

1. The Subscribers' Advisory Committee, or the Chairperson, with the approval of the Subscribers' Advisory Committee, may appoint one or more subcommittees of Subscribers or Committee members. Such subcommittees may be continuing or temporary.

2. The Executive Committee shall consist of the Chairperson, who shall serve as the Chairperson of the committee, the Vice Chairperson(s), Treasurer and the President *ex officio*. The Subscribers Advisory Committee may also elect the immediate past Chairperson of the Committee to serve on the Executive Committee for a period of three years at its discretion. The affairs and management of the RECIPROCAL shall be supervised by the Executive Committee, which shall have the power to transact all regular business of the RECIPROCAL during the period between meetings of the

11

Subscribers' Advisory Committee, subject to any prior limitations imposed by the Subscribers' Advisory Committee, these Rules & Regulations, or applicable law. The Executive Committee shall have the power without the approval of the Subscribers' Advisory Committee to authorize any expenditure or commit the RECIPROCAL consistent with policies established by the Subscribers' Advisory Committee. The Executive Committee shall review and evaluate no less than annually all relevant data regarding appropriate compensation levels for the President and other officers and perform such other functions regarding employee compensation as it shall determine appropriate. The Executive Committee shall also perform such other tasks as may be assigned by the Subscribers' Advisory Committee from time to time.

3. Except as otherwise provided by law or in these Rules & Regulations, the Committee members may delegate to any such subcommittee or subcommittees any or all of their powers. Any subcommittee to which the powers of the Committee are delegated shall consist solely of Committee members. Any subcommittee established to advise the Committee members may consist of non-Committee members. Any subcommittee appointed by the Subscribers' Advisory Committee to consider requests for donations or charitable contributions shall be established as an advisory subcommittee and charged with making independent and objective recommendations to the Subscribers' Advisory Committee regarding donations or charitable contributions by the Reciprocal in accordance with applicable policies and guidelines adopted by the Subscribers' Advisory Committee.

4. The Subscribers' Advisory Committee shall have the authority to fix the duties and responsibilities of all subcommittees. All subcommittees shall act under the supervision of the Subscribers' Advisory Committee except as otherwise provided in these Rules & Regulations.

5. Members of all subcommittees may be removed by the Subscribers' Advisory Committee at any time with or without cause, and the Subscribers' Advisory Committee may terminate any of the subcommittees at any time.

6. Any vacancy in a subcommittee caused by death, resignation, removal or disqualification of a subcommittee member or Subscriber shall be filled by appointment by the Chairperson of the subcommittee. The Chairperson of a subcommittee shall have the authority to appoint additional members of a subcommittee. Such successors or additional members shall serve on the respective subcommittees to which they are appointed until the next meeting of the Committee members.

7. Each subcommittee may make such rules and regulations as the Subscribers' Advisory Committee may approve and as the subcommittee may deem proper for its own governance and for the transaction of its business (including but not limited to, rules with respect to call or notice or waiver of call or notice, and the number necessary to constitute a quorum). Except as otherwise provided by     the

12

subcommittee or such rules and regulations, subcommittee business shall be conducted in the same manner as provided by these Rules & Regulations for the conduct of business by the Subscribers' Advisory Committee.

## Article VII - Attorney-In-Fact

1. The Attorney-In-Fact of the RECIPROCAL (the "Attorney") shall be appointed by and serve at the pleasure of and under the supervision of the Subscribers' Advisory Committee, consistent with the terms of the Power of Attorney and Management Services Agreement ("Power of Attorney"), policy adopted by the Subscribers' Advisory Committee or other agreement between the RECIPROCAL and the Attorney.

2. The Attorney shall, consistent with policy adopted by the Subscribers' Advisory Committee, serve as the general manager of the RECIPROCAL, and shall submit an annual report to the Subscribers' Advisory Committee setting forth work performed on behalf of the RECIPROCAL, its financial operations and status, and a budget for the ensuing year.

3. Subject to policy adopted by and the supervision of the Subscribers' Advisory Committee, the Attorney may delegate to, hire, contract with, and otherwise employ agents and representatives to assist it in carrying out its responsibilities under these Rules & Regulations, the Power of Attorney and any other agreement with the RECIPROCAL.

