| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** | **Hearing Date/Time: April 15, 2026, 10:00 a.m.** |
| **NORTHERN DISTRICT OF NEW YORK** | **Hearing Location:  Syracuse, NY** |
| **SYRACUSE DIVISION** | **Opposition Due: April 7, 2026** |

-------------------------------------------------------------------x

In re                                                  :   Chapter 11
                                                         :
NORTH STAR HEALTH ALLIANCE, INC., *et al*,[1]  :   Case No. 26-60099-5-wak
                                                         :   Main Case
            Debtors.                               :   Jointly Administered
                                                         :   Case No. 26-30078
                                                         :   Case No. 26-30079
                                                         :   Case No. 26-60100

-------------------------------------------------------------------x

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO REJECT CERTAIN EXECUTORY CONTRACTS

North Star Health Alliance, Inc. ("North Star"), Carthage Area Hospital, Inc. ("Carthage" or "CAH"), Claxton-Hepburn Medical Center, Inc. ("Claxton" or "CHMC"), and Meadowbrook Terrace, Inc. ("Meadowbrook"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"),[2]: hereby move (the "Motion") this Court (as defined herein) for entry of an order (the "Proposed Order"), substantially in the form attached hereto as **Exhibit A**, granting the relief described below and represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. Consideration of this matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this proceeding is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).

[2] The Debtors' non-debtor affiliates (individually each a "Non-debtor Affiliate" or, collectively, the "Non-debtor Affiliates") consist of: (1) Claxton-Hepburn, P.C. ("CHPC"), (2) North Country Orthopaedic Group PC ("NCOG"), (3) North Country Realty, LLC ("NCR"), (4)  Comprehensive Women's Health Services, PLLC (5) the Claxton-Hepburn Medical Center Foundation, Inc., (6) the Carthage Area Hospital Foundation, Inc., (7) the Claxton-Hepburn Medical Center Auxiliary, (8) the Carthage Area Hospital Auxiliary, (9) Claxton Medical PC,;(10) Claxton-Hepburn Medical Campus, and (11) North Country Orthopeadic Ambulatory Surgical Center, LLC.

1

2.	The statutory predicates for the relief requested herein are Bankruptcy Code sections 105 and 365, Bankruptcy Rule 6006, and Rule 6006–1 of the Local Bankruptcy Rules for the Southern District of New York ("Local Rules").

## BACKGROUND

### A.	The Chapter 11 Cases

3.	On February 10, 2026 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of their properties and are operating and managing their businesses, as debtors-in-possession, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.	No request for the appointment of a trustee, examiner or patient care ombudsman has been made in these Chapter 11 Cases and no statutory committees have been appointed or designated.

### B.	The Debtors' Corporate Structure and Operations

5.	North Star Health Alliance, Inc. was established in September 1993 and incorporated in the State of New York as a not-for-profit corporation.  North Star is the umbrella organization within which Carthage, Claxton, Meadowbrook and related non-debtor affiliates coordinate governance, strategy, and shared services under what is referred to as the Transformation Plan.[3] North Star is a passive parent entity that does not itself exercise financial

---

[3] Beginning in or about August 2022, North Star pursued a complex transition (the "Transformation Plan") designed to preserve access to acute care and behavioral health services in the North Country while addressing Claxton's unsustainable legacy cost and reimbursement structure as a Sole Community Hospital. The Transformation Plan involved coordinated planning among North Star member organizations, engagement with DOH, CMS and OMH, and stepwise regulatory actions. On October 23, 2024, DOH and OMH issued operating certificates that reorganized Claxton into two distinct hospital entities at the Ogdensburg, New York location: (i) a standalone inpatient psychiatric hospital, and (ii) a separate acute-care critical access hospital operated by Carthage under a shared operating certificate.

control over each member organization; rather, it serves as a platform for alignment and operational integration, including shared leadership and centralized administrative functions (*e.g.*, finance, human resources, information technology, compliance, revenue cycle coordination, and cash planning) that are critical to sustaining rural healthcare delivery across multiple campuses. The North Star system as a whole employs approximately 1,600 employees who work at operations managed by the Debtor and the Non-debtor Affiliates.

