**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------------x
In re                                           :
                                                :       Chapter 11
                                                :       Case No. 26-60099-wak
NORTH STAR HEALTH ALLIANCE, INC., et al,[1]     :       Main Case
                                                :       Jointly Administered
                                                :       Case No. 26-30078
                                                :       Case No. 26-30079
                              Debtors.          :       Case No. 26-60100
                                                :
-----------------------------------------------------------------------x
```

### MOTION BY OVATION HEALTHCARE (I) TO COMPEL COMPLIANCE WITH THE OVATION SERVICES AGREEMENTS, (II) FOR RELIEF FROM THE AUTOMATIC STAY, AND (III) TO COMPEL ASSUMPTION OR REJECTION OF THE OVATION SERVICES AGREEMENTS

Ovation Healthcare f/k/a Quorum Health Resources ("Ovation Healthcare"), a creditor in the above-referenced proceedings, *Motion by Ovation Healthcare (I) To Compel Compliance with the Ovation Services Agreements, (II) For Relief from the Automatic Stay, and (III) To Compel Assumption or Rejection of the Ovation Services Agreements* (the "Motion") for entry of an order, (I) compelling compliance with the Ovation Services Agreements (defined below), specifically the payment of amounts owed to Ovation Healthcare for post-petition services, including the ████████████████ pursuit to the Revenue Cycle Services Agreement (defined below) and amounts due pursuant to the Coding Services Agreement (defined below), (II) granting relief from the automatic stay to the extent necessary for Ovation Healthcare to terminate the Ovation Services Agreements, and (III) compelling the assumption or rejection of the Ovation Services Agreements (defined below).  In support of this Motion, Ovation Healthcare submits the *Declaration of Scott Gressett* (the "Declaration"), annexed hereto as **Exhibit A**, and respectfully states:

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).

### PRELIMINARY STATEMENT[2]

For several years prior to the Petition Date, Ovation Healthcare provided revenue cycle services, and related services, to Claxton-Hepburn Medical Center. However, by the end of 2025, the medical center owed a sizeable overdue balance of more than $6 million. The amount continued to grow. By the time that the Debtors filed these chapter 11 cases, they owed Ovation Healthcare not less than $7,463,23143, making Ovation Healthcare among the largest creditors.

Ovation Healthcare is sympathetic to the Debtors' position, and has worked cooperatively with them both before and after the commencement of these chapter 11 cases.

Prior to the Petition Date, despite the sizeable balance owed, Ovation Healthcare did not terminate its contractual arrangement with the Debtors – an option available under the contracts – and it did not exercise self-help. Rather, Ovation Healthcare worked diligently with the Debtors' representatives to reach agreement on modified terms. While the parties' discussions progressed through the exchanged of final redlined versions, the Debtors did not ultimately execute a new arrangement. Nevertheless, Ovation Healthcare continued to provide the contracted services. Indeed, as a courtesy, Ovation Healthcare consistently provided additional services above and beyond what was contemplated by the agreements.

Ovation Healthcare remains willing to engage with the Debtors to resolve these issues consensually, but the plain truth is that Ovation Healthcare simply cannot continue to provide the extensive portfolio of services to the Debtors in exchange for the unpredictable and insufficient payments that the Debtors unilaterally determine to pay for

---

[2]    Capitalized terms used but not defined in this section shall have the meanings given to them in the subsequent sections of the Motion.

the post-petition services.  While Ovation Healthcare's team, comprised of over sixty individuals, continues to provide services to the Debtors, the Debtors' payments have been woefully insufficient – at times, ████████████████████████████ ████████████████████████.  In so doing, the Debtors are depriving Ovation Healthcare of the benefit of the bargain under the established contracts and preventing Ovation Healthcare from re-deploying those resources to other customers who will pay for the services provided.

Further, if there was not a contractual arrangement like the one that the Debtors have in place with Ovation Healthcare, the Debtors would have to pay employees of their own to conduct the work done by Ovation Healthcare.  However, as it stands, Ovation Healthcare, one of the Debtors' creditors, is being forced to shoulder the financial burden and essentially finance the Debtors' operations.

Simply put, it is neither sustain able nor equitable for Ovation Healthcare to continue financing the Debtors' bankruptcy cases to its own detriment.  For these reasons, while Ovation Healthcare's discussions with the Debtors continue, this Motion has become necessary.

## **RELIEF REQUESTED**

1.      By this Motion, Ovation Healthcare seeks entry of an order, substantially in the form annexed hereto as **Exhibit B**, (I) compelling compliance with the Ovation Services Agreements, specifically the payment of all amounts due for post-petition services, including the ████████████████████ pursuit to the Revenue Cycle Services Agreement (defined below) and all amounts due pursuant to the Coding Services Agreement (defined below), (II) granting relief from the automatic stay to the extent necessary for Ovation Healthcare to terminate the Ovation Services Agreements, and (III) compelling the assumption or rejection of the Ovation Services Agreements.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the Northern District of New York (the "Court") has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of this case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein is sections 105, 362(d)(1), 365(d)(2), 503(a), 503(b)(1)(A), and 507(a)(2) of title 11 of the United States Code (the "Bankruptcy Code").

4.      Ovation Healthcare consents to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### I.      The Ovation Services Agreements and Pre-Petition Services

5.      Ovation Healthcare is a premier shared services partner for independent hospitals and healthcare providers.  Its portfolio of shared services includes leadership advisory, spend management, revenue cycle management, and technology designed to provide scale and efficiency to hospital business operations.  *See* Decl., ¶ 4.

6.      On or about March 23, 2020, representatives of Ovation Healthcare and Claxton-Hepburn Medical Center executed that certain Operational, Financial, and Strategic Assessment Agreement, effective as of March 23, 2020 (referred to as the "Master Agreement").  *See* Decl., ¶ 5.  A true and correct copy of the Master Agreement is annexed to the Declaration as Exhibit 1 and incorporated by reference herein.

7.      Following entry of the Master Agreement, Ovation Healthcare and Claxton-Hepburn Medical Center executed two statements of work to the Master Agreement covering revenue cycle services (the "Revenue Cycle Services Agreement") and revenue cycle coding services (the "Coding Services Agreement," and together with the Revenue Cycle Services Agreement and the Master Agreement, the "Ovation Services Agreements"). *See* Decl., ¶ 6. True and correct copies of the Revenue Cycle Services Agreement and the Coding Services Agreement are annexed to the Declaration as Exhibit 2 and Exhibit 3, respectively, and are incorporated by reference herein.

