**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**
**SYRACUSE DIVISION**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| NORTH STAR HEALTH ALLIANCE, INC., *et al*,[1] | : | Case No. 26-60099-5-wak |
| | : | Main Case |
| Debtors. | : | Jointly Administered |
| | : | Case No. 26-30078 |
| | : | Case No. 26-30079 |
| | : | Case No. 26-60100 |

-------------------------------------------------------------------x

**DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING**
**A SETTLEMENT INVOLVING CARTHAGE AREA HOSPITAL, INC.,**
**WALTER DODARD, D.O., AND COMPREHENSIVE WOMEN'S**
**HEALTH SERVICES, PLLC, AND FOR RELATED RELIEF**

North Star Health Alliance, Inc. ("North Star"), Carthage Area Hospital, Inc. ("Carthage"),

Claxton-Hepburn Medical Center, Inc. ("Claxton"), and Meadowbrook Terrace, Inc.

("Meadowbrook"), the above-captioned debtors and debtors-in-possession (collectively, the

"Debtors"), hereby move (the "Motion") this Court (as defined herein) for entry of an order (the

"Proposed Order"), substantially in the form attached hereto as **Exhibit A**, granting the relief

described below, as supported by the Declaration of Andrew R. Manzer attached hereto as **Exhibit**

**B** (the "Manzer Declaration"), and represent as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and

1334.  Consideration of this matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of

this proceeding is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).

2.      The Debtors consent to the entry of a final order on this Motion if it is determined that the Court, absent consent of the parties, cannot enter a final order consistent with Article III of the United States Constitution.

3.      The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363, and 554 and Rules 9019, 6006, and 6007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

### A.  The Chapter 11 Cases

4.      On February 10, 2026 (the "Petition Date"), the Debtors commenced these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of their properties and are operating and managing their businesses, as debtors-in-possession, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

6.      By Notice of Appointment dated March 4, 2026, the Office of the United States Trustee (the "UST") appointed an official committee of unsecured creditors (the "Committee").

7.      By Notice of Appointment dated March 12, 2026, the UST appointed Suzanne Koenig as the Patient Care Ombudsman (the "PCO").

### B.  The Debtors' Corporate Structure and Operations

8.      North Star was established in September 1993 and incorporated in the State of New York as a not-for-profit corporation.  North Star is the umbrella organization within which Carthage, Claxton, Meadowbrook, and related affiliates coordinate governance, strategy, and

50477981.1

shared services under what is referred to as the Transformation Plan.[2] North Star is a passive parent entity that does not itself exercise financial control over each member organization; rather, it serves as a platform for alignment and operational integration, including shared leadership and centralized administrative functions (*e.g.*, finance, human resources, information technology, compliance, revenue cycle coordination, and cash planning) that are critical to sustaining rural healthcare delivery across multiple campuses.  The North Star system, as a whole, employs approximately 1,475 employees.

9.      Carthage was established in November 1921 and incorporated in the state of New York as a not-for-profit corporation.  Carthage operates a 25-bed Critical Access Hospital in each of Carthage, New York and Ogdensburg, New York, serving a large, rural tri-county area. Carthage holds a New York State Department of Health ("DOH") operating certificate (No. 2238700C; Facility ID/PFI 379 & Facility ID/PFI 15684) for primary care hospital-critical access hospital services located at 1001 West Street, Carthage, New York 13619, and 214 King Street, Suite A, Ogdensburg, New York 13669 (the "Claxton Campus").  The Claxton Campus is the designated "9.39" hospital for the area and is the former acute-care component of Claxton that Carthage now operates as part of the Transformation Plan.  While the DOH issued the operating certificate reflecting this configuration, Centers for Medicare & Medicaid Services ("CMS") processes to recognize and operationalize the Claxton Campus as a critical access hospital (including surveys, enrollment steps, and related notifications) have involved additional steps and timing considerations.

