# EXHIBIT C
**Assignment Agreement and Provider Employment Agreements**

## Articles of Organization and Member Operating Agreement
## Transfer of Powers

**FOR VALUE RECEIVED**, the sufficiency of which is hereby acknowledged, Walter A. Fink, Member/Manager of Comprehensive Woman's Health Services, P.L.L.C., hereby sells, assigns and transfers to Michael E. Gordon, his managership, membership and ownership interest under the Articles of Organization and/or Member Operating Agreement, of Comprehensive Woman's Health Services, P.L.L.C.,  standing in my name on the books and records of said Company represented by the Articles of Organization and/or Member Operating Agreement, held by the Member/Manager, and does hereby irrevocably constitute and appoint The CEO of Carthage Area Hospital, Richard Duvall, and whomever shall succeed him in said position, as attorney-in-fact to transfer the said stock on the books of the within named Corporation with full power of substitution.

Date: March ___14___ , 2020

_____
Walter A. Fink

In presence of:

Sworn before me
This 14th Day of March, 2020

DAVID N. HOFFMAN
NOTARY PUBLIC, State of New York
No. 02HO5025072
Qualified in New York County
Commission Expires May 13, 2022

4849-2782-8338.2

## OWNERSHIP INTEREST ASSIGNMENT AGREEMENT

**THIS AGREEMENT**, dated as of July 26, 2020 (the "Agreement"), is by and between Walter A. Fink, D.O., an individual residing at 2610 Strathmore Court, Reno Nevada 89521 (the "Assignor"), and   Michael E. Gordon, M.D., an individual having an address at 1000 West Street, Carthage NY 13619.  (the "Assignee").

## RECITALS:

1.      The Assignor and Assignee are each physicians duly licensed to practice medicine in New York State.

2.      The Assignor holds 100% of the membership units, management and voting rights (collectively, the "Interests") in Comprehensive Woman's Health Services, P.L.L.C. the "Company").

3.      The Assignor, (or the Assignor's attorney -in-fact), has determined to sell and Assignee has agreed to purchase all of the Interests of the Company in accordance with the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.      **PREAMBLES.**  The recitals set forth above are hereby incorporated herein.

2.      **ASSIGNMENT OF INTERESTS.**

(a)      Assignor hereby assigns to the Assignee and the Assignee agrees to accept from the Assignor, all of Assignor's interests in the company, upon the payment to Assignor of the price of One Dollar ($1.00), receipt of which is hereby acknowledged by the Assignor. Assignor shall deliver to the Assignee a transfer agreement duly executed for transfer of all of assignors Interests.

(b)      Following transfer of Assignor's interests set forth above, the Assignee shall own in the aggregate one hundred percent (100%) of the Company and Assignor shall not assume or retain any liabilities of or responsibilities or obligations to the Company under this Agreement.

(c)      The parties acknowledge that the Company, pursuant to a Provider Employment Agreement, is employing Assignee to provide clinical and administrative services to the Company. Pursuant to Section 5.G of a certain Provider Employment Agreement with Walter Dodard, the Original Assignor, may under certain circumstances, re-acquire ownership Interest in the Company.  In such event, the Assignee (or the successor in interest to the Assignee) shall, at the direction of Carthage Area Hospital, transfer all of the membership units, management, and voting rights in the Company to the Original Assignor.

- 2 -

(d)    The Assignee confirms that it will not permit the Hospital or any entitled affiliated with or under contract with the Hospital to provide services to Practice other than at cost.

3.    **REPRESENTATIONS AND WARRANTIES.**

(a)    The Assignee represents and warrants to the Assignor, which representations and warranties shall survive the transfer of the Interests hereunder, that: (i) he is a physician duly licensed to practice medicine under the laws of New York State; (ii) he has the full power and authority to execute and deliver this Agreement, to perform the obligations hereunder and to consummate the transactions contemplated hereby; and (iii) this Agreement has been duly executed and delivered by him/her and constitutes a valid and legally binding obligation enforceable against him/her in accordance with its terms.

(b)    The Assignor represents and warrants to the Assignee, which representations and warranties shall survive the transfer of the Interests hereunder, that he has been advised by Carthage Area Hospital that: (i) he is the sole, exclusive and lawful owner of the Interests being sold hereunder; (ii) the Interests are owned free and clear of all liens, claims and encumbrances and no other party owns or has any rights whatsoever in any of the Interests in the Company; (iii) no other party has or has asserted any claims against the Assignor with respect to the Interests; (iv) no consents of any third parties not already obtained or required are needed in order to permit the sale and delivery of such Interests hereunder; (v) he has full power and authority to sell the Interests; and (vi) this Agreement has been duly executed and delivered by him and constitutes a valid and legally binding obligation enforceable against him in accordance with its terms.

4.    **ENTIRE AGREEMENT: MODIFICATIONS**. This Agreement is the entire agreement among the parties concerning the subject matter hereof and shall not be changed, except by a writing signed by all the parties.

5.    **FURTHER ASSURANCES.** The parties shall execute and deliver all documents, provide all information and take or forbear from all such action as may be necessary or appropriate to achieve the purposes set forth in this Agreement.

6.    **BINDING EFFECT.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

7.    **GOVERNING LAW**. This Agreement shall be governed by and construed in accordance with the laws of New York State without regard to conflict of law rules.

4849-2782-8338.2

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first written above.

**ASSIGNEE**　　　　　　　　　　　　　　　**ASSIGNOR**

_____　　　　_____
Michael E.  Gordon, M. D.　　　　　　　Walter A. Fink, D.O.

- 4 -

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first written above.


**ASSIGNEE**                                    **ASSIGNOR**

_____                    _____

Michael E.  Gordon, M. D.                         Walter A. Fink, D.O.


- 4 -

4849-2782-8338.2

CARTHAGE AREA HOSPITAL
1001 West Street
Carthage, New York 13619

March _____, 2020

Michael E. Gordon, M.D.
1000 West Street
Carthage NY 13619.

RE:  Comprehensive Woman's Health Services, P.L.L.C.

Dear Dr. Gordon:

This letter agreement (the "Agreement") shall supplement your employment relationship with Carthage Area Hospital, Inc. (the "Hospital"). At the request of the Hospital, you have agreed to serve as managing member of, and to provide to the hospital professional services of the employees of Comprehensive Woman's Health Services, P.L.L.C. (the "Company").

The COMPANY shall provide professional services at such locations as are deemed appropriate by the Hospital. The Hospital may, in its sole discretion, request that additional shareholders be added to the COMPANY. Upon any such request, you shall take all actions reasonably necessary to effectuate such request.

You shall hold ownership of the COMPANY solely in your capacity as a Hospital employee. Any and all income or distributions received by you as a member, manager, officer, director or employee of the COMPANY shall be promptly turned over to the Hospital.

You shall transfer your ownership interest in the COMPANY to a designee (s) of the Hospital upon: (1) the termination, for any reason, of your employment with Hospital; or (ii) as otherwise requested by Hospital. This provision shall be binding upon your estate, successors, heirs and assigns and shall apply to all ownership interest in the COMPANY held by you regardless of when such interest is assigned (including any interest acquired after the date hereof). In furtherance of the foregoing, upon the execution hereof, you shall deliver the original of the Articles of Organization and Member Operating Agreement for the COMPANY to the Hospital, together with a fully executed power of attorney Authorizing the CEO of the Hospital to transfer your ownership interest and all rights attendant thereto to a Physician selected and designated by the Hospital in its sole discretion. The Hospital shall, as your attorney-in-fact, have the right, at any time, to transfer such interests at any time whatsoever, to its designee (s), in accordance with this letter agreement.

- 5 -

4849-2782-8338.2

As collateral security for the fulfillment of your duties and obligations hereunder, you hereby pledge, assign, transfer, set over and deliver unto the Hospital a continuing security interest in all of your right, title and interest in, the COMPANY, and all accessions to substitutions for, replacements of and products and proceeds thereof.

You and the COMPANY further pledge, assign, set over and deliver, on your behalf and on behalf of the COMPANY, unto the Hospital a continuing security interest in all of the COMPANY's rights, title and interest in any and all of the assets of the COMPANY, whether now existing or hereinafter acquired, including, without limitation, all of the accounts receivable of the COMPANY, and all accessions hereto, substitutions therefor and replacements, products and proceeds thereof.

From time to time, you shall and shall cause the COMPANY to promptly execute and deliver any and all further instruments and documents (including financing statements), and take all further action that the Hospital may direct, in order to enable the Hospital to exercise and enforce its rights and remedies hereunder with respect to the collateral in which a security interest has been granted.

On an annual basis, the COMPANY shall prepare an operating and capital budget for its annual operations (the "Budget") for review and approval by the Hospital. The Budget may only be amended with the advance approval of the Hospital. Further, you also agree to: 1) consult with the Hospital in connection with all actions taken in your capacity as a member, manager, officer and/or director of the COMPANY; and (ii) follow such instructions and take such actions as are deemed reasonable and necessary by the Hospital with respect to the operation and activities of the COMPANY.

You agree to cooperate fully with the Company, both during and after your employment with the Company, with respect to the collection and preservation of all assets and property rights (both in the United States and foreign countries) relating to the Company. You agree to sign all papers, including, without limitation, applications, declarations, oaths, formal assignments, assignments of priority rights, and powers of attorney, which the Hospital may deem necessary or desirable in order to protect its rights and interests in the Company. You further agree that if the Company is unable, after reasonable effort, to secure your signature on any such papers, any executive officer of the Hospital shall be entitled to execute any such papers as your agent and attorney-in-fact, and you hereby irrevocably designate and appoint each executive officer of the Hospital or their successor, as your agent and attorney-in-fact to execute any such papers on your behalf, and to take any and all actions as the Hospital may deem necessary or desirable in order to protect its rights and interests in the Company, under the conditions described herein.

The Hospital agrees to defend, indemnify and hold you harmless for any and all liabilities, losses, damages, costs (including reasonable attorneys' fees) which you might incur (collectively, the 'Claims") in your capacity as a member, manager, officer or director of the COMPANY; provided, however, that this indemnity and hold harmless agreement shall only be effective under the following conditions: (i) you act in good faith and without malice; (ii) you promptly notify the Hospital of any potential or actual Claims against you arising from your serving as a member,

- 6 -

manager, director or officer of the COMPANY upon your becoming aware of the same; (iii) you permit the Hospital to select counsel reasonably acceptable to you; and (iv) you cooperate with and permit the Hospital to conduct the defense, negotiation and/or settlement of any such Claims. The indemnity hereunder shall not apply to any Claim to the extent such Claim results, in whole or in part, from: (x) your breach of this Agreement; (y) your medical malpractice or your willful misconduct; or (z) the medical malpractice or willful misconduct of any person under your direct medical supervision or control, except in your role as a member, manager, officer or director of the COMPANY This indemnity shall only apply to those activities conducted by the COMPANY at locations approved in advance by the Hospital.  The indemnification provided hereunder shall be secondary to and shall only apply to those amounts in excess of any applicable insurance coverage.

This Agreement may only be terminated by written agreement signed by you and the Hospital.  The Hospital's indemnity obligation hereunder shall survive the termination of this Agreement with respect to Claims arising out of the incidents occurring prior to such termination.

Please acknowledge your acceptance of this agreement by signing where noted below.

Sincerely,

CARTHAGE AREA HOSPITAL, INC.

By:    *Richard Duvall*
Chief Executive Officer

Agreed to and accepted by:

Michael E. Gordon, M.D.

- 7 -

4849-2782-8338.2

## OWNERSHIP INTEREST ASSIGNMENT AGREEMENT

**THIS AGREEMENT**, dated as of October 1, 2018 (the "Agreement"), is by and between Walter Dodard, D.O., an individual residing at 16451 Deer Park Road, Watertown, NY 13601 (the "Assignor"), and  Walter Fink, D.O., an individual having an address at 34811 Lewis Loop, Carthage NY 13619.  (the "Assignee").

