**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**
**SYRACUSE DIVISION**

---------------------------------------------------------------------x

**Hearing Date:  May 20, 2026**
**Hearing Time:  2:00 p.m. (EST)**
**Hearing Location: Syracuse, NY**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| NORTH STAR HEALTH ALLIANCE, INC., *et al*,[1] | : | Case No. 26-60099 |
|  | : | Main Case |
| Debtors. | : | Jointly Administered |
|  | : |  |

---------------------------------------------------------------------x

**DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 364(c)
AND 364(d) OF THE BANKRUPTCY CODE (A) AUTHORIZING DEBTORS
TO (i) OBTAIN POSTPETITION, SECURED, SUPER-PRIORITY
FINANCING ON A PERMANENT BASIS, AND (ii) BORROW UNDER SUCH
POSTPETITION FACILITY ON AN INTERIM BASIS, PENDING A FINAL
HEARING , (B) PROVIDING FOR PAYMENTS TO SECURED CREDITORS,
AND (C) SCHEDULING INTERIM AND FINAL HEARINGS ON THE
MOTION, PURSUANT TO BANKRUPTCY RULE 4001**

North Star Health Alliance, Inc. ("North Star"), Carthage Area Hospital, Inc. ("Carthage"),

Claxton-Hepburn Medical Center, Inc. ("Claxton"), and Meadowbrook Terrace, Inc.

("Meadowbrook"), the above-captioned debtors and debtors-in-possession (collectively, the

"Debtors"), by and through their undersigned counsel, hereby seek this Court's approval for the

Debtors to obtain debtor-in-possession financing under the terms described herein (the "DIP

Motion"). In support thereof, the Debtors rely on the *Declaration of Andrew R. Manzer in Support

of the DIP Motion*, filed substantially contemporaneously herewith (the "Manzer DIP

Declaration"), and respectfully represent, as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).

1

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion are proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are section 364 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors consent to the entry of a final order on this DIP Motion if it is determined that the Court, absent consent of the parties, cannot enter a final order consistent with Article III of the United States Constitution.

**Summary of Terms Pursuant to Bankruptcy Rule 4001 (c)**

3. Pursuant to Bankruptcy Rule 4001(c), the following summarizes certain provisions of the proposed *Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement* (the "DIP Agreement") by and among the Dormitory Authority of the State of New York ("DASNY") as administrator of funds available under the Health Facility Restructuring Pool (the "HFRP"), as lender (the "Lender"), Carthage, as borrower (the "Borrower"), and North Star, Claxton, and Meadowbrook, as guarantors (collectively, the "Guarantors"), and certain other agreements with respect to the collateral security for the obligations of Borrower and Guarantors, copies of which in substantially the forms attached hereto as **Exhibit 1**, with up to $60,000,000 to be advanced as described herein, pursuant to the terms of the proposed interim and final orders approving the same (the "DIP Loan"):

| Provision | Description | Location |
|---|---|---|
| Lender: | DASNY | Page 1 of DIP Agreement |
| Borrower: | Carthage | Page 1 of DIP Agreement |
| Guarantors: | North Star, Claxton, and Meadowbrook | Page 2 of DIP Agreement |
| Interest Rate: | Zero percent (0.00%) on the Reimbursement of the DOH VAPAP Advances (as hereinafter defined and described); <br> - And - <br> Two percent (2%) on all other Advances | Page 2 of DIP Agreement |
| Repayment: | The full balance shall be payable upon the Termination Date. No interim payments (monthly or otherwise) are required. Interest (where applicable) shall be capitalized and added to the balance of the DIP Loan | Page 17 of DIP Agreement |
| Liens: | Priming Liens under Section 364(d) on substantially all of Debtors' encumbered assets, liens on any of Debtors' unencumbered assets under section 364(c)(2), and a superpriority administrative expense claim under Section 364(c)(1); no liens on avoidance actions | Paragraphs 11 and 12 of DIP Order <br> Pages 18-20 of DIP Agreement |
| Borrowing Limit: | Up to $60,000,000.00 – Final (inclusive of the Interim amount); and <br> Up to $15,000,000.00 – Interim (or such lesser amount as is needed to prevent irreparable harm) | Paragraph 9 of DIP Order <br> Page 4 of DIP Agreement |
| Borrowing Conditions: | Entry of order approving DIP Agreement and compliance with DIP Agreement conditions | Paragraph 9 of DIP Order <br> Page 3 of DIP Agreement |
| Termination Date: | The earliest to occur of: (a) twenty four (24) months following last to occur of entry of a Final Order and execution and delivery of all DIP Loan documents, (b) repayment or refinancing of the DIP Loan, (c) the effective date of a confirmed plan of reorganization; and (d) an event of default | Page 6 and 17 of DIP Agreement |

