# <u>EXHIBIT 1</u>

**EXHIBIT 1**
**(DIP Agreement)**

Senior Secured, Super-Priority Debtor-In-Possession Loan Agreement dated May __, 2026, between Carthage Area Hospital, Inc., as borrower, and North Star Health Alliance, Inc., Claxton-Hepburn Medical Center, Inc., and Meadowbrook Terrace, Inc., Debtors, as guarantors, and the Dormitory Authority of the State of New York, as lender, with up to $60,000,000.00 to be advanced.

50718927.1

Execution Version

_____

SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of May ___, 2026

among

CARTHAGE AREA HOSPITAL, as Borrower

and

DORMITORY AUTHORITY OF THE STATE OF NEW YORK,

as DIP Lender

<u>**SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**</u>

**SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT** ( "**Agreement**"), dated as of May ____, 2026 (the "**Effective Date**") by and between the **DORMITORY AUTHORITY OF THE STATE OF NEW YORK**, a public benefit corporation established pursuant to Chapter 524 of the Laws of 1944 of the State of New York, as amended, and constituting Title 4 and Title 4-B of Article 8 of the Public Authorities Law (the "**Dormitory Authority Act**"), with principal offices located at 515 Broadway, Albany, New York 12207 (the "**Authority**") and **CARTHAGE AREA HOSPITAL**, a not-for-profit corporation (the "**Hospital**"), organized and existing under the Not-for-Profit Corporation Law of the State of New York and licensed to operate as a general hospital under Article 28 of the Public Health Law of the State of New York (the "**Act**"), having its principal office located at 1001 West Street, Carthage, New York 13619.

**WITNESSETH:**

WHEREAS, Hospital and its affiliates North Star Health Alliance, Inc., Claxton-Hepburn Medical Center, Inc. and Meadowbrook Terrace, Inc (the " Debtor Affiliates") have commenced cases under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Northern District of New York,

WHEREAS,  the Hospital and the Debtor Affiliates have retained possession of their respective assets and are each authorized under the Bankruptcy Code to continue the operation of their business as a debtor-in-possession;

WHEREAS, prior to the commencement of the Chapter 11 Cases, certain prepetition lenders made secured loans, and provided other financial or credit accommodations to Hospital and the Debtor Affiliates pursuant to, inter alia, prepetition secured loan documents;

WHEREAS, subsequent to the filing of the Chapter 11 Cases, to help the Hospital meet its operational obligations the New York State Department of Health ("DOH") provided the Hospital with interim bridge financing for a thirteen (13) week period in the aggregate amount of $15,000,000 through the Vital Access Provider Assurance Program ("VAPAP") ;

WHEREAS, the Hospital remains unable to satisfy postpetition operational obligations through revenue and seeks additional funding to repay the VAPAP financing outstanding and to fund ongoing operations;

WHEREAS, DOH agreed to commit $60,000,000 in funding to the Hospital from funds made available to the Authority for lending from its health facility restructuring pool established pursuant to Section 2815 of the Act (the "Restructuring Pool"), provided, *inter alia*, the Hospital submits a complete application to the Authority for such Restructuring Pool loan, the Hospital agrees to use $15,000,000 of the loan proceeds to immediately repay in full all outstanding VAPAP funding received and the repayment of the Restructuring loan is guaranteed by the Affiliates and secured by first priority liens, entitled to superpriority status in bankruptcy, on substantially all assets of the Hospital and the Debtor Affiliates;

;

**WHEREAS**, pursuant to the Act, the Authority, the Commissioner of Health of the State (the "**Commissioner**") and the New York State Housing Finance Agency have entered into an agreement dated as of September 21, 1998, as amended (the "**MOU**"), which MOU has been approved by the director of the budget, for the purpose of administering funds in the Restructuring Pool in a manner that will benefit the public health by encouraging improvements in the health care delivery system in the State of New York (the "**State**");

**WHEREAS,** pursuant to the Act and the MOU, loans from the Restructuring Pool shall be made by the Authority pursuant to agreements with the Participating Borrowers (as such term is defined in the Act);

**WHEREAS**, the Hospital is a Participating Borrower as it is a not-for-profit general hospital that has received written approval from the Commissioner to participate in the Health Facility Restructuring Program pursuant to the Act;

**WHEREAS**, the Hospital is licensed to operate as a general hospital under Article 28 of the Act under the name "Carthage Area Hospital;"

**WHEREAS,** the Hospital seeks to obtain final postpetition financing, incorporating the VAPAP Funding, and enter into a senior secured priming and superpriority debtor in possession credit agreement through receipt of a Restructuring Pool loan from the Authority in the original principal amount up to Sixty Million and 00/100 Dollars ($ 60,000,000.00) (the " **DIP Loan**");

**WHEREAS**, the DIP Loan shall be used by the Hospital for the purpose of satisfying its obligation to repay the VAPAP Funding and to further fund the ordinary costs of its operations including payroll and vendor payables, which will in turn allow the Hospital to maintain business relationships with the Debtor Affiliates, vendors and suppliers, provide care to its patients and its community, and otherwise pay the costs attendant to the Chapter 11 case. ;

**WHEREAS,** the New York State Department of Health ("**DOH**") has approved the DIP Loan;

**WHEREAS**, the Authority has complied with all of the provisions of the MOU and the Act required to enable it to extend the DIP Loan to the Hospital and with respect to expending funds from the Restructuring Pool to the Hospital pursuant to this Agreement; and

**WHEREAS**, the parties hereto desire to enter into this Agreement for the purpose of setting forth the respective agreements, rights and/or obligations of the Hospital and the Authority with respect to the DIP Loan and the security for the DIP Loan.

**NOW, THEREFORE**, in consideration of the foregoing and as a condition of the Authority making the DIP Loan to the Hospital in accordance with the terms of the Act and the MOU, the Hospital and the Authority hereby agree as follows:

1.  **Definitions.** All terms not otherwise defined herein shall have the meanings ascribed to them in the Dormitory Authority Act and the Act.  For purposes of this Agreement, the following terms have the following meanings:

(a)   "**Affiliate**" means any direct or indirect affiliate, subsidiary or member of the Hospital.

(b)   "**Business Day**" means any day other than a Saturday, a Sunday, or a legal holiday on which banks in New York are not open for business.

(c)   "**CAH Payment Pledge**" shall have the meaning ascribed to such term in Section 5(d) hereof.

(d)   "**Carve-Out**" shall have the meaning ascribed to such term in the DIP Order.

(e)   "**Collateral Documents**" means the Hospital and the each Debtor Affiliates Mortgage, the UCC-1 Financing Statements, and each other document or instrument that has been or will be executed and delivered (or filed or recorded), on or at any time following the Effective Date, by or on behalf or at the request of the Authority pursuant to this Agreement or any of the other Loan Documents in connection with the DIP Loan.

(f)   "**Commitment**" means an amount not to exceed Sixty Million and 00/100 Dollars ($ 60,000,000.00) which constitutes the maximum aggregate amount of the DIP Loan. For the avoidance of doubt, any principal amount repaid may not be reborrowed.

(g)   "**Consultant**" shall mean any financial or consulting professional advisory firm retained by or on behalf of the Authority in accordance with the terms of this Agreement.

4

(h)      "**Control**" shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise, and the terms Controlled, Controlling and Common Control shall have correlative meanings.

(i)      **"Critical Access Hospital Payments"** or **"CAH Payments"** shall mean those reimbursements from Medicare, Medicaid and Commercial Payors to the Hospital based on the Hospital's status as a Critical Access Hospital, a designation given to eligible rural hospitals by the Centers for Medicare & Medicaid Services.

(j)      **"CAH Payments Pledge"** shall have the meaning ascribed to such term in Section 5(d) hereof.

