UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NORTH STAR HEALTH ALLIANCE, INC., *et al*., | ) Case No. 26-60099 (WAK) |
| | ) Main Case |
| | ) Joint Administration |
| Debtors. | ) Case No. 26-30078 |
| | ) Case No. 26-30079 |
| | ) Case No. 26-60100 |
| | ) |

**NORTHERN CREDIT UNION'S OBJECTION TO THE DEBTORS' MOTION
FOR AN ORDER PURSUANT TO SECTIONS 364(c) AND 364(d) OF THE
BANKRUPTCY CODE (A) AUTHORIZING DEBTORS TO (I) OBTAIN
POSTPETITION, SECURED, SUPER-PRIORITY FINANCING ON A PERMANENT
BASIS, AND (II) BORROW UNDER SUCH POSTPETITION FACILITY ON
AN INTERIM BASIS, PENDING A FINAL HEARING, (B) PROVIDING FOR
PAYMENTS TO SECURED CREDITORS, AND (C) SCHEDULING INTERIM AND
FINAL HEARINGS ON THE MOTION, PURSUANT TO BANKRUPTCY RULE 4001**

Northern Credit Union ("NCU"), by and through its undersigned counsel, hereby files this

objection (this "Objection") to the *Debtors' Motion for an Order Pursuant to Sections 364(c) and*

*364(d) of the Bankruptcy Code (A) Authorizing Debtors to (I) Obtain Postpetition, Secured, Super-*

*Priority Financing on a Permanent Basis, and (II) Borrow Under Such Postpetition Facility on an*

*Interim Basis, Pending a Final Hearing, (B) Providing for Payments to Secured Creditors, and*

*(C) Scheduling Interim and Final Hearings on the Motion, Pursuant to Bankruptcy Rule 4001*

[Docket No. 308]  (the "DIP Motion") filed by the above-captioned debtors and debtors in

possession (the "Debtors") seeking entry of interim and final orders authorizing postpetition

financing from the Dormitory Authority of the State of New York ("DASNY"), pursuant to 11

U.S.C. §§ 364(c) and 364(d). In support of this Objection, NCU respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.      NCU, a prepetition secured creditor, files this Objection to the Debtors' request

for authorization to obtain postpetition financing from DASNY. The proposed $60 million DIP

23549151.v3

facility would grant DASNY priming liens senior to NCU's existing liens, superpriority administrative expense claims, and would improperly "roll up" $15 million in prior emergency funding that was never authorized by this Court as a loan, let alone a secured loan.

2.      NCU recognizes the critical role that the Debtors play in the communities they serve. NCU does not seek to obstruct the Debtors' efforts to reorganize and continue providing essential healthcare services to the people of Northern New York. To the contrary, NCU has cooperated extensively with the Debtors throughout these Chapter 11 Cases, consenting to multiple interim cash collateral orders. NCU remains supportive of the Debtors' efforts to obtain additional funding to continue operations and pursue a path to long-term sustainability. However, NCU cannot consent to any DIP financing arrangement that (a) forces NCU to bear the entire risk of a speculative reorganization by jeopardizing NCU's existing rights to repayment, (b) fails to provide adequate protection for NCU's secured claims, or (c) improperly subordinates NCU's existing liens without satisfying the strict requirements of section 364(d) of the Bankruptcy Code.

3.      NCU objects to the DIP Motion on multiple grounds. First, the Debtors have failed to demonstrate that NCU's interests will be adequately protected, particularly given the Debtors' significant negative cash flow, the speculative nature of stabilization from finding a strategic partner, and the lack of any reliable valuation evidence. Second, any retroactive authorization of the $15 million previously advanced to the Debtors through the Vital Access Provider Assurance Program is improper. Those funds were never characterized as a loan, never put before this Court for approval, and cannot now be transformed after the fact into superpriority obligations that encumber the estate with $60 million in new priming liens when only $45 million in new money is being advanced. Third, the Debtors have not demonstrated that financing is unavailable on less onerous terms under section 364(c)(1)-(3)—indeed, the DOH has already demonstrated the

2

State's willingness to advance funds without requiring a first lien position or even any repayment obligations.  Fourth, the Debtors' financing needs through the week ending June 5, 2026 do not appear to exceed $3 million based on the Debtors' most recent cash projections [Docket No. 290], making the Debtors' request for emergency authorization to borrow $15 million on an interim basis far greater than what is necessary to avoid immediate and irreparable harm.  Fifth, NCU's setoff rights under section 553 cannot be primed under section 364, which by its plain terms does not authorize the subordination of setoff rights.