4. The Attorney shall arrange for the currency and safekeeping of all documents and records of the RECIPROCAL, including financial statements, policies, these Rules & Regulations, the Power of Attorney, all records of the actions of the Subscribers and the Subscribers' Advisory Committee, including standards and formulas adopted by the Committee, all as amended. The Attorney shall maintain on behalf of the RECIPROCAL a list of all of the Subscribers of each class and their addresses. Said list shall be open to inspection by any Subscriber at any reasonable time.

## Article VIII - Execution of Papers

Consistent with policy adopted by the Subscribers' Advisory Committee, the Attorney shall, on behalf of the RECIPROCAL, sign all policies, deeds, leases, transfers, contracts,

13

bonds, notes, checks, drafts and other obligations made, accepted or endorsed by the
RECIPROCAL.

### Article IX - Personal Liability

1. The Subscribers, Committee members and Attorney shall not be personally liable for any debt, liability or obligation of the RECIPROCAL. All persons, corporations or other entities extending credit to, contracting with or having any claim against the RECIPROCAL may look only to the funds and property of the RECIPROCAL for the payment of any such contract or claim, or for the payment of any debts, damages, judgment or decree or of any money that may become due and payable to them from the RECIPROCAL. The Attorney shall have no liability to make up any deficiency of the RECIPROCAL, whether as contemplated by 8 V.S.A. '4856, as amended, or otherwise.

2. A member of the Subscribers' Advisory Committee shall have no liability to the RECIPROCAL, the Attorney or the Subscribers for money damages for any action taken, or any failure to take any action, solely as a member of the Committee, based on a failure to discharge his or her duties in good faith, with due care, and in a manner the member reasonably believes to be in the best interests of the RECIPROCAL, except for (i) the amount of a financial benefit received by the member to which he or she is not entitled, (ii) an intentional or reckless infliction of harm on the RECIPROCAL or its Subscribers, (iii) unlawful distributions of the RECIPROCAL's assets, or (iv) an intentional or reckless criminal act.

### Article X – Indemnification

1. The RECIPROCAL shall indemnify any person who is or was a Subscribers' Advisory Committee member, any other member of a committee of the RECIPROCAL, the Attorney, or any officer, employee or agent of the RECIPROCAL or the Attorney, or any other person who, at the request of the RECIPROCAL served as an officer or director of another reciprocal, corporation, partnership, joint venture, trust or other enterprise ( all of such persons herein referred to as "Eligible Persons"), against any liability incurred by any of them in their capacity as such, to the full extent permitted by the laws of Vermont.

2. The RECIPROCAL shall indemnify any Eligible Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including any action by or in the right of the RECIPROCAL) by reason of the fact and in his or her capacity as an Eligible Person against expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with such action, suit or proceeding, except that no such indemnification shall be made in respect of any

14

claim, issue or matter as to which such person shall have been adjudged in any such action, suit or proceeding to be liable to the RECIPROCAL, the Attorney or the Subscribers based on one or more exceptions set forth in Section 2 of Article IX. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person was liable for reckless or willful misconduct.

3.    Any indemnification under Section 2 of this Article X (unless ordered by a court) shall be made by the RECIPROCAL only as authorized in the specific case upon a determination that indemnification of the Eligible Person is proper in the circumstances because he or she has met the applicable standard of conduct set forth in Section 2 of this Article X. Such determination shall be made (i) by the Subscribers' Advisory Committee by a majority vote of a quorum consisting of Committee members who were not parties to such action, suit or proceeding, or (ii) if such a quorum is not obtainable, or, even if obtainable, a quorum of disinterested Committee members so directs, by independent legal counsel in a written opinion, or (iii) by the Subscribers.

4.    The Reciprocal shall pay expenses incurred by an Eligible Person in defending any civil or criminal action, suit or proceeding in advance of the final disposition of such action or proceeding, upon receipt of a request by or on behalf of such Eligible Person and as authorized by the Subscribers' Advisory Committee in the specific case. Said Eligible Person must agree in writing to repay such amount(s) if it shall ultimately be determined that he is not entitled to be indemnified by the RECIPROCAL as authorized in these Rules and Regulations.

5.    The indemnification provided by this Article X shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any law, agreement, vote of Subscribers or disinterested Committee members or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a Committee member or officer and shall inure to the benefit of the heirs, executors and administrators of such a person.

6.    The RECIPROCAL shall purchase and maintain insurance on behalf of all Eligible Persons, against any liability asserted against him or her or incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the RECIPROCAL would have the power to indemnify against such liability under the provisions of this Article X.