6.      Carthage was established in November 1921 and incorporated in the state of New York as a not-for-profit corporation.  Carthage operates a 25-bed Critical Access Hospital in Carthage, New York serving a large, rural tri-county area. Carthage holds a New York State Department of Health operating certificate (No. 2238700C; Facility ID/PFI 379) for primary care hospital-critical access hospital services located at 1001 West Street, Carthage, New York 13619, and it also operates a second 25 bed acute-care campus located at 214 King Street, Suite A, Ogdensburg, New York 13669 (the "Claxton Campus") under the same operating certificate (Facility ID/PFI 15684).  The Claxton Campus is the designated "9.39" hospital for the area and is the former acute-care component of Claxton that is now operated by Carthage under a shared operating certificate as part of the Transformation Plan.

7.      Claxton-Hepburn Medical Center, Inc. was established in December 1916 as the North Country's first hospital and incorporated in January 1917 in the state of New York as a not-for-profit corporation.  Following the implementation of the Transformation Plan, Claxton now operates exclusively as a standalone Article 31 Inpatient Psychiatric Hospital licensed by the New York State Office of Mental Health under Operating Certificate No. 8231002, located at 214 King Street, Suite B, Ogdensburg, New York 13669.  Claxton provides acute inpatient behavioral health services for adults (28 beds) and children/adolescents (12 beds), including the region's only acute

inpatient unit dedicated to children and adolescents.  Claxton also leads the Pathways to Recovery Peer Coaching program and has been planning to establish the region's first Comprehensive Psychiatric Emergency Program.

8.      Meadowbrook Terrace, Inc. was established in December 2011 and incorporated in the state of New York as a not-for-profit corporation.  Meadowbrook is a 60-bed assisted living facility (58 ALP beds and 2 Adult Home) that provides assisted living services for seniors in the North Country region. Meadowbrook is a key part of the Debtors' care continuum for elderly and medically fragile patients, supporting safe discharge planning and community-based care.

9.      For more detailed background and structure information, the Debtors make reference to the February 17, 2026 *Declaration of Rob Bloom, Chief Restructuring Officer of North Star Health Alliance, in Support of Chapter 11 Petitions*, at CM/ECF docket no. 47.

10.     As to the specific relief requested herein, the Debtors rely upon the *Declaration of Rob Bloom Chief Restructuring Officer of North Star Health Alliance, in Support of Debtors' Motion for an Order to Reject Certain Executory Contracts,* filed herewith.

11.     Through this bankruptcy proceeding, the Debtors intend to continue to fulfill their mission by operating their facilities to deliver quality health care in their communities.

### **RELIEF REQUESTED**

12.     By this Motion, and pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, Bankruptcy Rule 6006 and Local Rule 6006–1, the Debtors seek entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, authorizing them to reject certain executory contracts identified in **Exhibit B** hereto and described herein (the "Contracts"), effective as of the filing date of this Motion.  In material part, the Debtors seek to reject all employment agreements

of any kind with the below referenced employees, whether oral or written, implied, in-effect or expired.

13.     As part of their reorganization, the Debtors are in the process of identifying which of their contractual relationships are no longer necessary or beneficial, including those related to the Debtors' employees in facilities being reorganized.

14.     As a result of the foregoing, and in consultation with their advisors, the Debtors determined that the Contracts are not necessary and have little or no value to the Debtors' estates, especially when weighed against the costs of the Contracts.  Accordingly, the Debtors seek to eliminate the costs and obligations associated therewith.  The requested relief will allow for rejection of the Contracts and elimination of burdensome and unnecessary obligations related thereto,  as of the date of this Motion, as opposed to waiting until the Motion is granted, or a plan is confirmed.