8.      Under the Revenue Cycle Services Agreement, ████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████
████████████████████

9.      Under the Coding Services Agreement, ████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████

10.    As part of the Master Agreement, ███████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

██████████████████████████████

11.    Prior to the commencement of the chapter 11 cases, the Debtors stopped making payments as required by the Ovation Services Agreements.  As of December 31, 2025, the Debtors owed Ovation Healthcare not less than $6,266,838.68 under the Ovation Services Agreements.  *See* Decl., ¶ 7.

12.    During this period, Ovation Healthcare engaged with representatives of the Debtors to address the Debtors' failure to make payments as they came due.  *See* Decl., ¶ 8.

13.    On or about January 9, 2026, Ovation Healthcare proposed a resolution where: ███████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████



*See* Decl., ¶ 9.

14.     Throughout this time, the Debtors were unable to demonstrate a path to positive cash flow.  *See* Decl., ¶ 10.

15.     While the parties' discussions progressed through the exchanged of final redlined versions, the Debtors did not ultimately execute a new arrangement prior to the commencement of the chapter 11 cases.  Nevertheless, Ovation Healthcare continued to provide the contracted services.  Indeed, as a courtesy, Ovation Healthcare consistently provided additional services above and beyond what was contemplated by the agreements.  Specifically, Ovation Service took on obligations in connection with the patient switchboard (i.e., taking all inbound patient calls to the hospital switchboard and routing them to appropriate departments) despite that not being within the scope of the

Ovation Services Agreements.  In addition, Ovation Healthcare took on charge capture work required despite the fact that it was outside the scope of the contractual agreements; though Ovation Services billed an hourly rate for this, as set forth above, the Debtors did not keep and have not kept current with their payments.  *See* Decl., ¶ 11.

16.    As of February 10, 2026, the Debtors owed Ovation Healthcare not less than $7,463,23143 on account of services provided pursuant to the Ovation Services Agreements.  *See* Decl., ¶ 12.

**II.    The Chapter 11 Cases**

17.    On February 10, 2026 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code.  The Debtors did not notify Ovation Healthcare prior to commencing the chapter 11 cases.  *See* Decl., ¶ 13.

18.    The Debtors continue to operate their business and manage their affairs as debtors-in-possession.

19.    As set forth in a filing by Debtor Claxton-Hepburn Medical Center, Inc., as a result of the sizeable balance due to Ovation Healthcare, Ovation Healthcare is among the top five creditors in the bankruptcy case.  *See* Ch. 11 Case No. 26-60100-5-wak, Docket No. 5.

20.    The Debtors' chapter 11 cases are jointly administrated.

21.    On February 11, 2026, the Debtors filed the *Motion for Interim and Final Orders Authorizing Use of Cash Collateral* [Docket No. 13], with proposed budgets.  For Claxton-Hepburn Medical Center, Inc., the Debtors' entire budgeted weekly amount for purchased services ███████████████████████████████████████████

███████████████████████.  Specifically, for purchased services, the Debtors budgeted $78,107 for February 13, 2026 and $37,771 for the week ending February 20, 2026;  no

amount was disclosed for purchased services for the week ending February 27, 2026. *See id.* at Ex C.

22.     Additionally, in the proposed budget, the Debtors projected negative cash flows for the Claxton-Hepburn Medical Center in the amount of:

    a.  $346,283 for the week ending February 13, 2026;

    b.  $412,898 for the week ending February 20, 2026; and

    c.   $504,072 for the week ending February 27, 2026.

*See* Docket No. 13, Ex C. The budget also projected a significant negative cash balance for the medical center at the end of the proposed period. *See id.* at Ex C.

23.     On February 13, 2026, the Court entered the *Interim Order Authorizing Use of Cash Collateral* [Docket No. 31]; in the budget annexed thereto, Claxton-Hepburn Medical Center proposes a budgeted amount of only $88,107 for the week ending February 13, 2026. *See id.* Additionally, the medical center shows a negative net cash flow of $477,528 for the week ending February 13, 2026. *See id.*

24.     On February 18, 2026, the Court entered the *Second Interim Order Authorizing Use of Cash Collateral* [Docket No. 57]. The annexed Claxton-Hepburn Medical Center, Inc. budget showed $24,091 actually paid for purchased services during the week ending February 13, 2026 and budgeted $245,878 for the week ending February 20, 2026. *See id.* However, this was associated with a negative net cash flow of $807,669. *See id.*

25.     On February 23, 2026, the Debtors filed the *Updated Cash Flow Projections Relating to Motion for Interim and Final Orders Authorizing Use of Cash Collateral [Dkt No. 13]* [Docket No. 70] (the "Updated Projections"). For the projections for the week ending February 27, 2026 and thereafter, ████████████████████████

████████████████████████████████████████████

████████████████████████████████. *See id.* Additionally, while the

Updated Projections showed a positive actual cash flow for Claxton-Hepburn Medical

Center, Inc. the week ending February 20, 2026, the Debtors also projected negative cash

flows for nine of the following thirteen weeks.  *See id.*

26.    On February 26, 2026, the Court entered the *Third Interim Order*

*Authorizing Use of Cash Collateral* [Docket No. 84], which included a budgeted amount of

$167,367 for purchased services for the week ending February 27, 2026 █████████

███████████████████████████████████████████████

███.  *See id.*  The budget also showed a negative net cash flow in the amount of

$1,423,868 and a negative cash balance for the end of the period.  *See id.*

27.    On March 5, 2026, the Court entered the *Fourth Interim Order*

*Authorizing Use of Cash Collateral* [Docket No. 124], which provided a budgeted amount of

$166,072 for purchased services for the week ending March 6, 2026 ████████

███████████████████████████████████████████████

██████████████    *See id.*

## III.    **Post-Petition Services**

28.    Since the Petition Date, the Debtors continued to receive services

from Ovation Healthcare in accordance with the Ovation Services Agreements.  Indeed,

Ovation Healthcare has continued to provide services, as a courtesy, above and beyond

what is contemplated by the Ovation Services Agreements.  *See* Decl., ¶ 14.