---

[2] Beginning in or about August 2022, North Star pursued a complex transition (the "Transformation Plan") designed to preserve access to acute care and behavioral health services in the North Country while addressing Claxton's unsustainable legacy cost and reimbursement structure as a Sole Community Hospital.  The Transformation Plan involved coordinated planning among North Star member organizations, engagement with DOH and OMH, and stepwise regulatory actions.  On October 23, 2024, DOH and OMH issued operating certificates that reorganized Claxton into two distinct hospital entities:  (i) a standalone inpatient psychiatric hospital (CHMC) and (ii) a separate acute-care campus operated by Carthage under a shared operating certificate (the Claxton Campus).

3

10. Claxton-Hepburn Medical Center, Inc. was established in December 1916 and incorporated in January 1917 in the state of New York as a not-for-profit corporation. Following the implementation of the Transformation Plan, Claxton now operates exclusively as a standalone Article 31 Inpatient Psychiatric Hospital licensed by the New York State Office of Mental Health under Operating Certificate No. 8231002, located at 214 King Street, Suite B, Ogdensburg, New York 13669. Claxton provides acute inpatient behavioral health services for adults (28 beds) and children/adolescents (12 beds), including the region's only acute inpatient unit dedicated to children and adolescents.

11. Meadowbrook Terrace, Inc. was established in December 2011 and incorporated in the state of New York as a not-for-profit corporation. Meadowbrook is a 60-bed assisted living facility (58 ALP beds and 2 Adult Home) that provides assisted living services for seniors in the North Country region. Meadowbrook is a key part of the Debtors' care continuum for elderly and medically fragile patients, supporting safe discharge planning and community-based care.

12. Through these bankruptcy proceedings, the Debtors intend to continue to fulfill their mission by operating their facilities to deliver quality health care, with a dedicated local workforce, in their communities.

**C. The Business Relationship Between Dr. Dodard, CWHS, and Carthage**

13. Dr. Walter Dodard is the sole physician of Comprehensive Women's Health Services, PLLC ("CWHS" or the "Practice"), having a principal place of business at 622 Washington Street, Watertown, New York 13601. CWHS provides gynecology and other reproductive services. CWHS is a part of the North Star organization.

14. While CWHS was founded by Dr. Dodard, pursuant to (i) an Ownership Interest Assignment Agreement dated as of October 1, 2018, between Walter Dodard, D.O., as assignor

4

50477981.1

and then-owner of 100% of the membership units in CWHS, and Walter Fink, D.O., as assignee (the "Assignment Agreement");[3] (ii) a Provider Employment Agreement dated as of October 1, 2018, between the Practice and Dr. Dodard (the "Practice Provider Employment Agreement"); and (iii) a Provider Employment Agreement dated as of October 1, 2018, between Carthage and Dr. Dodard (the "Carthage Provider Employment Agreement", and together with the Practice Provider Employment Agreement, the "Provider Employment Agreements"), Dr. Dodard assigned all of his interests in the Practice to Walter Fink, among other terms.  As part of the Provider Employment Agreements, Dr. Dodard retained the right to purchase the Practice for the sum of (a) the amount Dr. Dodard was paid pursuant to the Assignment Agreement, *i.e.*, one dollar ($1), and (b) the then current depreciated value of the physical improvements to the Practice or equipment added at the Practice site (collectively, the "Buyback").[4]  Copies of the Assignment Agreement and Provider Employment Agreements are attached hereto as **Exhibit C**.

15.    On or about May 13, 2025, Dr. Dodard commenced litigation against Carthage Area Hospital alleging, among other things, that the Debtor breached the Assignment and Provider Employment Agreements (Supreme Court of the State of New York, Jefferson County, Index No. EF2025-1634) (the "Dodard Litigation").  The Debtor asserted counterclaims in the Dodard Litigation for breach of fiduciary duties, breach of the Carthage Provider Employment Agreement and for unjust enrichment.  The parties were in discovery when the Debtors filed the Chapter 11 Cases.

---

[3] The membership interest was later assigned by agreement from Dr. Walter Fink to Dr. Michael E. Gordon (the Debtor's Chief Medical Officer) pursuant to an Ownership Interest Assignment Agreement dated March 14, 2020.