## RECITALS:

1.        The Assignor and Assignee are each physicians duly licensed to practice medicine in New York State.

2.        The Assignor holds 100% of the membership units, management and voting rights (collectively, the "Interests") in Comprehensive Woman's Health Services, P.L.L.C. the "Company").

3.        The Assignor, (or the Assignor's attorney -in-fact), has determined to sell and Assignee has agreed to purchase all of the Interests of the Company in accordance with the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.        **PREAMBLES.** The recitals set forth above are hereby incorporated herein.

2.        **ASSIGNMENT OF INTERESTS.**

(a)        Assignor hereby assigns to the Assignee and the Assignee agrees to accept from the Assignor, all of Assignor's interests in the company, upon the payment to Assignor of the price of One Dollar ($1.00), receipt of which is hereby acknowledged by the Assignor. Assignor shall deliver to the Assignee a transfer agreement duly executed for transfer of all of assignors Interests.

(b)        Following transfer of Assignor's interests set forth above, the Assignee shall own in the aggregate one hundred percent (100%) of the Company and Assignor shall not assume or retain any liabilities of or responsibilities or obligations to the Company under this Agreement.

(c)        The parties acknowledge that the Company, pursuant to a Provider Employment Agreement, dated October 1, 2018, is employing Assignor to provide clinical and administrative services to the Company and that Carthage Area Hospital (the "Hospital"), pursuant to a Provider Employment Agreement, dated October 1, 2018, is employing Assignor to provide clinical and administrative services to the Hospital.  Pursuant to Sections 5.G of both Provider Employment Agreements, the Assignor, under certain circumstances, may re-acquire the Interests in the Company.  In such event, the Assignee (or the successor in interest to the Assignee) shall transfer all of the membership units, management, and voting rights in the Company to Assignor.

4849-2782-8338.2

(d)     The Assignee confirms that it will not permit the Hospital or any entitled affiliated with or under contract with the Hospital to provide services to Practice other than at cost.

3.     **REPRESENTATIONS AND WARRANTIES.**

(a)     The Assignee represents and warrants to the Assignor, which representations and warranties shall survive the transfer of the Interests hereunder, that:  (i) he is a physician duly licensed to practice medicine under the laws of New York State; (ii) he has the full power and authority to execute and deliver this Agreement, to perform the obligations hereunder and to consummate the transactions contemplated hereby; and (iii) this Agreement has been duly executed and delivered by him/her and constitutes a valid and legally binding obligation enforceable against him/her in accordance with its terms.

(b)     The Assignor represents and warrants to the Assignee, which representations and warranties shall survive the transfer of the Interests hereunder, that: (i) he is the sole, exclusive and lawful owner of the Interests being sold hereunder; (ii) the Interests are owned free and clear of all liens, claims and encumbrances and no other party owns or has any rights whatsoever in any of the Interests in the Company; (iii) no other party has or has asserted any claims against the Assignor with respect to the Interests; (iv) no consents of any third parties not already obtained or required are needed in order to permit the sale and delivery of such Interests hereunder; (v) he has full power and authority to sell the Interests; and (vi) this Agreement has been duly executed and delivered by him and constitutes a valid and legally binding obligation enforceable against him in accordance with its terms.

4.     **ENTIRE AGREEMENT:  MODIFICATIONS**. This Agreement is in the entire agreement among the parties concerning the subject matter hereof and shall not be changed, except by a writing signed by all the parties.

5.     **FURTHER ASSURANCES.** The parties shall execute and deliver all documents, provide all information and take or forbear from all such action as may be necessary or appropriate to achieve the purposes set forth in this Agreement.

6.     **BINDING EFFECT.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

7.     **GOVERNING LAW**. This Agreement shall be governed by and construed in accordance with the laws of New York State without regard to conflict of law rules.

4849-2782-8338.2

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first written above.

**ASSIGNEE**                              **ASSIGNOR**

_____          _____
Walter Fink, D.O.                         Walter Dodard, D.O.

- 3 -

4849-2782-8338.2

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first written above.

**ASSIGNEE**

**ASSIGNOR**

_____
Walter Dodard, D.O.

- 3 -

4849-2782-8338 2

## PROVIDER EMPLOYMENT AGREEMENT

**THIS PROVIDER EMPLOYMENT AGREEMENT** (the "Agreement"), dated as of and commencing on October 1, 2018, ("Commencement Date") by and between **CARTHAGE AREA HOSPITAL, INC.,** located in Carthage, New York, a tax-exempt corporation organized and existing pursuant to New York law, having a principal place of business at 1001 West Street, Carthage, New York 13619 ("Hospital") and **WALTER DODARD, D.O.,** residing at 16451 Deer Run Rd, Watertown, NY 13601 ("Provider"). The Hospital and the Provider may be referred to in this Agreement individually as a "Party" and collectively as the "Parties."

### WITNESSETH:

**WHEREAS,** the Hospital owns and operates an Article 28 licensed facility hospital and clinics under the laws of the State of New York and possesses an operating certificate from the New York State Department of Health. The Hospital has also been designated as a critical access hospital and is accredited by the Joint Commission for Healthcare Organizations;

**WHEREAS,** the Hospital requires the services of the Provider to deliver professional medical services to Hospital patients ("Patients");

**WHEREAS,** the Hospital desires to employ Provider as a full-time, professionally exempt Employee of the Hospital; and

**WHEREAS,** Provider is licensed to practice medicine in New York and desires to enter into an agreement with the Hospital to provide such professional medical and administrative services for and at the Hospital under the terms and conditions contained in this Agreement.

**NOW, THEREFORE,** it is mutually agreed upon by and between the Parties hereto as follows:

1. **Provider's Obligations and Qualifications and Hospital Obligations.**

A.   Within the scope of his delineated clinical privileges, Provider shall provide professional medical services to Patients on a full-time basis at the Hospital or at such other locations as the Hospital may require as further detailed in **Attachment A**, attached hereto and made a part hereof.

At all times during this Agreement's term, the Provider shall engage in sufficient professional medical activity on the Hospital's behalf for it to acquire adequate information to assess the quality, appropriateness and medical necessity of the professional medical services that he provides hereunder as delineated in **Attachment A** (hereinafter Provider's "Duties"). Further, the Provider shall fully cooperate with the Hospital regarding any inspections or audits conducted by the Hospital, government officials or by accrediting organizations periodically visiting the Hospital.

Furthermore, prior to performing services at the Hospital, the Provider shall apply for and secure membership in the Hospital's Medical Staff with appropriate privileges in Provider's

4819-6927-0642.2

specialty and in accordance with the Hospital and Medical Staff's bylaws ("Credentialing").  The Provider shall maintain unrestricted Medical Staff membership and unrestricted privileges at the Hospital for the duration of this Agreement and periodically re-apply and complete the Credentialing process as required by the Hospital and Medical Staff's bylaws.

B.   The Provider shall comply with all applicable New York and federal laws, regulations and judicial decisions (the "Laws").  The Provider shall maintain his active Hospital Medical Staff (the "Medical Staff") membership and admitting privileges and shall comply with the Hospital's and its Medical Staff Bylaws, rules, regulations, policies and procedures as all may be amended from time to time (collectively, the "Policies").

C.   The Provider represents that there are no administrative, regulatory, civil, or criminal actions, suits, investigations, audits or other proceedings pending or, to the best of the Provider's knowledge, threatened against, involving or affecting him.  The Provider shall immediately notify in writing the Hospital's Chief Executive Officer ("CEO") upon learning of any such occurrence.  The Provider similarly represents that no provision of any contract, lease or other arrangement, whether written or oral, binding upon him or affecting his business or professional affairs, conflicts with or in any way adversely impacts or prevents this Agreement's execution, enforcement or performance.  The Provider further warrants that he is not subject to any restrictive covenant or other agreement that prohibits or restricts his ability to be employed by the Hospital hereunder.

D.   The Provider shall promptly notify the Hospital's CEO upon learning of:

1.     any investigation of or inquiry involving the Provider initiated by the New York Department of Education Office of the Professions and/or by the New York Department of Health Office of Professional Medical Conduct, or by any similar professional licensure entity in any other state (collectively, the "Medical Board") or by any federally funded healthcare program or other government or regulatory agency, any private healthcare insurance company or payor, any professional organization, a Patient or his guardian or heirs, any healthcare facility, or peer review entity;

2.     any threatened or asserted claim of the Provider's professional liability and/or unprofessional conduct or any facts that could be expected to result in such a claim;

3.     any criminal proceeding, charge against or investigation of the Provider; and/or

4.     any lawsuit or claim allegedly related to the Provider's provision of medical services or to his relationship with the Hospital.

E.   The Provider shall:

1.     participate in, cooperate with, and strictly adhere to the policies of the Hospital and its medical staff, as they may be amended from time to time, including but not limited to the policies related to quality of care, cost effectiveness, compliance, grievances, peer review and case, medical and utilization management efforts;

- 2 -

4819-6927-0642.2

2.    not use the Hospital's equipment, instruments or supplies for the purposes for which they are not intended or in a manner inconsistent with sound medical practice, and/or;

3.    supervise such ancillary and support personnel and house staff officers that are assigned to him or who assist him with caring for Patients.

F.    The Hospital has a corporate code of conduct and compliance policies to ensure its compliance with Laws (the "Compliance Program"). The Provider shall participate in and comply with the Compliance Program and in all Hospital in-service compliance education programs applicable to him. The Provider's failure to comply with the Compliance Program shall constitute good and sufficient grounds for the Hospital to immediately terminate this Agreement.

G.    The Hospital's CEO or designee shall evaluate the Provider's performance hereunder periodically. The Hospital also may contract with outside parties to review its employed providers. The Provider shall cooperate with any such reviews arranged by the Hospital.

H.    At such times that the Hospital determines necessary, the Provider shall prepare and submit to it a written time allocation report specifying the respective amounts of time that he devotes to any administrative duties hereunder, if any. The Provider also shall notify the Hospital immediately should Medicare, Medicaid or their intermediaries request access to such records.

I.    The Provider shall participate with all Payors with which the Hospital participates.

J.    The Provider shall devote his best efforts to fulfilling his Duties hereunder. To this end, while employed by the Hospital, the Provider shall not practice medicine other than on the Hospital's behalf, which shall include , being employed by Comprehensive Woman's Health Services, PLLC, and maintaining privileges at, and admitting patients to, Samaritan Medical Center, or engage in any other professional activity that in any way interferes with the performance of his duties hereunder, whether such activity is pursued for gain, profit or other pecuniary advantage, without the Hospital's prior written consent. Notwithstanding any clause in this Agreement to the contrary, nothing in this Agreement does, or will be construed or interpreted to prevent, the Provider from pursuing essentially passive investment activities (e.g. real estate, trading in securities or commodities, etc.) for his own account.

K.    The Provider shall participate in and cooperate with Medicare, Medicaid, other federal and state reimbursement programs and with any commercial third party healthcare insurer, health maintenance organization, preferred provider organization or other health benefit plan or program (including, without limitation, any self-funded employee benefit plan) with which the Hospital may contract or affiliate (collectively, "Payors" and individually a "Payor"). The Provider represents and warrants that he has not been suspended or excluded from participating with any Payor.

- 3 -

4819-6927-0642.2

L.   The Provider is compliant with and neither has violated nor defaulted under any student loans or federal scholarships with the United States pursuant to the National Health Service Corps Scholarship Program, the Health Professional Shortage Area Scholarship Program, the Health Education Assistance Loan Program or any other government program, whether Federal, State or local (collectively, "Student Loans"), any repayment agreement between the Provider and the U.S. Secretary of Health and Human Services (the "Secretary") entered into because he defaulted on a Student Loan ("Repayment Agreement") and any default or notice of default by the Provider on a Repayment Agreement.