50718927.1

| Events of Default: | Failure to make payments when due; failure to maintain enforceable collateral security and guaranties; material breach of covenants or representations; dismissal or conversion of bankruptcy cases; appointment of a chapter 11 trustee; failure to comply with the Final Order | Pages 30-33 of DIP Agreement |
|---|---|---|
| Default Interest Rate: | Five percent (5%) | Page 5 of DIP Agreement |
| Automatic stay: | Terminated upon Event of Default and expiration of cure period, if any | Paragraph 20 of DIP Order |

## BACKGROUND

### A. The Chapter 11 Cases

4.     On February 10, 2026 (the "Petition Date"), the Debtors commenced these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of their properties and are operating and managing their businesses, as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

6.     By Notice of Appointment dated March 4, 2026, the Office of the United States Trustee ("UST") appointed an official committee of unsecured creditors (the "Committee").

7.     By Notice of Appointment dated March 12, 2026, the UST appointed Suzanne Koenig as the Patient Care Ombudsman (the "PCO").

### B. The Debtors' Business

8.     North Star Health Alliance, Inc. was established in September 1993 and incorporated in the State of New York as a not-for-profit corporation.  North Star is the umbrella

4

50718927.1

organization within which Carthage, Claxton, Meadowbrook, and related affiliates coordinate governance, strategy, and shared services under what is referred to as the Transformation Plan.[2] North Star is a passive parent entity that does not itself exercise financial control over each member organization; rather, it serves as a platform for alignment and operational integration, including shared leadership and centralized administrative functions (*e.g.*, finance, human resources, information technology, compliance, revenue cycle coordination, and cash planning) that are critical to sustaining rural healthcare delivery across multiple campuses. The North Star system as a whole employs approximately 1,200 employees.

9.      Carthage was established in November 1921 and incorporated in the State of New York as a not-for-profit corporation.  Carthage operates a 25-bed Critical Access Hospital in each of Carthage, New York and Ogdensburg, New York, serving a large, rural tri-county area. Carthage holds a New York State Department of Health operating certificate (No. 2238700C; Facility ID/PFI 379 & Facility ID/PFI 15684) for primary care hospital-critical access hospital services located at 1001 West Street, Carthage, New York 13619 and at 214 King Street, Suite A, Ogdensburg, New York 13669 (the "Claxton Campus").  The Claxton Campus is also the designated "9.39" hospital for the area.  While the New York State Department of Health ("DOH") issued the operating certificate reflecting this configuration, the Centers for Medicare & Medicaid Services ("CMS") processes to recognize and operationalize the Claxton Campus as a critical

---

[2] Beginning in or about August 2022, North Star pursued a complex transition (the "Transformation Plan") designed to preserve access to acute care and behavioral health services in the North Country while addressing Claxton's unsustainable legacy cost and reimbursement structure as a Sole Community Hospital. The Transformation Plan involved coordinated planning among North Star member organizations, engagement with DOH and OMH, and stepwise regulatory actions. On October 23, 2024, DOH and OMH issued operating certificates that reorganized Claxton into two distinct hospital entities: (i) a standalone inpatient psychiatric hospital (CHMC) and (ii) a separate acute-care campus operated by Carthage under a shared operating certificate (the Claxton Campus).

5

access hospital (including surveys, enrollment steps, and related notifications) have involved additional steps and timing considerations.