(k)      **"Default Rate"** shall mean, with respect to the  DIP Loan, a rate *per annum* equal to  five percent ( 5.00%).

(l)      "**DIP Budget**" shall have the meaning ascribed to such term in the DIP Order. "DIP Collateral" shall have the meaning ascribed to it in the DIP Order.

(m)      "**DIP Credit Agreement**" shall have the meaning assigned to such term in the preamble.

(n)      "**DIP Lender**" shall mean the Authority in its capacity as lender hereunder, together with its successors and assigns in such capacity.

(o)      "**DIP Liens**" shall have the meaning ascribed to such term in the DIP Order.

(p)      "**DIP Loan Documents**" shall have the meaning ascribed to such term in the DIP Order and shall, for the avoidance of doubt, include the DIP Order.

(q)    "**DIP Obligations**" shall have the meaning ascribed to such term in the DIP Order.

(r)    "**DIP Order**" shall mean any Interim Order or the Final Order, as applicable and in effect.

(s)    "**DIP Superpriority Claims**" shall have the meaning ascribed to such term in the DIP Order.

(t)    "**DIP Transaction**" shall have the meaning ascribed to such term in the DIP Order.

(u)    "**DIP Transaction Deadline**" shall have the meaning ascribed to such term in the DIP Order.

(v)    **"Equipment"** shall mean all machinery, apparatus, equipment, fittings, fixtures, furnishings, chattel, and articles of personal property of every kind and nature whatsoever now or hereafter located in or upon the Real Estate or any part thereof and used or useable in connection with any present or future operation or letting of the Real Estate or the activities at any time conducted therein and now owned or hereafter acquired by the Hospital.

(w)    **"Equipment Pledge"** shall have the meaning ascribed to such term in Section 5(f) hereof.

(x)    **"Final Payment Date"** shall mean the date that is twenty four (24) months from the closing date of the definitive debtor in possession financing documentation.

(y)    **"Fixtures"** shall have the meaning described to such term in the Hospital Mortgage.

(z)    "**Governmental Authority**" shall mean any court, board, agency, commission, office or authority of any nature whatsoever or any governmental unit (federal, state,

6

commonwealth, county, district, municipal, city or otherwise) whether now or hereafter in existence.

(aa)    **"Gross Receipts Pledge"** shall have the meaning ascribed to such term in Section 5(e) hereof.

(bb)    **"Relevant Mortgage"** shall mean that certain Mortgage and Security Agreement dated as of the date hereof pursuant to which the Hospital and each Debtor Affiliate grants to the Authority a first priority security interest in and to the Mortgaged Property, as such term is defined below and further defined in the Relevant Mortgage, subject to the Permitted Encumbrances (as defined below).

(cc)    "**Interest Rate**" shall mean, a rate of two percent ( 2.00%) *per annum*.

(dd)     "**Lease**" means any lease, sublease or sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect), pursuant to which any Person is granted a possessory interest in, or right to use or occupy, all or any portion of the Mortgaged Property, and every modification, amendment or other agreement relating to such lease, sublease, sub-sublease or other agreement entered into in connection with such lease, sublease, sub-sublease or other agreement.

(ee)    "**Lien**" shall mean any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any portion of any of the Mortgaged Property or any interest therein, or any direct or indirect interest in the Hospital or any Debtor Affiliate, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic

effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

(ff)   "**Loan Documents**" means this Agreement, the Collateral Documents, and any and all other documents, instruments, or agreements executed and delivered by the Hospital for the benefit of the Authority in connection with the  DIP Loan, as any of the same may be amended, restated, supplemented or otherwise modified from time to time.

(gg)   "**Mortgaged Property**" shall mean the land, the improvements now or hereafter erected thereon, and all personal property owned by the Hospital  or any Debtor Affiliate and encumbered by the Relevant Mortgage, together with all rights pertaining to such property and improvements, as more particularly described in the "granting clauses" of the Relevant Mortgage.

(hh)   "**Notice of Advance"** shall have the meaning ascribed to such term in Section 2(a) hereof.

(ii)   **Outstanding Principal Balance**" shall mean, as of any date, the outstanding principal balance of the  DIP Loan.

(jj)   **"Permitted Encumbrances**" shall mean, collectively, (i) the Liens and security interests created by the Loan Documents, (ii) the Liens, if any, for Taxes imposed by any Governmental Authority and not yet due or payable or are being contested in good faith by appropriate proceedings diligently pursued, (iii) carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens that are discharged or bonded within no more than sixty (60) days of the Hospital's notice of the filing thereof or being diligently and continuously contested in good faith by appropriate proceedings, (iv) purchase money lease or purchase obligations (secured or unsecured) for personal property or equipment incurred in the ordinary course of business and not evidenced by a note including the existing Liens held by third parties as

set forth on **Schedule II**, (v) judgment Liens which (a) are discharged of record, bonded or stayed within thirty (30) days of entry, or (b) not exceeding $75,000.00 as to which enforcement proceedings shall not have been commenced by the holder of such judgment, and (v) Liens and security interests created by or in connection with the mortgages referenced on **Schedule II** or in the Title Report (as defined below), and such other title and survey exceptions or other matters as the Authority may hereafter approve in writing in the Authority's discretion.

(kk) "**Person**" means an individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization, or a government or any agency or political subdivision thereof.

(ll) **"Prior Loan Documents"** (each a Prior Loan Document,", shall mean, collectively, (i) each loan agreement, credit agreement, reimbursement agreement, trust indenture or other agreement or undertaking between the Authority and the Hospital or any Affiliate of the Hospital (or by the Authority to the Hospital or any Affiliate of the Hospital, or by the Hospital or any Affiliate of the Hospital to the Authority), as amended, restated, supplemented or otherwise modified from time to time, and (ii) each and every mortgage, note, deed of trust, hypothecation, assignment, security agreement, charge, encumbrance, lien, guaranty, pledge, pledge and security agreement, account collateral agreement, collateral assignment, financing statement, document or instrument that has been executed and delivered (or filed or recorded) pursuant to or in connection with any of the documents described in the immediately preceding subclause i), as each of the same may have been amended, restated, supplemented or otherwise modified from time to time.

(mm) "**Property**" shall mean that certain parcel of real property (together with the improvements now or hereafter erected or installed thereon) owned by the Hospital andby the Debtor Affiliates. .

9

(nn)    **"Real Estate"** shall have the meaning ascribed to such term in the Relevant Mortgage.

(oo)    **Taxes**" shall mean all real estate and personal property taxes, ad valorem taxes, assessments, water rates or sewer rents or other utility charges, now or hereafter levied or assessed or imposed against any of the Property or any part thereof, together with all interest and penalties thereon.

2.    **The  DIP Loan**.

(a)    The DIP Loan.    Subject to Section 3 below, the Authority has agreed to make the proceeds of the  DIP Loan available to the Hospital from available money on deposit in the Restructuring Pool in two or more advances (collectively the "**Advances**"; and each separately, an **"Advance**"), in an aggregate amount not to exceed the Commitment, as follows: (i) an initial Advance in the amount needed to support continued operations and  repay the $15M VAPAP Funding shall be disbursed to the Hospital on the Effective Date, in accordance with written direction of  the Hospital given to the Authority, and upon satisfaction of the conditions set forth in Section 3 below, and (ii) one or more subsequent Advances on the date of funding so requested by the Hospital, if and only if the Hospital delivers to the Authority an irrevocable written notice in the form of Exhibit A (each such  notice, a "**Notice of Advance**"), given not later than 12:00 Noon (New York City time), at least ten (10) Business Days prior to the date of funding of the proposed Advance.  The Notice of Advance shall be delivered to the Authority in accordance with the notice provisions set forth in Section 19 hereof. Notwithstanding any provisions of this Agreement to the contrary, the Hospital shall not request or be entitled to receive any Advance if (A) any representation or warranty set forth in this Agreement or in the Notice of Advance is untrue or incorrect in any material respect as of the date of the Notice of Advance or as of the date of such

10

Advance or (B) an Event of Default shall exist, either at the time of the Notice of Advance is delivered to the Authority or at any other time.