4.       NCU does not ask this Court to deny the Debtors access to funding altogether. Rather, NCU asks only that any DIP financing be structured in a manner that does not improperly shift the risk of the Debtors' reorganization entirely to NCU.  If the Debtors' collateral is as valuable as they assert in the DIP Motion, DASNY can be adequately protected by junior liens and there is no reason to prime NCU.  If the Debtors' prospects for finding a strategic partner are as promising as they represent, NCU should not be forced to subsidize that search by surrendering its priority and receiving nothing but additional risk in exchange.

5.       For these reasons, and as set forth more fully below, the DIP Motion must be denied, at least insofar as the Debtors seek to secure the repayment of the DIP loan by granting liens which are senior or equal in priority to NCU's liens on the Debtors' assets.

## **BACKGROUND**

6.       On February 10, 2026 (the "Petition Date"), the Debtors filed separate voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of New York (the "Court"), commencing the Debtors' chapter 11 cases (these "Chapter 11 Cases").

3

23549151.v3

7.      On March 4, 2026, the United States Trustee appointed an Official Committee of Unsecured Creditors [Docket No. 111] (the "Committee").  As of the date of this filing, no request for a trustee or examiner has been made in these Chapter 11 Cases, and no other official committees have been appointed or designated.

8.      On February 11, 2026, the Debtors filed their *Motion for Interim and Final Orders Authorizing Use of Cash Collateral* [Docket No. 13] (the "Cash Collateral Motion").  On the same date, NCU filed its *Objection and Reservation of Rights to Motion for Interim and Final Orders Authorizing Use of Cash Collateral* [Docket No. 23] (the "NCU Cash Collateral Objection"), raising certain objections to the Debtors' use of NCU's cash collateral.

9.      Prior to the Petition Date, NCU made a line of credit available to Debtor North Star Health Alliance, Inc. ("North Star").

10.      The line of credit is also guaranteed by Debtor Carthage Area Hospital, Inc. ("Carthage Hospital"), and Debtor Claxton-Hepburn Medical Center, Inc. ("Claxton-Hepburn").

11.      As of the Petition Date, the outstanding principal balance owed to NCU by North Star and guaranteed by Claxton-Hepburn and Carthage Hospital was approximately $3,900,000.00, plus accrued interest, fees, and other charges (collectively, the "NCU Prepetition Obligations").

12.      The NCU Prepetition Obligations are secured by a lien and security interest covering amounts deposited as of the Petition Date in the Debtors' accounts held at NCU (the "NCU Cash Collateral").  In addition, NCU has the right, under section 553 of the Bankruptcy Code, to setoff any amounts held as NCU Cash Collateral against the NCU Prepetition Obligations.

4

13.     Following the filing of the NCU Cash Collateral Objection, this Court has entered a series of interim cash collateral orders with the consent of NCU [Docket Nos. 31, 57, 84, 124, 159, 173, 203, 225, 295, and 298] (collectively, the "Cash Collateral Orders").[1]

14.     The Cash Collateral Orders provide NCU with certain adequate protection for the use of the NCU Cash Collateral, including: (a) Roll-Over Liens on all of the Debtors' post-petition acquired assets pursuant to section 361(2) of the Bankruptcy Code; (b) superpriority claims pursuant to sections 503(b) and 507(b) of the Bankruptcy Code; (c) first priority perfected security interests and liens on all unencumbered assets of the Debtors; and (d) junior perfected security interests and liens on all encumbered assets of the Debtors, subordinate only to valid, perfected, and non-avoidable liens in existence on the Petition Date.  Pursuant to the stipulations contained in the Cash Collateral Orders, the Debtors have acknowledged the validity, extent, and priority of NCU's prepetition liens and debts.

## OBJECTION

### I.     *The Debtors Have Not Demonstrated That Funding Is Unavailable on Less Onerous Terms, including on a junior or unsecured basis.*

15.     Section 364 of the Bankruptcy Code establishes a hierarchy for postpetition financing, requiring debtors to demonstrate that they cannot obtain financing on less onerous terms before the Court may authorize financing secured by priming liens.  Specifically, section 364(d)(1)(A) requires a showing that the debtor "is unable to obtain such credit otherwise." 11 U.S.C. § 364(d)(1)(A).  Here, the Debtors have failed to make this showing.

16.     The DIP Motion purports to satisfy the Debtors' burden by asserting that the Debtors contacted fifteen potential lenders and that all would require priming liens.  *See* DIP

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the DIP Motion or Cash Collateral Orders, as applicable.

5

Motion, ¶ 15.  The DIP Motion is not supported by sworn testimony that details the alleged efforts of the Debtors to secure postpetition financing.  However, even if the Debtors can demonstrate through competent proof that no lender other than DASNY is willing to extend the required credit, that only underscores the inequity of allowing the Debtors to prime NCU's existing secured position to the tune of $60 million when the Debtors cannot demonstrate any realistic path to repaying either the DIP loan or NCU's prepetition claims.