## Article XI - Surplus Accounts

1.    The surplus accounts maintained by the RECIPROCAL shall include (a) an unassigned surplus account ("Unassigned Surplus"), (b) a paid-in surplus account

15

("Paid-In Surplus Account") for each Subscriber that contributes surplus to the RECIPROCAL, (c) a paid in surplus subaccount ("Paid-In Surplus Subaccount") for each Subscriber that elects to contribute dividends paid to its Paid-In Surplus Subaccount, (d) a surplus capital account ("Surplus Capital Account") for each Subscriber that elects to convert amounts allocated to its Subscriber's Savings Account to its Surplus Capital Account, and (d) a Subscriber's Saving Account ("SSA") for each Subscriber.

2.  Allocations to Unassigned Surplus and SSAs shall be made in accordance with standards and formulas adopted by the Subscribers' Advisory Committee, which standards and formulas may be amended from time to time; provided that the standards and formulas shall provide for priority allocations to the SSAs of Class A Subscribers, and such priority allocations shall not be changed without the approval of the Class A Subscribers. The standards and formulas may be based on premium paid, losses incurred, duration of coverage, paid-in surplus, and such other factors deemed relevant by the Committee, and shall be furnished to the Attorney to be made available for review by any Subscriber. In no event shall allocations to the foregoing accounts exceed current statutory earnings or exceed the allocations allowable under Section 832(f) of the Internal Revenue Code.

    Subsequent to completion of the Reciprocal's annual audited financial statements, if it is subsequently determined for any reason, including but not limited to, actuarial, audit or regulatory review, that an error exists or an adjustment should otherwise be made in the Reciprocal's financial statements, the Subscribers' Advisory Committee may make any appropriate adjustments to any allocations to Subscriber' Savings Accounts to correct either an underallocation or overallocation to Subscriber's Savings Accounts in the prior fiscal year. Such adjustments shall be made, to the extent possible, consistently with the applicable Internal Revenue Code statutes and regulations promulgated thereunder.

3.  The standards and formulas to be adopted by the Subscribers' Advisory Committee relating to allocations to SSAs shall be consistent with the following:

    (a)  Allocations to SSAs shall be made no later than March 15 following the calendar year to which they apply. The Subscribers' Advisory Committee shall designate whether any such allocations made between January 1 and March 15 relate to the year in which the allocations are actually credited or to the prior calendar year. In the absence of such designation, any allocations made from January 1 to March 15 shall be presumed to relate to the prior calendar year.

    (b)  On or before March 15 of the year subsequent to the year to which the credits to SSAs relate, the RECIPROCAL shall mail to each Subscriber written notification of: (i) the amount (if any) credited to the Subscriber's SSA for the year, (ii) the date on which such amount was credited, and (iii) the date on which the Subscriber's rights to such amount first would become fixed if such Subscriber had terminated his contract at the close of the

16

RECIPROCAL'S taxable year. Upon written withdrawal or expulsion of a Subscriber from the Reciprocal, any amounts in such Subscriber's SSA shall be paid promptly in accordance with applicable IRS regulations; provided, however, that such payment may be deferred for a period not to exceed thirty-six months following the effective date of a Subscriber's termination so that the Committee shall have the opportunity to determine the Reciprocal's liability for coverages previously provided by the Reciprocal during the period of time in which the withdrawing Subscriber participated in the program. The Committee may direct that such liabilities be established by an independent actuarial certification. If a confidence level within the actuary's range of recommendations is not achieved, the SSAs and/or SCAs of all Subscribers may at the Committee's discretion be adjusted pro rata based upon the ratio that each Subscriber's Surplus bears to Total Subscriber Surplus to accomplish that level of funding and the remaining portion of the SSA shall then be promptly paid to the departing Subscriber. No interest will be paid on amounts due to a Subscriber pursuant to this paragraph. Further, the withdrawing Subscriber shall have no liability with respect to events and claims arising after cancellation of its insurance coverages.

(c) No interest will be paid on any amounts due to any Subscriber under these Rules and Regulations or the adopted Standards and Formulas.

### Article XII - Distributions

1. The Subscribers' Advisory Committee shall have the authority, in its sole discretion, to declare and pay dividends and make other distributions to Subscribers; provided however, that such dividends or distributions shall be made in accordance with any standards and formulas adopted by the Committee with respect to the relative priorities and preferences of the Class A, Class B and Class C Subscribers, and shall further be subject to any required regulatory approval. The Reciprocal may on occasion make donations or charitable contributions that have been approved by the Subscribers' Advisory Committee in accordance with policies and guidelines adopted by the Subscribers' Advisory Committee. All such donations and charitable contributions shall be reasonable in amount. Any donation or charitable contribution made in accordance with this paragraph shall not be an unlawful distribution of the Reciprocal's assets under Section 2 of Article IX of these Rules & Regulations.