15.     The Contracts sought to be rejected hereby all pertain to certain executive level employees of the Debtors, as follows:

A. June Arndt – Ms. Arndt is presently employed by the Debtor CAH as Vice President of Nursing of Carthage Area Hospital, pursuant to the terms of a written employment agreement ("Arndt Employment Agreement") dated June 1, 2022 and amended effective April 28, 2024.  The Arndt Employment Agreement included an initial term continuing through December 31, 2025 and thereafter continuing for successive terms of twelve (12) months unless a notice of intention not to renew is provided at least one hundred twenty (120) days prior to the expiration of any term.  The Arndt Employment Agreement is terminable during any term under certain circumstances, subject to various rights and obligations of the parties, as set forth in the agreement.[4]

B. Brandon Bowline – Mr. Bowline is presently employed by the Debtor CHMC as Chief Operations Officer of Claxton Hepburn Medical Center, pursuant to the terms of a written employment agreement ("Bowline Employment Agreement") dated September 14, 2022 and amended effective April 29, 2024

---

[4] Ms. Arndt has been employed by the Debtors since 2008.  Following rejection of the Arndt Employment Agreement, it is the Debtors' intention to retain Ms. Arndt as an at-will employee, and to modify her job duties and title. The Debtors will be proposing alternate arrangements as such immediately to Ms. Arndt.

and as Temporary Chief Administrative Officer, effective January 28, 2026 pursuant to Board resolution.  The Bowline Employment Agreement included an initial term continuing through December 31, 2025 and thereafter continuing for successive terms of twelve (12) months unless a notice of intention not to renew is provided at least one hundred twenty (120) days prior to the expiration of any term.  The Bowline Employment Agreement is terminable during any term under certain circumstances, subject to various rights and obligations of the parties, as set forth in the agreement.

C.  David Ferris, Jr. (also known as David Ferris) – Mr. Ferris is presently employed by the Debtor CHMC as Senior Vice President of Nursing (Acute) at Claxton Hepburn Medical Center, pursuant to the terms of a written employment agreement ("Ferris Employment Agreement") dated March 1, 2023 and amended effective April 29, 2024.  The Ferris Employment Agreement included an initial term continuing through March 1, 2026 and thereafter continuing for successive terms of twelve (12) months unless a notice of intention not to renew is provided at least one hundred twenty (120) days prior to the expiration of any term.  The Ferris Employment Agreement is terminable during any term under certain circumstances, subject to various rights and obligations of the parties, as set forth in the agreement.[5]

D.  William Randall Fipps (also known as Randy Fipps) – Mr. Fipps is presently employed by the Debtor CHMC as Administrator of System Integration and Behavioral Health of Claxton Hepburn Medical Center, pursuant to the terms of a written employment agreement ("Fipps Employment Agreement") dated March 1, 2023 and amended effective April 29, 2024.  The Fipps Employment Agreement included an initial term continuing through March 1, 2026 and thereafter continuing for successive terms of twelve (12) months unless a notice of intention not to renew is provided at least one hundred twenty (120) days prior to the expiration of any term.  The Fipps Employment Agreement is terminable during any term under certain circumstances, subject to various rights and obligations of the parties, as set forth in the agreement.

E.  Beth E. Stemples – Ms. Stemples is presently employed by the Debtor CHMC as Executive Director of Physician Practice Management at Claxton Hepburn Medical Center, pursuant to the terms of a written employment agreement ("Stemples Employment Agreement") dated March 1, 2023 and amended effective April 29, 2024.  The Stemples Employment Agreement included an initial term continuing through March 1, 2026 and thereafter continuing for successive terms of twelve (12) months unless a notice of intention not to renew is provided at least one hundred twenty (120) days prior to the expiration of any term.  The Stemples Employment Agreement is terminable during any term

---

[5] Mr. Ferris has been employed with the Debtors since 2000.  Following rejection of the Ferris Employment Agreement, it is the Debtors' intention to retain Mr. Ferris as an at-will employee, and to modify his job duties and title. The Debtors will be proposing alternate arrangements as such immediately to Mr. Ferris.

under certain circumstances, subject to various rights and obligations of the parties, as set forth in the agreement.[6]

16.     Additionally, the Debtors also seek to end their employment relationship with Peter Sinagra, who is the Executive Director of each of, respectively, the Carthage Area Hospital Foundation, Inc. and the Claxton-Hepburn Medical Center Foundation, Inc.  It is the Debtors' belief that Mr. Sinagra has no written employment contract with the Debtors, and that he is presently employed as an at-will employee.  It appears that Mr. Sinagra had a PTO Agreement with the Debtors', however same has expired by its own terms as of the Petition Date.  In an abundance of caution, the Debtors seek to reject and all employment agreements with Mr. Sinagra, whether oral or written.