29.    At present, Ovation Healthcare has more than sixty team members

providing services to the Debtors.  Through their efforts, Ovation Healthcare has been

able to collect ████████████ of accounts receivable on behalf of the Debtors

between the Petition Date and March 5, 2026, and anticipates that the total expected

cash will be ████████ for March 2026 and ████████ for April 2026.  *See* Decl.,

¶ 15.

30.    As of March 6, 2026, Ovation Healthcare has issued invoices to the Debtors for post-petition services pursuant to the Revenue Cycle Services Agreement totaling ███████, and for post-petition services pursuant to the Coding Services Agreement totaling ████████  In sum, as of March 6, 2026, Ovation Healthcare's invoices to the Debtors for post-petition services total ██████.  *See* Decl., ¶ 16.[3]  Specifically, the invoices during this period were as follows:



*See id.*

31.    During the next six weeks, Ovation Healthcare estimates that approximately ██████ will be generated on account of services provided under the Ovation Services Agreements.  Importantly, if an arrangement like the Revenue Cycle Services Agreement was not in place, the Debtors would have to pay employees to conduct the work currently done by Ovation Healthcare.  *See* Decl., ¶ 17.

---

[3]    Ovation Healthcare provided an invoice dated February 13, 2026 for services provided pursuant to the Revenue Cycle Services Agreement, of which ██████was attributable to services provided after the Petition Date.

32.    Nevertheless, the Debtors have failed to fulfill their duties and responsibilities under the Ovation Services Agreements.  *See* Decl., ¶ 18.

33.    The Debtors have failed to compensate Ovation Healthcare for those services at the agreed, contracted rate.  Instead, the Debtors have unilaterally undertaken to provide partial payments.  In total, the Debtors' post-petition payments to Ovation Healthcare total only $240,000:

    a.  $120,000 for the week ending February 20, 2026;

    b.  $60,000 for the week ending February 27, 2026;  and

    c.  $60,000 for the week ending March 6, 2026.

*See* Decl., ¶ 19.

34.    As a result, as of March 6, 2026, the Debtors owe Ovation Healthcare not less than ███████ on account of post-petition services provided pursuant to the Ovation Services Agreements (the "Post-Petition Charges").  *See* Decl., ¶ 20.

35.    While failing to pay amounts due for post-petition services, the Debtors have not yet executed replacement contracts that would provide for, among other things, a tightened scope of services at a lower cost to the Debtors.  *See* Decl., ¶ 21.

36.    Following the Petition Date, Ovation Healthcare sought to restart negotiations with the Debtors to reach a workable solution under new contracts with a reduced scope of services.  *See* Decl., ¶ 22.  Ovation Healthcare provided draft contracts on March 1, 2026.  However, those negotiations, have not yet reached a successful resolution.  *See id.*

## BASIS FOR RELIEF REQUESTED

I.    **The Debtors Should Be Compelled to Comply with the Ovation Services Agreements**

37.    Since the Petition Date, the Debtors continue to receive services from Ovation Healthcare under the Ovation Services Agreements and should be required to comply with those agreements, including the obligation to pay for those post-petition services.

38.    The U.S. Supreme Court has stated that if a "debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services…." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984). More recently, the Fifth Circuit rejected a debtor's argument that "unless and until an executory contract is assumed or rejected, [the debtor] has no legal obligation to perform under that contract." *In re Mirant Corp.,* 197 F. App'x 285, 294-95 (5th Cir. 2006). Noting *Bildisco,* the Fifth Circuit held that "there is no authority to support the position that [a debtor] may force [a counterparty] to continue performance under [an executory contract] while [the debtor] discontinues and refuses payment without court permission." *Id.* As the Fifth Circuit noted, the position taken by the debtor in *Mirant* is "contrary to the universally accepted rule that a trustee [or debtor] cannot accept the benefits of an executory contract without accepting the burdens as well." *Id.* (internal quotation marks omitted); *see also Metro. Life Ins. v. Sharon Steel Corp. (In re Sharon Steel Corp.),* 161 B.R. 934, 937 (Bankr. W.D. Pa. 1994) (holding that debtor was obligated to pay premiums as administrative expense where debtor elected to continue receiving benefits under its insurance policy from nondebtor pending decision to assume or reject contract).

39.     Here, the Debtors continue to receive services under the Ovation

Services Agreements while failing to comply with the obligations that the Debtors owe

under those agreements.  Consequently, Ovation Healthcare respectfully requests that

the Court order the Debtors to comply with the Ovation Services Agreements,

including, but not limited to, by paying:  (i) the unpaid portion of the Post-Petition

Charges, and (ii) any and all additional amounts for post-petition services as they come

due.

**II.    Cause Exists to Lift the Automatic Stay to Permit Ovation Healthcare to
        Terminate the Ovation Services Agreement**

40.     In an abundance of caution, Ovation Healthcare is seeking to lift the

automatic stay to exercise its bargained-for contract rights under the Ovation Services

Agreements and stop the inequitable situation that currently exists wherein Ovation

Healthcare is shouldering the financial burden of the Debtors' operations.

41.     Pursuant to section 362(d)(1) of the Bankruptcy Code, upon request

of a party in interest, the court shall grant relief from the automatic stay "for cause,

including the lack of adequate protection of an interest in property of such party in

interest…." 11 U.S.C. § 362(d)(1).  A movant requesting relief from the automatic stay

"must initially produce evidence establishing cause' for the relief." *In re Project Orange

Assocs., LLC,* 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010) (internal citation omitted).  "Once the

moving party establishes a *prima facie* case for 'cause,' the burden shifts to the debtor to

disprove its existence." *Id.*  Whether to lift the stay is committed to the discretion of the

bankruptcy judge.  *See, e.g., Burger Boys, Inc. v. South St. Seaport Ltd. P'Ship (In re Burger

Boys, Inc.),* 183 B.R. 682, 687-88 (S.D.N.Y. 1994).