[4] As part of the Settlement, the parties have agreed to waive any consideration for the current depreciated value of the physical improvements and equipment purchases Carthage has invested in and acquired for the Practice, if any, since October 1, 2018.

50477981.1

16.     In addition, CWHS operated at a premises owned by BCD Properties, LLC (the "Landlord"). CWHS owes over $185,000.00 in unpaid rent to the Landlord dating back to approximately October 2024. The Landlord is owned by Dr. Dodard.

17.     Since approximately January, 2026, it appears that CWHS could not maintain its operations on a standalone basis and the Debtors began paying its payroll and/or supplies. Even with such subsidies, CWHS periodically fell behind on certain of its obligations even before January 2026, including rent, as noted above.

18.     In early March of 2026, the Debtors concluded that they could not continue to subsidize CWHS and made the determination to close the Practice.

19.     By notice dated March 6, 2026, Carthage notified current and former patients of the Practice that it was closing the Practice effective April 10, 2026 (the "Closing Notice").

20.     Since disseminating the Closing Notice, various patient issues have arisen. Specifically, it has been difficult for CWHS and Carthage to respond timely to patient record requests and, upon information and belief, patients have informed Dr. Dodard that the closest alternative provider was at least an hour away, and they have to wait for a year to schedule appointments at other practices.

**D.  The Settlement**

21.     On or about April 7, 2026, Dr. Dodard approached Carthage to exercise the Buyback which led to the negotiation and memorialization of the Membership Interest Transfer Agreement (the "Dodard Agreement") (unexecuted and in substantially final form) and Term Sheet (the "Term Sheet") (executed), attached hereto as **Exhibit D** and **Exhibit E**, respectively, subject to this Court's approval.  Thus, the Debtors file this Motion seeking approval of the Dodard

6

Agreement and Term Sheet as part of the settlement between Carthage, Dr. Dodard, and CWHS (the "Settlement").

22.     Under the Settlement, Dr. Dodard will exercise the Buyback to purchase the Practice and both Dr. Dodard and Carthage will agree to exchange mutual releases, including but not limited to dismissal with prejudice of the Dodard Litigation.

23.     Notably, the settlement, among other things, ensures the continuity of care to patients in an underserved area (who consist largely of military families), provides for the retention and custody of records, results in the preservation of jobs, and provides for the cancellation and/or transfer of liabilities and a final end to any further subsidizing of CWHS by Carthage or any of the other Debtors.  Alternatively, if the Settlement is not approved, the Carthage will be responsible for the costs associated with dissolving the Practice, addressing any liabilities, and responding to requests for and addressing the preservation of patient records.

## RELIEF REQUESTED

### A.  Approval of the Settlement

24.     Bankruptcy Rule 9019 governs the approval of compromises and settlements, and provides in relevant part as follows:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indentured trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).  Compromise or settlement is generally favored, with the Rule 9019 approval process actually encouraging such outcomes, subject to analysis and approval by the Court.  *See Nellis v. Shugrue*, 165 B.R. 115, 122 (S.D.N.Y. 1994) (citing *In re New York, N.H. &*

7

50477981.1

*H. R.R. v. Smith,* 632 F.2d 955, 959 (2d Cir.), *cert. denied sub nom. Barry v. American Financial Enterprises, Inc.,* 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980)).

25. In approving a compromise or settlement, the Court is required to make an "informed and independent judgment" as to whether the compromise is "fair and equitable" based on an

> educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

*Protective Comm. for Index. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968); *see also Airline Pilots Ass'n v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

26. Any determination on the "propriety of the settlement" shall be made by the court after considering whether the proposed settlement is in the "best interest of the estate," (*Handler v. Roth (In re Handler)*, 386 B.R. 411, 420 (Bankr. E.D.N.Y. 2007) (quoting *In re Adelphia Comm'n Corp.*, 327 B.R. 143, 158 (Bankr. S.D.N.Y. 2005))), with approval within the sound discretion of the court. *Arrow Air*, 85 B.R. at 891; *see also Depo v. Chase Lincoln First Bank, N.A. (In re Depo)*, 77 B.R. 381, 383 (N.D.N.Y. 1987). "[T]he bankruptcy court does not substitute its judgment for that of the Debtor" (*Depo*, 77 B.R. at 384) (citations omitted)), but it is to make "an independent determination" of the propriety of the proposed settlement terms without merely accepting a trustee's statement that the settlement is reasonable, or rubber stamping such proposal. *Nellis*, 165 B.R. at 122 (citing *Ionosphere*, 156 B.R. at 426).