M.   As 10 NYCRR §405.3(b)(10) requires, the Provider represents that he is free from any health impairment that potentially could adversely impact Patients or that may interfere with his performing his Duties hereunder, including habituation or addiction to depressants, stimulants, narcotics, alcohol or other drugs or substances that may alter his behavior.

N.   The Hospital shall make available for use by the Provider all such equipment, supplies and incidental space as mutually agreed upon by the Provider and the Hospital or as the Hospital shall reasonably determine are necessary and appropriate to fulfill the Provider's obligations hereunder.

O.   The Hospital will provide all billing and collection services in an appropriate, accurate, and timely manner related to the Provider's employment as deemed appropriate by hospital standards.

P.   The Hospital will provide to the Provider all required billing forms and procedures as necessary for the Provider to appropriately, accurately, and completely record services for billing purposes.

2.   **Non Disclosure**.

A.   In accordance with all Laws including, without limitation, HIPAA, the Provider, without the Hospital's prior written consent, shall not disclose to any person or entity without limitation:  Patient Information, records and charts; Hospital operations, plans and/or business operations; lists and/or names, addresses or telephone numbers of or any other information concerning Patients; communications with Patients, Hospital personnel and/or other service providers; Hospital symbols, trademarks, tradenames, servicemarks, designs, management information systems, credentialing and utilization procedures and protocols; Hospital payment arrangements, forms, claims processing techniques and fee schedules; utilization review and quality assurance mechanisms; Payor contracts and the identity of purchasers of services; educational programs related to the Hospital's Quality Assurance and Continuous Quality Improvement activities; any information relating to the Hospital's financial affairs and/or to its business and marketing plans and strategies; and/or any other information that the Hospital reasonably considers confidential and/or trade secrets (collectively, "Protected Information").

B.   All Protected Information is and shall remain, at all times, the Hospital's sole and exclusive property and neither the Provider nor his agents, representatives,

- 4 -

4819-6927-0642.2

employees, employers or co-venturers shall use, furnish or disclose it without prior written Hospital consent for any purpose other than to assist the Provider with performing his duties hereunder. He will not copy Protected Information for his or any other party's use and shall return all Protected Information at any time upon the Hospital's request and upon this Agreement's termination.

      C.  The Provider neither shall use nor further disclose, and shall use appropriate safeguards to prevent such use or disclosure by other parties of, any "individually identifiable health information" or "protected health information", as such terms are defined at 45 CFR Section 164.500 (collectively, "Protected Health Information"), other than as permitted by this Agreement or by law pursuant to 104 P.L. 191 and 44 CFR Parts 160 and 164 respecting the standards for privacy of individually identifiable health information (collectively, "HIPAA Privacy Rules") or as otherwise may be required by law. The Provider shall report to the Hospital any use or disclosure of Protected Health Information not provided for by this Agreement of which the Provider becomes aware.

The Provider shall provide Patients access to their Protected Health Information, including an accounting of any disclosures thereof, and shall comply with such Patients' requests to amend their Protected Health Information to the extent required by 45 CFR Section 164.504(e)(2). The Provider shall make his internal practices, books and records relating to use and to disclosure of Protected Health Information available to the Secretary of HHS as required to determine compliance with the HIPAA Privacy Rules. Notwithstanding the foregoing, no attorney-client, accountant-client or other legal privilege shall be deemed waived by the Provider or by the Hospital by virtue of this Section.

Upon this Agreement's termination, the Provider shall return or destroy, as the Hospital requires, all Protected Health Information that he received from the Hospital and still maintains in any form. If the return or destruction of such Protected Health Information is infeasible, the Provider shall extend this Agreement's protections to said Protected Health Information and limit its further use and disclosure exclusively to those purposes that make its return or destruction infeasible.

      D.  The Provider shall exercise his best efforts to ensure that Protected Information remains confidential. If at any time a judicial, administrative or government proceeding requires the Provider to disclose any Protected Information, he promptly shall notify the Hospital so that it may seek a protective order or other appropriate remedy preventing such Protected Information's disclosure. If such a protective order or other remedy is unobtainable, the Provider shall only furnish such Protected Information that Hospital counsel reasonably determines legally required to be released. The Provider shall assist the Hospital with obtaining, and shall not contest any action by it to obtain, an appropriate protective order or other reliable assurance that Protected Information shall remain confidential.

**3.**     **Compensation**.

      A.  As consideration for the Provider fulfilling his duties, obligations and responsibilities hereunder, the Hospital shall pay the Provider an annual base salary

- 5 -

(Provider's "Salary") set forth in Attachment C, to be paid incrementally in accordance with the Hospital's normal payroll practices and procedures. The Provider shall also receive additional compensation and those employment benefits set forth in Attachments B (Management/Director Benefit Plan), and C (Compensation and Other Benefits).

B.   The Provider's Salary, additional compensation, and the benefits detailed in Attachments B and C shall constitute his "Compensation." The Provider's Compensation satisfies and discharges in full his/her claims for compensation from the Hospital and/or from Patients for professional services that he/she provides Patients or the Hospital hereunder.

C.   The Parties acknowledge and agree that all compensation payable to the Provider under this Agreement represents the fair market value of the Duties performed by the Provider. The Provider's Hospital employment hereunder in no way confers upon him any ownership interest in or personal claim upon any fees, payments, money, anything else of value or any other type of remuneration collected or otherwise obtained by the Hospital for the Provider's provision of medical and/or any other professional/clinical services, whether the same are billed and/or collected during this Agreement's effectiveness or after its termination. He/She hereby disclaims and renounces any such possible ownership, interest, or claim. All payments, monies, fees, anything else of value and/or any other remuneration generated or attributable to services that he provides, whether paid to him/her or to the Hospital for services provided by or attributable to the Provider or to another Hospital employee, shall belong to the Hospital. The Provider shall have no right or entitlement to or ownership of any such income, fees and/or other remuneration except as provided in this Agreement, or as approved by the Hospital in writing in its sole and absolute discretion. The Provider shall assist the Hospital to recover and/or to justify any claim or payment for medical services that he provides Patients.

D.   The Provider shall treat all Patients regardless of their ability to pay. The Hospital has complete and sole authority to contract on the Provider's behalf with all Payors with which its provider-employees participate. The Provider neither shall bill nor collect for any clinical services that he provides hereunder. He shall cooperate with the Hospital or with its designated billing company. The Provider shall assign, account, pay to, surrender, deliver to (if applicable), transfer and remit to the Hospital all income, fees, risk pool surpluses, Payor "holdbacks" and/or other remuneration, payments, monies and/or credits of any nature received from any and all sources, except in connection with armed forces service, relating to medical or to other professional services rendered by the Provider at Carthage Area Hospital.

E.   All such compensation and any bonuses declared by the Hospital shall be determined in accordance with all applicable laws, rules and regulations, including but not limited to, the Federal Anti-kickback Law, and the Federal Physician Self-Referral Law (known as the "Stark" law), it being the intent of the Hospital and Provider that any and all compensation paid under this Agreement shall be determined in accordance with then-prevailing legal standards.

4819-6927-0642.2

4.    **Term, Renewal and Termination**.

A.   This Agreement shall commence on the Commencement Date and shall expire on September 30, 2023, unless terminated earlier by either Party as provided for herein. This agreement shall automatically renew for one (1) year terms upon the same terms and conditions contained in this Agreement including without limitation, Salary (collectively the Agreement's "Term" and each year in the Term, a "Contract Year") unless either Party provides the other Party prior written notice of termination as required hereunder.

B.   This Agreement may be terminated prior to its expiration date upon:

1.    Either Party giving notice in writing terminating this Agreement with or without cause upon 18 months prior written notice to the other Party.

2.    It being determined by Hospital that this Agreement violates Laws and cannot be restructured to circumvent the violation.

2A    The Hospital, or any party exercising control over the Hospital, materially changes the responsibilities and authority of the Provider at the Hospital.

3.    The Hospital learns of or determines that any of the following has occurred, in which case Hospital, in any such instance, may terminate this Agreement immediately upon written notice to Provider:

a.    Provider does not obtain medical staff privileges on the Hospital's Medical Staff;

b.    Revocation, withdrawal, suspension without stay , cancellation, lapse, loss, termination, expiration, modification, relinquishment or limitation of the Provider's (i) license to practice medicine in New York or in any other state, (ii) Medical Staff membership or privileges at the Hospital or at any other healthcare facility and/or his resignation or expulsion from any healthcare facility, (iii) state or federal license or authorization to dispense or prescribe narcotic drugs, and/or (iv) right to participate with any Payor and/or his resignation from or expulsion by any Payor;

c.    Any government entity or professional organization having jurisdiction finding the Provider to have participated in professional misconduct;

d.    Provider's failure to cure any of the following concerns described in writing to the Provider, to the reasonable satisfaction of Hospital, within sixty (60) days after notice to Provider: (i) unsatisfactory adherence to the Policies or the Compliance Program; or (ii) violation or breach of any term of this Agreement for which Hospital determines that Provider can adequately cure with notice to Hospital's satisfaction.

e.    Provider's fraud, embezzlement, misappropriation of Hospital assets or business opportunities, acts of moral turpitude and/or his conviction or plea of nolo contendere to any misdemeanor or felony involving moral turpitude or to any felony whatsoever;

- 7 -

f.    Provider has been excluded from Medicare, Medicaid, or Tricare;

g.    Provider's retirement, death, legal incompetence, repeated or untreatable substance abuse or total and/or permanent incapacity;

h.    Any court and/or government agency finding the Provider in default on any Student Loans or on any Repayment Agreement which finding may result in the Provider's suspension from Medicare and/or Medicaid and, in the event of such suspension, whether the Hospital terminates this Agreement, the Provider shall remit to the Hospital an amount equal to all payments that any government payor refuses to pay, or recovers from, the Hospital because of the Provider's default on any such Student Loans and/or failure to timely cure any default on any Repayment Agreement acceptable to the government and/or to the Hospital;

i.    Provider withholding from the Hospital any professional or other fees, without prior written approval from the CEO;

j.    Hospital's inability to insure, whether through the Hospital's self-insurance trust or third party provider, the Provider for his professional negligence at commercially reasonable rates and terms, as determined by the Hospital in its discretion; and/or

k.    The Hospital ceases its business and/or is forced to disassociate with the Provider.  Hospital determines in its sole discretion that this employment arrangement is not economically sustainable due to inadequate patient volume or reimbursement.

C.    Upon this Agreement's expiration or termination, the Parties' obligations shall cease except Provider shall promptly complete any medical records, "Attending Provider's Statements" or other documentation, including time and effort reports, as needed or requested by the Hospital, and fulfill any duties attendant to continued medical staff membership.

5.    **Restrictive Covenants.** During this Agreement's Term and for one (1) year thereafter, the Provider shall not, directly or indirectly:

A.    Within a fifteen (15) mile radius of the Hospital, enter into any type of arrangement or contract, employment or otherwise, other than with Comprehensive Woman's Health Services, PLLC, with (a) any entity authorized to operate pursuant to the New York Public Health Law, (b) any freestanding clinic, (c) any other healthcare facility/provider, (d) provider medical practices or (e) or participate in any manner whatsoever in or assist any person or entity in any way with establishing any undertaking that in any way might compete with the Hospital or with any Hospital service, program of affiliate, whether operated by the Hospital, without the CEO's prior written consent.