10.     Claxton-Hepburn Medical Center, Inc. was established in December 1916 and incorporated in January 1917 in the State of New York as a not-for-profit corporation.  Following the implementation of the Transformation Plan, Claxton now operates exclusively as a standalone Article 31 Inpatient Psychiatric Hospital licensed by the New York State Office of Mental Health under Operating Certificate No. 8231002, located on the Claxton Campus.  Claxton provides acute inpatient behavioral health services for adults (28 beds) and children/adolescents (12 beds), including the region's only acute inpatient unit dedicated to children and adolescents.  Claxton also leads the Pathways to Recovery Peer Coaching program.

11.     Meadowbrook Terrace, Inc. was established in December 2011 and incorporated in the state of New York as a not-for-profit corporation.  Meadowbrook is a 60-bed assisted living facility (58 ALP beds and 2 Adult Home beds) that provides assisted living services for seniors in the North Country region. Meadowbrook is a key part of the Debtors' care continuum for elderly and medically fragile patients, supporting safe discharge planning and community-based care.

12.     Through the bankruptcy proceedings, the Debtors intend to continue to fulfill their mission by operating their facilities to deliver quality health care in their communities, supported by a local workforce.

## RELIEF REQUESTED

13.     By this Motion, the Debtors request entry of an order pursuant to Section 364(c) and (d) of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c)) (A) authorizing Debtors to (i) obtain post-petition financing on a permanent basis, (ii) borrow under such postpetition

50718927.1

facility on an interim basis, pending a final hearing on the Motion, and (B) schedule interim and final hearings pursuant to Rule 4001(c) of the Bankruptcy Rules.

## Funding of the Debtors' Operations on Petition Date

14. On the Petition Date, the Debtors had no active prepetition borrowing facilities. Prepetition, the Debtors had a fully exhausted line of credit with Northern Credit Union and relied on revenue generated from governmental agencies and funding from the DOH in conjunction with a Transformation Plan[3] to support their not-for-profit operations.

## The Critical Need for the Proposed Postpetition Financing Arrangements

15. The Debtors urgently require the DIP Loan to stabilize and maintain their operations and businesses during the Chapter 11 Cases while implementing an arrangement with a health care partner under DOH's Safety Net Transformation Program ("SNTP")  Indeed, in the absence of available working capital, the Debtors will have no choice but to cease their operations and to discontinue service to their patients, leaving two large counties bereft of local essential healthcare which are likely to cost lives.  Thus, any significant disruptions of the Debtors' ordinary course operations due to a lack of sufficient funding would be devastating to their operations.  The Debtors' inability to obtain sufficient operating liquidity and meet their postpetition obligations will result in the closure of their operations and  cause a precipitous loss of value to their operations and assets translates into a tremendous loss for the Debtors their creditors, their estates, the communities they serve and the hundreds of employees who will lose their jobs.  Indeed, as of the

---

[3]Beginning in or about August 2022, North Star pursued a complex transition (the "Transformation Plan") designed to preserve access to acute care and behavioral health services in the North Country while addressing Claxton's unsustainable legacy cost and reimbursement structure as a Sole Community Hospital.  The Transformation Plan involved coordinated planning among North Star member organizations, engagement with DOH and OMH, and stepwise regulatory actions. On October 23, 2024, DOH and OMH issued operating certificates that reorganized Claxton into two distinct hospital entities:  (i) a standalone inpatient psychiatric hospital (CHMC) and (ii) a separate acute-care campus operated by Carthage under a shared operating certificate (the Claxton Campus).

50718927.1

date of the filing of this Motion, the Debtors' Budget, attached to hereto as **Exhibit 3**, demonstrates that the Debtors do not have sufficient funds to operate their businesses absent the DIP Loan.

16. The Debtors have determined, in the exercise of their sound business judgment, that it is critical to their reorganization efforts to maintain a post-petition credit facility that provides them with the ability to utilize the credit provided by Lender. The Debtors have concluded that Debtor-in-Possession financing with Lender provides the best – and only - opportunity for uninterrupted access to critical working capital and liquidity needs throughout these Chapter 11 Cases and their path to sustainability with a partner.

17. The dire circumstances of the Debtors' financial situation is what makes the DIP Loan so urgent. And the recognition of these circumstances is why DASNY, as Lender, is prepared to offer this lifeline in the form of the DIP Loan to the Debtors.