(b)      Purpose. The Hospital shall use the proceeds of the first advance of the DIP Loan to repay the VAPAP Funding and any remaining amount to fund the ordinary costs of its operations including payroll and vendor payables and the costs attendant to the Chapter 11 case

(c)      Non-Revolving. Any principal prepaid or repayment of VAPAP Funding hereunder may not be reborrowed by the Hospital. The DIP Loan is not a revolving credit facility.

(d)      Guaranty. The DIP Loan shall be guaranteed and secured by the Debtor Affiliates by execution of separate Mortgage, Guaranty and Security Agreements in form and substance attached hereto.

(e)      Deposit of DIP funds. Proceeds of the DIP Loan disbursed by the Authority to the Hospital shall not be deposited in any account subject to Prior Encumbrances or any cash collateral order entered by the bankruptcy court in the Chapter 11 Case, and shall be free from collateral interests or rights of offset by any person other than Authority.

3.      **Conditions Precedent to Advance of DIP Loan Proceeds**. The Authority shall not be required to make any Advance of the DIP Loan available to the Hospital until the pre-Advance requirements, conditions and other requirements set forth below have been completed and fulfilled to the satisfaction of the Authority, at the Hospital's sole cost and expense, any of which may be waived in writing by the Authority in its sole and absolute discretion.

(a)      **Conditions Precedent to the Initial Advance**. The Authority's obligation to make the Initial Advance is subject to satisfaction of all of the following conditions precedent (collectively, the "**Initial Advance Conditions Precedent**"), any of which may be waived in writing by the Authority in its sole and absolute discretion:

11

(i)       The Authority shall have received a copy of the resolutions of the Hospital's governing board and/or the consents of those parties necessary to authorize the transaction contemplated hereby, including but not limited to the Hospital Mortgage and the Gross Receipts Pledge.

(ii)       The Authority shall have received copies of (A) the organizational documents for the Hospital, certified as true, correct and complete by an officer, member or manager of the Hospital, authorized to do so, together with  a  current  certificate  of good  standing  or  subsistence  from  the jurisdiction in which the Hospital was organized.

(iii)       If requested by the Authority, with respect to each Debtor Affiliate, the Authority shall have received a copy of the organizational documents for each such Affiliate, certified as true, correct and complete by an officer, member or manager of the Affiliate authorized to do so, together with a current certificate of good standing or subsistence from the jurisdiction in which such Affiliate was organized.

(iv)       The Authority shall have received from outside counsel for the Hospital, and if requested from the Debtor Affiliates, an opinion in form and substance satisfactory to the Authority.

(v)       Concurrently, with the execution and delivery of this Agreement, the Hospital and each Debtor Affiliate shall have executed and delivered to the Authority the Relevant Mortgage in proper form for recordation, Guaranty and Security Agreement.

(vi)       The Hospital shall have delivered to the Authority a title report from a New York State insurance company or title insurance agent (the "**Title Company**") with respect to the Real Estate (the "**Title Report**") which Title Report shall show that the Real

Estate is free and clear of any Lien (other than the Permitted Encumbrances) and,  except with respect to the Permitted Encumbrances, there are no outstanding real estate taxes or assessments due, or title defects, in respect of the Real Estate.

(vii)    The Hospital shall deliver to the Authority, all such other agreements, documents, and/or exhibits as may be required, in the Authority's judgment, to assure compliance with the requirements of this Agreement.

(viii)    Hospital shall submit an operating and cash flow budget ("Budget") approved by DASNY and DOH at closing of the facility and upon each Advance.

(ix)    Hospital shall submit projected patient service revenue and anticipated collections.

(x)    Hospital shall report cost savings achieved by restructuring actions.

(xi)    Hospital shall submit weekly updates from the financial advisor regarding the financial advisor's assessment of the Debtor's financial, operational, and capital condition and all transformation opportunities to DOH and DASNY. Debtor leadership will arrange meetings with the financial advisor, DOH and DASNY when requested by DOH and DASNY.

(xii)    Hospital shall submit all required information regarding utilization of funds to DOH and DASNY for approval and once approved Hospital shall submit a Report to DOH and DASNY as prescribed by DOH and DASNY detailing how the loaned funds under this Term Sheet are being utilized in achieving the goals of the project, as made a part hereof. Such Reports must document expenditures in a manner consistent with the approved Budget. The Reports for the quarters ending March 31st, June 30th, September 30th, and December 31st of each calendar year will be due no later than 45 days

13

after the close of the given quarter throughout the term of this Agreement. Accordingly, the Reports are due no later than May 15th, August 15th, November 15th of the same calendar year and February 15th of the subsequent calendar year for each calendar year cycle of the project.

(xiii) The Reports must include an overview of the goals and objectives to be accomplished under the project and must quantify current status toward fulfilling the deliverables as approved by DOH and DASNY. The Reports must consist of:

(1) A brief narrative summary adhering to the general guidelines for presentation as provided in the Outline for Reports, included in the project,

(2) An update of the project timeline reflecting the current quarter's progress, including metrics and budget,

(xiv) The narrative portion of the Reports must provide ongoing updates to the project and must include:

(1) Specific actions taken during the quarter to achieve long term financial stability, including the status of DOH and DASNY approved benchmarks used to measure performance in achieving the goals.

(2) A detailed analysis of performance measurements, as agreed to by the Hospital and approved by DOH and DASNY per the Plan, targeting improvement in the quality of care provided.

(3) A showing the project is ensuring that the healthcare needs of the community are being met, including any actionable plan developed in collaboration with community and/or regional stakeholders.

(4) A showing the project addresses disparities in health

14

services and helps to provide better care to vulnerable populations who are at greater risk for experiencing poorer health outcomes than the general population.

(b)    **Conditions Precedent to Subsequent Advances**. The Authority's obligation to make any Advance to the Hospital subsequent to the Initial Advance (each, a "**Subsequent Advance**") is subject to satisfaction of all of the following conditions precedent, any of which may be waived in writing by the Authority in its sole and absolute discretion:

i.    The representations and warranties made by the Hospital herein in connection with the DIP Loan shall be true and correct in all material respects on and as of the date of each Subsequent Advance with the same effect as if made on such date.

ii..    There shall exist no Event of Default.

iii.    All Initial Advance Conditions Precedent shall have been satisfied as of the date of each prior Subsequent Advance, notwithstanding that any such conditions precedent may have been waived with respect to the Initial Advance or any other Subsequent Advance.

iv.    The Hospital shall have submitted, in accordance with the terms of Section 2(a) hereof, a Notice of Advance no later than ten (10) Business Days prior to the date the Subsequent Advance is to be made.

v.    Continued satisfaction of the obligations of the Hospital under Sections 10(a)-(d) hereof.

vi..    The Authority shall have received the written approval of DOH with respect to such Subsequent Advance.

vii..    Hospital shall submit to DOH and DASNY certification from its board of directors that all materials submitted to DOH and DASNY are true and accurate to the best of its knowledge, information and belief after appropriate inquiry. Any modifications to materials submitted must be accompanied with a board recertification.

viii..    Such other information as the Authority may reasonably require verifying the substance of a Notice of Advance.

ix.    No Advance shall constitute a waiver of any condition precedent to the obligation of the Authority to make any Subsequent Advance or preclude the Authority from thereafter declaring the failure of the Hospital to satisfy any such condition precedent to be an Event of Default.

x. The guaranties from the Debtor Affiliates remain in full force and effect.