17.      Moreover, the Debtors' claim that the State will not advance further funds without priming liens or superpriority claims rings hollow in light of the State's prior conduct.  The DOH has already demonstrated its willingness to advance funds to the Debtors without requiring a first lien position—or even any repayment obligation.  The $15 million in VAPAP funding previously provided was characterized as emergency assistance, not a loan, and was provided without strings attached and without any request to authorize same as borrowings pursuant to section 364.[2]  This establishes that the State was willing to support the Debtors' operations without demanding priming liens, and the Debtors have offered no credible explanation for why the State cannot continue to provide assistance on similar terms.

18.      Accordingly, the Debtors have failed to make the showing required by sections 364(c) and (d)(1)(A) in order to obtain approval of the proposed financing.

---

[2] The Debtors make reference to (i) *Vital Access Provider Assurance Program Temporary Medicaid Rate Adjustment Agreement*, and the *Vital Access Provider Assurance Program Temporary Medicaid Rate Adjustment Agreement Addendum*, each dated March 27, 2026 (collectively, the "VAPAP Agreement"), and the Letter from DOH to the Debtor dated March 25, 2026 (the "DOH Letter") as the governing documents for which previous VAPAP grants were made to the Debtors.  *See* DIP Motion, ¶ 20.  However, NCU, and upon information and belief, this Court, have not received copies of these documents.  Instead, NCU was led to believe that the disbursements previously granted to the Debtors were just that; grants.

23549151.v3

**II. The Debtors May not Prime NCU's Secured Claims Without Demonstrating NCU is Adequately Protected**

19. Under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien on previously encumbered collateral only if (a) the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected, or (b) the debtor obtains the consent of such parties. 11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) provides, in relevant part, that a court may:

> Authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
> (A) the [debtor] is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

20. Adequate protection is further defined in Bankruptcy Code section 361, which provides nonexclusive examples of how such protection may be achieved, including (i) periodic cash payments to compensate for any decrease in value, (ii) additional or replacement liens, or (iii) other relief that provides the indubitable equivalent of the creditor's interest in the property. 11 U.S.C. § 361.

21. The determination of adequate protection is a fact-specific inquiry. *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case … but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." *In re Beker Industries Corp.*, 58 Bankr. 725, 736 (Bankr. S.D.N.Y. 1986).

7

23549151.v3

22.     The debtor bears the burden of proof in establishing that the holder of the lien to be subordinated is adequately protected. *See Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital)*, 501 B.R. 549, 590 (Bankr. S.D.N.Y. 2013); *see also In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).

23.     Courts have consistently held that adequate protection for a prepetition secured creditor in the context of priming DIP financing must provide the "'pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing.'" *In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (quoting *Swedeland*, 16 F.3d at 564); *In re WorldCom, Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) (holding that "the purpose of providing adequate protection is to insure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy.").

24.     Moreover, "[g]iven the fact that super priority financing displaces liens on which creditors have relied in extending credit, a court that is asked to authorize such financing must be particularly cautious when assessing whether the creditors so displaced are adequately protected." *In re First South Savings Association,* 820 F.2d 700, 710 (5th Cir. 1987); *In re Seth Co.,* 281 B.R. 150, 153 (Bankr. D. Conn. 2002) ("ability to prime is extraordinary") (citing 3 COLLIER ON BANKRUPTCY P 364.05 (15th ed. rev. 2002)).  Because priming liens subordinate bargained-for lien rights, courts treat section 364(d) authorization as extraordinary relief that should be granted only as a last resort.  *In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (holding that "granting post-petition financing on a priming basis is extraordinary and is allowed only as a last resort."); *In re Planned Sys., Inc.*, 78 B.R. 852, 861 (Bankr. S.D. Ohio 1987) (holding that a secured creditor to be primed "is entitled to constitutional

8

protection for its bargained-for property interest”); *In re Qualitech Steel Corp.*, 276 F.3d 245, 248 (7th Cir. 2001) (holding that “[s]ection 364(d) is supposed to be a last resort.”).

25.     In cases such as the instant case, where a debtor is seeking to prime a prepetition secured creditor, and the debtor proposes to simply subordinate such prepetition creditor, courts will often conduct an analysis to determine whether (i) the priming financing will increase the value of the collateral such that the primed creditor is adequately protected (value enhancement), or (ii) sufficient equity will remain in the collateral after the priming lien to cover the primed creditor’s debt (an “equity cushion”). *See In re Moche*, Case No. 25-11831 (JPM), 2026 LX 120121, at *41 (Bankr. S.D.N.Y. Mar. 9, 2026); *Resolution Tr. Corp. v. Swedeland Dev. Grp. (In re Swedeland Dev. Grp.)*, 16 F.3d 552, 566 (3d Cir. 1994).