2. Upon adoption of a plan of liquidation and dissolution by the RECIPROCAL in accordance with applicable law, the Subscribers' Advisory Committee shall

17

terminate and wind up the business and affairs of the RECIPROCAL, in which event the assets of the RECIPROCAL, after the payment of or provision for all liabilities, obligations, and expenses of the RECIPROCAL, that are available for distribution to the Subscribers shall be allocated among the Subscribers and distributed to them in accordance with a plan determined by the Subscribers' Advisory Committee and approved by the Vermont Insurance Commissioner (the "Commissioner"); provided that any such plan shall give priority to the Paid-in Surplus Accounts, Paid-in Surplus Subaccounts, Surplus Capital Accounts and the SSAs of Class A Subscribers.

## Article XIII - Amendments

1.    Subject to the approval of the Commissioner, these Rules & Regulations may be amended or repealed and new Rules & Regulations may be adopted by vote of the Subscribers' Advisory Committee at any regular or special meeting; provided that approval of the Subscribers is required for any amendment that would change the voting rights of Subscribers or affect any priority allocations referred to in Article XI.

2.    Notwithstanding the above, no amendment shall authorize or permit the RECIPROCAL to be operated other than as a non-assessable insurer.

## Article XIV - Miscellaneous

1.    Reliance on Certificates. A Certificate by the Attorney or any designee as to any action taken by the Subscribers or the Subscribers' Advisory Committee, shall be, as to all persons who rely thereon in good faith, conclusive evidence of such action.

2.    Waiver of Claims Against Subscribers; Rights of Third Parties. Each Subscriber waives any claim it may have against any other Subscriber based on the insolvency of the RECIPROCAL; provided, however, any such waiver shall not include the waiver of any claim which the Subscribers may have with respect to any Subscriber's obligations to the RECIPROCAL including, but not limited to, any obligations described in Article II, Sections 2 and 5 of these Rules & Regulations. No person except the RECIPROCAL or the Subscribers shall be deemed to have any right conferred upon it under any provision of these Rules & Regulations. Nor shall any term of these Rules & Regulations be enforceable against the RECIPROCAL or any Subscriber except by the RECIPROCAL, its assignee, or one or more Subscribers.

3.    Accounting; Audits; Actuarial Review. The Attorney shall maintain financial records of the RECIPROCAL in good order in accordance with the requirements of the insurance laws and regulations of Vermont, and cause such financial records to be audited at least once a year by its certified public accountants.    The loss

18

reserves established by the RECIPROCAL shall be certified by an actuary or loss reserve specialist at least annually. Each Subscriber shall be entitled to access to the financial records of the RECIPROCAL on such terms and conditions as may be reasonably specified by the Attorney.

4    Arbitration. Any and all disagreements arising out of, relating to, or in any way connected with these Rules and Regulations or the operation of the Reciprocal in general, a Subscriber's rights with respect to any business dealing relating in whole or in part to the Reciprocal or the Attorney-in-fact, including, but not limited to, any policy of insurance issued or procured for a Subscriber by the Reciprocal or claims handled thereunder, including but not limited to all disputes regarding the validity, formation, applicability, interpretation, breach or enforcement of the policy and its coverages as well as all disputes regarding the handling of claims, including allegations of bad faith and extra-contractual damages, shall be submitted to binding arbitration. In addition, disagreements arising out of the Subscriber Agreement, disputes over decisions of the Subscribers' Advisory Committee, disputes regarding allocations or distributions, or any agreements made incident to or in connection with the Subscribers Agreement, including the Power of Attorney and Management Services Agreement, these Rules and Regulations, the Standards and Formulas for Surplus Allocations and Distributions, the Deposit Agreement (if any) and the MCARE Reimbursement Agreement (if any) will also be submitted to binding arbitration.

Any arbitration hereunder shall take place in Pittsburgh, Pennsylvania, and shall be filed with and administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, before three arbitrators. A judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

These rules and the rights of the parties hereunder shall be governed by and construed in accordance with the laws of the State of Vermont, exclusive of conflict or choice of law rules.