17.     By way of recent background, on Thursday, February 26, at 4:30 p.m., the Boards of Directors of North Star Health Alliance, Inc., Carthage Area Hospital, Inc., Claxton-Hepburn Medical Center, Inc., and Meadowbrook Terrace, Inc. convened virtually for a regular meeting, at which duly constituted quorums of each Board were present.

18.     The Boards duly approved proceeding with the Plan of Financial Correction as vetted by the Restructuring Committee which includes the executory contract rejections sought in this Motion.  All actions were approved by duly constituted quorums of each Board and were duly recorded in the minutes.

19.     The Debtors believe that the Contract rejections described above will not result in any reduction in quality of care and services for patients, while the Contract rejections will enable significant and necessary reductions in both payroll and costs.

---

[6] Ms. Stemples been employed with the Debtors since 2003.  Following rejection of the Stemples Employment Agreement, it is the Debtors' intention to retain Ms. Stemples as an at-will employee, and to modify her job duties and title. The Debtors will be proposing alternate arrangements as such immediately to Ms. Stemples.

**BASIS FOR RELIEF**

**A.     Rejection of the Contracts is an Exercise of the Debtors' Sound Business Judgment**

20.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a); *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 521 (1984); *Med. Malpractice Ins. Ass'n v. Hirsch* (*In re Lavigne*), 114 F.3d 379, 386 (2d Cir. 1997).  "[T]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'"  *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993).

21.     Courts defer to a debtor's business judgment in determining whether to approve rejection of an executory contract or unexpired lease and, upon finding that a debtor has exercised its sound business judgment, regularly approve the rejection under section 365(a) of the Bankruptcy Code.  *See Bildisco & Bildisco*, 465 U.S. at 523 (recognizing the use of the "business judgment" standard to approve rejection of executory contracts); *In re Old Carco LLC*, 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009) (same); *In re Penn Traffic Co.,* 524 F.3d 373, 383 (2d Cir. 2008) (same); *In re Klein Sleep Products, Inc*, 78 F.3d 18, 25 (2d Cir. 1996) (same); *In re Minges*, 602 F.2d 38, 42–43 (2d Cir. 1979) (same); *In re Balco Equities Ltd.*, 323 B.R. 85, 98–99 (Bankr. S.D.N.Y. 2005) (same); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994) (approving rejection of license by debtor because such rejection satisfied the "business judgment" test); *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (stating that a debtor may assume or reject an unexpired lease under § 365(a) in the exercise of its "business judgment").

22.    Courts emphasize that the business judgment rule is not an onerous standard and that it "is flexible and encourages discretion."  *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011). "Great judicial deference is given to the [debtor's] exercise of business judgment."  *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (N.D. Tex. 2005); *see also In re Penn Traffic Co.*, 524 F.3d at 383; *In re Old Carco LLC*, 406 B.R. at 188.  As long as a transaction "appears to enhance a debtor's estate, court approval of a debtor in possession's decision to [enter into the transaction] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the Bankruptcy Code."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (citation and internal quotation marks omitted).

23.    Courts generally will not second-guess a debtor's business judgment concerning the rejection of an executory contract.  *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121– 22 (Bankr. D. Del. 2001); *see also In re Penn Traffic Co.,* 524 F.3d at 383; and *In re Old Carco LLC*, 406 B.R. at 188.  Satisfying the "business judgment" standard requires only a modest showing, relevantly, that the proposed treatment of the executory contract or unexpired lease will benefit the debtor's estate.  *See id.*; *see also In re Orion Pictures Corp.*, 4 F.3d at 1098-99 (stating that section 365 of the Bankruptcy Code permits a debtor in possession, subject to court approval, to decide which executory contracts would be beneficial to reject).