42.     To determine whether cause exists to lift the automatic stay, courts in

this Circuit often apply the twelve *Sonnax* factors.[4]  However, the *Sonnax* factors are

tailored to situations where a court is deciding whether to lift the automatic stay to allow

litigation to proceed or begin outside of the bankruptcy court.  *See, e.g., B.N. Realty Assocs.*

*v. Lichtenstein,* 238 B.R. 249, 258-59 (S.D.N.Y. 1999).  For this reason, certain of the *Sonnax*

factors may not be applicable where, as here, the movant does not seek to begin or

continue litigation.  *See In re Payam, Inc.,* 642 B.R. 365, 370 n.2 (Bankr. S.D.N.Y. 2022) ("[T]he

*Sonnax* Factors are inapplicable because they apply when a movant is moving to continue

an underlying state court action involving unadjudicated state law issues.").

43.     Unless Ovation Healthcare is permitted to terminate the Ovation

Services Agreements, the Debtors will receive benefits under the agreements to which they

are not entitled either under the agreements or the Bankruptcy Code.  Meanwhile,

Ovation Healthcare is continuously harmed by this arrangement.  Week after week,

Ovation Healthcare is being forced to subsidize the Debtors' operations by providing

services for which it is not being paid.  Ovation Healthcare is losing its bargained-for right

and opportunity to terminate the Debtors as customers and instead provide its limited

capacity to its other customers, who are willing to pay for Ovation Healthcare's services.

*See* Decl., ¶ 23.

44.     When considering whether to grant relief from the automatic stay,

---

[4]    The "*Sonnax* factors" are:  (1) whether relief would result in a partial or complete resolution of the
issues;  (2) lack of any connection with or interference with the bankruptcy case;  (3) whether the
other proceeding involves the debtor as a fiduciary;  (4) whether a specialized tribunal with the
necessary expertise has been established to hear the cause of action;  (5) whether the debtor's insurer
has assumed full responsibility for defending it;  (6) whether the action primarily involves third
parties;  (7) whether litigation in another forum would prejudice the interests of other creditors;
(8) whether the judgment claim arising from the other action is subject to equitable subordination;
(9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the
debtor;  (10) the interests of judicial economy and the expeditious and economical resolution of
litigation;  (11) whether the parties are ready for trial in the other proceeding;  and (12) impact of the
stay on the parties and the balance of harms.  *See, e.g., In re Breitburn Energy Partners LP*, 571 B.R. 59,
64 (Bankr. S.D.N.Y. 2017) (citing *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990)).

some courts "focus on whether lifting the stay will return the parties to the prepetition status quo (and not create any new rights or take away any rights)." *Project Orange,* 430 B.R. at 110-12. "It is well-settled law that the filing of a bankruptcy petition does nto alter a debtor's contractual rights or obligations." *Penn Traffic Co. v. COR Route 5 Co., LLC (In re Penn Traffic Co.),* 2005 WL 2276879, at *6 (S.D.N.Y. Sept. 16, 2005) (citation omitted). Except as expressly set forth in certain provisions, the Bankruptcy Code does not otherwise change contract rights. *See In re Lucre, Inc.,* 339 B.R. 648, 655 (Bankr. W.D. Mich. 2006). Here, lifting the stay is necessary to avoid creating new rights for the Debtors and taking away Ovation Healthcare's rights. Outside of bankruptcy, there is no mechanism under the contract or other applicable law where the Debtors could avoid termination of the Ovation Services Agreements and force Ovation Healthcare to perform indefinitely.

45.    Finally, Ovation Healthcare is not seeking to exercise its rights under the Ovation Services Agreements for any improper bankruptcy-related reason or in violation of the prohibitions of the Bankruptcy Code. Courts have repeatedly observed that there may be grounds lift the automatic stay where a party has grounds to terminate an agreement for a legitimate reason (i.e., a reason other than the debtor's bankruptcy filing or the existence of a prepetition claim). *See, e.g., In re Ernie Haire Ford, Inc.,* 403 B.R. 750, 760 n.3 (Bankr. M.D. Fla. 2009) (finding that counterparty violated stay by terminating due to chapter 11 filing, but noting that "if the [creditors] believe that there are acceptable grounds for termination of the contracts, apart from the filing of the bankruptcy, they may present such ground in an appropriately filed motion for relief from stay"); *In re El Paso Refinery, L.P.,* 220 B.R. 37, 40, 42 (Bankr. W.D. Tex. 1998) (granting counterparty relief from stay to terminate its executory contract with debtor "based on the estate's post-petition default" and noting that the question of a nondebtor party's options when the estate does not perform its postposition obligations is "especially pointed when . . . the estate does not

perform its obligations under the executory contract in question, leaving the non-debtor party at a substantial risk of loss").

46.    Accordingly, Ovation Healthcare respectfully submits that cause exists to lift the automatic stay to permit Ovation Healthcare to exercise any and all termination rights under the Ovation Services Agreements.

### III.    Timely Assumption or Rejection of the Ovation Services Agreements Is Warranted

47.    Ovation Healthcare respectfully requests that this Court compel the Debtors to either assume or reject the Ovation Services Agreements within thirty (30) days of entry of the Court's order on this Motion.  As set forth below, it would be manifestly inequitable to permit the Debtors to continue to receive the benefits of the Ovation Healthcare.

48.    The Bankruptcy Code generally provides a chapter 11 debtor until confirmation of the chapter 11 plan to assume or reject its executory contracts.  11 U.S.C. § 365(d);  *In re Dana Corp.,* 350 B.R. 144, 147 (Bankr. S.D.N.Y. 2006).

49.    However, the Bankruptcy Code provides a mechanism for a counterparty to compel a debtor to decide on assumption or rejection more quickly. Pursuant to section 365(d)(2) of the Bankruptcy Code, at the request of a counterparty to an executory contract, the court may "order [the debtor] to determine within a specific period of time whether to assume or reject such contract…."  11 U.S.C. § 365(d)(2).  The purpose of this provision is to reduce the uncertainty of executory contract counterparties from "being left in doubt concerning their status vis-à-vis the estate." *In re Beker Indus. Corp.,* 64 B.R. 890, 898 (Bankr. S.D.N.Y. 1986) (quoting H. Rep. No. 95-595, 95th Cong., 1st Sess. 348-9 (1977)).  Parties seeking to compel assumption or rejection have the burden to

17

demonstrate cause. *In re Dana Corp.*, 350 B.R. at 147. Bankruptcy courts have discretion to

determine what constitutes a reasonable period of time for a debtor to assume or reject. *Id.*

50.    When determining whether cause exists to compel assumption or

rejection, courts consider the following factors:

   i.   The nature of the interests at stake;

   ii.   The balance of hurt to the litigants;

   iii.   The good to be achieved;

   iv.   The safeguards afforded to the litigants;

   v.   Whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary;

   vi.   The debtor's failure or ability to satisfy post-petition obligations;

   vii.   The damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code;

   viii.   The importance of the contract to the debtor's business and reorganization;

   ix.   Whether the debtor has sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan of reorganization;

   x.   Whether there is a need for judicial determination as to whether an executory contract exists;

   xi.   Whether exclusivity has been terminated; and

   xii.   Above all, the broad purpose of chapter 11, which is to permit successful rehabilitation of debtors.