27. The court is not required in making its independent determination "to decide the numerous questions of law and fact . . . [R]ather [the court should] canvass the issues and see

8

50477981.1

whether the settlement falls below the lowest point in the range of reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983). Thus, the court does not engage in a "mini-trial" of the dispute being settled. *In re Soup Kitchen Int'l Inc.*, 506 B.R. 29, 37 (Bankr. E.D.N.Y. 2014) ("A bankruptcy court need not conduct an independent investigation into the reasonableness of the settlement…. It is not necessary for the court to conduct a 'mini-trial' of the facts or the merits underlying the dispute." (quoting *In re Chemtura Corp.*, 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010))); *In re Purofied Down Prods. Corp.*, 150 B.R. 519 (S.D.N.Y. 1993) (noting that mini-trial of settled claims to determine whether settlement should be approved was not necessary). All that the proponent of the settlement must do is establish that it is "prudent to eliminate the risks of litigation to achieve specific certainty though admittedly [the settlement] might be considerably less (or more) than were the case fought to the bitter end." *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir. 1960); *see also United States v. Alaska Nat'l Bank of N. (In re Walsh Constr., Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982) (bankruptcy court need not conduct "exhaustive investigation into the validity of the asserted claim").

28.    Ultimately, "[t]he process of approval is committed to the Court's sound discretion to be exercised with the best interests of the estate and creditors in mind*." In re Neuman*, 103 B.R. 491, 500 (Bankr. S.D.N.Y. 1989), *rev'd on other grounds*, 124 B.R. 155 (S.D.N.Y. 1991).

29.    By this Motion and pursuant to Bankruptcy Rule 9019 (a), the Debtors seek approval of the Settlement between, among others, Dr. Dodard and Carthage, as memorialized by the Dodard Agreement and Term Sheet. As is discussed below, because the Settlement may involve property of the Debtors' estates — personal property and a mutual release — in an abundance of caution, the Debtors also seek relief under Bankruptcy sections 363(b) and 554.

9

30.    Failure to consummate the Settlement would result in the permanent closing of the Practice and negatively impact patient care in the region.  The Settlement is important as it preserves continuity of care for the patients of CWHS, many of whom include active-duty members or their spouses living or working in local United States military bases or facilities.

31.    Approval of the Settlement will also end any further financial and operational support of the Practice by Carthage.  Moreover, the Settlement will relieve Carthage of the burden of maintaining custody of patient medical records and any responsibilities in connection with such medical records.

32.    The Debtors believe the benefits of the Settlement outweigh any burden to the Carthage estate.

33.    The benefits under the Settlement to the Debtors are substantial and are a significant benefit to the estates and the Debtors' creditors.  In addition to the benefits to the patients and community, the Settlement also resolves the claims raised in the Dodard Litigation as well as eliminates any claims by the Landlord through the proposed releases in the Settlement.  Ultimately, the Settlement is intended to provide a "clean break" between Carthage and Dr. Dodard while providing for the continued care of patients in the region.

**B.  Sale of the Practice and Abandonment of Personal Property**

34.    Section 363 provides that a debtor in possession "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  "The standard for approval under Section 363(b) is whether the debtor exercised sound business judgment." *Advanced Contracting Sols., LLC v. Metallic Lathers & Reinforcing Ironworkers Local 46 (In re Advanced Contracting Sols., LLC)*, 582 B.R. 285, 310 (Bankr. S.D.N.Y. 2018).  "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation

10

50477981.1

acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations omitted).