B.    Within a fifteen (15) mile radius of the Hospital, become interested in, provide services to or otherwise assist, directly or indirectly, financially or otherwise, as a principal agent, employee, officer, director, partner, stockholder, manager, member or creditor

- 8 -

or in any other capacity, any proprietorship, firm, partnership, person(s), limited liability company, corporation, medical office, clinic, other healthcare facility or system or other entity, that in any manner competes with the Hospital.

C.   Within a fifteen (15) radius of the Hospital, in any capacity, except as permitted in this Agreement, see, attend to, treat and/or provide professional and/or clinical medical services to or care for patients in any manner or in any capacity whatsoever.

D.   Hire, solicit or engage, attempt to hire, solicit or engage, or assist any other person or entity in hiring, soliciting or otherwise engaging any current or future Hospital employee and/or contractor, whether full time, part time or temporary, or suggest, induce, persuade or solicit such employee or contractor to discontinue his employment, contract or other arrangement with the Hospital.

E.   Suggest, induce, persuade or solicit any Patient to terminate, curtail or restrict his relationship with and/or use of the Hospital; and/or suggest, request or direct any Patient or his guardian, or assist any other person or entity to request or direct that the Hospital, copy or have copied or otherwise remove or transfer medical records from the Hospital; and/or solicit business for a Hospital competitor from any past, present or future Patient.

F.   For purposes of this Section 5, "soliciting" Patients or enrollees includes, without limitation, advertising to the general public and/or distributing promotional materials directly to Patients.  Neither the Provider nor any of his future employers, agents, and/or affiliates shall make any public announcements of, or advertise, the Provider's former relationship with, affiliation with, or employment by, the Hospital without the Hospital's prior written consent.  Nothing in this agreement prevents the Provider from listing his employment with the Hospital on his curriculum vitae or any other professional biographical material in whatever form.

G.   Notwithstanding anything to the contrary in this Section 5 or in any other provisions of this Agreement, the provisions of this Section 5 shall not be enforceable if this Agreement expires or is terminated by either Party, with or without cause.  In the event of such expiration or termination, Provider shall have the right, but not the obligation, to purchase the Comprehensive Woman's Health Services, PLLC (the "Practice") for the sum of (a) the amount the Provider was paid for the Provider's ownership interest in the Practice pursuant to a certain transfer agreement, dated October 1, 2018, between the Provider and a designee of the Hospital and (b) the then current depreciated value of any physical improvements the Practice makes or equipment the Practice adds at the Practice site after the Commencement Date.

H.   Nothing in this Agreement shall prohibit Provider from (a) securing and maintaining admitting privileges at Samaritan Medical Center at any time or (b) in the event Provider re-acquires the Practice, practicing without restriction or limitation of any kind.

6.   **Books and Records.**  If the Secretary, the Comptroller General of the United States (the "General") or their respective representatives determine that this Agreement is a

- 9 -

4819-6927-0642.2

contract described in the Social Security Act's Section 1861(v)(1)(1), then, until the expiration of four (4) years after furnishing services pursuant to this Agreement, the Provider, upon written request, shall make available to the Hospital, the Secretary, the General or any of their duly authorized representatives, this Agreement and the Provider's books, documents and records necessary to certify the nature and extent of amounts paid the Provider by the Hospital pursuant to this Agreement.

7.   **Assignment.** No assignment or assumption of this Agreement, or the rights and obligations hereunder, shall be valid or enforceable for any purpose without the Parties' specific prior written consent, except that following prior written notice to the Provider, this Agreement may be assigned by the Hospital, in whole or in part, to a Hospital affiliate or to any successor entity operating the Hospital.

8.   **Entire Agreement Non-Waiver.** This Agreement supersedes all previous contracts, arrangements, and/or relationships between the Parties hereto and constitutes the entire Agreement between the Hospital and the Provider with respect to this Agreement's subject matter.  No prior or contemporaneous oral statements, written agreements or other material not specifically incorporated herein shall be of any force or effect and no changes in or modifications, additions or amendments to this Agreement shall be recognized or be of any force, effect or validity, unless in writing, signed by each Party hereto and incorporated herein as an amendment to this Agreement.  Any such amendment agreed upon by the Parties hereto shall become effective on the date stipulated therein.

9.   **Applicable Law and Jurisdiction.**

A.   This Agreement shall be governed by the laws of the State of New York. Any suits, actions, proceedings and/or any judgment entered by any court with respect to this Agreement shall be brought/entered in New York state courts at law or at equity in Jefferson County, New York ("New York Courts") and each party hereto accepts the exclusive personal jurisdiction of the New York Courts.

B.   The Provider understands and acknowledges that Sections 2 and 5 are designed to preserve the Hospital's goodwill and that any breach of them by the Provider would cause the Hospital irreparable harm that monetary damages would not adequately remedy.  Accordingly, if the Provider breaches or threatens to breach, or otherwise violates or threatens to violate, Sections 2 and/or 5, or causes them to be breached or violated, or to be threatened to be breached or violated in any manner, or participates in their breach or violation, in addition to any other remedies available under this Agreement, at law or at equity, the Hospital may seek relief from such breach or violation or threatened breach or violation and may enforce this Agreement by injunctive relief and by specific performance, such relief to be without the necessity of posting a bond, cash or any other security. Additionally, nothing in Sections 2 or 5 shall limit the Hospital's right to recover any other damages to which it is entitled as a result of the Provider's breach or violation of Sections 2 and/or 5 as described herein and to be indemnified by the Provider for all claims, damages, losses, liabilities, costs and/or expenses whatsoever related to the Provider's breach or violation or threatened breach or violation of Sections 2 and/or 5.  The Provider acknowledges and agrees that this Section 9(B) constitutes Hospital consideration for entering into this

- 10 -

4819-6927-0642.2

Agreement and is necessary to protect the Hospital's legitimate business obligations and interests and is reasonable in scope, time, and geography. If any provision in Sections 2 and/or 5 is held by a court of competent jurisdiction to be unenforceable due to an excessive time period, geographic area or restricted activity, such provision shall be reformed to comply with such time period, geographic area or restricted activity that would be held and/or is enforceable.

**10.** **Legal Terms and Conditions**.

A.   Once executed by all parties, this written Agreement, together with all of the Attachments, and other documents attached hereto and made a part hereof, contains all the terms and conditions agreed upon by the parties hereto, and no other agreement, oral or otherwise, regarding the subject matter of this Agreement shall be deemed to exist or to bind any of the parties hereto, or to vary any of the terms contained herein

B.   The Agreement may be executed in any number of counterparts, each of which shall be an original, but such counterparts together shall constitute one and the same Agreement.

C.   If any of the Agreement's provisions are determined unlawful or otherwise unenforceable, the remainder shall continue unchanged and Hospital, after consulting with Provider, may amend this Agreement to comply with the law. Neither Party will enter into any agreement with any other party that directly or indirectly contravenes conflicts with or adversely impacts any of the Agreement's provisions.

D.   No other contractual relationship or restriction precludes the Provider from entering into this Agreement. The Provider warrants that there are no fees payable by or on behalf of him related to his using any employment or recruiting agency with respect to his employment hereunder.

E.   The captions provided herein are solely for use as a guide and shall not be used to interpret any of the Agreement's provisions.

F.   Any notice required or permitted to be given pursuant to the Agreement shall be in writing, signed by a Hospital officer and/or by the Provider, as applicable, and mailed by registered, certified mail, return receipt requested, in a postage paid envelope or by reputable overnight delivery service, either addressed as follows:

| | |
|---|---|
| To the Provider: | Walter Dodard, D.O.<br>16451 Deer Run Road<br>Watertown, NY 13601 |
| To the Hospital: | Rich Duvall, CEO<br>Carthage Area Hospital, Inc.<br>1001 West Street<br>Carthage, New York 13619 |

4819-6927-0642.2

G.   This Agreement shall not be construed against either party because he may be responsible for drafting it or any provision thereof.

H.   This Agreement is only enforceable by the Parties hereto and by their successors in interest.  No other person or entity may enforce any of the provisions contained herein, including, without limitation, any Patient, nor shall this Agreement be used by any person or entity to impose any obligation, duty, standard of care or of practice different from or in addition to whatever obligations, duties and standards exist in this Agreement.

I.   No remedy set forth in this Agreement or otherwise conferred upon or reserved to either Party shall be considered exclusive of any other remedy available to either Party, but the same shall be distinct, separate, and cumulative and may be exercised from time to time as often as occasion may arise or as may be deemed expedient.

J.   No provision of this Agreement shall be modified or construed by any practice that is inconsistent with it and failure either by the Provider or by the Hospital to comply with any provision, or to require the other party to so comply, shall not affect either Party's rights thereafter to comply or to require the other party to comply.

K.   If after this Agreement's execution, any new or amended statute or regulation becomes effective or, any binding interpretation of a statute, regulation, or facts by any court or government authority, whether federal or state is rendered making the relationship in this Agreement between the Hospital and the Provider illegal, or, requiring the relationship's modification, then, this Agreement shall not terminate.  Rather the Hospital, after consultation with the Provider, shall amend this Agreement to the extent necessary to comply with the New Law and, to the extent possible, to preserve the underlying economic and financial arrangements between the parties.

L.   Each Party hereto agrees hereafter to execute, acknowledge and deliver such further instruments, agreements and documents and to do such further acts and things that may be necessary, expedient, required and/or useful to carry out this Agreement's intent and purpose, as are consistent with the terms hereof.

M.   Each Party shall indemnify and hold the other Party and, without limitation, the other Party's employees, agents, officers, trustees, representatives, advisors, contractors and invitees, harmless from any costs, claims, losses, damages, liabilities or any other expenses, including reasonable attorneys' fees, incurred by the other Party because of the first Party's negligent and/or intentional acts which are not or which are determined not to be covered by the other Party's professional liability insurance.

N.   The Provider represents and warrants that, except as otherwise disclosed, no member of the Provider's immediate family has a compensation arrangement of any kind with the Hospital.  For purposes of this Agreement, the Provider's "immediate family" shall include his spouse, natural or adoptive parent(s), child(ren), sibling(s), step-parent(s), step-child(ren), step-brother(s), step-sister(s), father-in-law, mother-in-law, grandparent(s), grandchild(ren) and spouses of the Provider's child(ren), grandparent(s) and grandchild(ren). For further purposes of this Section, "compensation" shall mean any type of remuneration

- 12 -

4819-6927-0642.2

whatsoever paid directly or indirectly, overtly or covertly, in cash or in kind.  Should any member of the Provider's immediate family enter into a compensation arrangement with the Hospital, the Provider immediately shall notify the Hospital in writing.

4819-6927-0642.2

**IN WITNESS WHEREOF**, the Parties hereto have set their hands and seals on the day and year first above written.

**CARTHAGE AREA HOSPITAL**                **PROVIDER**

By:_____                By:_____

Gary A. Rosenberg                                     Walter Dodard, D.O.
Administrator of Support Services

4819-6927-0642 2

## TERMS SHEET (OB PROVIDER)

## ATTACHMENT A

## PROVIDER'S DUTIES

The Provider shall:

A.    Work a minimum of 80 hours per pay period.

1.    The Provider shall spend as much time as necessary to timely complete all charts and records for which he is responsible without additional compensation.

2.    Whenever the Provider uses Paid Time Off, he must secure adequate coverage by working in good faith with the other available providers employed by CAH.

3.    The Provider shall spend as much time as necessary to accomplish his director responsibilities.

B.    Work in good faith with other OB/GYN providers in order to provide full coverage of the service each month as scheduled by the Hospital. Provider shall have administrative responsibility for insuring adequate coverage for the Service, which will under ordinary circumstances include provider being on call every fourth night, except during vacations and other approved time off.