18. Under the proposed DIP Agreement, Lender, will provide a credit facility, advances under which will be secured by liens under 11 U.S.C. § 364(c)(2), priming liens under 11 U.S.C. § 364(d), and, if the collateral proves inadequate, under 11 U.S.C. § 364(c)(1), DIP Loan advances will be entitled to superpriority administrative expense treatment having priority over all other administrative expenses specified in 11 U.S.C. §§ 503(b), 506(c), and 507, subject to a carve-out for approved professional fees.

19. Both prior to and after the Petition Date, the Debtors fifteen (15) potential lenders ("Potential Lenders") and received one due diligence term sheet from these Potential Lenders. Notably, the Debtors' understanding is that all Potential Lenders would require priming liens under 11 U.S.C. § 364(d) in connection with any potential financing. However, Lender was the only Potential Lender with whom the Debtors were able to come to an agreement within the time constraints of the circumstances. The discussions with Lender culminated in an agreement

8

50718927.1

regarding the proposed credit facility on the terms and conditions set forth in the proposed Interim

Order attached hereto as **Exhibit 2**.

<u>**Required Use of DIP Loan Proceeds: repayment of the DOH VAPAP Advances**</u>

20. Following the Petition Date, while the Debtors were seeking to obtain DIP

financing from Potential Lenders, the DOH facilitated the continuance of the Debtors' operations

by pre-funding certain of the Debtors' accounts receivables and other reimbursements that were

or would be payable to the Debtors by DOH under Medicaid and Medicare (the "DOH VAPAP

Advances"), pursuant to the *Vital Access Provider Assurance Program Temporary Medicaid Rate*

*Adjustment Agreement*, and the *Vital Access Provider Assurance Program Temporary Medicaid*

*Rate Adjustment Agreement Addendum*, each dated March 27, 2026 (collectively, the "<u>VAPAP</u>

<u>Agreement</u>"), and the Letter from DOH to the Debtor dated March 25, 2026 (the "<u>DOH Letter</u>").

Without these DOH VAPAP Advances the Debtors would have run out of cash some time ago.

21. A substantial portion of the Debtors' revenue consists of Medicare and Medicaid

reimbursements from DOH. With respect to the DOH VAPAP Advances, the DOH is, in effect,

fully secured as the DOH has and retains recoupment rights with respect to all future Medicare

and Medicaid reimbursements payable to the Debtors by DOH and, thus, DOH could withhold

future Medicare and Medicaid reimbursements until such time as the DOH VAPAP Advances

would have been fully reimbursed and paid to the Debtors.

22. However, ongoing recoupment of the Debtors' Medicare and Medicaid

reimbursements would be unduly disruptive to the Debtors' cash flow, resulting in a rapid

drawdown of what would be essentially a downsized DIP Loan from Lender. To accommodate the

Debtors, the DIP Loan was sized so as to accommodate the repayment of the DOH VAPAP

Advances by way of an interest-free advance under the DIP Loan upon entry of the Final Order.

50718927.1

Furthermore, it is a condition of the DIP Loan that the DOH VAPAP Advances be afforded the foregoing treatment under the DIP Loan and Final Order.

## The Proposed DIP Financing Arrangement Should Be Authorized

23.     The Debtors' working capital needs can only be satisfied if the Debtors are authorized to utilize credit of up to $60 million, with $15 million of that amount authorized (to maintain operations and prevent irreparable harm to the Debtors' estates) on an interim basis, under the DIP Agreement.  As noted, a budget reflecting the Debtors' financing requirements is attached hereto as **Exhibit 3**.  The credit provided under the DIP Agreement will enable the Debtors to continue operating so that they can pay their employees and maintain their operations in the ordinary course to preserve and enhance the value of their facilities and other assets for the benefit of all parties in interest and in furtherance of their mission.  The availability of credit under the DIP Agreement will provide outside parties with a measure of confidence in the Debtors that will enable and encourage them to maintain or perhaps resume ongoing credit relationships with the Debtors, and promote efforts toward effectuating the success of the Debtors' Chapter 11 Cases.