4.    **Payment and Term**.

(a)    Payment of the DIP Loan.

(i)    The Hospital hereby agrees to repay to the Authority at its offices, or at such place as may be designated in writing by the Authority to the Hospital, the DIP Loan (or so much thereof as may be advanced pursuant to the terms hereof and remain outstanding), in lawful money of the United States of America, plus interest thereon at the Interest Rate on the terms and conditions set forth herein. Interest on the Outstanding Principal Balance shall accrue at the Interest Rate, computed on the basis of a 360-day year

16

Case 26-60099-5-wak   Doc 308-1   Filed 05/18/26   Entered 05/18/26 16:33:03   Desc
Exhibit 1   Page 20 of 50

consisting of twelve 30-day months, from and after the date of the advance of any portion of the  DIP Loan to and including the Final Payment Date or such earlier date upon which the Outstanding Principal Balance has been paid in full.

(ii)    The Outstanding Principal Balance, together with any and all accrued and unpaid interest thereon (including interest at the Default Rate, if applicable) and accrued fees, if any, and all other amounts payable to the Authority hereunder, shall be due and payable on the earlier to occur of (i) the Final Payment Date, (ii) repayment or refinancing of the DIP Facility, (iii) the effective date of a confirmed plan of reorganization, (iv) such earlier date as may be approved by the Bankruptcy Court or (v) an Event of Default.  The Hospital hereby agrees and acknowledges that (1) the repayment of the Loan, as provided in this Agreement, is not conditioned on receipt of any Federal financial grant receipts or federal reimbursements, or any portion thereof, and (2) the Hospital confirms that it shall not assert or claim that repayment of the  DIP Loan, as required in this Agreement, is conditioned on receipt of any Federal financial grant receipts or federal reimbursements or any portion thereof.

(b)    Default Rate.  In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the Outstanding Principal Balance and all other amounts due and owing hereunder and under any other Loan Document shall accrue interest at the Default Rate, calculated from the date such payment was due or the breach or default shall have occurred without regard to any grace or cure periods contained herein.

(c)    Payment Dates.  For purposes of making payments hereunder, but not for purposes of calculating interest accrual periods, if any hereunder is due is not a Business Day, then amounts due on such date shall be due on the immediately preceding Business Day.  All amounts

17

due pursuant to this Agreement and other Loan Documents shall be payable without setoff, counterclaim, defense or any other deduction whatsoever.

(d)    Prepayments. The DIP Loan may be prepaid, in whole or in part, without premium or penalty, on any Business Day prior to the Final Payment Date. In the case of any such prepayment, the Hospital shall concurrently with such prepayment repay to the Authority any and all accrued and unpaid interest on the DIP Loan (including interest at the Default Rate, if applicable) and accrued fees and all other amounts payable to the Authority hereunder.

5.    **Security for the DIP Loan.** As further security for the repayment of the DIP Loan, the Hospital and each Debtor Affiliate:

(a)    shall execute and deliver to the Authority, together with the delivery of this Agreement, each Relevant Mortgage. It is understood and agreed that to the fullest extent permissible by law, all Equipment is appropriated to the use of the Mortgaged Property and, whether affixed or annexed or not, for the purpose of this Mortgage, shall be deemed conclusively to be Mortgaged Property and conveyed thereby;

(b)    hereby grants to the Authority a security interest in and to any and all condemnation awards or property and/or casualty insurance payments, including interest thereon, and the right to receive the same, which may be made with respect to the Mortgaged Property;

(c)    hereby grants to the Authority a security interest in and to all right, title and interest of the Hospital in and to Leases and rents relating to the Mortgaged Property and all rights and interests of Hospital under any and all contracts relating to the use, operation, maintenance, repair and/or improvement of the Mortgaged Property, subject to any restrictions on the granting of such security interests;

18

(d)      hereby pledges and grants to the Authority a security interest in and lien on the Hospital's each Debtor Affiliate's gross receipts from its operations, including, without limitation, all CAH Payments and any other receipts, revenues, income and other money paid or payable to, or received or receivable by or on behalf of the Hospital or the Debtor Affiliates , including without limitation contributions, donations, pledges and grants whether in the form of cash, securities or other personal property and the rights to receive the same whether in the form of accounts, payment intangibles, general intangibles, health care insurance receivables, chattel paper, deposit accounts, instruments, promissory notes and the proceeds thereof, as such terms are presently or hereinafter defined in the New York Uniform Commercial Code, and any funds received from Federal or State grants or payments and any insurance or condemnation proceeds received by the Hospital or any of its Affiliates, whether now existing or hereafter coming into existence and whether now owned or hereafter acquired  (collectively, the "**Gross Receipts Pledge**"); <u>provided however</u>, that the Gross Receipts Pledge shall not include gifts, grants, bequests, donations, and contributions heretofore or hereafter made, designated at the time of the making thereof by the donor or maker as being for a specific purpose contrary to paying debt service;

(e)      without limiting the generality of the foregoing, hereby pledges and grants to the Authority a security interest in and lien on and collaterally assigns to the Authority any right, title or interest that the Hospital may have or hereafter acquire in and to the Equipment including the right to receive the same and the proceeds thereof; whether in the form of equipment, goods, inventory, accounts, payments, intangibles, general intangibles, health care insurance receivables, chattel paper, deposit accounts, instruments, promissory notes and the proceeds thereof, as such terms are presently or hereinafter defined in the New York Uniform Commercial Code whether

19

now existing or hereafter coming into existence and whether now owned or hereafter acquired (collectively, the "**Equipment Pledge**"); and

(f)      the Hospital and each Debtor Affiliate hereby grant to the Authority a security interest in and to all proceeds of the foregoing set forth in subsections (a) through (f) of this Section 5.

6.      **Superpriority Nature of Loans and DIP Lender's Liens. At all times during Chapter 11 Case*:***

(a)      The DIP Liens shall have the priority and senior secured status as more fully set forth in the DIP Order and shall be subject and junior only to the Permitted Encumbrances and the Carve Out.

(b)      All DIP Obligations shall constitute DIP Superpriority Claims. Except as set forth herein and in the DIP Order, no other claim or Lien having a priority superior or pari passu to that granted to the Authority by the DIP Order shall be granted or approved while any DIP Obligations or Commitments under this DIP Credit Agreement remain outstanding. Subject to the terms of the DIP Order, no costs or expenses of administration shall be imposed against the DIP Lender or any of its DIP Collateral under Section 506(c) of the Bankruptcy Code or otherwise, and the Hospital and each Debtor Affiliate serving as guarantor hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the DIP Lender.

(c)      No Discharge; Survival of Claims. The Hospital and Debtor Affiliates agree that (a) the DIP Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in the Chapter 11 Case (and the Hospital and Debtor Affiliates hereby waive

20

any such discharge pursuant to Section 1141(d)(4) of the Bankruptcy Code) and (b) the DIP Superpriority Claims and the DIP Liens shall not be affected, altered or limited in any manner by the entry of an order confirming a plan of reorganization in any Chapter 11 Case.

(d)    Waiver of Priming Rights. On the date hereof, and on behalf of themselves and their estates, and for so long as any DIP Obligation or Commitment shall be outstanding under any DIP Loan Document, without limiting any terms or conditions of the DIP Order, the  Hospital and each Debtor Affiliate serving as guarantor hereby irrevocably waives any right, (i) to grant or impose, or request that the Bankruptcy Court grant or impose, under Section 364 of the Bankruptcy Code or otherwise, Liens on or security interests in the DIP Collateral that are of equal or greater priority than the DIP Liens, and/or (ii) to grant or impose, or request that the Bankruptcy Court grant or impose, under Section 364 of the Bankruptcy Code or otherwise, claims or expenses against the Hospital, which are equal or superior to the DIP Superpriority Claims.