### A. Value Enhancement Theory

26.     Under the value enhancement theory, adequate protection must be based on facts or projections grounded in a firm evidentiary basis. *In re Mosello*, 195 B.R. 277, 289-90 (Bankr. S.D.N.Y. 1996).  Speculative or overly optimistic assumptions regarding the value of collateral or future improvements are insufficient to establish adequate protection.  *See id.*

27.     In light of the Debtors’ financial projections in these Chapter 11 Cases, as well as the budget accompanying the DIP Motion, it is evident that the proposed DIP financing is not value-enhancing.[3] Rather, the DIP funds are intended solely to cover the Debtors’ ongoing operational losses while they search for a strategic partner. There is no assurance that any such partner will be forthcoming.  Moreover, it is even less certain what, if anything, an acquiring entity would be willing to provide as consideration to the Debtors’ estates in connection with such an acquisition.  The Debtors appear to be counting on the speculative future receipt of SNTP

---

[3] Indeed, Debtors do not even attempt to argue in the DIP Motion that the DIP funds will enhance the value of the Debtors’ estates.

23549151.v3

assistance to fund their exit from bankruptcy and the future provision of medical services. However, the Debtors can provide no assurance that any SNTP assistance will be available at all. Even if SNTP assistance is provided, it is far from clear whether (i) such funds will be subject to use restrictions on the repayment of prior funded debt or (ii) even if not so restricted, sufficient in amount to repay the DIP loan, let alone provide any recovery for NCU's prepetition secured claims. Indeed, neither the DIP funding nor any future SNTP funding is likely to be used to pay prepetition creditors. Rather, those funds are earmarked for ongoing operations and the continuation of healthcare services, not the satisfaction of prepetition obligations. Additionally, it is not at all clear whether any strategic partner would be willing to assume or pay prepetition claims as part of an acquisition. This creates a fundamental conflict of interest: the State, through DASNY, would hold a senior lien position while simultaneously controlling whether SNTP funds—the Debtors' anticipated source of repayment—will be made available. Granting the State priming liens would allow it to control both whether NCU gets repaid and its own priority of recovery, an inequitable structure that this Court should not permit. Under these circumstances, the DIP financing merely shifts the risk of the Debtors' continued and significant operational losses onto NCU and other prepetition secured creditors.

### B. Equity Cushion Theory

28. Under the "equity cushion" theory, courts assess whether "'the value of the property, above the amount owed to the creditor with a secured claim, that will shield that interest from loss due to any decrease in the value of the property'" is sufficient to adequately protect such creditor's interests. *See In re Moche*, Case No. 25-11831 (JPM), 2026 LX 120121, at *41 (Bankr. S.D.N.Y. Mar. 9, 2026) ("Courts typically find inadequate protection where the equity cushion is insufficient or nonexistent."). Additionally, an equity cushion alone is insufficient to

10

23549151.v3

provide adequate protection where a prepetition creditor's bargained-for rights are being diminished by a priming lien.  In re *Stoney Creek Techs., LLC*, 364 B.R. 882, 891 (Bankr. E.D. Pa. 2007) (holding that "an equity cushion may provide adequate protection but that an equity cushion alone will not be determinative.").

29.    Courts generally require an equity cushion of at least 20% or more as a prerequisite to finding that an equity cushion is sufficient to provide adequate protection.  *In re Broadway Realty I Co., LLC*, Case No. 25-11050 (DSJ), [Docket No. 64] (Bankr. S.D.N.Y. June 29, 2025) (denying request for priming DIP and stating that "the Court is concerned that leveling all equity cushions at 15% imposes serious risk on [creditor to be primed] given Debtors' seeming ongoing negative cash flow… and given how speculative (at best) it is to think that favorable deal terms could be achieved given the acknowledged challenges facing the rent-regulated housing real estate market"); *see also* In re Garcia, 584 B.R. 483, 489 (Bankr. S.D.N.Y 2018) ("Courts may find that there is adequate protection for a secured creditor where there is equity in the property, but the equity cushion must be significant."); *Matter of Mendoza*, 111 F.3d 1264, 1272 (5th Cir. 1997) (recognizing that many courts have held that under appropriate circumstances "an equity cushion of 20% or more [above the total debt] constitutes adequate protection.").

30.    Like the debtors in *In re Broadway Realty I Co., LLC*, the Debtors here are experiencing significant negative cash flow. [4]  Moreover, by the Debtors' own characterization, they operate rural hospitals in a difficult market, making the prospect of finding a strategic partner willing to acquire the Debtors' assets in a transaction generating proceeds sufficient to repay the

---

[4] Further, the potential for administrative insolvency looms over these Chapter 11 Cases, as evidenced by the several recent motions for allowance of section 503(b)(9) and postpetition unpaid vendor claims that have been filed in this case.  [Docket Nos. 140, 157, and 291].