Notwithstanding the provision in the preceding paragraph with respect to applicable substantive law, any arbitration conducted pursuant to this section shall be governed by the Federal Arbitration Act. 9 U.S.C. § 1-16, *et seq.*

Pursuant to these Rules and Regulations, arbitration is the exclusive means of dispute resolution and each party thereto shall bear its own attorneys' fees and costs with respect to proceeding in arbitration. In the event the Reciprocal or Attorney-in-fact must defend itself in any action before a court of law, whether such action is initiated by a Subscriber or other third party claiming rights under the Subscriber's policy, Subscriber must indemnify and hold harmless the Reciprocal or Attorney-in-fact from and against any and all attorneys' fees and costs ("Indemnity Costs") resulting from such court proceedings.

20

# EXHIBIT "D"

**COMMUNITY HOSPITAL ALTERNATIVE FOR RISK TRANSFER
(A RECIPROCAL RISK RETENTION GROUP)**

**AMENDED September 7, 2017**

Standards and Formulas for Surplus Allocations and Distributions

These Standards and Formulas ("Standards") for surplus allocations and distributions of Community Hospital Alternative For Risk Transfer (A Reciprocal Risk Retention Group) (the "Reciprocal"), have been adopted by the Reciprocal's Subscribers' Advisory Committee pursuant to Articles XI and XII of the Rules & Regulations of the Reciprocal. Specifically, these Standards provide for the following types of allocations and distributions:

1) Allocation of the Reciprocal's profits and losses to its Class A and Class C Subscribers;

2) Payment of distributions to Class A and C Subscribers;

3) Return of a Class A or Class C Subscriber's paid in surplus, paid in surplus subaccounts, surplus capital accounts and amounts allocated to subscribers savings accounts upon withdrawal of that Subscriber; and

4) Distributions to Class A and Class C Subscribers upon liquidation of the Reciprocal.

Under the Reciprocal's Rules & Regulations, these Standards are subject to amendment by the Subscribers' Advisory Committee. In the event of any inconsistency between these Standards and the Rules & Regulations, the Rules & Regulations shall control. Allocations and distributions under these Standards are, in all cases, subject to applicable regulatory considerations and may, in some cases, require prior approval of the Commissioner.

1. <u>Definitions</u>.

**Commissioner** means the Commissioner of the Vermont Department of Financial Regulation.

**Paid-in Surplus Subaccount ("PSS")** is the account established for each Class A and Class C Subscriber that elects to contribute to the Reciprocal any portion of a cash distribution paid to the Class A or Class C Subscriber

by the Reciprocal out of PSAs, SSAs or SCAs. A PSS may be adjusted to account for the contribution of any amounts to the PSS, distribution of any amounts from the PSS to the Subscriber and adjustments authorized by the SAC for purposes of any loss or loss reserve obligations of the Reciprocal.

**Paid-in Surplus Account ("PSA")** is the account established for each Class A and Class C Subscriber that contributes paid-in surplus to the Reciprocal. A PSA may be adjusted for subsequent contributions of surplus or repayment of surplus. A PSA may be credited with paid in surplus where a Subscriber has secured its obligation to contribute surplus by providing a letter of credit acceptable to the SAC.

**SAC** means the Subscribers' Advisory Committee of the Reciprocal.

**Subscriber Surplus** for a particular Subscriber means the total amount in the PSA, PSS, SCA and the SSA of such Subscriber.

**Subscribers Savings Account ("SSA")** is the account established for each Class A and Class C Subscriber to which amounts may be allocated from time to time in accordance with the Rules & Regulations and these Standards.

**Surplus Capital Account ("SCA")** is the account established for each Class A and Class C Subscriber that elects to convert any portion of the balance of its SSA to its SCA. A SCA may be adjusted to account for the conversion of any portion of the balance of a Subscriber's SSA to its SCA, any adjustments authorized by the SAC for purposes of any loss or loss reserve obligations of the Reciprocal or the distribution of any amounts from a Subscriber's SCA.

**Total Subscriber Surplus** means the total amount of all PSAs, PSSs, SCAs and SSAs of all current Reciprocal Subscribers.

**Unassigned Surplus** consists of Reciprocal surplus that is not allocated to or accounted for in any PSA, PSS, SCA or SSA.