24.    As part of their reorganization and ongoing efforts to reduce costs and burdensome obligations, the Debtors have determined that the Contracts provide little or no ongoing benefit to the Debtors' estates, and are not commensurate with their costs.  Accordingly, rejecting the Contracts would clearly benefit the Debtors' estates and creditors for all the reasons set forth herein.

25.     In light of the foregoing, the Debtors respectfully request that the Court approve rejection of the Contracts pursuant to section 365(a) of the Bankruptcy Code in the manner requested herein as a sound exercise of their business judgment.

**B.      Rejection as of the Date of this Motion is Appropriate**

26.     The Debtors submit that it is appropriate for the Court to deem the Debtors' rejection of the Contracts effective as of the filing date of this Motion. *See, e.g., Thinking Machs. Corp. v. Mellon Fin. Servs. Corp. (In re Thinking Machines Corp.)*, 67 F.3d 1021, 1028-29 (1st Cir. 1995) (indicating "rejection under section 365(a) does not take effect until judicial approval is secured, but the approving court has the equitable power, in suitable cases, to order a rejection to operate retroactively" to the motion filing date); *Pacific Shore Dev., LLC v. At Home Corp (In re At Home Corp.)*, 392 F.3d 1064, 1065 (9th Cir. 2004) (citing *Thinking Machines Corp.* in holding same).

27.     Section 365 of the Bankruptcy Code does not address when the rejection ordered by the Court is deemed effective, nor does the Bankruptcy Code restrict courts from concluding that the effective date of the rejection is the date of the requested relief. *See In re Amber's Stores, Inc.*, 193 B.R. 819, 827 (Bankr. N.D. Tex. 1996) (stating that the best interpretation of section 365 of the Bankruptcy Code requires an order of the court to determine the date of rejection); *see also In re Jamesway Corp.*, 179 B.R. 33, 37 (S.D.N.Y. 1995) (stating that section 365 of the Bankruptcy Code does not include "restrictions as to the manner in which the court can approve rejection"); *see also In re CCI Wireless, LLC*, 297 B.R. 133, 138 (D. Colo. 2003) (noting that section 365 of the Bankruptcy Code "does not prohibit the bankruptcy court from allowing the rejection of [leases] to apply retroactively"). However, courts, including those in this Circuit, have held that a bankruptcy court may exercise its equitable powers in granting such a retroactive order when doing

so promotes the purposes of section 365(a) of the Bankruptcy Code. *See In re Avianca Holdings S.A.,* 618 BR 684, 709 (Bankr. S.D.N.Y. 2020) (approving *nunc pro tunc* rejection), citing *BP Energy Co. v. Bethlehem Steel Corp.*, 2002 U.S. Dist. LEXIS 22052 at *3-4 (S.D.N.Y. Nov. 15, 2002) (same); *In re Jamesway Corp.*, 179 B.R. at 38 (holding that courts may approve retroactive rejection); *see also In re Chi-Chi's, Inc.*, 305 B.R. 396, 399 (Bankr. D. Del. 2004) ("[T]he court's power to grant retroactive relief is derived from the bankruptcy court's equitable powers so long as it promotes the purposes of § 365(a).").

28.     As an ongoing part of their reorganization and scrutiny of their operations, the Debtors have, in consultation with their advisors, undertaken an analysis of their contracts. This analysis has resulted in a determination that the Contracts should be rejected effective as of the date of this Motion. As noted, the Contracts for which the Debtors seek rejection provide minimal or no value to the Debtors' estates or creditors from and after the date of this Motion, especially in light of their costs, and instead may unnecessarily tax the Debtors' limited resources until the rejection effective date is established. In this case, the balance of equities favors the rejection relief requested herein.