*In re Hawker Beechcraft, Inc.*, 483 B.R. 424, 429 (Bankr. S.D.N.Y. 2012) (citing *In re Adelphia*

*Commc'ns Corp.*, 291 B.R. 283, 293 (Bankr. S.DN.Y. 2003)). These factors are non-

exhaustive, and courts may consider other factors based on other circumstances. *Hawker*

*Beechcraft*, 483 B.R. at 429.

51.    As noted in *Adelphia Communications*, several of these factors often

overlap. *See Adelphia Commc'ns*, 291 B.R. at 296, 298. Given the significant factual overlap

between these factors, the court in *Hawker Beechcraft* organized its analysis by grouping the factors into three categories: (1) the importance of the agreement to the debtor's business and reorganization effort, which helps inform whether a debtor has had sufficient time to make an assumption or rejection decision (implicating Factors (viii), (ix), and (xii)); (2) the balance of the hurt to the parties and the compensability of any injury (implicated Factors (ii), (iv), (vi), and (vii)); and (3) the good to be achieved by accelerating shortening a debtor's assumption or rejection period (implicating Factors (i) and (iii)). Here, each of these factors supports Ovation Healthcare's request.

52. First, the Debtors have recognized the importance of the Ovation Services Agreements to their business. Given the importance of the services provided pursuant to the Ovation Services Agreements, Ovation Healthcare submits that no additional time is needed, and the Debtors should be required to decide by no later than thirty (30) days after the Court's entry of an order on this Motion.

53. Additionally, Ovation Healthcare suffers a meaningful harm from the Debtors' nonperformance. As set forth above, the Debtors are continuing to use – and benefit from – services provided by Ovation Healthcare without paying the agreed, contractual amounts. As a result, Ovation Healthcare is essentially financing the Debtors' chapter 11 cases.

54. Finally, the nature of the interest at stake favors finality. In *Adelphia Commc'ns*, the court recognized that the nondebtor's interest, and particularly its interest in receiving the benefit of its contractual bargain, constituted an important interest. *See Adelphia Commc'ns,* 291 B.R. at 296. The court also determined that the debtor's interest in the agreement was important as well, and therefore balanced the interest of the nondebtor party. *Id.* Addressing the good to be achieved, the court determined that the important

good to be achieved for the nondebtor was relieving it "from sitting in limbo for an inordinate amount of time." *Id.* at 296-97. So is the case here.

## RESERVATION OF RIGHTS

55.    Ovation Healthcare reserves the right to modify, supplement, or amend this Motion. Ovation Healthcare further reserves all rights and remedies against the Debtors under applicable law.

## NOTICE

56.    Notice of this Motion will be served on (i) counsel for the Debtors; (ii) the Office of the United States Trustee for the Northern District of New York; (iii) counsel for the Official Committee of Unsecured Creditors; (iv) the New York State Department of Health; (v) the Office of the Attorney General for the State of New York; (vi) the Centers for Medicare & Medicaid Services; (vii) the United States Department of Justice; (viii) counsel for Northern Credit Union; and (ix) those persons who have formally appeared and requested service in the above-captioned chapter 11 cases pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

## NO PRIOR REQUEST

57.    No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Ovation Healthcare respectfully requests entry of an order, substantially in the form annexed hereto as **Exhibit B**, (I) compelling compliance with the Ovation Services Agreements, including the payment of all amounts due under the Ovation Services Agreements for post-petition services, (II) granting relief from the automatic stay to the extent necessary for Ovation Healthcare to terminate the Ovation Services Agreements, and (III) compelling the assumption or rejection of the

Ovation Services Agreements.

Dated: March 11, 2026
        New York, New York

                                      TOGUT, SEGAL & SEGAL LLP

                                      */s/ Frank A. Oswald*
                                      Frank A. Oswald
                                      Minta J. Nester
                                      One Penn Plaza, Suite 3335
                                      New York, New York 10119
                                      Telephone: (212) 594-5000

                                      *Counsel for Ovation Healthcare f/k/a*
                                      *Quorum Health Resources*

## EXHIBIT A

**(Declaration of Scott Gressett)**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
In re                                          :
                                               :        Chapter 11
                                               :        Case No. 26-60099-wak
NORTH STAR HEALTH ALLIANCE, INC., *et al,*[1]  :        Main Case
                                               :        Jointly Administered
                                               :        Case No. 26-30078
                                               :        Case No. 26-30079
                             Debtors.          :        Case No. 26-60100
                                               :
-----------------------------------------------------------------------x

## DECLARATION OF SCOTT GRESSETT

I, Scott Gressett, submit this declaration pursuant to 28 U.S.C. § 1746, and declare as follows to the best of my knowledge, information, and belief:

1.      I am the President of Ovation Health Services f/k/a Quorum Health Resources ("Ovation Healthcare").

2.      I am authorized to submit this declaration on behalf of Ovation Healthcare and in support of the *Motion by Ovation Healthcare (I) To Compel Compliance with the Ovation Services Agreements, (II) For Relief from the Automatic Stay, and (III) To Compel Assumption or Rejection of the Ovation Services Agreements* (the "Motion")[2].

3.      All facts set forth in this Declaration and based upon my personal knowledge and information provided to me by Ovation Healthcare's employees and advisors, and review of relevant documents maintained by Ovation Healthcare in the ordinary course of business.  If called to testify as a witness in this matter, I would testify competently to the facts set forth in this Declaration.

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).