35.    For the reasons set forth above, the Debtors believe the Settlement is an exercise of their sound business judgment.

36.    Ample business justifications support approval of the Settlement.  As described above, the Dodard Agreement offers substantial benefits to the Debtors.  The commercial terms of the Dodard Agreement represent the best option available to the Debtors and the Settlement is the result of arms' length negotiations between the parties.

37.    The Debtors submit that the Dodard Agreement represents a benefit to the estates and the Debtors should be permitted to exercise their business judgment to sell the Practice under the Dodard Agreement, pursuant to 11 U.S.C. § 363(b).

38.    In addition, Section 554 provides that a debtor in possession may abandon, subject to court approval, "property of the estate that. . . is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a).  Before authorizing abandonment of property, a Bankruptcy Court must find either: (i) the property is burdensome to the estate, or (ii) the property is of inconsequential value and inconsequential benefit to the estate.  *See*, *e.g., Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 497 (1986); *In re Texaco, Inc.*, 92 B.R. 38, 44 (S.D.N.Y. 1988); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 882 n.7 (Bankr. S.D.N.Y. 1990).

39.    While the parties do not believe any of the personal property at CHWS is owned by Carthage, in an abundance of caution and in the alternative, the Debtors believe it is appropriate to abandon any personal property at CHWS's offices.  The personal property proposed to be abandoned in connection with the Dodard Agreement would potentially primarily consist of

11

50477981.1

fixtures, furniture, and other office and store equipment located at the CHWS's offices that are (i) of minimal or no material value or benefit to the Debtors' estates, and/or (ii) burdensome insofar as the costs and expenses of removal and storage of such property are likely to exceed the net proceeds realizable from their sale (the "Personal Property"). The Debtors do not believe they have an interest in the equipment located at the Practice. To the extent they do have interests in the equipment, the Debtors believe the value is de minimis.

40. The Debtors have determined, in their sound exercise of their reasonable business judgment, that the abandonment of the Personal Property is in the best interest of their estates and their creditors. The abandonment of unnecessary or burdensome property and the attendant reduction in the estates' administrative costs to maintain that Personal Property reflects the Debtors' exercise of sound business judgment. Abandonment of the Personal Property will reduce the Debtors' post-petition obligations and promote the efficiency and overall cost-effectiveness of the Debtors' reorganization.

41. Accordingly, the Debtors submit that the standard set forth in section 554(a) of the Bankruptcy Code is satisfied.

**NOTICE**

42. Notice of this Motion has been provided to (a) the Office of the United States Trustee for the Northern District of New York, (b) counsel for the Official Committee of Unsecured Creditors, (c) the New York State Department of Health, (d) the Office of the Attorney General for the State of New York, (e) the Centers for Medicare & Medicaid Services, (f) the Office of the U.S. Attorney for the Northern District of New York, and (g) those persons who have formally appeared and requested service in these Chapter 11 Cases pursuant to Rule 2002

12

50477981.1

(collectively, the "Notice Parties").  In light of the nature of the relief requested in this Motion and the circumstances herein, the Debtors respectfully submit that no further notice is necessary.

## NO PRIOR REQUEST

43.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

## CONCLUSION

44.     The Settlement, incorporating the sale of the Practice, the abandonment of personal property of questionable value, the dismissal with prejudice of the Dodard Lawsuit, the cancellation and/or transfer of liabilities, including rent, and the exchange of mutual releases, is clearly in the best interests of the Debtors and their estates and makes eminent economic sense.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated:  April 22, 2026        **BARCLAY DAMON LLP**
  New York, New York        *Proposed Counsel for Debtors and*
            *Debtors-In-Possession*

            By:  */s/Janice B. Grubin*
            Janice B. Grubin
            Ilan Markus (admitted *pro hac vice*)
            1270 Avenue of the Americas, Suite 2310
            New York, New York 10020
            Janice B. Grubin:
            (212) 784-5808; jgrubin@barclaydamon.com
            Ilan Markus:
            (203) 672-2661; imarkus@barclaydamon.com

13

50477981.1