1.    Call Duties. When on call, the Provider shall be available to attend patients at the Hospital, within thirty (30) minutes unless otherwise required by NYS statutes or published regulations, in accordance with the coverage schedule established for in-patient services at the Hospital by mutual agreement between the Hospital and the Provider.

a.    The Provider will render call coverage to the Hospital as assigned according to the needs of the Hospital. The Hospital will use its best efforts to coordinate the call dates with the provider; however, the needs of the Hospital for coverage shall always be paramount in such assignments.

b.    The Provider shall not be required to serve any oncall period more than that which is in accordance with applicable governmental regulations, or the rules and regulations, or practices and procedures of the Hospital. If the Hospital requests any additional on call, the Provider will use his best efforts to satisfy that request. The Hospital shall compensate Provider for such extraordinary additional call (including, without limitation, being on call more frequently than every fourth night for a period that exceeds thirty nights) at the fair market value of such call.

C.    Assume the administrative title of Director of Obstetrics and Gynecology. **Attachment D** outlines the general duties of this title. **Attachment E** outlines the specific duties of this title.

A-1

4819-6927-0642.2

D.      Provide clinically required, competent and appropriate medical services to patients, prepare timely records thereon, and consult with other members of the Hospital's Medical Staff in connection therewith;

E.      Complete all supplied forms for billing purposes as provided by the Hospital in an appropriate, accurate, and timely manner;

F.      Refer Patients for other specialty care when appropriate;

G.      Appropriately direct, supervise, oversee and lead Hospital nurses and other staff and demonstrate by example the importance of delivering coordinated patient care as a member of a health care team;

H.      Utilize the principles of continuous performance improvement, treat co-workers, staff and patients with respect, and work with others to ensure quality patient outcomes and ongoing compliance;

I.      Assist in compiling and analyzing statistical data related to inpatient care;

J.      Assist in identifying and prioritizing Hospital and Department needs;

K.      Work with others to evaluate, analyze and improve service in such areas as patient/parent satisfaction;

L.      Work with the Hospital to develop efficient ongoing care management emphasizing ease of access and continuity of care for Patients, irrespective of where such care is delivered and establish a working environment consistent with Hospital goals and regulatory requirements;

M.      Cooperate with the Hospital's other departments to enhance a meaningful multidisciplinary program of continuous quality improvement addressing the various facets of clinical activity within the Hospital;

N.      Promptly complete and submit all records and reports, including medical records, pursuant to applicable Laws and to all Policies, capture Patient encounters through Hospital billing procedures and work cooperatively with Hospital financial services staff to assure proper billing and collection for medical services that he provided;

O.      Report to and perform such other appropriate duties assigned by the CEO or his designee;

P.      Upon their request, assist the Hospital and Medical Staff members with medical care issues;

Q.      Accept reasonable assignments and participate reasonably as a member of the Hospital, and Medical Staff committees as required.

A-2

R.     Perform the general duties of the Provider as OB/GYN Director under this agreement which shall be as follows:

a. Be accountable, in coordination with the clinic manager, for all clinical, administrative, operational, and patient safety related activities within his department.

b. Give guidance on the overall medical policies of the Hospital and develop and implement policies and procedures that guide and support the provision of care, treatment, and services.

c. Maintain continuing review of the professional performance (including scope of practice) of all practitioners with clinical privileges in his department and report regularly thereon to the Medical Executive/Professional Activities Committee.

d. In coordination with the clinic manager, implement and monitor processes for continuous assessment and improvement of quality care, treatment and services within his department.

e. Be responsible, in coordination with the clinic manager, for enforcement of the hospital bylaws, the Medical Staff Bylaws, and the rules and regulations within both the Hospital and his department.

f. Be responsible for implementation of actions taken by the Medical Executive/Professional Activities Committee within his department.

g. Assist, in coordination with the clinic manager, in recruitment of department providers.  Interview, all applicants seeking clinical privileges in the department and transmit to the Credentialing Committee his recommendation concerning the appointment or reappointment, and the delineation of clinical privileges for all such applicants and practitioners in his department.

h. Recommend to the Medical Staff the criteria for clinical privileges that are relevant to the care provided in the department.

i. Be responsible for orientation, teaching, and continuing educational programs in his department

j. Participate in every phase of administration in his department through cooperation with the nursing service and the Hospital administration in matters affecting patient care and services, including: qualifications and competence of department  personnel who are not licensed independent practitioners; recommendations for sufficient number of qualified and

A-3

4819-6927-0642.2

competent personnel; supplies; special regulations; protocols; maintenance of quality control programs; techniques; and space and other resources.

k. In coordination with the clinic manager, assist in the preparation of such annual reports, including budgetary planning, pertaining to his department, as may be required by the medical Staff, the Hospital Administration, or the Board of Directors.

l. Assess and make recommendations to the relevant Hospital authority concerning off-site sources for needed patient care services not provided by the department or organization.

m. Coordinate and integrate interdepartmental and intradepartmental services in coordination with the clinic manager.

n. In coordination with the clinic manager, integrate the department into the overall functions of the Hospital.

S. The specific duties of the Provider as OB/GYN Director under this agreement which shall be as follows:

a. The specific duties will be determined jointly by the Provider and Administration, not later than 90 days after start of employment.

A-4

4819-6927-0642.2

**ATTACHMENT B**

**MANAGEMENT/DIRECTOR BENEFIT PLAN**

| | |
|---|---|
| **Life Insurance:** | $40,000 Term Life Insurance. |
| **Long-term Disability Insurance:** | If disabled >6 months, this pays for 60% of your salary (up to the $15,000/month cap) until you can return to work or you reach age 65. |
| **Health Insurance:** | The employee may enroll in the Hospital's Health Plan option. Employees are eligible on the first of the month following 30 days of employment.  Both '+1'and Family coverage are also available as employee-paid voluntary options. |
| **Dental Insurance:** | The employee may enroll in the Hospital's Dental Plan option. Employees are eligible on the first of the month following 30 days of employment.  Family coverage is available as an employee-paid voluntary option. |
| **Vision Insurance:** | The employee may enroll in the Hospital's Vision Plan option.  The employee pays the premium for this voluntary coverage. |
| **Paid Time Off:** | Management Group/Provider Benefit Plan (CE).  216 hours /year, prorated (earned) over 26 pay periods.  Paid Time Off is capped at 216 hours.  Provider shall submit notice of need for time off as soon as possible, and for vacation, at least four (4) weeks advanced notice.  Not more than 14 days may be taken consecutively without approval. |
| **Holidays** | Six Fixed Holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving, and Christmas |
| **401k:** | The Hospital contribution of a 50% match of your elective contribution is discretionary.  The Hospital's matching contributions will not to exceed 5% of your salary.  Eligible on the first of the month following 30 days of employment; vested after 3 years. |
| **Flexible Spending:** | Healthcare Spending Account Dependent Care Spending Account |
| **Miscellaneous Benefits:** | Electronic Direct Deposit Employee and Family Hospital Discount Voluntary Insurance Life / Disability / Accident / Cancer |

B-1

4819-6927-0642.2

## ATTACHMENT C

## COMPENSATION AND OTHER BENEFITS

A.    **Medical Liability Insurance**. The Provider acknowledges that medical liability insurance policy must be in force, paid for by the Hospital. The policy shall be as set forth in the insurance policy, shall be occurrence based, and shall provide a minimum of $1.3M per person coverage with an annual aggregate of $3.9M.

B.    **CME & Other Professional Fees**: The Hospital will reimburse the Provider up to $4,500.00 annually (per contract year) for approved CME & other professional fees required to maintain licensure, society memberships, and/or Hospital Staff Fees. This benefit shall not be accumulated/rolled over from one year to another.

1.    Requested CME must be approved, in advance, by the CEO or his designee.

2.    The Provider shall receive up to 40 hours of paid time for approved CME. This benefit shall not be accumulated/rolled over from one year to another.

C.    Annual Salary: The Hospital shall pay Provider an annual salary of $250,000.

C-1

4819-6927-0642.2

4819-6927-0642.2

## PROVIDER EMPLOYMENT AGREEMENT

THIS PROVIDER EMPLOYMENT AGREEMENT (the "Agreement"), dated as of and commencing on October 1, 2018, ("Commencement Date") by and between **COMPREHENSIVE WOMAN'S HEALTH SERVICES, PLLC**, organized and existing pursuant to New York law, having a principal place of business at 622 Washington Street, Watertown, New York 13601 ("Practice") and **Walter Dodard, D.O.**, residing at 16451 Deer Run Road, Watertown, NY 13601 ("Provider"). The Practice and the Provider may be referred to in this Agreement individually as a "Party" and collectively as the "Parties."

### WITNESSETH:

WHEREAS, the Practice owns and operates a woman's health private medical practice under the laws of the State of New York; and

WHEREAS, the Practice requires the services of the Provider to deliver professional medical services to Practice patients ("Patients") and to assist in the administration of the Practice; and

WHEREAS, the Practice desires to employ Provider as a professional employee of the Practice; and

WHEREAS, Provider is licensed to practice medicine in New York and desires to enter into an agreement with the Practice to provide such professional medical and administrative services for and at the Practice under the terms and conditions contained in this Agreement.

NOW, THEREFORE, it is mutually agreed upon by and between the Parties as follows:

1.    **Provider's Obligations and Qualifications and Practice Obligations.**

A.    This agreement is intended to be an Exclusive and Sole Employment Agreement between the Provider and the Practice.

1.    Services to be rendered. Provider agrees to dedicate his professional efforts to administrative and patient care services on behalf of the Practice. The Provider agrees to provide professional patient care services in the specialty of OB/GYN at the Practice and, as required by the Practice at other Practice clinical locations. Such services shall include, without limitation: medical and surgical services, consultations, on-call coverage, participation in the education and training of the Practice's medical, allied health, and other professional staff, attending and reporting at Practice meetings, and quality improvement programs. The Provider agrees that the Practice shall have the sole authority to set all fees charged to patients for the Patient Services provided by the Provider hereunder. The Provider agrees to see and treat all patients of the Practice regardless of any such patient's ability to pay.

2.    Billings and Collection. The Provider agrees that all billings and collections for the Provider's services provided to the Practice's patients, and any other patients seen or treated by Provider, will be carried out in the name of, and provider number of the Practice or under another arrangement established by the Practice. All billing and collection shall be performed by the

4819-1959-4610.2

Practice or in accordance with an agreement with the Practice, either directly or utilizing such contractors or subcontractors as the Practice may determine in its sole discretion. The Provider hereby assigns to the Practice any and all billings and collections for services provided hereunder regardless of the location where such services are provided. In the event that the Provider is erroneously reimbursed directly or receives payment for services hereunder, such payment shall be promptly delivered to the Practice. The Provider hereby agrees to execute such additional documentation as may be necessary in the opinion of the Practice or its counsel, including, without limitation, documents needed to effectuate or evidence such assignment. Provider further agrees to execute a limited power of attorney to enable Practice to implement such assignment in the absence of the Provider.

B.      Provider shall provide professional medical services to Patients at the Practice or at such other locations as the Practice may require and as consented to by Provider, as further detailed in **Attachment A**, attached hereto and made a part hereof.

At all times during this Agreement's term, the Provider shall engage in sufficient professional medical activity on the Practice's behalf for it to acquire adequate information to assess the quality, appropriateness and medical necessity of the professional medical services that he provides hereunder as delineated in **Attachment A** (hereinafter Provider's "Duties"). Further, the Provider shall fully cooperate with the Practice regarding any inspections or audits conducted by the Practice, government officials or by accrediting organizations periodically visiting the Practice.