24.     The terms and conditions of the DIP Agreement are fair and reasonable and were negotiated by the parties in good faith and at an arms' length.  Notably the terms and conditions of the DIP Agreement are far below market terms and are much more favorable to Debtors than the proposals received from or discussed with other Potential Lenders in terms of interest rates and fees, thereby saving the Debtors hundreds of thousands of dollars. Accordingly, Lender as the lender under the DIP Agreement should be accorded the benefits of Section 364(e) of the Bankruptcy Code.

10

50718927.1

**The Interim Approval Should Be Granted**

25.     Rules 4001(b) and 4001(c) of the Bankruptcy Rules provide that a final hearing on a motion to obtain credit pursuant to Section 364 may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the court is empowered to conduct an expedited preliminary hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

26.     Pursuant to Bankruptcy Rule 4001(c), the Debtors request that the Court (i) conduct an immediate preliminary hearing on the Motion (the "Preliminary Hearing"), (ii) authorize the Debtors to borrow an amount up to $15,000,000.00 pending a final hearing on the DIP Credit Facility; (iii) authorize the interim use of the DIP Credit Facility pursuant to Section 364, in order to (a) maintain ongoing operations, and (b) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest as a result of inadequate funding, and (iv) schedule a final hearing on the DIP Credit Facility.

27.     The Debtors have an urgent and immediate need for cash to continue to operate. The Debtors will be immediately and irreparably harmed absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on the Motion (the "Final Hearing").  The availability of such interim loans will provide necessary assurance to third parties of the Debtors' ability to meet their near-term obligations.  In the short-term, if the Debtors are unable to maintain their operations and the care for their patients will be jeopardized and the jobs of employees will most certainly be lost.

28.     The Debtors are unable to obtain unsecured credit under Section 364(b) allowable as an administrative expense under Section 503(b)(1) or, under Section 364(c) as a priority

11

50718927.1

unsecured administrative expense, secured by junior liens, or secured by liens on otherwise unencumbered property. Absent interim postpetition financing, the Debtors' objective of utilizing these Chapter 11 Cases to restructure and right-size their operations and negotiate and implement an arrangement with a partner for the long-term sustainability of their health care services while continuing to care for their patients and maintaining, and hopefully enhancing, value for their constituent body, will be lost. In these circumstances, the granting of the relief requested by the Motion is warranted.

## BASIS FOR RELIEF

**I.    THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN POST-PETITION FINANCING ON A PRIMING SECURED, SECURED, AND SUPERPRIORITY BASIS.**

29.    The Debtors meet the requirements for relief under section 364(d) of the Bankruptcy Code, which permits a debtor to obtain post-petition financing secured by senior, priming, liens on their unencumbered property. Specifically, section 364(d)(1) of the Bankruptcy Code provides that the court may approve financing:

> … secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> **(A)** the trustee is unable to obtain such credit otherwise; and
> **(B)** there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

30.    The estimated value of the Debtors' real estate is approximately $50 million and the Debtors' accounts receivables are in excess of $100 million. There is ample remaining equity in the Debtors' encumbered property such that the current secured creditors (the "Secured Creditors"), NCU and M&T, have an ample equity cushion. Furthermore, subject to DASNY's approval of the use of funds advanced under the DIP Loan, the Debtors are willing to consider reasonable additional adequate protection such as increasing existing payments being made to each

12

50718927.1

of the Secured Creditors and granting junior liens on other property of the Debtors so as to satisfy any concerns regarding adequate protection.

31. The Debtors meet the requirements for relief under section 364(c) of the Bankruptcy Code, which permits a debtor to obtain post-petition financing and, in return, to grant superpriority administrative status, liens on their otherwise unencumbered property. Specifically, section 364(c) of the Bankruptcy Code provides that the court may approve financing: "(1) with priority over any or all administrative expenses . . . (2) secured by a lien on property of the estate that is not otherwise subject to a lien" 11 U.S.C. § 364(c).