(e)    Payment of DIP Obligations. Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the DIP Order, upon the maturity (whether by acceleration or otherwise) of any of the DIP Obligations, DIP Lender shall be entitled to immediate payment of such DIP Obligations and to enforce the remedies provided for hereunder or under applicable law, in accordance with provisions of the DIP Order.

7.    **Repayment Obligation of the Hospital**. The obligations of the Hospital to repay the  DIP Loan (and any amounts due to the Authority under this Agreement) shall be absolute, unconditional, and irrevocable and shall be observed strictly in accordance with the terms hereof

without regard to the existence of any claim, set-off or any other defense or right that the Hospital may have at any time against the Authority or the Commissioner.

8.        **Representations and Warranties of the Hospital**.  To induce the Authority to make the DIP Loan pursuant to this Agreement, the Hospital hereby represents and warrants to the Authority as follows:

(a)        The Hospital is a duly organized and validly existing not-for-profit corporation, organized under the laws of the State, which (i) is a certified facility, under Article 28 of the New York Public Health Law, and (ii) has been approved for participation in the Health Facility Restructuring Program by the Commissioner.

(b)        The Hospital has all requisite corporate power and authority to execute, deliver and carry out the terms and provisions of this Agreement and each Loan Document to which the Hospital is a party.

(c)        This Agreement and the Loan Documents to which the Hospital is a party have been duly executed and delivered by the Hospital, constitute legal, valid and binding obligations of the Hospital and are enforceable against the Hospital in accordance with its or their respective terms, except to the extent such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, (ii) general principles of equity, and (iii) laws concerning recourse by creditors to security in the absence of notice and hearing.

(d)        Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated herein or in any Loan Document, nor compliance with the provisions hereof or of any Loan Documents, will violate any provision of the Certificate of Incorporation or By-Laws of the Hospital or any law, rule or regulation applicable to the Hospital,

22

or any judgment, order or decree of any Governmental Authority or court having jurisdiction over the Hospital or any of its properties, or constitute a breach of or default under any indenture, mortgage, deed of trust, bank loan, credit agreement or other agreement or instrument relating to the payment of money to which the Hospital is a party.

(e)    No authorization or approval or other action by, filing with, or notice to, any Person or Governmental Authority or court is required for the due execution, delivery and performance by the Hospital of this Agreement or the Loan Documents, except such authorizations, approvals, actions or filings which have been duly obtained or notices which have been duly given by the Hospital, each of which is in full force and effect.

(f)    Each Relevant Mortgage, when duly executed and delivered by the Hospital and the Debtor Affiliates pursuant to the terms of this Agreement, constitutes legal, valid and binding obligations of the Hospital and the Debtor Affiliates and is enforceable against the Hospital and the Debtor Affiliates in accordance with its terms, except to the extent such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, (ii) general principles of equity, and (iii) laws concerning recourse by creditors to security in the absence of notice and hearing.

(g)    The organizational chart attached hereto as **Schedule I** is a true, complete and correct chart setting forth the organizational structure of the Hospital on the date hereof. No Person other than those Persons shown on **Schedule I** have any ownership or membership interest in, or right of Control, directly or indirectly, in the Hospital. The name of each Person identified on **Schedule I** is the exact legal name of each such Person.

(h)    The Hospital and each Debtor Affiliate has good fee title to the Mortgaged Property, subject to the Permitted Encumbrances. Other than the Permitted Encumbrances, there

23

are no mortgages or other Liens in existence (recorded or not recorded) secured by or with respect to the Mortgaged Property.

(i)      Each Relevant Mortgage, when properly recorded in the appropriate records, together with this Agreement when properly filed in the appropriate records and any Uniform Commercial Code financing statements required to be filed in connection therewith, will create a valid, first priority, perfected lien on the Mortgaged Property, subject only to the Permitted Encumbrances.

(j)      No portion of the Mortgaged Property is subject to any presently effective purchase and sale agreement (or option or other agreement or letter of intent with respect to the sale of such Property or any part thereof), purchase option, right of first refusal, right of first offer or other similar right in favor of third parties.

(k)

(l)      The Hospital and each Debtor Affiliate currently maintain the insurance coverage described in Section 9(c) below.

9.      **Covenants of the Hospital.**   To induce the Authority to make the DIP Loan pursuant to this Agreement, the Hospital hereby covenants to the Authority as follows:

(a)      The proceeds of the  DIP Loan for will be used solely in accordance with the DIP Loan Documents, DIP Order and DIP Budget: (a) to use $15,000,000 of the loan proceeds to immediately repay in full all outstanding VAPAP funding received; (b) to fund working capital requirements of the Hospital, operating expenses of the Hospital, capital expenditures and other line items in accordance with the terms of the DIP Budget, and DIP Transaction and, to the extent permitted pursuant to the terms of the DIP Budget, other fees, costs and expenses associated with the Chapter 11 Case; (c) fund the payment of the Retained Professional Fees; ( d; and (e) to fund

24

the payment of fees and expenses of the Authority, including, without limitation, attorneys' fees and fees of professional advisors.  The proceeds of the DIP Loan shall not in any event directly or indirectly be transferred to, or used by or for the benefit of, any entity other than the Hospital for itself. Except as otherwise provided for in the DIP Order, no portion of the DIP Loan or the Carve-Out, shall be used to assert any claim, cause of action or objection against the Authority, , or their advisors, including, without limitation, to challenge any claim or lien of the  Authority or the validity or enforceability of the  DIP Loan.*,* all of which use is in furtherance of the Hospital's corporate purpose and in compliance with Subsection 3(b) of Section 2815 of the Public Health Law of the State of New York.

(b)     The Hospital shall not (i) engage in any dissolution, liquidation or consolidation, or merger with or into any other business entity, (ii) engage in any business activity which is neither related to the business currently being conducted by such party nor prohibited by the Hospital's organizational documents, (iii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the Hospital's property or assets, or (iv) cause, permit or suffer the Hospital to (A) dissolve, wind up or liquidate or take any action, or omit to take any action, as a result of which the Hospital would be dissolved, wound up or liquidated in whole or in part, or (B) amend, modify, waive or terminate the certificate of incorporation, certificate of formation or operating agreement of the Hospital , in each case without obtaining the prior consent of the Authority. The Hospital shall not change its principal place of business from the address set forth on the first page of this Agreement without first giving the Authority thirty (30) days prior written notice.

(c)     The Hospital shall, with respect to its own operations, maintain commercially reasonable and customary insurance during the term of the  DIP Loan, which

25

insurance shall include property damage, fire and extended coverage, public liability, property damage liability, and medical malpractice/hospital professional liability insurance in amounts estimated to indemnify any reasonably anticipated damage, loss or liability, subject to reasonable deductible provisions. The Hospital shall at all times also maintain workers' compensation coverage and disability benefits insurance coverage as required by the laws of the State. All policies of insurance required pursuant to this Section shall include the Authority as a named additional insured, mortgagee and a loss payee as applicable, as its interests may appear. If the Authority shall so request in writing, the Hospital shall provide to the Authority summaries or other evidence of its insurance coverage and shall obtain endorsements reasonably requested by the Authority.