23549151.v3

proposed $60M DIP and the NCU Prepetition Obligations uncertain, at best. These circumstances strongly weigh against a finding that NCU is adequately protected under the circumstances.

31.     Further, the Debtors provide no reliable evidence concerning the equity cushion available to protect NCU's interests. The two primary operating Debtors have still not filed their Schedules and Statements of Financial Affairs. Although the DIP Motion asserts that the Debtors' real estate is worth approximately $50 million and accounts receivable exceed $100 million, the Manzer Declaration provides no supporting evidence, analysis, or independent appraisal to substantiate these figures. The Manzer Declaration merely attests that the factual assertions in the DIP Motion are true and correct, without providing any actual valuation analysis. The lack of competent valuation evidence is reason alone to deny the DIP Motion, as there is no reliable basis for the Court to determine whether any proposed adequate protection is sufficient to protect NCU's interests.

32.     Moreover, even if an equity cushion exists, NCU is being asked to relinquish its first lien rights to cash collateral, and instead to rely on a junior lien in illiquid, special purpose real property which is critical to the Debtors' ongoing operations and of highly speculative value in a liquidation scenario, together with accounts receivable that the Debtors have repeatedly represented to the Court they are struggling to collect on a timely basis and where, at least with respect to Medicare/Medicaid payables which, upon information and belief represent a large portion of such accounts receivable, (i) DOH retains significant setoff and recoupment rights as admitted by the Debtors in the DIP Motion (*see* ¶ 22), and (ii) other applicable federal law may impair or prevent any junior lien in favor of NCU from attaching or being enforceable.[5]

---

[5] NCU takes no position at this time with respect to whether DOH has valid recoupment rights against the Debtors' Medicare and Medicaid reimbursements. In fact, to the extent that such recoupment rights actually exist, the enforcement of such rights would appear to perform an "end run" around the requirement that a debtor obtain prior court approval for secured postpetition borrowing under section 364 of the Bankruptcy Code. Further, if such

12

23549151.v3

33.     Accordingly, unless the Debtors can demonstrate that NCU is adequately protected as required under section 364(d)(1)(B), any DIP financing should be limited to financing that does not prime NCU's existing liens—whether unsecured financing under section 364(b), financing with superpriority administrative expense status under section 364(c)(1), or financing secured by liens junior to NCU's existing liens under section 364(c)(3).

**III.     Any Interim Funding Should Be Strictly Limited to Immediate Necessity**

34.     Under Federal Rule of Bankruptcy Procedure 4001(c)(2), the Court may authorize postpetition financing at an interim hearing "only to the extent necessary to avoid *immediate* and *irreparable harm* to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(c)(2) (emphasis added). This standard requires the Debtors to demonstrate a specific, immediate need for each dollar of interim financing, rather than a generalized assertion that the estate requires funding.

35.     As a threshold matter, the budget attached to the DIP Motion (the "DIP Budget") provides insufficient detail for the Court or any party in interest to evaluate the Debtors' actual funding needs or proposed use of cash.  The DIP Budget is less a budget and more a funding schedule—it shows only high-level categories such as "Baseline Ending Cash Balance," "Revenue Cycle Enhancements," "Restructuring Initiatives," and "Bankruptcy Costs," with monthly aggregate figures.  It contains no detail regarding the specific expenditures the Debtors intend to make with the DIP proceeds.  Without granular line-item information showing what funds will actually be spent on, neither NCU nor the Court can meaningfully assess whether the

---

recoupment rights exist, they significantly diminish the value of the accounts receivable as collateral available to support NCU's adequate protection.  Moreover, the State should not be permitted to assert recoupment rights that reduce the collateral available to NCU while simultaneously seeking priming liens on the remaining assets.  Permitting both would give the State priority over NCU through two separate mechanisms—recoupment against the receivables and priming liens on all other collateral—essentially permitting the State to have its cake and eat it too.

23549151.v3

requested interim funding is truly necessary to avoid "immediate and irreparable harm" as required by Bankruptcy Rule 4001(c)(2).

36. The financial projections submitted in these Chapter 11 Cases demonstrate that the $15 million previously granted to the Debtors funded operations from March 27, 2026 through May 15, 2026—a period of approximately seven weeks. The Debtors' projections do not reflect a dramatic change in income or expenditures in the coming few weeks, and appear to show that the Debtor's need for additional financing through the week ending 6/5 does not exceed $3 million.[6]

37. Further compounding this problem, the DIP Motion, the DIP Budget, and the DIP Credit Agreement are internally inconsistent regarding the amount of interim funding the Debtors are seeking. The DIP Motion summary table states the interim borrowing limit is "Up to $15,000,000.00 – Interim (or such lesser amount as is needed to prevent irreparable harm)." However, Section 2(a) of the DIP Credit Agreement provides that the initial Advance "in the amount needed to support continued operations and repay the $15M VAPAP Funding shall be disbursed to the Hospital on the Effective Date." If the first advance must include $15 million to repay the VAPAP funding plus additional amounts for operations, then the initial draw will necessarily exceed $15 million, contradicting the interim borrowing limit stated in the DIP Motion. The Debtors must clarify exactly how much they are seeking to draw on an interim basis and reconcile these inconsistent representations before any interim relief can be granted.