2.      Annual Allocation of Reciprocal's Profits and Losses.  Net income of the Reciprocal (determined using GAAP) for each calendar year shall be allocated by the SAC as follows. Allocations for a calendar year must be made no later than March 15 of the following calendar year, and unless otherwise designated by the SAC, any allocations made between January 1 and March 15 shall be presumed to relate to the prior calendar year. In no event shall such allocations exceed current statutory earnings or exceed the allocations allowable under Section 832(f) of the Internal Revenue Code, as interpreted by IRS regulations and rulings. If the SAC

determines that the severity of any losses incurred by the Reciprocal requires an assessment against SCAs and/or SSAs, the SAC may authorize the Attorney-in-Fact to debit from each Subscriber's SCA and/or SSA an amount equal to the pro rata share of losses based upon the ratio that each Subscriber's Surplus bears to Total Subscriber Surplus as of December 31 of the most recent calendar year preceding the date on which the debit hereunder is authorized by the SAC.

The percentages specified in (a), (b) and (c) below shall be those percentages that result in the allocation of one half of the net income according to (a), (b), and (c) combined; the remaining half shall be allocated according to (d) below.

(a)    The SSA of each Class A Subscriber that has contributed surplus to the Reciprocal shall be allocated, on a first priority basis, an amount equal to a specified percentage of the aggregate balance in its PSA and PSS as of December 31 of the prior year. The right to receive this first priority allocation is cumulative in the event that such allocation is not made for any reason.

(b)    In the event that there is unallocated net income after all allocations have been made under paragraph 2(a) above, then the SSA of each Class A Subscriber that has contributed surplus to the Reciprocal shall be allocated an amount equal to a specified percentage of the balance in its SCA as of December 31 of the prior year.

(c)    In the event that there is unallocated net income after all allocations have been made under paragraphs 2(a) and 2(b) above, then the SSA of each Class C Subscriber that has contributed surplus to the Reciprocal shall be allocated an amount equal to a specified percentage of the aggregate balance in its PSA, PSS and SCA as of December 31 of the prior year. The specified percentage shall not exceed 50% of the specified percentage applicable to Sections 2(a) and 2(b) above.

(d)    Any allocation available after payments provided for in paragraphs 2(a), 2(b) and 2(c) above, shall be prorated by premium contribution to the SSA of those Class A and Class C Subscribers which have had a claim-loss ratio of 90% or less for the preceding three (3) year period. If a Subscriber has not subscribed for at least three (3) years, it nonetheless shall be entitled to an allocation under this provision if its claim-loss ratio from the time of initial policy inception to the date of allocation is 90% or less.

Notwithstanding the foregoing provisions, if a Subscriber has had less than six (6) months of loss experience as a Subscriber of the Reciprocal, such Subscriber shall not be entitled to receive an allocation under this provision.

For the purpose of any allocation under this paragraph, a Subscriber's claim-loss ratio shall be calculated as the sum of the Subscriber's loss payment which includes indemnity payments, loss adjustment expenses and outstanding case reserves. Claims-loss ratio does not include incurred but not reported claims nor underwriting expenses.

(e) No allocation will be made to a withdrawing Subscriber's SSA on any allocation date following the effective date of cancellation or nonrenewal of all insurance policies issued by the Reciprocal to such Subscriber. Any Subscriber who withdraws, non-renews professional liability insurance, or cancels professional liability insurance issued to the Subscriber by the Reciprocal is thereafter ineligible, from the date of notice of said withdrawal, nonrenewal, or cancellation, or the effective date of said withdrawal, nonrenewal or cancellation (whichever is earlier) for any allocation of net income by the Reciprocal to SSAs thereafter, regardless of the calendar or fiscal year to which such allocation relates.

On or before March 15th of the year following the calendar year to which any allocations to SSAs relate, the Reciprocal shall send to each Subscriber (i) the amount credited to such Subscriber's SSA for that year, if any; (ii) the date on which such amounts were credited; and (iii) the date on which the Subscriber's rights to such amount first would become fixed if such Subscriber had terminated his contract at the close of the Reciprocal's taxable year.

3. Cash Distributions to Subscribers. The SAC may, in its sole discretion, declare and pay cash distributions out of PSAs, PSSs, SCAs and SSAs. All distributions are subject to prior approval by the Commissioner, and further subject to any policy regarding minimum capitalization adopted from time to time by the SAC or as otherwise required under Vermont law. A Subscriber may elect to contribute to the Reciprocal any portion of a cash distribution paid; provided, that, any such contribution must be made immediately following receipt of a cash distribution by a Subscriber.