29.     Without a rejection date as of the date of this Motion, there is a risk that the Debtors could be forced to incur unnecessary obligations or administrative costs for Contracts that provide little or no tangible benefit to the Debtors' estates. *See, e.g.*, *BP Energy Co. v. Bethlehem Steel Corp.*, 2002 U.S. Dist. LEXIS 22052 at *3 (S.D.N.Y. Nov. 15, 2002) (finding retroactive rejection valid when the balance of equities favors such treatment); *In re Jamesway Corp.*, 179 B.R. at 33.

30.     Moreover, bankruptcy courts have granted relief, similar to the relief sought here, in other chapter 11 cases. *See, e.g.*, *In re GetSwift, Inc.*, Case No. 22-11057 (MEW) [ECF No. 133] (Bankr. S.D.N.Y. Jan. 25, 2023); *In re Grupo Aeromexico, S.A.B. de C.V.*, Case No. 20-11563

11

(JPM) [ECF No. 210] (Bankr. S.D.N.Y. July 29, 2020); *In re LATAM Airlines Group S.A.*, Case No. 20-11254 (JLG) [ECF No. 391] (Bankr. S.D.N.Y. Jun. 28, 2020); *In re Avianca Holdings S.A.*, Case No. 20-11133 (MG) [ECF No. 277] (Bankr. S.D.N.Y. Jun. 11, 2020); *In re AMR Corporation*, Case No. 11-15463 (Bankr. S.D.N.Y. Dec. 23, 2011) (SHL) [ECF No. 454]; *In re Northwest Airlines Corporation*, Case No. 05-17930 (ALG) [ECF No. 672] (Bankr. S.D.N.Y. Oct. 13, 2005); and *In re Delta Air Lines, Inc.*, Case No. 05-17923 (PCB) [ECF No. 164] (Bankr. S.D.N.Y. Sep. 16, 2005).

## NOTICE

31.     Notice of this Motion has been provided to (a) the Office of the United States Trustee for the Northern District of New York, (b) the Cash Collateral Secured Creditors, (c) the holders of the 20 largest unsecured claims against each of the Debtors, (d) any party that has requested notice pursuant to Bankruptcy Rule 2002, (e) the New York State Department of Health, (f) the Office of the Attorney General for the State of New York, (g) the Centers for Medicare & Medicaid Services, (h) the United States Department of Justice and (i) the counterparties listed on **Exhibit B**; (collectively, the "Notice Parties").  In light of the nature of the relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

## RESERVATION OF RIGHTS

32.     Nothing contained herein or any action taken pursuant to such relief is intended or shall be construed as:  (a) an admission as to the validity or priority of any claim against the Debtors; (b) a waiver of the Debtors or any appropriate party in interest's rights to dispute the amount of, basis for or validity of any claim against the Debtors; (c) a waiver of any claims or causes of action which may exist against any creditor or interest holders, or (d) an approval, assumption, adoption or rejection of any agreement, contract, lease, program or policy between

12

the Debtors and any third party under section 365 of the Bankruptcy Code that is not included on

**Exhibit B**.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to

the Court's order is not intended to be and should not be construed as an admission as to the validity

or priority of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NO PRIOR REQUEST

33.    No previous request for the relief sought herein has been made by the Debtors to

this or any other court.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Order,

substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and

such other and further relief as the Court deems just and proper.

Dated:  March 2, 2026
      New York, New York

**BARCLAY DAMON LLP**
*Proposed Counsel for Debtors and*
*Debtors-In-Possession*

By:  */s/Janice B. Grubin*
Janice B. Grubin
Jeffrey A. Dove
Ilan Markus (*pro hac vice* admission to be sought)
Allen J. Underwood II (*pro hac vice* admission to be sought)
1270 Avenue of the Americas, Suite 2310
New York, New York 10020
Janice B. Grubin:
(212) 784-5808; jgrubin@barclaydamon.com
Jeffrey A. Dove:
(315) 413-7112; jdove@barclaydamon.com
Ilan Markus:
(203) 672-2661; imarkus@barclaydamon.com
Allen J. Underwood II
(212) 784-5843: aunderwood@barclaydamon.com