[2]    Capitalized terms used but not defined in this section shall have the meanings given to them in the subsequent sections of the Motion

**The Ovation Services Agreements and Pre-Petition Services**

4.      Ovation Healthcare is a premier shared services partner for independent hospitals.  Its portfolio of shared services includes leadership advisory, spend management, revenue cycle management, and technology designed to provide scale and efficiency to hospital business operations.

5.      On or about March 23, 2020, representatives of Quorum Health Resources, LLC d/b/a QHR Health (now, Ovation Healthcare) and Claxton-Hepburn Medical Center executed that certain Operational, Financial, and Strategic Assessment Agreement, effective as of March 23, 2020 (referred to as the "Master Agreement").  A true and correct copy of the Master Agreement is annexed hereto as **Exhibit 1** and incorporated by reference herein.

6.      Following entry of the Master Agreement, Ovation Healthcare and Claxton-Hepburn Medical Center executed two statements of work to the Master Agreement covering revenue cycle services (the "Revenue Cycle Services Agreement") and revenue cycle coding services (the "Coding Services Agreement," and together with the Revenue Cycle Services Agreement and the Master Agreement, the "Ovation Services Agreements").  True and correct copies of the Revenue Cycle Services Agreement and the Coding Services Agreement are annexed hereto as **Exhibit 2** and **Exhibit 3**, respectively, and are incorporated by reference herein.

7.      Prior to the commencement of the chapter 11 cases, the Debtors stopped making payments as required by the Ovation Services Agreements.  As of December 31, 2025, the Debtors owed Ovation Healthcare not less than $6,266,838.68 under the Ovation Services Agreements.

8.      During this period, Ovation Healthcare engaged with representatives of the Debtors to address the Debtors' failure to make payments as they

came due.

9.    On or about January 9, 2026, Ovation Healthcare proposed a

resolution where:



10.    Throughout this time, the Debtors were unable to demonstrate a

path to positive cash flow.

11.    While the parties' discussions progressed through the exchanged of

final redlined versions, the Debtors did not ultimately execute a new arrangement prior to

the commencement of the chapter 11 cases. Nevertheless, Ovation Healthcare continued to provide the contracted services. Indeed, as a courtesy, Ovation Healthcare consistently provided additional services above and beyond what was contemplated by the agreements. Specifically, Ovation Service took on obligations in connection with the patient switchboard (i.e., taking all inbound patient calls to the hospital switchboard and routing them to appropriate departments) despite that not being within the scope of the Ovation Services Agreements. In addition, Ovation Healthcare took on charge capture work required despite the fact that it was outside the scope of the contractual agreements; though Ovation Services billed an hourly rate for this, as set forth above, the Debtors did not keep and have not kept current with their payments.

12.     As of February 10, 2026, the Debtors owed Ovation Healthcare not less than $7,463,23143 on account of services provided pursuant to the Ovation Services Agreements.

**Post-Petition Services**

13.     The Debtors did not notify Ovation Healthcare prior to commencing the chapter 11 cases.

14.     Since the Petition Date, Ovation Healthcare in accordance with the Ovation Services Agreements. Indeed, Ovation Healthcare has continued to provide services, as a courtesy, above and beyond what is contemplated by the Ovation Services Agreements.

15.     At present, Ovation Healthcare has more than sixty team members providing services to the Debtors. Through their efforts, Ovation Healthcare has been able to collect ███████████ of accounts receivable on behalf of the Debtors between the Petition Date and March 5, 2026, and anticipates that the total expected cash will be ████████ for March 2026 and ████████ for April 2026.

4

16.      As of March 6, 2026, Ovation Healthcare has issued invoices to the
Debtors for post-petition services pursuant to the Revenue Cycle Services Agreement
totaling ███████, and for post-petition services pursuant to the Coding Services
Agreement totaling ████████ In sum, as of March 6, 2026, Ovation Healthcare's invoices
to the Debtors for post-petition services total ██████. Specifically, the invoices during
this period were as follows:



17.      During the next six weeks, Ovation Healthcare estimates that
approximately ████████ will be generated on account of services provided under the
Ovation Services Agreements.  Importantly, if an arrangement like the Revenue Cycle
Services Agreement was not in place, the Debtors would have to pay employees to
conduct the work currently done by Ovation Healthcare.

18.      Nevertheless, the Debtors have failed to fulfill their duties and
responsibilities under the Ovation Services Agreements.

19.      The Debtors have failed to compensate Ovation Healthcare for

those services at the agreed, contracted rate.  Instead, the Debtors have unilaterally

undertaken to provide partial payments.  In total, the Debtors' post-petition payments

to Ovation Healthcare total only $240,000:

      a.   $120,000 for the week ending February 20, 2026;

      b.   $60,000 for the week ending February 27, 2026;  and .

      c.   $60,000 for the week ending March 6, 2026.

    20.    As a result, as of March 6, 2026, the Debtors owe Ovation

Healthcare not less than ██████ on account of post-petition services provided

pursuant to the Ovation Services Agreements (the "Post-Petition Charges").

    21.    While failing to pay amounts due for post-petition services, the

Debtors have not yet executed replacement contracts that would provide for, among other

things, a tightened scope of services at a lower cost to the Debtors.

    22.    Following the Petition Date, Ovation Healthcare sought to restart

negotiations with the Debtors to reach a workable solution under new contracts with a

reduced scope of services.  Ovation Healthcare provided draft contracts on March 1,

2026.  However, those negotiations, have not yet reached a successful resolution.

    23.    As it stands, Ovation Healthcare is losing its bargained-for right and

opportunity to terminate the Debtors as customers and instead provide its limited capacity

to its other customers, who are willing to pay for Ovation Healthcare's services.

    I declare under penalty of perjury that the foregoing statements made by

me are true and correct to the best of my knowledge, information, and belief.