Furthermore, during the term of this Agreement performing services at the Practice, the Provider shall apply for and secure membership in the Carthage Area Hospital's ("Hospital") Medical Staff with appropriate privileges in Provider's specialty and in accordance with the Hospital's and Medical Staff's bylaws ("Credentialing"). The Provider shall maintain unrestricted Medical Staff membership and unrestricted privileges at the Hospital for the duration of this Agreement and periodically re-apply and complete the Credentialing process as required by the Practice and Medical Staff's bylaws.

C.      The Provider shall comply with all applicable New York and federal laws, regulations and judicial decisions (the "Laws").

D.      The Provider represents that there are no administrative, regulatory, civil, or criminal actions, suits, investigations, audits or other proceedings pending or, to the best of the Provider's knowledge, threatened against, involving or affecting him. The Provider shall immediately notify in writing the Practice's Chief Executive Officer ("CEO") upon learning of any such occurrence. The Provider similarly represents that no provision of any contract, lease or other arrangement, whether written or oral, binding upon him or affecting his business or professional affairs, conflicts with or in any way adversely impacts or prevents this Agreement's execution, enforcement or performance. The Provider further warrants that he is not subject to any restrictive covenant or other agreement that prohibits or restricts his ability to be employed by the Practice hereunder.

E.      The Provider shall promptly notify the Practice's CEO upon learning of:

1.      any investigation of or inquiry involving the Provider initiated by the New York Department of Education - Office of the Professions and/or by the New York Department of Health Office of Professional Medical Conduct, or by any similar professional licensure entity in any other state (collectively, the "Medical Board") or by any federally funded healthcare program or other government or regulatory agency, any private healthcare insurance company or payor, any professional organization, a Patient or his guardian or heirs, any healthcare facility, or peer review entity;

2.      any threatened or asserted claim of the Provider's professional liability and/or unprofessional conduct or any facts that could be expected to result in such a claim;

3.      any criminal proceeding, charge against or investigation of the Provider; and/or

4.      any lawsuit or claim allegedly related to the Provider's provision of medical services or to his relationship with the Practice.

F.      The Provider shall:

1.      participate in, cooperate with, and strictly adhere to the policies of the Practice, as they may be amended from time to time, including but not limited to the policies related to quality of care, cost effectiveness, compliance, grievances, peer review and case, medical and utilization management efforts;

2.      not use the Practice's equipment, instruments or supplies for purposes for which they are not intended or in a manner inconsistent with sound medical practice, and/or;

3.      supervise such ancillary and support personnel and house staff officers that are assigned to him or who assist him with caring for Patients.

G.      The Practice has a code of conduct and compliance policies to ensure its compliance with Laws (the "Compliance Program"). The Provider shall participate in and comply with the Compliance Program and in all Practice in-service compliance education programs applicable to him. The Provider's failure to comply with the Compliance Program shall constitute good and sufficient grounds for the Practice to immediately terminate this Agreement.

H.      The Practice's CEO or designee shall evaluate the Provider's performance hereunder periodically. The Practice also may contract with outside parties to review its employed providers. The Provider shall cooperate with any such reviews arranged by the Practice.

I.      At such times that the Practice determines necessary, the Provider shall prepare and submit to it a written time allocation report specifying the respective amounts of time that he devotes to administrative duties hereunder. The Provider also shall notify the Practice immediately should Medicare, Medicaid or their intermediaries request access to such records.

-3-

4819-1959-4610.2

J.     The Provider shall participate with all Payors with which the Practice participates.

K.     The Provider shall devote his best efforts to fulfilling his Duties hereunder.  To this end, while employed by the Practice, the Provider shall not practice medicine other than on the Hospital's and Practice's behalf or engage in any other professional activity that in any way interferes with the performance of his duties hereunder, whether such activity is pursued for gain, profit or other pecuniary advantage, without the Practice's prior written consent.  Notwithstanding any clause in this Agreement to the contrary, nothing in this Agreement does, or will be construed or interpreted to prevent, the Provider from pursuing essentially passive investment activities (e.g. real estate, trading in securities or commodities, etc.) for his own account, being employed by Carthage Area Hospital or maintaining privileges at and admitting patients to Samaritan Medical Center.

L.     The Provider shall participate in and cooperate with Medicare, Medicaid, other federal and state reimbursement programs and with any commercial third-party healthcare insurer, health maintenance organization, preferred provider organization or other health benefit plan or program (including, without limitation, any self-funded employee benefit plan) with which the Practice may contract or affiliate (collectively, "Payors" and individually a "Payor"). The Provider represents and warrants that he has not been suspended or excluded from participating with any Payor.

M.     The Provider is compliant with and neither has violated nor defaulted under any student loans or federal scholarships with the United States pursuant to the National Health Service Corps Scholarship Program, the Health Professional Shortage Area Scholarship Program, the Health Education Assistance Loan Program or any other government program, whether Federal, State or local (collectively, "Student Loans"), any repayment agreement between the Provider and the U.S. Secretary of Health and Human Services (the "Secretary") entered into because he defaulted on a Student Loan ("Repayment Agreement") and any default or notice of default by the Provider on a Repayment Agreement.

N.     The Provider represents that he is free from any health impairment that potentially could adversely impact Patients or that may interfere with his performing his Duties hereunder, including habituation or addiction to depressants, stimulants, narcotics, alcohol or other drugs or substances that may alter his behavior.

O.     The Practice shall make available for use by the Provider all such equipment, supplies and incidental space as mutually agreed upon by the Provider and the Practice or as the Practice shall reasonably determine are necessary and appropriate to fulfill the Provider's obligations hereunder.

P.     The Practice will provide all billing and collection services in an appropriate, accurate, and timely manner related to the Provider's employment as deemed appropriate by Practice standards.

-4-

Q.      The Practice will provide to the Provider all required billing forms and procedures as necessary for the Provider to appropriately, accurately, and completely record services for billing purposes.

2.      **Non Disclosure**.

A.      In accordance with all Laws including, without limitation, HIPAA, the Provider shall not, without the Practice's prior written consent, disclose to any person or entity without limitation:  Patient Information, records and charts; Practice operations, plans and/or business operations; lists and/or names, addresses or telephone numbers of or any other information concerning Patients; communications with Patients, Practice personnel and/or other service providers; Practice symbols, trademarks, tradenames, servicemarks, designs, management information systems, credentialing and utilization procedures and protocols; Practice payment arrangements, forms, claims processing techniques and fee schedules; utilization review and quality assurance mechanisms; Payor contracts and the identity of purchasers of services; educational programs related to the Practice's Quality Assurance and Continuous Quality Improvement activities; any information relating to the Practice's financial affairs and/or to its business and marketing plans and strategies; and/or any other information that the Practice reasonably considers confidential and/or trade secrets (collectively, "Protected Information").

B.      All Protected Information is and shall remain, at all times, the Practice's sole and exclusive property and neither the Provider nor his agents, representatives, employees, employers or co-venturers shall use, furnish or disclose it without prior written Practice consent for any purpose other than to assist the Provider with performing his duties hereunder.  He will not copy Protected Information for his or any other party's use and shall return all Protected Information at any time upon the Practice's request and upon this Agreement's termination.

C.      The Provider neither shall use nor further disclose, and shall use appropriate safeguards to prevent such use or disclosure by other parties of, any "individually identifiable health information" or "protected health information", as such terms are defined at 45 CFR Section 164.500 (collectively, "Protected Health Information"), other than as permitted by this Agreement or by law pursuant to 104 P.L.  191 and 44 CFR Parts 160 and 164 respecting the standards for privacy of individually identifiable health information (collectively, "HIPAA Privacy Rules") or as otherwise may be required by law.  The Provider shall report to the Practice any use or disclosure of Protected Health Information not provided for by this Agreement of which the Provider becomes aware.

The Provider shall provide Patients access to their Protected Health Information, including an accounting of any disclosures thereof, and shall comply with such Patients' requests to amend their Protected Health Information to the extent required by 45 CFR Section 164.504(e)(2).  The Provider shall make his internal practices, books and records relating to use and to disclosure of Protected Health Information available to the Secretary of HHS as required to determine compliance with the HIPAA Privacy Rules.  Notwithstanding the foregoing, no attorney-client, accountant-client or other legal privilege shall be deemed waived by the Provider or by the Practice by virtue of this Section.

-5-

4819-1959-4610.2

Upon this Agreement's termination, the Provider shall return to the Practice all Protected Health Information that he received from the Practice and still maintains in any form. If the return of such Protected Health Information is infeasible, the Provider shall extend this Agreement's protections to said Protected Health Information and limit its further use and disclosure exclusively to those purposes that make its return infeasible.

D.    The Provider shall exercise his best efforts to ensure that Protected Information remains confidential. If at any time a judicial, administrative or government proceeding requires the Provider to disclose any Protected Information, he promptly shall notify the Practice so that it may seek a protective order or other appropriate remedy preventing such Protected Information's disclosure. If such a protective order or other remedy is unobtainable, the Provider shall only furnish such Protected Information that Practice counsel reasonably determines legally required to be released. The Provider shall assist the Practice with obtaining, and shall not contest any action by it to obtain, an appropriate protective order or other reliable assurance that Protected Information shall remain confidential. The provisions of this section 2 shall survive the termination of expiration of this agreement.

3.    **Compensation**.

A.    As consideration for the Provider fulfilling his duties, obligations and responsibilities hereunder, the Practice shall pay the Provider an annual base salary (Provider's "Salary") as set forth in **Attachment B** (Compensation and Benefits), to be paid incrementally in accordance with the Practice's normal payroll practices and procedures. The Provider shall also receive additional compensation and those employment benefits set forth in **Attachment B** (Benefit Plan),

B.    The Provider's Salary, additional compensation, and the benefits detailed in Attachments A and B shall constitute his "Compensation." The Provider's Compensation satisfies and discharges in full his claims for compensation from the Practice and/or from Patients for professional services that he provides Patients or the Practice hereunder.

C.    The Parties acknowledge and agree that all compensation payable to the Provider under this Agreement represents the fair market value of the Duties performed by the Provider. The Provider's Practice employment hereunder in no way confers upon him any ownership interest in or personal claim upon any fees, payments, money, anything else of value or any other type of remuneration collected or otherwise obtained by the Practice for the Provider's provision of medical and/or any other professional/clinical services, whether the same are billed and/or collected during this Agreement's effectiveness or after its termination. He hereby disclaims and renounces any such possible ownership, interest, or claim. All payments, monies, fees, anything else of value and/or any other remuneration generated or attributable to services that he provides, whether paid to him or to the Practice for services provided by or attributable to the Provider or to another Practice employee, shall belong to the Practice. The Provider shall have no right or entitlement to or ownership of any such income, fees and/or other remuneration except as provided in this Agreement or as approved by the Practice in writing in its sole and absolute discretion. The Provider shall assist the Practice to recover and/or to justify any claim or payment for medical services that he provides Patients.

- 6 -

D.    The Provider shall treat all Patients regardless of their ability to pay. The Practice has complete and sole authority to contract on the Provider's behalf with all Payors with which its provider-employees participate. The Provider neither shall bill nor collect for any clinical services that he provides hereunder. He shall cooperate with the Practice or with its designated billing company. The Provider shall assign, account, pay to, surrender, deliver to (if applicable), transfer and remit to the Practice all income, fees, risk pool surpluses, Payor "holdbacks" and/or other remuneration, payments, monies and/or credits of any nature received from any and all sources, except in connection with armed forces service, relating to medical or to other professional services rendered by the Provider at Practice Area Practice.

E.    All such compensation and any bonuses declared by the Practice shall be determined in accordance with all applicable laws, rules and regulations, including but not limited to, the Federal Anti-kickback Law, and the Federal Physician Self-Referral Law (known as the "Stark" law), it being the intent of the Practice and Provider that any and all compensation paid under this Agreement shall be determined in accordance with then-prevailing legal standards.