32. Provided that an agreement to obtain secured credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant considerable deference to a debtor's exercise of its business judgment when evaluating their requests to incur postpetition credit. *See, e.g.*, *In re Latam Airlines Grp. S.A.*, 2020 WL 5506407 at *27 (Bankr. S.D.N.Y. Sept. 10, 2020) ("Generally, in evaluating the merits of proposed post-petition financing, courts will defer to a debtor's business judgment provided that the financing does not unduly benefit a party in interest at the expense of the estate."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (deferring to a debtor's "reasonable business judgment...so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

33. In determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Loan, this Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed post-petition facility. *See In re ION Media Networks, Inc.*, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) ("noneconomic elements such "as the timing and certainty of closing, the impact on creditor constituencies and the likelihood

50718927.1

of a successful reorganization" may be properly considered by debtors when selecting post-petition financing, because the "business decision to obtain credit from a particular lender is almost never based purely on economic terms").

34.    Here, given all the facts and circumstances, the Debtors have amply satisfied the necessary conditions under sections 364(c) and 364(d) of the Bankruptcy Code for authority to enter into the DIP Loan.  As set forth more fully below, the Debtors exercised proper business judgment in securing the DIP Loan on terms that are fair and reasonable and the best available to them under the circumstances and in the current market.  The DIP Loan terms are extremely advantageous to Debtors and clearly show the commitment of Lender to preserve the Debtors' business and move this case to a successful resolution ensuring health care in the North Country. For all the reasons discussed further below, the Debtors respectfully submit that the Court should grant the Debtors' request to enter into the DIP Loan pursuant to section 364(c) of the Bankruptcy Code.

### A.    Priming Liens should be Allowed under Section 364(d).

35.    Based on the facts of these Chapter 11 Cases, the DIP Loan should be allowed under Section 364(d). As noted above, the Debtors sought out financing from a dozen or more Potential Lenders – all of whom would have required priming liens under Section 364(d) to secure their respective possible loans to the Debtors. "Section 364(d)(1) does not require the debtor to seek alternate financing from every possible lender. However, the debtor must make an effort to obtain credit without priming a senior lien." *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992).

36.    Granting a priority priming lien requires a showing that:

the creditor's interest is not being jeopardized, considering all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will

14

depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan.

*In re Olde Block Owner, LLC*, 448 B.R. 482, 493 (Bankr.N.D.Ill. 2011) (internal quotations omitted). *See also, In re Aqua Assoc.*, 123 B.R. 193, 196-197 (Bankr.E.D.Pa. 1991) (adequate protection considers whether the creditor's interest is being *unjustifiably* jeopardized based on, among other factors, an equity cushion, the debtor's performance under a plan, and the prospects of a successful reorganization).

37.     In this case, the Debtors contend that there is an ample equity cushion for the secured creditors to be primed by the DIP Loan solely in hard assets, such as real estate, equipment, fixtures, and accounts receivable, and a more robust equity cushion when considering the enterprise value of the Debtors.

**B.     The Debtors Exercised Sound and Reasonable Business Judgment in Deciding to Enter into the DIP Loan**.

38.     Based on the facts of the Chapter 11 Cases, the DIP Loan represents a proper exercise of the Debtors' business judgment.  As noted above, bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including decisions about whether and how to borrow money.  *See, e.g.*, *In re Integrated Res., Inc.,* 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity") (citing *Aronson* v. *Lewis,* 473 A.2d 805, 812 (Del. 1984)); *In re Garrett Motion Inc.*, No. 20-12212 (Bankr. S.D.N.Y. October 23, 2020) (approving postpetition financing as "a sound and prudent exercise of the debtors' business judgment"); *In re Metaldyne Corp.,* 409 B.R. 661, 667–68 (Bankr. S.D.N.Y. 2009) (noting "decisions in [the Southern District of New York] emphasizing that [bankruptcy courts] should not substitute [their] business judgment for that of the Debtors'.") (citations omitted), *aff'd* 421 B.R. 620 (S.D.N.Y. 2009); *In re*

50718927.1

*Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.").