(d)    Subject to the terms of the DIP Order, the DIP Order is effective to create in favor of the Authority legal, valid and enforceable security interest in the DIP Collateral described therein and proceeds thereof and constitutes a fully perfected Lien on, and security interest in, all right, title and interest of the  Hospital and the Debtor Affiliates in such DIP Collateral and the proceeds thereof, as security for the DIP Obligations, in each case prior and superior in right to any other Person (except for the Permitted Encumbrances and the Carve-Out). At all times during the Chapter 11 Case, once the DIP Order is entered, all of the DIP Obligations of the  Hospital under the DIP Loan Documents shall be secured by the DIP Liens, in favor of the Authority, for its benefit, subject in priority only to Permitted Encumbrances and the Carve-Out.

(e)    The Hospital and each Debtor Affiliate shall not permit, suffer, create, incur, assume or permit to exist any Lien on any Mortgaged Property or any portion of any Mortgaged Property, or on or in any direct or indirect interest in the Hospital and each Debtor Affiliate, except for the Permitted Encumbrances. In addition, if any mechanic's or materialmen's liens or other matters adversely affecting title to the Mortgaged Property is filed, the Hospital shall provide a

26

copy of such lien or other encumbrance to the Authority within five (5) Business Days of receipt and the Hospital shall either bond such lien (to the extent bondable) or satisfy and remove such lien of record within no more than sixty (60) days following the Hospital's and Debtor Affiliates' receipt of such lien or encumbrance.

(f)     The Hospital and each Debtor Affiliate shall not, without the prior written consent of the Authority in each case, purchase, sell, or enter into any agreement or option to purchase or sell the Real Estate.

(g)     The Hospital shall promptly notify the Authority, within ten (10) days of the Hospital's or Debtor Affiliates' receipt of any declaration of default made by any Person acting as or on behalf of any lender to the Hospital and each Debtor Affiliate or lienholder with respect to any Hospital  or Debtor Affiliate assets with respect to any agreement between any such Person and the Hospital or Debtor Affiliate

.

10.     **Reorganization Matters**.

(a)     The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (x) the motion seeking approval of the DIP Loan Documents and the DIP Order, and (y) the hearing(s) for the approval of the DIP Order, will be given. Hospital shall give, on a timely basis as specified in the DIP Order, all notices required to be given to all parties specified in the DIP Order.

27

(b)    After the entry of the DIP Order, and pursuant to and to the extent permitted in the DIP Order, the DIP Obligations will constitute allowed superpriority administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims and unsecured claims against the Hospital and Debtor Affiliates now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject, as to priority only, to the Carve-Out.

(c)    After the entry of the DIP Order and pursuant to and to the extent provided in the DIP Order, the DIP Obligations will be secured by a valid and perfected first priority Lien on all of the DIP Collateral, subject, as to priority only, to the Carve-Out and the Permitted Encumbrances.

(d)    The DIP Order is in full force and effect has not been reversed, stayed, modified or amended without the Authority's consent.

11.    **Fees and Expenses**.  The Hospital hereby agrees that it shall pay (and hereby confirms its prior agreements to pay) to the Authority all reasonable costs and expenses (including fees, expenses, and disbursements of any appraisers, consultants, advisors, auditors, accountants, attorneys, and agents) reasonably incurred by the Authority in connection with this Agreement, any of the guaranties, mortgages, pledges, documents or other instruments executed and delivered (or required to be executed and delivered) pursuant to or in connection with the DIP Loan, this Agreement, and any of the Loan Documents, including but not limited to reasonable attorneys' fees and expenses incurred following the occurrence of an Event of Default and/or realizing upon

28

any security given by the Hospital in connection with the Loan. In addition, the Hospital acknowledges and agrees that the Authority or its counsel may engage one or more Consultants to advise and assist the Authority or its counsel in connection with the Hospital and its or their obligations to (and agreements with) the Authority, and the Hospital shall reimburse the Authority for any and all reasonable fees and expenses of any such Consultant(s). The Hospital acknowledges and agrees that the Authority may in its sole discretion elect to maintain the confidentiality of any conclusions reached or reports prepared by any such Consultant(s) and preserve the attorney client privilege, the work product doctrine or any other evidentiary privilege or protection from disclosure. The Hospital acknowledges and agrees that the Authority, its counsel and the Consultant(s) shall have no obligation to disclose the reports prepared by the Consultant(s), or the conclusions reached by the Consultant(s), to the Hospital.

12. **Additional Obligations of the Hospital**. The Hospital hereby agrees that, so long as the DIP Loan shall remain outstanding or any amount is due or owing to the Authority hereunder, the Hospital shall furnish to the Authority and the Commissioner, with respect to the Hospital:

(a) A weekly cash flow forecast, in form and substance reasonably satisfactory to the Authority and otherwise in accordance with this Agreement, as the same shall be amended, supplemented or otherwise modified from time to time;

(b) (i) Monthly utilization statistics and, to the extent produced by the Hospital, monthly interim financial statements and cash flow statements for the Hospital not later than thirty (30) days following the end of the month which is the subject of the aforesaid statements and (ii) quarterly financial statements not later than thirty (30) days following the end of the calendar quarter which is the subject of the aforesaid statements;

29

(c)      If and when requested by the Authority or Commissioner, (i) a schedule of the capital expenditures incurred by the Hospital and its Affiliates in the immediately prior month, and (ii) a schedule of the capital expenditures anticipated to be incurred (or paid for) by the Hospital and its Affiliates in such month;

(d)      Annual audited financial statements for the Hospital, not later than one hundred and eighty (180) days following the end of the fiscal year;

(e)      Operating budgets for the Hospital (upon reasonable request of the Authority from time to time), including a reconciliation with previous budgets; and

(f)      Any and all financial or other information concerning the Hospital as the Authority, or the Commissioner may reasonably request from time to time.

(g)      The Hospital shall present a minimum of three partnership options to DOH and DASNY in a Letter of Intent to apply for funding and approval under the DOH's Safety Net Transformation Program on or before June 20, 2026.

(h)      Within thirty (30) days of written approval of the Letter of Interest by DOH, Hospital shall submit a formal application for a Safety Net Transformation Program award.

(i)      Hospital shall file a Plan of Reorganization, Motion to Dismiss or Notice of Conversion within _____ days of final decision on application for Safety Net Transformation Program.

13.      **Event of Default**.  As used herein, the term "Event of Default" shall mean the occurrence of any of the following:

(a)      The Hospital shall fail to timely pay any amount payable pursuant to this Agreement; or

30

(b)      The Hospital shall default in the timely performance of any other obligation herein contained and such default continues for fifteen (15) days after receipt of written notice to the Hospital  from the Authority specifying the nature of such default and requiring the same to be remedied; or

(c)      Any of the following events shall have occurred with respect to the Hospital or any of the Debtor Affiliates : (i)  the dismissal of their chapter 11 bankruptcy case, or the conversion of their  chapter 11 bankruptcy case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code  (ii) a general assignment for the benefit of its general creditors, (iii) the appointment of a custodian, receiver, trustee or other officer with similar powers for itself or for any substantial part of its property.

(d)      Any representation or warranty made by the Hospital in this Agreement, any other Loan Document or otherwise in connection with the  Loan shall be untrue or incomplete in any material respect when made or deemed made or restated hereunder;

(e)      The Hospital's license to operate as a general hospital under Article 28 of the Act is suspended or revoked or the Hospital is subjected to any adverse regulatory action taken by the DOH which results in the Hospital's inability to operate as a general hospital;

(f)      With regard to each Collateral Document, the occurrence of an Event of Default (as defined in each such Collateral Document) under any such Collateral Document; or

(g)      An event of default occurs with respect to any Prior Loan Document.