38. Accordingly, NCU submits that any interim DIP financing order should be strictly limited to the minimum amount necessary to avoid immediate and irreparable harm, pending a

---

[6] In fact, actual cash needs may be less than projected as the Debtors continue to project significant weekly expenditures for "Bankruptcy Administration" and, except with respect to a single fee application for Wintergreen in the amount of approximately $284,000, no professionals for the Debtor or the Committee have sought approval of any fees or expenses.

23549151.v3

final hearing on proper notice to NCU and other creditors.  Moreover, if the Debtors' position is that NCU is adequately protected by virtue of a substantial equity cushion in the collateral, then the converse must also be true: if the Debtors' collateral package is truly as robust as claimed, there is no need for DASNY to receive priming liens on an interim basis for a limited advance of approximately $3 million against that same collateral. DASNY would be more than adequately protected by junior liens on collateral the Debtors claim far exceeds all secured debt.

**IV.     Any Retroactive Recharacterization of Prior Emergency Funding Is Improper**

39.     Based upon the Debtors' prior representations to the Court, NCU understands that the Debtors have received $15 million in postpetition emergency funding from the New York State Department of Health through the Vital Access Provider Assurance Program ("VAPAP"). To the extent the DIP Motion seeks retroactive or *nunc pro tunc* authorization to recharacterize such prior state assistance as debt, let alone debt to be secured by an after-the-fact priming lien at the expense of NCU's first lien position, such request should be denied.

40.     The Court should likewise deny any attempt by the Debtors to use advances under the DIP to roll up or repay any prior VAPAP grants.  *In re Reilly*, 542 B.R. 317 (Bankr. W.D.N.Y. 2015); *In re Ockerlund Constr. Co.*, 308 B.R. 325, 330 (Bankr. N.D. Ill. 2004).

41.     In *In re Reilly*, the Bankruptcy Court for the Western District of New York held that section 364(b) of the Bankruptcy Code "contemplates prior authorization of any extraordinary loan to a debtor in possession" and that a bankruptcy court has "no authority to authorize the loan retroactively." *Id.* at 319-20. The court emphasized that "[e]xcept in an emergency context, [Bankruptcy Rule 4001] mandates a hearing on 14 days notice prior to any authorization of credit. Implicitly, neither the Bankruptcy Code nor the Bankruptcy Rules make any allowance for the *nunc pro tunc* approval of a loan." *Id.*

15

42.     Similarly, in *Ockerlund,* the court denied a request for retroactive approval of a postpetition loan noting that "the scheme Congress envisioned as a whole covers all post-petition financing situations (i. e., those in and out of the ordinary course of business) and would be incapacitated by retroactive approval of the ones demanding prior approval and notice to creditors; notice after a debtor has already taken action is generally not meaningful."

43.     Here, the $15 million previously provided by the State to the Debtors was never characterized as a loan requiring Court approval under section 364. Those funds were provided without the procedural safeguards required by the Bankruptcy Code—no motion was filed, no notice was given to creditors, and no hearing was held to authorize the advance as postpetition credit.  Having bypassed these requirements, the Debtors and the State cannot now seek to recharacterize such assistance as a loan entitled to superpriority status and secured by priming liens.  Yet that is precisely what the proposed DIP facility attempts to accomplish: by "rolling up" the prior $15 million grant into a $60 million DIP facility, the Debtors and DASNY seek to encumber the estate with $60 million in priming liens when only up to $45 million in new money is actually being advanced. This structuring improperly bootstraps the State's prior funding grants into obligations secured by priming liens and superpriority claims, to the severe detriment of NCU and other prepetition secured creditors.

44.     The Debtors attempt to justify this roll-up by arguing that DOH "would otherwise have an administrative expense under 11 U.S.C. § 503(b) in the amount of the DOH VAPAP Advances" and that DOH "possess[es] substantial recoupment rights."  *See* DIP Motion, ¶ 42. This is revisionist history.  The VAPAP advances were never characterized as a loan at the time they were made, nor were they subject to any Court-approved repayment obligation.  The fact that DOH might have an administrative expense claim (which has not been established by the

16

Debtors or approved by the Court), which would be junior to NCU's secured claims, does not justify priming NCU to convert that junior claim into a superpriority obligation. Similarly, even if DOH possesses recoupment rights against future Medicaid and Medicare reimbursements, those rights exist independent of any DIP financing and do not require priming NCU to be exercised. The Debtors' argument essentially seeks to elevate a potential section 503(b) administrative claim—which would rank behind NCU's secured claim in any distribution—into a superpriority priming lien that leapfrogs NCU's existing secured position. The Bankruptcy Code's priority scheme does not permit such an end-run.