4. Return of SSAs Upon Withdrawal or Expulsion of a Subscriber.
Upon written withdrawal or expulsion of a Subscriber from the Reciprocal, any amounts in such Subscriber's SSA shall be paid promptly in accordance with applicable IRS regulations; provided, however, that such payment may be deferred

for a period not to exceed thirty-six months following the effective date of a Subscriber's termination so that the Committee shall have the opportunity to determine the Reciprocal's liability for coverages previously provided by the Reciprocal during the period of time in which the withdrawing Subscriber participated in the program. The Committee may direct that such liabilities be established by an independent actuarial certification. If a confidence level within the actuary's range of recommendations is not achieved, the SSAs and/or SCAs of all Subscribers may at the Committee's discretion be adjusted pro rata based upon the ratio that each Subscriber's Surplus bears to Total Subscriber Surplus to accomplish that level of funding and the remaining portion of the SSA shall then be promptly paid to the departing Subscriber. No interest will be paid on amounts due to a Subscriber pursuant to this paragraph. Further, the withdrawing Subscriber shall have no liability with respect to events and claims arising after cancellation of its insurance coverages.

5.    Return of PSAs upon withdrawal of a Subscriber.

Upon the withdrawal of a Subscriber, such Subscriber's PSA, valued at the lesser of the stated value at the time of cancellation or termination or the actual amount of the paid in surplus contribution shall be paid to the Subscriber in a lump sum on the fifth anniversary of the Subscriber's effective date of termination, subject to approval by BISHCA. No interest will be paid on amounts due to a Subscriber pursuant to this paragraph. For purposes of this Section 5(a), any PSA that has been credited for surplus contributions secured by a letter of credit shall be decreased by the face value of such letter of credit. Subject to the foregoing limitations, the Reciprocal shall take reasonable actions to seek BISHCA's approval to terminate a letter of credit provided by a Subscriber following the Subscriber's effective date of termination.

6.    Return of SCAs upon withdrawal of a Subscriber. Upon withdrawal or expulsion of a Subscriber from the Reciprocal, the balance of any amounts accounted for in such Subscriber's SCA at the time of payment shall be paid to the Subscriber in a lump sum on the fifth anniversary of the Subscriber's effective date of termination, subject to approval by BISHCA. No interest will accrue or be payable on the balance of any amounts accounted for in a Subscriber's SCA pursuant to this paragraph.

7.    Distributions from PSS During Term of Subscribership. A Subscriber may request a distribution from its PSS by giving written notice to the Reciprocal not less than 30 days prior to April 1 of any calendar year. A request for a distribution from a PSS under this paragraph must be submitted to the Reciprocal in writing, addressed to the President of the Reciprocal and indicate the amount of the requested

distribution which may be in any amount not to exceed the balance of the Subscriber's PSS as of the date of the request. Any request for a distribution from a PSS pursuant to this paragraph shall be subject to the prior approval of the SAC and the prior approval of BISHCA. All approved distributions from PSSs shall, except in the event of the withdrawal or expulsion of a Subscriber, be paid once each calendar year on April 1. No interest will accrue or be payable on the balance of any amounts accounted for in a Subscriber's PSS pursuant to this paragraph.

8.    Return of PSS upon withdrawal of a Subscriber. Upon withdrawal or expulsion of a Subscriber from the Reciprocal, the balance of any amounts accounted for in such Subscriber's PSS at the time of payment shall immediately be paid to the Subscriber in a lump sum, subject to approval by the SAC and BISHCA.

9.    Distributions to Subscribers upon Liquidation of the Reciprocal. Upon liquidation of the Reciprocal, any assets remaining after discharge and satisfaction of non-insurance liabilities and provision for policy obligations, shall be distributed to the Subscribers based on the ratio that each Subscriber's Surplus (determined as of the date of distribution as if the date of distribution were the end of the fiscal year) bears to the Total Subscriber Surplus at such date, similarly determined.

10.    Conversion of amounts allocated to SSAs to SCAs. Each Class A and Class C Subscriber of record may request in writing that the Reciprocal convert all or a portion of the then current balance of its SSA to its SCA.
The SAC may annually establish a date or dates on which each Subscriber may submit such a request.