Dated:  March 11, 2026

                         */s/ Scott Gressett*
                         Scott Gressett
                         President
                         Ovation Health Services

**EXHIBIT "1"**

**FILED UNDER SEAL**

**EXHIBIT "2"**

**FILED UNDER SEAL**

**EXHIBIT "3"**

**FILED UNDER SEAL**

## EXHIBIT B

**(Proposed Order)**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 |
| | : | Case No. 26-60099-wak |
| NORTH STAR HEALTH ALLIANCE, INC., *et al*,[1] | : | Main Case |
| | : | Jointly Administered |
| | : | Case No. 26-30078 |
| | : | Case No. 26-30079 |
| Debtors. | : | Case No. 26-60100 |
| | : | |

------------------------------------------------------------------------x

## ORDER

        Upon the application, dated May 21, 2021 (the "Motion")[2] of Ovation

Healthcare f/k/a Quorum Health Resources ("Ovation Healthcare") for entry of an

order, (I) compelling compliance with the Ovation Services Agreements, specifically the

weekly payments pursuant to the Revenue Cycle Services Agreement and all amounts

due for services provided pursuant to the Coding Services Agreement, (II) granting relief

from the automatic stay to the extent necessary for Ovation Healthcare to terminate the

Ovation Services Agreements, and (III) compelling the assumption or rejection of the

Ovation Services Agreements;  and upon the accompanying Declaration of Scott

Gressett and the specific facts set forth therein;  and the Court having conducted a

hearing to consider the issues raised in the Motion (the "Hearing");  and the Court

having jurisdiction to consider the foregoing pursuant to 28 U.S.C. §§ 157 and 1334;  and

this Court having the power to enter a final order consistent with Aetile III of the

United States Constitution;  and consideration of the Motion and the requested relief

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax
      identification number are: Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491);
      Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).

[2]   Capitalized terms used but not defined in this section shall have the meanings given to them in the
      subsequent sections of the Motion.

being a core proceeding pursuant to 28 U.S.C. § 157(b);  and venue being proper before

the Court pursuant to 28 U.S.C. §§ 1408 and 1409;  and due and proper notice of the

Motion having been provided;  and such notice having been adequate and appropriate

under the circumstances;  and it appearing that no other and further notice need be

provided;  and the Court having considered arguments made in the Motion and at the

Hearing;  and this Court having determined that the legal and factual bases set forth in

the Motion and at the Hearing establish just cause for the relief granted herein;  and

upon the record of the Hearing and all of the proceedings had before this Court and

after due deliberation and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED THAT:**

1.    To the extent that they have not already done so, the Debtors shall

pay to Ovation Healthcare all amounts due for post-petition services under the Ovation

Services Agreement, including, but not limited to, any unpaid portion of the Post-

Petition Charges, within two (2) business days of entry of this Order.

2.    The Debtors shall comply with the Ovation Services Agreements,

including, but not limited to, the payment of amounts owed to Ovation Healthcare in

accordance with the terms of the Ovation Services Agreements.

3.    The automatic stay in the Debtors' chapter 11 cases is hereby lifted

to permit Ovation Healthcare to exercise any and all termination rights under the

Ovation Services Agreements.

4.    The relief from stay granted herein shall be effective immediately

upon entry of this Order and shall not be stayed under Rule 4001(a)(3) of the Federal

Rules of Bankruptcy Procedures.

5.    The Debtors shall assume or reject the Ovation Services

Agreements no later than thirty (30) days after entry of this Order.

6.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry. The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

## CERTIFICATE OF SERVICE

I certify that on March 11, 2026, I caused copies of: (1) the *Motion to Redact and File Under Seal Certain Portions of the Motion by Ovation Healthcare (I) To Compel Compliance with the Ovation Services Agreements, (II) For Relief from the Automatic Stay, and (III) To Compel Assumption or Rejection of the Ovation Services Agreements*; and (2) the *Motion by Ovation Healthcare (I) To Compel Compliance with the Ovation Services Agreements, (II) For Relief from the Automatic Stay, and (III) To Compel Assumption or Rejection of the Ovation Services Agreements; and Notice of Motion* to be served via e-mail or via first class mail as listed on the service list attached hereto, and through the Court's electronic notification system.

Dated: March 11, 2026

/s/Frank A. Oswald
FRANK A. OSWALD

SERVICE LIST

| PARTY | ADDRESS | EMAIL | ROLE | Service by E-mail or FCM |
|---|---|---|---|---|
| US Trustee | Office of the U.S. Trustee (NDNY)<br>100 State Street<br>Room 4230<br>Rochester, NY 14614<br>Erin P. Champion, Esq. | erin.champion@usdoj.gov | US TRUSTEE | E-mail |
| Counsel for Carthage Area Hospital, Inc.<br>North Star Health Alliance, Inc.<br>Claxton-Hepburn Medical Center, Inc.<br>Meadowbrook Terrace, Inc. | Barclay Damon LLP<br>Barclay Damon Tower<br>125 East Jefferson Street<br>Syracuse, New York 13202<br>Jeffrey A. Dove, Esq.<br>Janice Grubin<br>-<br>555 Long Wharf Drive, Sixth Floor<br>New Haven, Connecticut 06511<br>Ilan Markus, Esq. | jdove@barclaydamon.com<br>imarkus@barclaydamon.com<br>jgrubin@barclaydamon.com | Debtors' Counsel | E-mail |