**4.    Term, Renewal and Termination.**

A.    This Agreement shall commence on the Commencement Date and shall expire on September 30, 2023, (the Initial Term) unless terminated earlier by either Party as provided for herein. This agreement shall automatically renew for another one (1) year term (a renewal term) with the same terms and conditions contained in this Agreement including without limitation, Salary (collectively the Agreement's "Term" and each year in the Term, a "Contract Year") unless either Party provides the other Party prior written notice of termination as required hereunder.

B.    This Agreement may be terminated prior to its expiration date if:

1.    Either Party gives written notice to terminate this Agreement with or without cause at any time after the Initial Term, upon 18 months prior written notice to the other Party.

2.    It is determined by the Practice that this Agreement violates Laws and cannot be restructured to resolve the violation.

3.    The Practice, or any party exercising control over the Practice, materially changes the responsibilities and authority of the Provider at the Practice.

4.    The Practice learns of or determines that any of the following has occurred, in which case Practice, in any such instance, may terminate this Agreement immediately upon written notice to Provider:

a.    Provider does not obtain or maintain medical staff privileges on the Hospital's medical staff;

b.    Revocation, withdrawal, suspension, without stay, cancellation, lapse, loss, termination, expiration, modification, relinquishment or limitation of the Provider's (i) license to practice medicine in New York or in any other state, (ii) state or federal

- 7 -

license or authorization to dispense or prescribe narcotic drugs, and/or (iii) right to participate with any Payor and/or his resignation from or expulsion by any Payor;

c.     Any government entity or professional organization having jurisdiction finding the Provider to have engaged in professional misconduct;

d.     Provider's failure to cure any of the following concerns, described in writing to the Provider, to the reasonable satisfaction of Practice within sixty (60) days after notice to Provider: (i) unsatisfactory adherence to the Policies or the Compliance Program; (ii) unsatisfactory performance of his duties and responsibilities under this Agreement; or (iii) violation or breach of any term of this Agreement for which Practice determines that Provider can adequately cure with notice to Practice's reasonable satisfaction.

e.     Provider's fraud, embezzlement, misappropriation of Practice assets or business opportunities, acts of moral turpitude, and/or his conviction or plea of nolo contendre to any misdemeanor or felony involving moral turpitude or to any felony whatsoever;

f.     Provider has been excluded from Medicare, Medicaid or Tricare;

g.     Provider's retirement, death, legal incompetence, repeated or untreatable substance abuse or total and/or permanent incapacity;

h.     Any court and/or government agency finding the Provider in default on any Student Loans or on any Repayment Agreement which finding may result in the Provider's suspension from Medicare and/or Medicaid and, in the event of such suspension, whether the Practice terminates this Agreement, the Provider shall remit to the Practice an amount equal to all payments that any government payor refuses to pay, or recovers from, the Practice because of the Provider's default on any such Student Loans and/or failure to timely cure any default on any Repayment Agreement acceptable to the government and/or to the Practice;

i.     Provider withholding any professional or other fees or providing patient care, without prior written approval from the CEO;

j.     Practice's inability to insure, whether through the Practice's self-insurance trust or third-party provider, the Provider for his professional negligence at commercially reasonable rates and terms, as determined by the Practice in its reasonable discretion; or

k.     The Hospital determines in its sole discretion that this employment arrangement is not economically sustainable due to inadequate patient volume or reimbursement.

- 8 -

l.      Practice ceases its business and/or is forced to disassociate with the Provider.

m.      The Provider's employment by Hospital as its Director of OB/GYN Services ends for any reason, including termination of this Agreement with the Hospital by either party for any reason or no reason.

C.      Upon this Agreement's expiration or termination, the Parties' obligations shall cease and the Provider's employment by the Practice shall immediately terminate and he shall promptly complete any medical records or other documentation, including time and effort reports, as needed or requested by the Practice.  The expiration or termination of this Agreement shall not in itself diminish, revoke, annul, or repeal Provider's admitting privileges at the Hospital.

**5.      Restrictive Covenants.** During this Agreement's Term and for one (1) year thereafter, the Provider shall not, directly or indirectly:

A.      Within a fifteen (15) mile radius of the Practice, enter into any type of arrangement or contract, employment or otherwise, with other than the Hospital or Samaritan Medical Center (a) any entity authorized to operate pursuant to the New York Public Health Law, (b) any freestanding clinic, (c) any other healthcare facility/provider, (d) provider medical practices or (e) or participate in any manner whatsoever in or assist any person or entity in any way with establishing any undertaking that in any way might compete with the Practice or with any Practice service, program of affiliate, whether operated by the Practice, without the CEO's prior written consent.

B.      Within a fifteen (15) mile radius of the Practice, become interested in, provide services to or otherwise assist, directly or indirectly, financially or otherwise, as a principal agent, employee, officer, director, partner, stockholder, manager, member or creditor or in any other capacity, any proprietorship, firm, partnership, person(s), limited liability company, corporation, medical office, clinic, other healthcare facility or system or other entity, that in any manner competes with the Practice.

C.      Within a fifteen (15) mile radius of the Practice, in any capacity, except as permitted in this Agreement, see, attend to, treat and/or provide professional and/or clinical medical services to or care for patients in any manner or in any capacity whatsoever.

D.      Hire, solicit or engage, attempt to hire, solicit or engage, or assist any other person or entity in hiring, soliciting or otherwise engaging any current or future Practice employee and/or contractor, whether full time, part time or temporary, or suggest, induce, persuade or solicit such employee or contractor to discontinue his employment, contract or other arrangement with the Practice.

E.      Suggest, induce, persuade or solicit any Patient to terminate, curtail or restrict his relationship with and/or use of the Practice; and/or suggest, request or direct any Patient or his guardian, or assist any other person or entity to request or direct that the Practice, copy or have copied or otherwise remove or transfer medical records from the Practice; and/or solicit business for a Practice competitor from any past, present or future Patient.

- 9 -

4819-1959-4610.2

F.      For purposes of this Section 5, "soliciting" Patients or enrollees includes, without limitation, advertising to the general public and/or distributing promotional materials directly to Patients.  Neither the Provider nor any of his future employers, agents, and/or affiliates shall make any public announcements of, or advertise, the Provider's former relationship with, affiliation with, or employment by, the Practice without the Practice's prior written consent.  Nothing in this agreement prevents the Provider from listing his employment with the Practice on his curriculum vitae or any other professional biographical material in whatever form.

G.      Notwithstanding anything to the contrary in this Section 5 or in any other provisions of this Agreement, the provisions of this Section 5 shall not be enforceable if this Agreement expires or is terminated by either Party, with or without cause.  In the event of such expiration or termination, Provider shall have the right, but not the obligation, to purchase the Practice for the sum of (a) the amount the Provider was paid for the Provider's ownership interest in the Practice pursuant to a certain transfer agreement, dated October 1, 2018, between the Provider and a designee of the Hospital and (b) the then current depreciated value of any physical improvements the Practice makes or equipment the Practice adds at the Practice site after the Commencement Date.

6.      **Books and Records.** If the Secretary, the Comptroller General of the United States (the "<u>General</u>") or their respective representatives determine that this Agreement is a contract described in the Social Security Act's Section 1861(v)(1)(1), then, until the expiration of four (4) years after furnishing services pursuant to this Agreement, the Provider, upon written request, shall make available to the Practice, the Secretary, the General or any of their duly authorized representatives, this Agreement and the Provider's books, documents and records necessary to certify the nature and extent of amounts paid the Provider by the Practice pursuant to this Agreement.

7.      **Assignment.** No assignment or assumption of this Agreement, or the rights and obligations hereunder, shall be valid or enforceable for any purpose without the Parties' specific prior written consent, except that following prior written notice to the Provider, this Agreement may be assigned by the Practice, in whole or in part, to a Practice affiliate or to any successor entity operating the Practice.

8.      **Entire Agreement Non-Waiver.** This Agreement supersedes all previous contracts, arrangements, and/or relationships between the Parties hereto and constitutes the entire Agreement between the Practice and the Provider with respect to this Agreement's subject matter.  No prior or contemporaneous oral statements, written agreements or other material not specifically incorporated herein shall be of any force or effect and no changes in or modifications, additions or amendments to this Agreement shall be recognized or be of any force, effect or validity, unless in writing, signed by each Party hereto and incorporated herein as

4819-1959-4610.2

an amendment to this Agreement. Any such amendment agreed upon by the Parties hereto shall become effective on the date stipulated therein.

**9.      Applicable Law and Jurisdiction.**

A.      This Agreement shall be governed by the laws of the State of New York. Any suits, actions, proceedings and/or any judgment entered by any court with respect to this Agreement shall be brought/entered in New York state courts at law or at equity in Jefferson County, New York ("New York Courts") and each party hereto accepts the exclusive personal jurisdiction of the New York Courts.

B.      The Provider understands and acknowledges that Sections 2 and 5 are designed to preserve the Practice's goodwill and that any breach of them by the Provider would cause the Practice irreparable harm that monetary damages would not adequately remedy. Accordingly, if the Provider breaches or threatens to breach, or otherwise violates or threatens to violate, Sections 2 and/or 5, or causes them to be breached or violated, or to be threatened to be breached or violated in any manner, or participates in their breach or violation, in addition to any other remedies available under this Agreement, at law or at equity, the Practice may seek relief from such breach or violation or threatened breach or violation and may enforce this Agreement by injunctive relief and by specific performance, such relief to be without the necessity of posting a bond, cash or any other security. Additionally, nothing in Sections 2 or 5 shall limit the Practice's right to recover any other damages to which it is entitled as a result of the Provider's breach or violation of Sections 2 and/or 5 as described herein and to be indemnified by the Provider for all claims, damages, losses, liabilities, costs and/or expenses whatsoever related to the Provider's breach or violation or threatened breach or violation of Sections 2 and/or 5. The Provider acknowledges and agrees that this Section 9(B) constitutes Practice consideration for entering into this Agreement and is necessary to protect the Practice's legitimate business obligations and interests and is reasonable in scope, time, and geography. If any provision in Sections 2 and/or 5 is held by a court of competent jurisdiction to be unenforceable due to an excessive time period, geographic area or restricted activity, such provision shall be reformed to comply with such time period, geographic area or restricted activity that would be held and/or is enforceable.

**10.     Legal Terms and Conditions.**

A.      Once executed by all parties, this written Agreement, together with all of the Attachments, and other documents attached hereto and made a part hereof, contains all the terms and conditions agreed upon by the parties hereto, and no other agreement, oral or otherwise, regarding the subject matter of this Agreement shall be deemed to exist or to bind any of the parties hereto, or to vary any of the terms contained herein, except the prior agreement between the Provider and the designee of Carthage Area Hospital who purchased the providers ownership interest in the Practice.

B.      The Agreement may be executed in any number of counterparts, each of which shall be an original, but such counterparts together shall constitute one and the same Agreement, provided that the second party to execute this agreement delivers to the first party to execute and deliver it executed version of the agreement, a fully executed and binding copy of

- 11 -

this agreement within ten days of the delivery of an executed copy of the agreement by the first party to so execute and deliver its copy of this agreement.

      C.     If any of the Agreement's provisions are determined unlawful or otherwise unenforceable, the remainder shall continue unchanged and Practice, after consulting with Provider, may amend this Agreement to comply with the law. Neither Party will enter into any agreement with any other party that directly or indirectly contravenes conflicts with or adversely impacts any of the Agreement's provisions.

      D.     No other contractual relationship or restriction precludes the Provider from entering into this Agreement. The Provider warrants that there are no fees payable by or on behalf of him related to his using any employment or recruiting agency with respect to his employment hereunder.

      E.     The captions provided herein are solely for use as a guide and shall not be used to interpret any of the Agreement's provisions.