39. Specifically, when evaluating whether a debtor's decision to obtain postpetition financing was an exercise of sound business judgment, courts need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys., Inc.*, 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006). When evaluating whether a debtor's decision to enter into postpetition financing was an exercise of sound business judgment, bankruptcy courts consider the terms of the financing in light of the debtor's circumstances and the market for financing more generally. *See In re Farmland Indus., Inc.*, 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp.* v. *First Nat'l Bank & Trust Co. (In re Ellingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

40. The Debtors' advisors actively negotiated the terms and provisions of the DIP Loan, in good faith, in an effort to reach the best available material terms given the circumstances surrounding these Chapter 11 Cases. The fees, interest rates, and other economics provided for in the DIP Loan, taken as a whole, are reasonable, below market, highly advantageous, and in the Debtors' best interests and the DIP Loan is the best and only reasonable financing option currently available to the Debtors under the circumstances.

41. Without the DIP Loan, the Debtors would have insufficient funds to operate their businesses in a safe manner that protects the patients in their care and would result in them closing

16

50718927.1

their operations to the detriment of all of Debtors' stakeholders.  Consequently, the Debtors' determination to move forward with the DIP Loan is a sound exercise of their business judgment, and, accordingly, the Debtors respectfully request the Court authorize the Debtors' entry into the DIP Loan and the borrowings contemplated therein as a reasonable exercise of the Debtors' business judgment.

42.    Furthermore, it is submitted that the use of the DIP Loan to repay the DOH VAPAP Advances is appropriate under the circumstances of this case as the DOH would otherwise have an administrative expense under 11 U.S.C. § 503(b) in the amount of the DOH VAPAP Advances and DOH possess substantial recoupment rights against future Medicare and Medicaid payments otherwise payable to the Debtors by DOH. Converting the DOH VAPAP Advances to an interest-free loan tranche under the DIP Loan is highly beneficial to the Debtors and will greatly aid in their reorganization efforts.

## C.    The Debtors Meet the Conditions Necessary Under Section 364(c) to Obtain Postpetition Financing on a Secured and Superpriority Basis

43.    In addition to the priority priming liens under Section 364(d), the Debtors propose to secure the DIP Loan by providing superpriority claims and liens on otherwise unencumbered property, if any, including the Debtors' real estate, pursuant to 11 U.S.C. § 364(c).

44.    In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts act in their "informed discretion." *In re Ames Dep't Stores*, 115 B.R. at 37.  Courts perform a qualitative analysis and consider factors including whether (a) the debtor made a reasonable effort to find financing with better terms, (b) the financing is necessary to preserve assets of the estate, and (c) the terms of the credit agreement are fair, reasonable, and adequate. *In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016).

50718927.1

(i)    *The Debtors Are Unable To Obtain Financing on More Favorable
Terms Than the DIP Loan*

45.    Debtors need to demonstrate that they made a reasonable effort to find alternative financing before a bankruptcy court will order superpriority liens.  *In re Latam Airlines Grp. S.A.*, 2020 WL 5506407, at *26 (Bankr. S.D.N.Y. Sept. 10, 2020).  But, the Bankruptcy Code "imposes no duty [on a debtor] to seek credit from every possible lender before concluding that such credit is unavailable."  *Id. (*citing *Bray* v. *Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986)); *In re Pearl-Phil GMT (Far East) Ltd.* v. *Caldor Corp.*, 266 B.R. 575, 584−85 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain superior terms after discussing possible postpetition financing with four lenders); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996).

46.    Moreover, when only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB* v. *Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

47.    Here, the Debtors had no prepetition lending relationships and thus entered into discussions with certain other interested parties regarding potential financing for a chapter 11 process, shared diligence materials (including proposed budgets and projections), and engaged in discussions regarding potential financing for a chapter 11 process, but ultimately they did not receive any other competitive offers.   The terms of the DIP Loan are the product of extensive and good faith negotiations between the Debtors and the Lender.  Through these vigorous negotiations, the Debtors developed the terms of the DIP Loan, which are the best and only reasonable financing

18

option currently available under the circumstances.   The DIP Loan is the Debtors' only viable source of funding, whether on an out-of-court or in-court basis, and no other, better alternative, taken as a whole, is currently available to the Debtors under the circumstances.  In sum, the DIP Loan represents the Debtors' best available postpetition financing option.

### (ii)    *The DIP Loan Is Necessary to Preserve the Value of the Debtors' Estates*

48.    The Debtors have a fiduciary duty to protect and maximize the value of their estates' assets. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004).  The Debtors seek access to the DIP Loan consistent with that duty.  Without the DIP Loan, the Debtors will not have sufficient funds to operate and will be forced to close, thereby destroying value for all stakeholders.