(h)      there shall have occurred any of the following in any Chapter 11 Case:

(i)      the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto, in each case, by the Borrower in the Chapter 11 Case, or the entry of any order by the Bankruptcy Court in the Chapter 11 Case: (w) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this DIP Credit Agreement; (x) to grant any Lien other than Liens expressly permitted under Section 6.02 of this DIP Credit

31

Agreement upon or affecting any DIP Collateral; (y) except as provided in the Interim or Final Order, as the case may be, to use Cash Collateral of the Authority under Section 363(c) of the Bankruptcy Code without the prior written consent of the Authority; or (z) that (in the case of the Borrower) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court on account of a request by the Borrower) approves or provides authority to take any other action or actions adverse to the Authority or its rights and remedies hereunder or their interest in the DIP Collateral;

(ii)    the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by the Borrower which does not provide for the repayment of all DIP Obligations under this DIP Credit Agreement in full in cash on the Effective Date of such plan and to which the Authority does not consent or otherwise agree to the treatment of its claims or the loss by the Borrower of the exclusive right to file and solicit acceptances of a plan of reorganization;

(iii)    the entry of an order in the Chapter 11 Case confirming a plan of reorganization that does not contain a provision for termination of the Commitments and repayment in full in cash of all of the DIP Obligations under this DIP Credit Agreement on or before the effective date of such plan;

(iv)    the entry of an order amending, supplementing, staying, vacating or otherwise modifying the DIP Loan Documents or the DIP Order without the prior written consent of the Authority;

(v)    the Final Order is not entered within thirty-five (35) days (or such other period as Authority may agree to in writing) following the entry of the Interim Order;

(vi)    the payment of, or application by the Borrower for authority to pay, any Prepetition Indebtedness without the Authority's prior written consent other than as provided for in Final Order Pursuant to Sections 105(a) and 363(b) of Bankruptcy Code Authorizing Debtor to pay Prepetition Claims of Critical Vendors entered or as otherwise subsequently consented to in writing by the Authority and provided for in the DIP Budget;

(vii)    the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Case with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrower or with the power to conduct an investigation of (or compel discovery from) the Authority or against agent or lenders under the Prepetition Secured Loan Documents; or the sale without the Authority's consent, of all or substantially all of the Borrower's assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full in cash of the DIP Obligations and termination of the Commitments;

(viii)    the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or the Borrower shall file a motion or other pleading seeking the dismissal of the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise;

(ix)    the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any DIP Collateral, or (y) with respect to any

32

Lien of or the granting of any Lien on any DIP Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect;

(x)     the entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations owing under this DIP Credit Agreement or the other DIP Loan Documents;

(xi)     the failure of the Borrower to perform any of its obligations under the DIP Order or any violation of any of the terms of the DIP Order;

(xii)     the challenge by the Borrower to the validity, extent, perfection or priority of any liens granted under the Prepetition Secured Loan Documents;

(xiii)     the remittance, use or application of the proceeds of DIP Collateral other than in accordance with cash management procedures and agreements acceptable to the Authority;

(xiv)     the use of Cash Collateral of the Prepetition Lender for any purpose other than to pay expenditures set forth in the DIP Budget or as otherwise permitted by the DIP Order or the Authority;

(xv)     the entry of an order in the Chapter 11 Case granting any other superpriority administrative claim or Lien equal or superior to that granted to the Authority, without the consent in writing of the Authority;

(xvi)     other than with respect to the appointment of an ombudsman appointed by the U.S. Trustee, the appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Borrower;

(xvii)     the filing of a motion by the Borrower requesting, or the entry of any order granting, any super-priority claim which is senior or pari passu with the DIP Lender's claims or with the claims of the Prepetition Lender under the Prepetition Secured Loan Documents;

(xviii)  the entry of an order without the prior consent of the DIP Lender amending, supplementing or otherwise modifying the DIP Order;

(xix)     the obtaining of additional financing or the granting of Liens not expressly permitted hereunder;

(xx)     the use of Cash Collateral without the consent of the Authority;

(xxi)     any attempt by the Borrower to reduce, set off or subordinate the DIP Obligations or the Liens securing such DIP Obligations to any other Indebtedness;

(xxii)   the reversal, vacation or stay of the effectiveness of the DIP Order;

(xxiii)  the payment of or granting adequate protection (except for Adequate Protection Payments) with respect to any Prepetition Indebtedness; or

(xxiv)  the cessation of Liens or super-priority claims granted with respect to this DIP Credit Agreement to be valid, perfected and enforceable in all respects.

14.     **Remedies.**  Upon the occurrence and during the continuance of an Event of Default, the Authority may take any one or more of the following actions:

33

(a)    Declare all sums payable by the Hospital under this Agreement immediately due and payable (including interest on the outstanding principal balance of DIP Loan, at the Default Rate);

(b)    Maintain an action against the Hospital hereunder or realize upon any security interest granted herein or under any Collateral Document to recover any sums payable by the Hospital or to require its compliance with the terms, without further order of the bankruptcy court; and

(c)    Exercise any and all rights and remedies available to the Authority at law or in equity, without further order of the bankruptcy court.

15.    **Acknowledgement of Security Interest.** The Hospital and each Debtor Affiliate hereby acknowledges, confirms and agrees that the Authority has and shall continue to have a valid, enforceable and (upon all necessary UCC-1 financing statements being duly filed in the appropriate filing office, and all necessary account control agreements as may be required by the Authority being executed and delivered by all parties thereto) perfected lien upon and security interest in the collateral granted to the Authority pursuant to this Agreement in which a security interest can be perfected by the filing of UCC-1 financing statements and/or the recording of each Relevant Mortgage. The Hospital and each Debtor Affiliate hereby irrevocably appoints the Authority during the term hereof as its lawful attorney-in-fact to execute and file, on their behalf, one or more financing statements or continuation statements thereof as to the security interests granted to the Authority hereunder and to file such financing statements and continuation statements in any appropriate public office.

16.    **Release**.

34

(a)      In consideration of this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Hospital, on behalf of itself, its successors and assigns, and its Affiliates, subsidiaries, divisions, directors, officers, attorneys, employees, agents and other representatives, each in its capacity as such (such parties being hereinafter referred to collectively as the "Releasing Parties" and individually as a "**Releasing Party**"), hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges the Authority, and its successors and assigns, and its present and former subsidiaries, predecessors, directors, officers, attorneys, employees, agents and other representatives, each in its capacity as such (all such persons being hereinafter referred to collectively as the "Releasees" and individually as a "**Releasee**"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set off, demands and liabilities whatsoever of every kind and nature, known or unknown, suspected or unsuspected, at law or in equity, which any Releasing Party, or any of their successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the date of this Agreement in connection with the Loan, the Loan Documents and the Collateral Documents (individually, a "Claim" and collectively, "**Party Claims**"), except to the extent that such Claim arises, directly or indirectly, from the fraud, gross negligence or willful misconduct, of any Releasee.

(b)      The Hospital and each Debtor Affiliate understands, acknowledges, and agrees that the release set forth above may be pleaded as a full and complete defense and may be

used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(c)     The Hospital and each Debtor Affiliate agrees that no fact, event, circumstance, evidence or transaction which could now be asserted as a Claim or which may hereafter be discovered to have existed on or prior to the date of this Agreement shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

17.     **Covenant Not to Sue**. Each of the Releasing Parties hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by the Hospital and each Debtor Affiliate pursuant to Section 14 above.  If any Releasing Party violates the foregoing covenant, the Hospital and each Debtor Affiliate, for itself and its successors and assigns, and its subsidiaries, divisions, directors, officers, attorneys, employees, agents and other representatives each in its capacity as such, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all reasonable attorneys' fees and costs incurred by any Releasee as a result of such violation.

18.     **Amendments and Waivers.**  No amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Authority, the Hospital and Debtor Affiliates, with a copy to the Commissioner, and if a waiver is so given by the Authority, shall only be effective in the specific instance in which given.