45. Accordingly, any such request to retroactively treat the $15 million previously granted to the Debtors as a loan with priming liens and superpriority claims must be denied.

## V. NCU's Setoff Rights Cannot Be Primed Under Section 364

46. In addition to NCU's secured claim arising pursuant to liens and security interests granted by statute and by the Debtors via various loan, guaranty and account agreements, NCU also has a secured claim arising from its right to setoff amounts held in such accounts under applicable New York law and Bankruptcy Code sections 506(a)(1) and 553. *In re Bennett Funding Grp.*, 146 F.3d 136, 139 (2d Cir. 1998) (holding that "[t]here is also no question that New York has long recognized a common law right of setoff [and that] New York also has codified the right to setoff.") (citing *Straus v. Tradesmen's Nat'l Bank*, 122 N.Y. 379, 25 N.E. 372, 372 (N.Y. 1890) and N.Y. Debt. & Cred. Law § 151 (McKinney 1997)).

47. To the extent the Debtors have been authorized to utilize the NCU Cash Collateral postpetition and to the extent of any resulting diminution in value thereof, the replacement liens and other protections granted in the Cash Collateral Orders were intended to preserve NCU's right of setoff as they existed on the Petition Date.

17

48.      If the Debtors are seeking, through the DIP Motion, to use section 364 to prime or subordinate NCU's rights of setoff under section 553 of the Bankruptcy Code, such relief should be denied. Section 553(a) provides, in relevant part that:

> [e]xcept as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case.

11 U.S.C. § 553(a). Notably, section 553 makes no reference to section 364. *Citizens Bank v. Strumpf*, 516 U.S. 16, 20 (1995) (noting that section 553, provides that "nothing in the Bankruptcy Code affects creditors' prebankruptcy setoff rights" except for as set forth in sections 362 and 363.).  The Second Circuit has recognized the "favored position of setoff" in bankruptcy. *See Official Comm. of Unsecured Creditors v. Manufacturers & Traders Trust Co. (In re Bennett Funding Grp.)*, 146 F.3d 136, 139 (2d Cir. 1998). Allowance of a setoff is a decision that lies within the sound discretion of the bankruptcy court, and courts have required "compelling circumstances" to disregard state-sanctioned setoff rights. *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1165 (2d Cir. 1979).

49.      Nothing in section 364 authorizes this Court to grant DASNY rights to recover against property of the Debtors' estates in a manner that displaces or otherwise undermines NCU's rights to setoff.  Judge Stern in *St. Mary's Hospital* addressed the inability of an incoming DIP lender to obtain rights superior to an existing right of setoff in *St. Mary's Hospital* :

> Where do you get a right under 364 for that purpose?. . . Well, how do you deal with this language of the code at 553(a), "Except as otherwise provided in this section and in Section 362 and 363 of this title. This title does not affect any right of a creditor." And then it goes on to provide for mutual offsets. . . 364 is not in the mix and is not affected. I'm sorry, does not affect 553. . . .I don't think a 364 right in a secured creditor or a creditor who would be given all of the advantages as a lender can use 364 for purposes of impacting on either recoupment or setoff. And I think that's exactly what this language says. . . . If Title 11 can't affect any right of a creditor to

23549151.v3

setoff but for 362 and 363, I think you have no argument at all." And to the extent that you've advanced this argument in many courts I think you've made a mistake and the courts, if they've granted it, have made a mistake. There's no impact on setoff rights by virtue of the bankruptcy code if 553 is complied with except with respect to automatic stay and certain aspects of 363 which are totally irrelevant here.

*See In re St. Mary's Hospital*, Case No. 09-bk-015619 [Docket No. 140, Hrg. Tr. at 65:19-67:11] (Bankr. D. N.J. Mar. 31, 2009).