11.    Bankruptcy Timing Allowance: Notwithstanding anything in the foregoing, in the event of a Reciprocal member hospital filing a bankruptcy action in the United States District Court under Chapter 7 (liquidation), the SAC may adjust the timing of the payout of any subscriber account of said bankrupt member (Including the SSA, SCA, PSA or PSS) if it finds such adjustment to be reasonably necessary and financially beneficial to the existing members, but only in the context of negotiating the resolution of any claims by the Reciprocal against the member's bankruptcy estate or any claims by a Federal Bankruptcy Trustee against the Reciprocal on behalf of the bankrupt member.

12.    Arbitration. Any and all disagreements arising out of, relating to, or in any way connected with these Standards and Formulas shall be submitted to binding arbitration.

Any arbitration hereunder shall take place in Pittsburgh, Pennsylvania, and shall be filed with and administered by the American Arbitration Association in accordance with its

Commercial Arbitration Rules, before three arbitrators. A judgment on the award
rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

These rules and the rights of the parties hereunder shall be governed by and construed in
accordance with the laws of the State of Vermont, exclusive of conflict or choice of law
rules.

Notwithstanding the provision in the preceding paragraph with respect to applicable
substantive law, any arbitration conducted pursuant to this section shall be governed by
the Federal Arbitration Act, 9 U.S.C. § 1-16, *et seq.*

Pursuant to these Standards and Formulas, arbitration is the exclusive means of dispute
resolution and each party thereto shall bear its own attorneys' fees and costs with respect
to proceeding in arbitration. In the event the Reciprocal or Attorney-in-fact must defend
itself in any action before a court of law, whether such action is initiated by a Subscriber
or other third party claiming rights under the Subscriber's policy, Subscriber must
indemnify and hold harmless the Reciprocal or Attorney-in-fact from and against any and
all attorneys' fees and costs ("Indemnity Costs") resulting from such court proceedings.

# EXHIBIT "E"

Community Hospital Alternative for Risk Transfer
(A Reciprocal Risk Retention Group)
*Statement*

| Account Number: | | | Date: | 1/31/2026 |
|---|---|---|---|---|
| | | | | |
| Claxton-Hepburn Medical Center | | | | |
| 214 King Street | | | | |
| Ogdensburg, NY 13669 | | | | |

| Date | Invoice Number | Description | Amount | Balance Due |
|---|---|---|---|---|
| 1/1/2025 | | Balance Forward | 262,504.93 | 262,504.93 |
| 1/7/2025 | | Payment Received-Check #100555 | (259,477.93) | 3,027.00 |
| 1/7/2025 | 12116 | Withdrawal Invoice-Due 3/31/25 | 131,657.52 | 134,684.52 |
| 1/7/2025 | 12116 | Deductible Deposit-Due 2/1/25 | 50,000.00 | 184,684.52 |
| 2/28/2025 | | Late Fee | 530.27 | 185,214.79 |
| 2/28/2025 | 4Q24DED | 4Q24 Deductible Loss | 9,910.13 | 195,124.92 |
| 3/31/2025 | | Late Fee | 1,852.15 | 196,977.07 |
| 4/30/2025 | 1Q25DED | 1Q25 Deductible Loss | 3,015.13 | 199,992.20 |
| 4/30/2025 | | Late Fee | 1,870.67 | 201,862.87 |
| 5/31/2025 | | Late Fee | 1,889.38 | 203,752.24 |
| 6/30/2025 | | Late Fee | 1,908.27 | 205,660.51 |
| 7/31/2025 | | Late Fee | 1,957.50 | 207,618.02 |
| 7/31/2025 | 2Q25DED | 2Q25 Deductible Loss | 207.66 | 207,825.68 |
| 8/31/2025 | | Late Fee | 1,979.16 | 209,804.83 |
| 9/30/2025 | | Late Fee | 1,998.95 | 211,803.78 |
| 10/31/2025 | | Late Fee | 2,018.94 | 213,822.72 |
| 10/31/2025 | 3Q25DED | 3Q25 Deductible Loss | 2,883.74 | 216,706.46 |
| 11/30/2025 | | Late Fee | 2,067.96 | 218,774.42 |
| 12/31/2025 | | Penalties | 7,098.83 | 225,873.25 |
| 12/31/2025 | | Late Fee | 3,405.49 | 229,278.74 |
| 1/31/2026 | 4Q25DED | 4Q25 Deductible Loss | 877.88 | 230,156.62 |
| 1/31/2026 | | Late Fee | 2,292.79 | 232,449.40 |
| 1/31/2026 | | Penalties | 844.51 | 233,293.91 |

# EXHIBIT "F"

**CHART RRG**
**Proforma 2025 Financials**
**12/31/2025**