| Special Counsel for Carthage Area Hospital, Inc.<br>North Star Health Alliance, Inc.<br>Claxton-Hepburn Medical Center, Inc.<br>Meadowbrook Terrace, Inc. | VERRILL DANA LLP<br>One Portland Square, 10th Floor<br>Portland, ME 04101<br>Lindsay Z. Milne<br>Roger A. Clement, Jr.<br>Robert J. Keach<br>Jennifer S. Novo<br>Nathaniel R. Hull | lmilne@verrill-law.com<br>rclement@verrill-law.com<br>rkeach@verrill-law.com<br>jnovo@verrill-law.com<br>nhull@verrill-law.com | Debtors' Special Counsel | E-mail |
| Coumsel for New York State Nurses Association | COHEN, WEISS AND SIMON LLP<br>909 Third Avenue, 12th Floor<br>New York, NY 10022<br>Richard M. Seltzer<br>Matthew E. Stolz | rseltzer@cwsny.com<br>mstolz@cwsny.com | Creditor | E-mail |
| Counsel for Davin Healthcare Workforce Solutions, Inc. | MORRISON COHEN LLP<br>909 Third Avenue, 27th Floor<br>New York, New York 10022<br>Heath D. Rosenblat, Esq. | hrosenblat@morrisoncohen.com<br>bankruptcy@morrisoncohen.com | Creditor | E-mail |
| Counsel for ARHC NCWTNNY01, LLC | Klestadt Winters Jureller<br>Southard & Stevens, LLP<br>One Old Country Road, Suite 237<br>Carle Place, NY 11514<br>Attn: Sean C. Southard<br>Lauren C. Kiss | ssouthard@klestadt.com<br>lkiss@klestadt.com | Creditor | E-mail |
| Counsel for Pension Benefit Guaranty Corporation | Office of the General Counsel<br>445 12th Street, S.W.<br>Washington, D.C. 20024<br>Michael I. Baird, Esq. | baird.michael@pbgc.gov<br>efile@pbgc.gov | Creditor | E-mail |

| PARTY | ADDRESS | EMAIL | ROLE | Service by E-mail or FCM |
|---|---|---|---|---|
| Counsel for Chart Risk Retention Group | LEMERY GREISLER LLC<br>Attorneys for Chart Risk Retention Group<br>677 Broadway, 8th Floor<br>Albany, New York 12207<br>Paul A. Levine, Esq. | PLevine@lemerygreisler.com | Creditor | E-mail |
| Counsel for Syracuse Biomedical Services, LLC | McConville, Considine, Cooman & Morin, PC<br>300 Meridian Centre Blvd., Suite 110<br>Rochester, NY 14618<br>Mikal Krueger, Esq. | mkrueger@mccmlaw.com | Creditor | E-mail |
| Counsel for Jorie Healthcare Partners, LLC | POLSINELLI PC<br>600 Third Avenue, 42nd Floor<br>New York, New York 10016<br>Brett D. Goodman<br>-<br>POLSINELLI PC<br>222 Delaware Avenue, Suite 1101<br>Wilmington, Delaware 19801<br>Shanti M. Katona<br>Katherine M. Devanney | bgoodman@polsinelli.com<br>skatona@polsinelli.com<br>kdevanney@polsinelli.com | Creditor | E-mail |
| Counsel for 1199SEIU UNITED HEALTHCARE WORKERS EAST | LEVY RATNER, P.C.<br>80 8th Avenue, 8th Floor<br>New York, NY 10011<br>Jessica I. Apter<br>Ryan J. Barbur | japter@levyratner.com<br>rbarbur@levyratner.com | Creditor | E-mail |
| Counsel for LC Real Estate Properties LLC | Saunders Kahler LLP<br>185 Genesee Street, Suite 1400<br>Utica NY 13501<br>Merritt S. Locke, Esq. | mlocke@saunderskahler.com | Creditor | E-mail |
| Counsel for M & T Bank | BUCHANAN INGERSOLL & ROONEY PC<br>640 5th Avenue, 9th floor<br>New York, NY 10019<br>Christopher P. Schueller, Esq. | christopher.schueller@bipc.com | Creditor | E-mail |
| Counsel for Westways Staffing Services, Inc. | GREENSPOON MARDER LLP<br>1875 Century Park East, Suite 1900<br>Los Angeles, California 90067<br>Howard M. Ehrenberg, Esq. | howard.ehrenberg@gmlaw.com | Creditor | E-mail |
| Counsel for Pennsylvania Manufacturers' Association Insurance Company and PMA Management Corp. | Earp Cohn, P.C.<br>20 Brace Rd., Suite 400<br>Cherry Hill, NJ 08034<br>Richard M. Schlaifer | rschlaifer@earpcohn.com | Creditor | E-mail |

| PARTY | ADDRESS | EMAIL | ROLE | Service by E-mail or FCM |
|---|---|---|---|---|
| Counsel for Community Computer Service, Inc. d/b/a Medent® | Law Offices of Pullano & Farrow PLLC 401 Main Street East Rochester, New York 14445 Langston D. McFadden, Esq. Patrick Pullano, Esq. | lmcfadden@lawpf.com ppullano@lawpf.com | Creditor | E-mail |
| Counsel for Varian Medical Systems, Inc. | Miller, Canfield, Paddock and Stone, P.L.C. 150 West Jefferson, Suite 2500 Detroit, MI 48226 Mark N. Swanson, Esq. | swansonm@millercanfield.com | Creditor | E-mail |
| Counsel for Connect America d/b/a Lifeline Systems Company and Medical Alert | Costello, Cooney & Fearon, PLLC 211 W. Jefferson Street, Suite 1 Syracuse, NY 13202 Alexandra L. Condon, Esq. | acondon@ccf-law.com | Creditor | E-mail |
| Counsel for The Official Committee of Unsecured Creditors | DENTONS US LLP 1221 Avenue of the Americas New York, New York 10020 Lauren M. Macksoud, Esq. - Dentons Bingham Greenebaum, LLP One City Center, Suite 11100 Portland, ME 04101-6420 | lauren.macksoud@dentons.com andrew.helman@dentons.com | Creditor | E-mail |
| Attorneys for Northern Credit Union | Bond, Schoeneck & King, PLLC One Lincoln Center, 18th Floor Syracuse, New York 13202-1355 Attn: Charles J. Sullivan, G. Walter, and A. Rivera | sullivc@bsk.com walterg@bsk.com arivera@bsk.com | Creditor | E-mail |
| NYS AG | Department of Law NYS Office of Attorney General Charities Bureau Registration Section 28 Liberty Street New York, NY 10005 | | NYS AG | First Class Mail |
| Center for Medicare (Additional Address) | Center for Medicare & Medicaid Services Department of Health & Human Services Attn: Office of General Counsel 200 Independence Avenue, S.W. Washington, D.C. 20201 | | Medicare/Medicaid | First Class Mail |
| Medicare Medicaid | CMS Ctr. For Medicare Medicaid Services 7500 Security Blvd. Baltimore, MD 21244 | | Medicare/Medicaid | First Class Mail |

| PARTY | ADDRESS | EMAIL | ROLE | Service by E-mail or FCM |
|---|---|---|---|---|
| NYSDOH | New York State Department of Health<br>Attn: Equal Coordinator<br>875 Central Avenue<br>Albany, NY 12206 | | NYS DEPT OF Health | First Class Mail |
| USDOJ | U.S. Department of Justice (DOJ)<br>950 Pennsylvania Avenue, NW,<br>Washington, DC 20530 | | US Dept of Justice | First Class Mail |
| United States Attorney General (NDNY) | Attn: Forrest T. Young, AUSAG | forrest.young@usdoj.gov | USAG (NDNY) | E-mail |