      F.     Any notice required or permitted to be given pursuant to the Agreement shall be in writing, signed by a Practice officer and/or by the Provider, as applicable, and mailed by registered, certified mail, return receipt requested, in a postage paid envelope or by reputable overnight delivery service, either addressed as follows:

      To the Provider:        Walter Dodard, D.O.
                                  16451 Deer Park Road
                                  Watertown, NY  13601

      To the Practice:        Rich Duvall, CEO
                                  Comprehensive Woman's Health Services, PLLC.
                                  1001 West Street
                                  Practice, New York 13619

      G.     This Agreement shall not be construed against either party because he may be responsible for drafting it or any provision thereof.

      H.     This Agreement is only enforceable by the Parties hereto and by their successors in interest. No other person or entity may enforce any of the provisions contained herein, including, without limitation, any Patient, nor shall this Agreement be used by any person or entity to impose any obligation, duty, standard of care or of practice different from or in addition to whatever obligations, duties and standards exist in this Agreement.

      I.     No remedy set forth in this Agreement or otherwise conferred upon or reserved to either Party shall be considered exclusive of any other remedy available to either Party, but the same shall be distinct, separate, and cumulative and may be exercised from time to time as often as occasion may arise or as may be deemed expedient.

      J.     No provision of this Agreement shall be modified or construed by any practice that is inconsistent with it and failure either by the Provider or by the Practice to comply

- 12 -

4819-1959-4610.2

with any provision, or to require the other party to so comply, shall not affect either Party's rights thereafter to comply or to require the other party to comply.

K. If after this Agreement's execution, any new or amended statute or regulation becomes effective or, any binding interpretation of a statute, regulation, or facts by any court or government authority, whether federal or state is rendered making the relationship in this Agreement between the Practice and the Provider illegal, or, requiring the relationship's modification, then, this Agreement shall not terminate. Rather the Practice, after consultation with the Provider, shall amend this Agreement to the extent necessary to comply with the New Law and, to the extent possible, to preserve the underlying economic and financial arrangements between the parties.

L. Each Party hereto agrees hereafter to execute, acknowledge and deliver such further instruments, agreements and documents and to do such further acts and things that may be necessary, expedient, required and/or useful to carry out this Agreement's intent and purpose, as are consistent with the terms hereof.

M. Each Party shall indemnify and hold the other Party and, without limitation, its employees, agents, officers, trustees, representatives, advisors, contractors and invitees ("Agents"), harmless from any costs, claims, losses, damages, liabilities or any other expenses, including reasonable attorneys' fees, incurred by the other Party or its Agents, because of the first Party's negligent and/or intentional acts which are not or which are determined not to be covered by professional liability insurance.

N. The Provider represents and warrants that, except as otherwise disclosed, no member of the Provider's immediate family has a compensation arrangement of any kind with the Practice. For purposes of this Agreement, the Provider's "immediate family" shall include his spouse, natural or adoptive parent(s), child(ren), sibling(s), step-parent(s), step-child(ren), step-brother(s), step-sister(s), father-in-law, mother-in-law, grandparent(s), grandchild(ren) and spouses of the Provider's child(ren), grandparent(s) and grandchild(ren). For further purposes of this Section, "compensation" shall mean any type of remuneration whatsoever paid directly or indirectly, overtly or covertly, in cash or in kind. Should any member of the Provider's immediate family enter into a compensation arrangement with the Practice, the Provider immediately shall notify the Practice in writing.

- 13 -

**IN WITNESS WHEREOF**, the Parties hereto have set their hands and seals on the day and year first above written.

Comprehensive Women's Health Services, PLLC    **PROVIDER**

By:_____    By:_____

Gary A. Rosenberg    Walter Dodard, D.O.
Administrator of Support Services

A-1

4819-1959-4610 2

## ATTACHMENT A

### PROVIDER'S DUTIES

The Provider shall:

Provide required full-time patient contact hours at the appropriate location as determined by the Practice.

1. The Provider shall spend as much time as is necessary to timely complete all charts and records for which he is responsible without additional compensation.

2. The Provider shall spend as much time as is necessary to accomplish his director responsibilities. Consistent with the obligations of a full-time employed member of the Practice, the provider will be available at all times practicable, for OB/GYN phone consultation and/or in person consultation on potential OB/GYN patients who present to the Practice's main, or other clinical locations. Notwithstanding the forgoing, Provider will not be expected to be available for in person consultations when out of town for vacation, professional conferences or other personal reasons. Availability for OB/GYN consultation shall be in addition to any scheduled on site on-call coverage scheduled by the Practice and agreed to by the provider.

3. Assume the administrative title of Director of OB/GYN Services.

4. Assist the Practice regarding all clinical, administrative, operational, and patient safety related activities.

5. Give guidance on the overall medical policies of the Practice and develop and implement policies and procedures that guide and support its provision of care, treatment, and services.

6. Maintain continuing review of the professional performance (including scope of practice) of all practitioners in the Practice.

7. Implement and monitor processes for continuous assessment and improvement of quality care, treatment and services in the Practice.

8. Assist in recruitment of Practice providers. Interview all applicants seeking employment at the Practice.

9. Be responsible for orientation, teaching, and continuing educational programs in the Practice.

10. Assist in the preparation of such annual reports, including budgetary planning, pertaining to the Practice.

A-2

4819-1959-4610.2

11. Provide clinically required, competent and appropriate medical services to patients, prepare timely records thereon, and consult with other members of the Practice's Staff in connection therewith;

12. Complete all supplied forms for billing purposes as provided by the Practice in an appropriate, accurate, and timely manner;

13. Refer Patients for other specialty care when appropriate;

14. Appropriately direct, supervise, oversee and lead Practice nurses and other staff and demonstrate by example the importance of delivering coordinated patient care as a member of a health care team;

15. Utilize the principles of continuous performance improvement, treat co-workers, staff and patients with respect, and work with others to ensure quality patient outcomes and ongoing compliance;

16. Assist in compiling and analyzing statistical data related to patient care;

17. Assist in identifying and prioritizing Practice needs;

18. Work with others to evaluate, analyze and improve service in such areas as patient satisfaction;

19. Work with the Practice to develop efficient ongoing care management emphasizing ease of access and continuity of care for Patients, irrespective of where such care is delivered and establish a working environment consistent with Practice goals and regulatory requirements;

20. Cooperate with the Practice's management team to enhance a meaningful multidisciplinary program of continuous quality improvement addressing the various facets of clinical activity within the Practice;

21. Promptly complete and submit all records and reports, including medical records, pursuant to applicable Laws and to all Policies, capture Patient encounters through Practice billing procedures and work cooperatively with Practice financial services staff to assure proper billing and collection for medical services that he provided;

22. Report to and perform such other appropriate duties assigned by the CEO or his designee;

23. Upon their request, assist the Practice and staff members with medical care issues;

24. Accept reasonable assignments and participate reasonably as a member of the Practice.

25. Be accountable for all clinical, administrative, operational, and patient safety related activities within the Practice.

A-3

4819-1959-4610.2

26.     Give guidance on the overall medical policies of the Practice and develop and implement policies and procedures that guide and support the provision of care, treatment, and services.

27.     Maintain continuing review of the professional performance (including scope of practice) of all practitioners with clinical privileges and report regularly thereon to the Practice management.

28.     Implement and monitor processes for continuous assessment and improvement of quality care, treatment and services.

29.     Be responsible for enforcement of the Practice rules and regulations within both the Practice and other sites.

30.     Assist in recruitment of providers.  Interview, all applicants for positions at the Practice.

A-4

4819-1959-4610.2

**ATTACHMENT B**

**PROVIDER BENEFIT PLAN**

**Base Salary:**                                    $ 200,000.00

**Incentive Compensation:**                 80% of net Practice revenue, not to exceed $ 120,000.00.  This component of compensation will be subject to annual review, for consideration of upward modification.

A.    **Medical Liability Insurance**.  The Provider acknowledges that medical liability insurance policy must be in force, paid for by the Practice and or the Hospital.  The policy shall be as set forth in the insurance policy, shall be occurrence based, and shall provide a minimum of $1.3M per person coverage with an annual aggregate of $3.9M.

B.    **CME & Other Professional Expenses**:  The Practice or the Hospital will reimburse the Provider up to $5,000.00 annually (per contract year) for reasonable expenses incurred for CME, professional expenses required to maintain licensure, society memberships, and/or Practice Staff fees.  This benefit shall not be accumulated/rolled over from one year to another.

1.    Requested CME must be approved, in advance, by the CEO or his designee.

2.    The Provider shall receive up to 40 hours of paid time for approved CME. This benefit shall not be accumulated/rolled over from one year to another.

B-1

4819-1959-4610.2

## AMENDMENT TO PROVIDER EMPLOYMENT AGREEMENT

This **AMENDMENT TO PROVIDER EMPLOYMENT AGREEMENT** (this "Amendment") is made and entered into effective **January 1, 2021** (the "Effective Date") by and between **COMPREHENSIVE WOMAN'S HEALTH SERVICES, PLLC**, organized and existing pursuant to New York law and having a principal place of business at 622 Washington Street, Watertown, NY 13601 (the "Practice") and **WALTER DODARD, D.O.,** licensed to practice medicine in New York and having an address of 16451 Deer Run Road, Watertown, NY 13601 (the "Provider"), (each a "Party" and collectively the "Parties").

## RECITALS

**WHEREAS,** the Parties entered into a Provider Employment Agreement commencing October 1, 2018 (the "Agreement");

**WHEREAS,** the Parties desire to amend certain provisions in the Agreement related to Provider's compensation;

**WHEREAS,** the Parties intend that this Amendment be incorporated into the Agreement as set forth herein.

**NOW THEREFORE,** in consideration of the foregoing, the Parties agree as follows:

Attachment B, on page B-1 of the Agreement, is deleted in its entirety and replaced with the following:

## ATTACHMENT B

## PROVIDER COMPENSATION

1. Base Salary and Incentive Compensation: As consideration for the Provider fulfilling his/her duties, obligations, and responsibilities in accordance with the Agreement, Provider shall receive a base salary and incentive compensation as follows:

   a. Base Salary: $220,000

   b. Incentive Compensation: 80% of net Practice revenue, not to exceed $150,000. This component of Provider's compensation shall be subject to annual review for consideration of upward modification.

2. Medical Liability Insurance. Provider acknowledges that medical liability insurance must be in force, paid for by the Practice and/or Carthage Area Hospital. The policy shall be occurrence based and shall ensure a minimum of $1.3M per person coverage with an annual aggregate of $3.9M.

3. <u>CME & Other Professional Expenses.</u>   Provider shall receive reimbursement for reasonable expenses as well as paid time, incurred for CME, professional expenses required to maintain licensure, society memberships, and/or Practice Staff fees, subject to the following:

    a.   Requested CME must be approved, in advance, by the CEO of his designee;

    b.   Provider shall receive reimbursement up to $5,000 annually (per contract year) for pre-approved CME;

    c.   Provider's annual reimbursement benefit shall not be accumulated/rolled over from one year to the next;

    d.   Provider shall receive up to 40 hours of paid time off for pre-approved CME; and,

    e.   Provider's annual paid time for pre-approved CME shall not be accumulated/rolled over from one year to the next.

Except as expressly provided in this Amendment, the terms and conditions of the Agreement shall remain in full force and effect.

**IN WITNESS WHEREOF**, the Parties agree to the foregoing by execution of this Amendment.

**COMPREHENSIVE WOMAN'S
HEALTH SERVICES, PLLC:**

**PROVIDER:**

By: _____

    **Richard A. Duvall**
    **Chief Executive Officer**

By: _____

    **Walter Dodard, D.O.**