### (iii)    *The Terms of the DIP Loan Are Fair, Reasonable, and Adequate under the Circumstances*

49.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc*., 294 B.R. at 886; *see also In re Ellingsen MacLean Oil Co.*, 65 B.R. at 365.  The appropriateness of a proposed financing facility should also be considered in light of current market conditions. *See In re Lyondell Chem. Co.*, No. 0910023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009), Hr'g Tr. 740:4-6 ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of the DIP] reasonable here and now.").  Here, the terms of the DIP Loan include a well below market interest rate (2%), with interest accruing, rather than being payable, no interest accruing on $15,000,000 of the total DIP Loan, no payments required prior to maturity/termination, no origination or success fees and

19

50718927.1

minimal related costs. The terms of the DIP Loan are fair, appropriate, reasonable, and adequate under the circumstances, and in the best interests of the Debtors, their estates, and their creditors.

50.    As noted above, the terms of the DIP Loan were actively negotiated by the Debtors. Under the current circumstances, the fees, interest rates, and other economics provided for in the DIP Loan, taken as a whole, are reasonable and in the Debtors' best interests, particularly in light of the absence of any more favorable alternatives.

## II.    FAILURE TO OBTAIN IMMEDIATE INTERIM ACCESS TO THE DIP LOAN WOULD CAUSE IMMEDIATE AND IRREPARABLE HARM

51.    Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Bankruptcy Rule 4001-2(g).

52.    Failure to obtain access to the DIP Loan would result in immediate and irreparable harm to the Debtors and their stakeholders, and cause a diminution in value to the Debtors' estates. Without the approval of the DIP Loan, the Debtors likely would cease operating as a going concern.  The DIP Loan provides the amounts necessary to maximize the Debtors' going concern value by allowing them to access additional necessary liquidity to fund their operations, including payment to their employees, and to pay their administrative expenses and implement the restructuring of their  businesses.

53.    Accordingly, pursuant to Bankruptcy Rule 4001(c), and Local Bankruptcy Rule 4001-2(g), the Debtors request that the Court conduct an expedited hearing on this Motion, and

20

enter the Interim Order authorizing the Debtors to obtain credit under the DIP Loan, on an interim basis, pending approval on a final basis after the Final Hearing.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

54.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to waive the 14-day stay period under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

55.    Nothing contained in this DIP Motion or any order granting the relief requested in this motion, and no action taken pursuant to such relief requested or granted (including any payment made in accordance with any such order), is intended as or should be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors, under the Bankruptcy Code or other applicable nonbankruptcy law, (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this DIP Motion or any order granting the relief requested by this DIP Motion, (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

21

50718927.1

## NOTICE AND NO PREVIOUS REQUEST

56.     Notice of this DIP Motion has been provided to (i) the Office of the United States Trustee; (ii) counsel for the Official Committee of Unsecured Creditors; (iii) counsel to the proposed Lender, the New York Attorney General; (iv) the Internal Revenue Service; ((v) counsel to M&T Bank; (vi) counsel to Northern Credit Union; (vii) the Centers for Medicare & Medicaid Services; (viii) the Office of the U.S. Attorney for the Northern District of New York; and (ix) and any party that has requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002. The Debtors submit that such notice is sufficient and appropriate under the circumstances and that no other or further notice need be given.

57.     No previous motion for the relief sought herein has been made to this or any other court.

WHEREFORE the Debtors respectfully request that the Court enter the proposed DIP Loan order granting the relief requested herein, and such other and further relief as may be just and equitable.

Dated:  May 18, 2026

**BARCLAY DAMON LLP**

By*:   /s/Janice B. Grubin*
Janice B. Grubin
Ilan Markus (admitted *pro hac vice*)
1270 Avenue of the Americas, Suite 2310
New York, New York 10020
Telephone:  (212) 784-5800
jgrubin@barclaydamon.com
imarkus@barclaydamon.com

*Counsel to Debtors and*
*Debtors-in-Possession*

50718927.1