19.     **Notices.**  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including a facsimile of same) and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or three (3) days after being deposited in the mail, certified mail, return receipt requested

36

postage prepaid, or the immediately succeeding Business Day if mailed by overnight delivery, or, in the case of facsimile notice, when sent (provided that the receipt by the party making such communication of the confirmation page of the facsimile at the end of such communication shall be deemed to be evidence of such actual receipt), addressed to their respective addresses as set forth below or such other address as may be hereafter notified by the respective parties hereto:

(a)    If to the Hospital or Debtor Affiliates, to:

Carthage Area Hospital
1001 West Street
Carthage, NY 13619
Attn.:  Andrew Manzer, Interim CEO
Telephone: (315)  315 713-5237
Email:  amanzer@nshany.org

with a copy to:

Barclay Damon, LLP
1270 Avenue of the Americas
Suite 2310
New York, NY 10020
Attention:  Janice B. Grubin
Telephone: 212 784-5808
Email:  JGrubin@barclaydamon.com

(b)    If to the Authority, to:

Dormitory Authority of the State of New York
515 Broadway
Albany, New York 12207
Attn.:  Managing Director of Public Finance and Portfolio Monitoring
Telephone: 518-257-3163
Facsimile: 518-257-3101

With a copy to its General Counsel at the same address.

20.    **Indemnity.**  The Hospital and each Debtor Affiliate, to the extent permitted by law, shall indemnify, defend and hold the Authority and each member, officer, employee, agent and representative of the Authority harmless from and against any and all liability, loss, cost,

damage or claim (including attorney's fees and costs) and shall pay any and all judgment or expense, of any and all kinds or nature and however arising, including interest thereon, which the Authority or any such member, officer, employee, agent or representative of the Authority may sustain, incur, or become subject to by reason of any claim, action or proceeding arising from, relating to or in connection with the DIP Loan, the Loan Documents, any security for the Loan and/or any of the Authority's rights and remedies under the Loan Documents, except if such liability, loss, cost, damage or claim shall arise from the Authority or any of its members', officers', employees', agents' or representatives' gross negligence, fraud or willful misconduct. The provisions of this Section shall be in addition to and not limited by any insurance provided by the Hospital pursuant to the Loan Documents. The provisions of this Section 19 shall survive the termination of this Agreement.

21.    **Severability of Invalid Provisions.** If any one or more of the covenants, stipulations, promises, obligations and agreements provided herein on the part of the Authority, the Hospital or Debtor Affiliate to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, obligation or obligations, agreement or agreements shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, obligations and agreements contained herein and shall in no way affect the validity of the other provisions hereof.

22.    **Section Headings.** All headings preceding the text of the several sections, and any table of contents appended to copies, shall be solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

23.    **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York and governed by the internal laws of the State

of New York applicable to contracts made and to be performed entirely within such State, without regard to conflict of laws principles.

24.   **Actions of the Authority.**   Whenever any action, direction or decision may be taken, made or given by the Authority pursuant to this Agreement, it may be done by any authorized officer of the Authority.  In addition, the Authority, by executing this Agreement, has given its prior written consent to the indebtedness incurred by the Hospital under this Agreement.

25.   **WAIVER OF JURY TRIAL**.  THE HOSPITAL, THE DEBTOR AFFILIATES AND THE AUTHORITY EACH HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

26.   **Reviewed by Attorneys**.  The Hospital, the Debtor Affiliates and the Authority each represent and warrant to the other that it has been afforded an opportunity to have this Agreement reviewed by, and to discuss this Agreement and the documents executed in connection herewith, with such attorneys and other persons and advisors as it may wish, and has entered into this Agreement and executed and delivered all documents in connection herewith of its own free will and accord and without threat, duress or other coercion of any kind.  The parties hereto acknowledge and agree that neither this Agreement nor the other documents executed pursuant hereto shall be construed more favorably in favor of one than the other based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation and preparation of this Agreement and the other documents executed pursuant hereto or in connection herewith.

39

27.    **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall constitute an original, but all of which when taken together shall constitute one instrument.  Delivery of an executed counterpart of this Agreement by facsimile or other electronic transmission shall be effective as delivery of an original counterpart.

28.    **Further Assurances**.  The Hospital and each Debtor Affiliate agrees to execute and deliver in form and substance satisfactory to the Authority such further documents, instruments, amendments, financing statements and to take such further action, as may be reasonably necessary from time to time to perfect and maintain the liens and security interests created by or pursuant to this Agreement.

29.    **Effective Date / Termination Date.**  This Agreement shall be effective as of the date on which this Agreement is fully executed.  This Agreement shall terminate on the date on which no amounts remain outstanding hereunder, provided, however, that the termination hereof shall not relieve the Hospital or Debtor Affiliate of any obligations of the Hospital hereunder accrued or arising prior to such termination, including but not limited to those arising under Section 19 hereof.

[Remainder of page intentionally left blank; signature page follows]

40

**IN WITNESS WHEREOF**, the parties hereto have caused this instrument to be duly executed by their duly authorized representatives.

**DORMITORY AUTHORITY OF THE STATE OF NEW YORK**

By: _____

Authorized Officer

**CARTHAGE AREA HOSPITAL**

By: _____

Name: _____

Title: _____

**NORTH STAR HEALTH ALLIANCE, INC.**

By:

Name:

Title :

41

**CLAXTON-HEPBURN MEDICAL CENTER, INC.**


By:

Name:

Title :


**MEADOWBROOK TERRACE, INC.**


By:

Name:

Title :

## **EXHIBIT A**

### FORM OF NOTICE OF ADVANCE

### NOTICE OF ADVANCE

Dated as of: _____ \_, 2026

Dormitory Authority of the State of New York
515 Broadway
Albany, New York 12207
Attn.: Managing Director Office of Public Finance and Portfolio Monitoring

Ladies and Gentlemen:

The undersigned, Carthage Area Hospital (the "**Hospital**") , refers to that certain  Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement dated as of May\_\_, 2026 (the "**Agreement**") the terms defined therein being used herein as therein defined), by and between the Hospital and the Dormitory Authority of the State of New York ("**DASNY**"), and hereby gives you notice, irrevocably, pursuant to Section 2 of the Agreement that the undersigned hereby requests a Subsequent Advance under the Agreement, and that in connection therewith sets forth below the information relating to such Subsequent Advance (the "**Proposed Advance**") as required pursuant to the applicable terms and conditions of the Agreement:

1.  The Business Day of the Proposed Advance is _____ \_\_, 2026.

2.  The aggregate amount of the Proposed Advance is $_____.

3.  The proceeds of the Proposed Advance should be sent by wire transfer in accordance with

    the wire instructions attached hereto as Schedule A.

The Hospital hereby certifies the following to the Authority as of the date of this Notice of Advance; and this request shall also be deemed an affirmation of such certifications as of the date of the requested Proposed Advance, as follows:

a.  all of the conditions precedent set forth in Section 3(b) of the Agreement have been satisfied and all of the representations and warranties contained in the Agreement are true and correct in all material respects and shall be true and correct in all material respects, before and after giving effect to the Proposed Advance and to the application of the proceeds therefrom, as though made on and as of the date of this request and the date of the Proposed Advance; and

b.  before and after giving effect to the Proposed Advance and to the application of the proceeds therefrom, the aggregate unpaid principal amount of all Advances outstanding does not exceed $60,000,000.00.

Very truly yours,

**CARTHAGE AREA HOSPITAL**

By:      _____

Name: _____

Title:   _____

44

**SCHEDULE A TO NOTICE OF ADVANCE**

<u>**WIRE TRANSFER INSTRUCTIONS**</u>



**SCHEDULE I**

**ORGANIZATION CHART**

**[See following page]**

## SCHEDULE II

## PERMITTED ENCUMBRANCES