50.     Even if the Court were to look past section 553's explicit limitation on affecting setoff rights, section 364(d) clearly does not authorize relief that would impair NCU's setoff rights. Section 364(d) permits priming "liens" and requires adequate protection of "the interest of the holder of the lien." Setoff is not a lien; it is a distinct state-law right to net mutual prepetition obligations, preserved by section 553, and no such authority for priming a setoff right exists. Further, while a lien and a setoff right are both treated as "secured claims" pursuant to section 506,[7] the two types of rights are completely distinguishable from one another. *Folger Adam Security, Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 259-260 (3d Cir. 2000). The Court in *Folger* explained:

> The terms "lien" and "setoff" have also been distinguished within the purview of § 363(f). In *Marley v. United States*, 180 Ct. Cl. 898, 381 F.2d 738, 743 (Ct.Cl. 1967), the Court of Claims noted that the terms "setoff" and "lien" "connote independent concepts, governed by distinct legal principles." The court turned to the definitions of these terms to illustrate its point. "Setoff," the court stated, referred to "'situations where both plaintiff and defendant have independent causes of action maintainable against each other in separate actions which can be mutually deducted whenever either one brings a suit against the other.'" In contrast, the court noted that a "lien" has been defined as "'a charge or encumbrance upon property to secure the

---

7 Bankruptcy Code section 506 provides that "[a]n allowed claim of a creditor *secured by a lien* on property in which the estate has an interest, *or that is subject to setoff under section 553* of this title, is a secured claim to the extent of the value of such creditors' interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be...."

19

> payment or performance of a debt, duty, or other obligation. It is
> distinct from the obligation which it secures.'" ….
>
> It is clear from the definitions of "lien" and "setoff" that the term
> "setoff" does not refer to the same type of interest as a "lien." A lien
> is distinct from the obligation it secures while the same is not true
> of a right of setoff or recoupment. They have no value separate and
> apart from a debtor's or purchaser's claim. Thus, under the canons
> of construction set forth previously, the phrase "any other interests"
> would not include setoff and recoupment since those interests are
> not similar to those enumerated in the Notice of Auction.

*See id.* (internal citations omitted). Accordingly, although setoff rights under Section 553 are treated as a secured claim, they do not constitute a lien subject to priming under section 364.

51.    NCU holds significant setoff rights against the Debtors arising from deposit accounts and other mutual obligations.[8]  As set forth above, section 553 expressly preserves these setoff rights, subject only to the limitations in Sections 362 and 363—section 364 is conspicuously absent from this list of limited exceptions.  Because a setoff right is legally distinct from a lien, section 364(d)'s priming mechanism simply does not apply.  Accordingly, any DIP financing order that purports to prime, subordinate, or otherwise impair NCU's setoff rights would exceed the Court's authority under section 364 and must be denied.

## VI.    NCU Reserves All Rights

52.    NCU files this Objection based on the information currently available regarding the anticipated DASNY DIP financing.  NCU expressly reserves all rights to supplement this Objection, including the right to: (a) object to specific terms of the proposed DIP facility; (b) challenge the adequacy of any proposed adequate protection; (c) request discovery on any matter pertaining to the DIP Motion, including, without limitation, with respect to the value of any

---

8 NCU's right of setoff arises under both the common law of New York and its account agreements with the Debtors. The Second Circuit has consistently recognized the "favored position of setoff" in bankruptcy. *In re Bennett Funding Grp.*, 146 F.3d 136, 139 (2d Cir. 1998); s*ee also Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1165 (2d Cir. 1979) (holding that courts require "compelling circumstances" to disregard state-sanctioned setoff rights).

20

23549151.v3

proposed adequate protection to be provided to NCU; the Debtors' efforts to obtain alternative financing, the prior VAPAP funding provided to the Debtors; and any negotiations with respect to, applications for, or agreements relating to, any request or proposal for SNTP assistance; (d) request an evidentiary hearing on disputed factual issues; and (e) raise any other objections that may become apparent upon review of the DIP loan documents and completion of discovery. NCU also reserves all objections previously raised in the NCU Cash Collateral Objection and any subsequent filings, which objections shall be treated as continuing objections applicable to any DIP financing sought in these Chapter 11 Cases.

WHEREFORE, NCU respectfully requests that the Court: deny the DIP Motion (i) to the extent the Debtors seek to prime or otherwise impair NCU's existing liens and setoff rights and (ii) to the extent the DIP Motion seeks retroactive or *nunc pro tunc* authorization to treat any previous State funding as debt under, or to be repaid with proceeds from, any postpetition financing provided by DASNY, and grant such other and further relief as this Court deems just and proper.

Dated: May 19, 2026

BOND, SCHOENECK & KING, PLLC

By:    ___/s/ Charles J. Sullivan_____
Charles J. Sullivan (Bar Roll #507717)
Grayson T. Walter (Bar Roll #518237)
Andrew S. Rivera (Bar Roll #700712)
One Lincoln Center, 18th Floor
Syracuse, NY  13202-1355
Telephone: (315) 218-8000
Facsimile: (315) 218-8100
Emails: sullivc@bsk.com
        walterg@bsk.com
        arivera@bsk.com

*Attorneys for Northern Credit Union*

21

23549151.v3