NITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

---

In Re:

NORTHSTAR HEALTH ALLIANCE, INC. *ET AL,*

Debtors.

Chapter 11

Case No. 26-60099-5-wak
Main Case
Jointly Administered
Case No. 26-30078
Case No. 26-30079
Case No. 26-60100

---

**MOTION TO ALLOW EXPENSES OF ADMINISTRATION AND DIRECT PAYMENT OF ALLOWED EXPENSES OF ADMINISTRATION AND FOR A PROTECTIVE ORDER AUTHORIZING DEBTOR TO VOLUNTARILY LIQUIDATE AND PAY PRIORITY WAGE CLAIMS AND FOR A PROTECTIVE ORDER DIRECTING DEBTOR TO DIRECT DEBTORS' BENEFITS ADMINISTRATOR TO DISBURSE FUNDS ON DEPOSIT IN THE RACHEL ZYSK FLEXIBLE SAVINGS ACCOUNT**

TO: Hon. Wendy A. Kinsella, United States Bankruptcy Judge:

Rachel Zysk ("Zysk"), Brandon Bowline ("Bowline"), and William (Randy) Fipps ("Fipps") move this Court for an order allowing the following claims for expenses of administration and for an order directing the Debtors to forthwith pay the allowed expenses and the same parties and Peter Sinagra ("Sinagra") move this Court for a protective order as set forth above and for a protective order safeguarding Zysk's right to recover funds in her Flexible Savings Account and for such other and further relief as to the Court seems just and proper.

1. On February 10, 2026, the Debtors filed petitions in reorganization in this Court. The Clerk entered orders for relief in each case.

2. Debtors have remained in possession of their property and operated their businesses as Debtors in Possession since the date they filed their petitions.

3. The Court authorized the Debtors cases to be jointly administered under the caption set forth above.

4. The Court has jurisdiction of these motions for the allowance and payment of expenses of administration and payment of the allowed expenses of administration pursuant to 28 USC 1334, 28 USC 157(b)(2), and 11 USC 503 and for the payment of the wage/benefit priority claims the moving parties filed in this case pursuant to 11 USC 502 and 105.

**Prior Proceedings And Events**

5. Each of the moving parties was employed by Debtors on their petition date. The Debtors elected to discharge them after Debtors filed their petitions effective on or after March 2, 2026.

6. Debtors filed and served motions to reject the moving parties' employment contracts. Bowline and Fipps opposed the motion to reject their employment contracts without simultaneously paying their claims for severance pay. Zysk filed a reservation of rights to seek the relief now sought in respect to severance rights when Debtors moved to reject her employment contract. The Court's orders approving rejection of the employment contracts were without prejudice to Bowline and Fipps seeking an order allowing their claims for and payment of severance and seeking other relief as they deemed appropriate.

7. Each of the moving parties filed proof of claim for their priority wage, benefit, and general unsecured claims. The Zysk proof of claim is annexed as Exhibit A. The Bowline proof of claim is annexed as Exhibit B. The Fipps proof of claim is annexed as Exhibit C. The Sinagra proof of claim is annexed as Exhibit D. No party has objected to the four proofs of claim or any of them.

8. The attorneys for Debtors and the moving parties worked together to reach consensus on the amount of the severance claims and the priority wage/benefit claims. The parties attained consensus on the existence and amount of severance due under the moving parties' employment contracts as set

forth in Exhibit E. Although Sinagra believed at the outset he was entitled to severance benefits, when the Debtors provided a copy of his employment contract Sinagra found his belief was mistaken.[1]

9. The parties reached consensus in respect to Mr. Bowline in the priority sum of $7,671.92, and Mr. Fipps in the sum of $1,094.72. Movants' attorneys believe Debtor will agree that Mr. Sinagra has a valid priority claim of $8,787.52. The discussions between the parties caused Ms. Zysk to realize her priority claim must be amended to reduce deferred wages and add a sum of 401(k) withholding in and after the start of the 180 reach back period under § 507(a)(3) and (4) not paid.

**The Zysk, Bowline, and Fipps Administrative Expense Claims Must Be Allowed**

10. Each of the Zysk, Bowline, and Fipps employment contracts provided for a severance benefit if the employee was discharged without cause. See ¶6(e) of the employment contracts in Exhibits A, B, and C. No party has argued that any of the three was discharged for cause. Each of them was discharged after Debtors filed their petitions, Zysk on April 6, 2026, Bowline on March 2, 2026, and Fipps on March 2, 2026.

11. The motion before the Court requires that the Court decide the issues raised in the Bowline and Fipps submissions in their April 6, 2026 "Demand for Allowance of Expenses of Administration and Payment of the Allowed Expenses . . ." and the April 13, 2026 reply Bowline and Fipps served to the Debtors' and Committee's response to their demand (the "Demand" attached without exhibits as Exhibit F).

12. The Demand noted that by their post-petition discharge Debtors created an expense of administration as discussed in <u>Supplee v Bethlehem Steel Corp. (In Re Bethlehem Steel Corp.)</u>, 479 F3d 167, 172-173 (2nd Cir. 2007) which elaborated and expanded on the relevant issues in <u>Trustees of the</u>

[1] Sinagra was escorted from his office so expeditiously, he did not have an opportunity to download his employment contract saved on his Debtor supplied work on computer, causing him to rely on his recollection and advice that employees at his level all had some severance benefits.

Amalgamated Ins. Fund v McFarlin's, Inc. (In Re McFarlin's, Inc., 789 F2d 98, 104 (2nd Cir. 1986) and Straus-Duparquet, Inc. v Local Union No. 3 Int. Bro. of Elec. Wkrs. 386 F2d 649, 650-651 (2nd Cir. 1977); and other cases. Bethlehem Steel explains that ". . . the key inquiry is whether it [severance pay] represents a new benefit earned at termination or an acceleration of a benefit . . . earned over the course of . . . employment." 479 F3d at 172. The Court explained that payment of severance as an expense of administration compensates the employee for the hardships associated with termination. 479 F3d at 173. The Debtors inflicted a hardship on the discharged employees.

13. The Debtors' and Committee's joint opposition (the "Opposition" attached as Exhibit G) made two basic points. They made comments about the relevant law. They also claimed that the compensation demanded was not documented or liquidated. The second point has been resolved as set forth in Exhibit E in respect to the computation of severance benefits.

14. The legal contentions raised in the Opposition are incorrect as explained in the April 13, 2025 portion of the Demand. Section 507(a)(2) and 503(b)(1) provide for payment of expenses of administration in a case. These cases do not include any domestic support claims within sec. 507(a)(1), thus making any claim within the scope of sec. 503(b)(1) an unsecured claim of the highest unsecured priority in these cases. Sec. 503(b)(1) includes claims for actual, necessary costs and expenses of preserving the estate incurred after the petition date. The requests for payment before the Court flow from Movants' personal work and services rendered to the Debtors after the Debtors' petitions. The Opposition did not dispute that Movants successfully aided in maintaining a functioning health care facility with adequate staffing and supplies during the turmoil and dislocation following any Chapter 11 filing. The Court can take notice that the start of any Chapter 11 case is fraught with difficulties in the best of circumstances.

15. The employment contracts at ¶6 provide for termination under several alternatives including voluntary resignation by the employee with 120 days-notice, the employee's death, disability,

cause, or termination without cause. Termination under the different alternatives leads to different consequences as specified in ¶6. The specified terms are effective only upon termination and do not depend upon prior service of any specified duration, any contribution to Debtors by the employee, or any other limitation (except to the extent that under the death and disability alternatives pre-existing benefits and earnings are accelerated or continued.) No advance notice is required for termination without cause. But the absence of an advance notice requirement is balanced by the employer paying the agreed severance benefits plus unemployment benefits[2] and doing so without delay or debate. Movants earned the right to severance benefits only when Debtors determined in Debtors' sole discretion to discharge Movants. Severance benefits were earned and payable only in the event of termination. The same termination terms applied under Debtors' form of contract if the employee worked for a day or a decade. The termination benefits do not depend on The Movants' length of employment.

16. The parties differ on the applicable law governing courts in the Second Circuit. Movants cited In Re Bethlehem Steel Corp., 479 F3d 167 (2nd Cir. 2007) as specifying the applicable law. In that case the Court explained:

> In determining whether a payment incident to termination is entitled to priority as an administrative expense, the key inquiry is whether it represents a new benefit earned at termination or an acceleration of a benefit the employee earned over the course of his or her employment. *See* Straus-Duparquet, 386 F.2d at 650 at 103. Regardless of when the debtor-in-possession becomes obliged to make the payment, it can only be an administrative expense if the debtor received the consideration for the obligation after the commencement of bankruptcy proceedings. (cite omitted)

479 F3d a 172-173. (underlining added). The Court further stated:

> We explained that severance payments are
>
> > A form of compensation for the termination of the employment relation, for reasons other than the displaced employees' misconduct, primarily to alleviate the consequent need for economic readjustment but also to recompense (them) for certain losses attributable to the dismissal.

[2] Ms. Zysk worked from and resided in Tampa, Florida. She was not entitled to unemployment compensation benefits and received none.

> *Id.* at 651 (internal quotation marks omitted). The severance payment at issue in *Straus-Duparquet* did not accrue day to day over the course of employment, but rather was triggered by termination, and as such it represented a new benefit payable because of termination rather than one that would be 'payable under any circumstances.' *Id.* Because this new benefit was incurred 'as an incident of the administration of the bankrupt's estate,' it was an administrative expense and 'entitled to priority as such an expense.' *Id.*

479 F3d at 173 (underlining added). The Court went on to further explain that severance pay compensated the terminated employee ". . . for the hardships associated with termination [which] are understood to have been earned by the employees by their termination." 479 F3d a6 173.

17. The discussion of Bethlehem Steel in the opposition overlooked the differences in the relevant facts in each case. The Bethlehem Steel employee's efforts to obtain administrative expense priority and payment did not involve a severance benefit. Instead, the employee sought payment of retirement benefits earned over the course of a lengthy prepetition employment relationship which became payable upon the employee's termination. The employee's assertion of administrative expense priority failed because the payment had been earned over decades of prepetition service, not by his services after the petition. The Court made the points quoted above in distinguishing In Re McFarlin's, 789 F2d 98 (2nd Cir. 1986) which found a union's multiemployer withdrawal liability tied to a history of employment benefits earned by services at multiple employers over lengthy periods to not be entitled to any priority). The Opposition correctly notes the employee in Bethlehem Steel was unsuccessful in converting a retirement benefit into an expense of administration. This point is irrelevant to the facts and circumstances surrounding Movants' demand for payment of severance benefits based upon their post-petition terminations after rendering valuable post-petition services to Debtors. Bethlehem Steel distinguishes retirement from severance as noted in the quote above. Bethlehem Steel unambiguously makes severance benefits arising from post-petition termination administrative expenses.

18. The Second Circuit has not abandoned or limited the statement of the relevant principles of law. The controlling law requires that the three requests for allowance of administrative expenses be allowed in the sums agreed between Debtors and Movants.

**The Allowed Expenses of Administration Should Be Paid Immediately**

19. The claims should be paid forthwith. Bethlehem Steel explains that payment of severance as an expense of administration compensates the terminated employee for the hardships associated with termination. 479 F3d at 173. No party claims that the moving parties did not suffer hardship. When counsel argued at the April 15, 2026 hearing on the motion to reject and the demand for allowance that Fipps and Bowline had suffered hardship, the Court agreed that they among others had suffered hardship.

**1**
**Hardship Inflicted On All Movants**

20. Unlike other terminated Debtors' management level employees who Debtors voluntarily paid priority wages/benefits, Movants have not received any portion of their priority wage/benefit claims except, Debtors claim, six (6) days of prepetition base salary which had accrued before Debtors' petition which was paid as part of regular payroll after the petition date. Movants believe that all other management level employees received, at very least, all accrued, but unpaid prepetition paid time off. Debtors have not given any reason for discriminating against Movants in paying accrued but undisputed priority wage/benefit claims. The absence of income caused Movants (including Mr. Sinagra) unwarranted hardships.

21. None of the Movants was a corporate officer, director, person in control of the Debtors or other type of "insider" or any of them as those terms are used in the Bankruptcy Code. Each of them had a duty to carry out the instructions of Debtors' chief executive officer and Board of Directors. The Board and CEO gave them orders and directions which it was their duty to execute to the best of their abilities.

22. None of the Movants were an officer, director, person in control or nay other type of "insider" of any of the Debtors as defined in 11 USC 101(31) or in case law. None of the Movants were given decision making authority akin to an executive. They were not given discretion to direct or change corporate policy. They were not given authority to make meaningful financial decisions, let alone critical financial decisions. Movants were asked to provide information, not provide advice. Movants were given instructions by Debtor CEO or Board which they were expected to carry out to the best of their abilities using the Debtors' available resources as authorized by the Board or CEO without debate or passive resistance. Movants were not owners, shareholders, lienors, lessors of real estate, lessors of equipment, lenders or otherwise in a position to enforce their will upon the Debtors, the Debtor's tangible property, and/or the Debtors' financial assets. They had no ability to dictate corporate policy or the disposition and/or use of corporate assets.

23. Debtors were licensed entities which were supervised by the NYS Department of Health and Office of Mental Health (the "Governmental Entities"). Before Debtors' petitions the Debtors and Governmental Entities were engaged in discussions or negotiations to reorganize and alter Debtors' future services and operations to preserve hospital, clinic level, and supporting health services in Debtor's service areas. These discussions and negotiations were guided, controlled, and conducted on the Debtors' part by Debtors' CEO, Board, and/or outside professionals. Movants' role was limited to providing information and avoiding activities or conduct that would or might interfere with the negotiations. They were required to strictly follow the instructions they were given by their corporate superiors with emphasis on logistics, leadership of practitioners and staff, and doing their part to make it possible to provide the best possible healthcare to Debtors' patients and others served by the Debtors.

24. The Debtors proposed the terms of the employment contracts to Movants when Debtors hired Movants. None of the Movants forced Debtors to include the severance benefit terms found in ¶6 of the employment contracts. Movants believe that the terms the Debtor proposed were terms that

Debtors found necessary in the marketplace to induce qualified candidates to work for Debtors. Movants believe that qualified candidates for the roles for which they were recruited would understand that entities such as the Debtors were or could easily become subject to financial and operational pressures which had afflicted other rural health care entities in both New York and other states. The possible pressures on rural health entities could lead to reorganization (in or out of bankruptcy proceedings) which might, in turn, lead to discharge without cause with little advance notice. The contract terms were within the range of business prudence and were not induced by overreaching or less-than-arm's length activities by Movants. Movants believe that all more senior administrative, professional, and supervisory employees had contracts with severance terms.

25. There was no close relation between Debtors and Movants. Movants had no control over Debtors' corporate and financial policies; corporate strategy, especially relating to discussions with the Governmental Entities; financial operations; and/or disposition of Debtors' property and funds. All these matters were stringently controlled by the CEO and Board. The Movants and Debtors' related to each other at arm's length in a typical employer/employee relationship. Whatever the Movants job titles; they lacked the discretion and authority confided in insiders. They followed orders from the Board and CEO on how to supervise operations as best they could with the limited resources available and under the stringent burdens of health care operations. Movants labored under health care operations. Movants labored under heavy responsibilities while lacking both the resources and authority to have any certainty of meeting those responsibilities.

26. Each of Movants was discharged without advance notice or even a hint that Debtors were considering their discharge. The absence of advance notice of the impending discharges demonstrates the separation of Movants from the locus of control and decision making for Debtor. Movants lack of protest of or resistance to their discharges demonstrates Movants belief of their non-controlling roles and lack of any ability to push back.

**2**

**Individual Information Demonstrating The Reasonableness Of Prompt Payment**

**a. Information Concerning Ms. Zysk**

27. Ms. Zysk has been unemployed since Debtors discharged her on April 1, 2026. Ms. Zysk worked remotely for the most part from Tampa, Florida. She was admitted to practice in Florida where she had practiced law in the past. She had contacts in the Tampa, Florida legal community. She thought her contacts would provide employment leads and the best opportunity for future employment. She sought employment in Florida.

28. Ms. Zysk's family consists of two minor daughters in addition to herself. Ms. Zysk is the family's sole wage earner. She is also the sole source of support for her daughters.

29. Ms. Zysk has been unable to find employment since her discharge. She has had no employment income since her discharge. She has supported herself and her family by withdrawing funds from her retirement accounts. The accounts have been substantially depleted.

30. Ms. Zysk has been unable to fund health care insurance for herself or her daughters. Health care benefits were part of her severance benefit. The health care benefit was and remains important to Ms. Zysk.. One of her daughters is a special needs child who has long required education not typically available in public schools, but only in a private setting. Public schools in Florida will not pay any portion of the cost of her daughter's education needs. The burden of providing the necessary education for her daughter's welfare and development has been borne entirely by Ms. Zysk. Ms. Zysk's other daughter started psychotherapy in 2025 and has a continuing need for psychotherapy for her welfare. Ms. Zysk has paid for this necessary and ongoing care. Ms. Zysk also needs care for which she has no funds.

31. Should Ms. Zysk be unsuccessful in obtaining employment and she fully depletes her retirement accounts, she will become a public charge. Ms. Zysk has suffered a marked degree of hardship. She is 46 years old. She has substantially depleted her retirement savings. The withdrawals from her retirement accounts create both an early withdrawal penalty and an income tax liability for which she

must make estimated income tax deposits. The use of retirement funds has come at a very high cost and will impact her for her lifetime. The failure to provide severance benefits will have a substantial adverse impact on both her and her children. Ms. Zysk has been substantially damaged by Debtors' failure to pay her severance benefits.

**b. Information concerning Mr. Fipps**

32. Mr. Fipps has been unemployed since he was discharged on March 2, 2026. He has sought employment without success. Employment opportunities for those with Mr. Fipps employment history and education are limited in the northern New York area in which his family resides.

33. Mr. Fipps is married with a dependent daughter enrolled in a nursing program at St. John Fisher University with two years remaining to obtain a bachelor's in nursing degree. The daughter's education needs to be funded by the Fipps family.

34. Mr. Fipps' wife is a 15-year employee of Samaritan Medical Center in Watertown, New York. Because of Mrs. Fipps' employment, Mr. Fipps' has a limited ability to freely relocate to find employment.

35. Mr. and Mrs. Fipps are the sole support of Mrs. Fipps' brother who suffered a traumatic brain injury. Mrs. Fipps' brother cannot obtain gainful employment due to his traumatic brain injury. But for the Fipps' support and assistance, Mrs. Fipps' brother would require institutional care and no longer could live in the general community. The Fipps believe that living in the general community is immeasurably better the best possible institutional care. The Fipps are seeking disability benefits for Mrs. Fipps' brother to help sustain his living in the general community. The process of obtaining disability benefits for Mrs. Fipps' brother has proven very slow with no end presently in sight.

36. Mr. Fipps received unemployment insurance benefits after his discharge. His unemployment benefits ended on September 2, 2026. Mr. Fipps, who is 61 years old, will need to draw on his retirement savings to make ends meet in the future. The Debtors' failure to pay severance benefits

will have an impact on Mr. Fipps. Mr. Fipps will suffer immediate income tax burdens and a lifelong impact on his retirement options as retirement benefits are consumed and the benefits of tax-free compounding of retirement savings are lost.

**c. Information concerning Mr. Bowline**

37. Mr. Bowline was unemployed between his discharge on March 2, 2026 through August 9, 2026. Mr. Bowline is married with two minor dependent children. Mr. Bowline received no unemployment compensation benefits for reasons unknown to him

38. The absence of severance benefits impacted him and his family. Mr. Bowline had to draw down a meaningful portion of his retirement assets to meet family living expenses while unemployed. He is 53 years old. Mr. Bowline will need to work hard and enjoy a measure of good luck under good general economic conditions to restore him and his family to the same economic position and same retirement options he and his family would have enjoyed had severance benefits been paid timely.

**Debtors' Failure To Pay Any Severance Benefit Is Inequitable**

39. Movants were and continue to be treated inequitably. Bowline and Fipps showed in their April 2026 submission in admissible evidentiary affidavit form, which no one disputed in any manner, that they played a key role in maintaining Debtors as functioning entities so that there were operating entities which could be reorganized for the benefit of everyone. They testified that their post-petition services were worth more than the base salary which they were paid through their abrupt discharge with no advance notice whatever.

40. Ms. Zysk, although working remotely in Tampa, also had a positive influence in transitioning the Debtors from the verge of financial failure to Chapter 11 Debtors in Possession which had a chance of reorganizing. She performed the following services. Ms. Zysk principally dealt with general contract issues and employment issues with medical and mental health providers of all types. During the

post-petition period she also assisted Debtors' attorneys in the transition from her in-house services to Debtors' attorneys providing the services she personally had provided.

41. The Debtors took advantage of a choice they had to make before they filed their petitions. They could opt to discharge Zysk, Bowline, and Fipps so that their severance benefit would be treated as a priority wage or benefit claim under 11 USC 507(a)(4) which specifically provides for severance benefits falling due and payable before the petition date. Or the Debtors could decide to retain Movants' services and reap the leadership and organizational benefits that the Debtors obtained. If Debtors opted to retain Movants, Debtors had to treat any severance benefits to which Movants were entitled under fixed Second Circuit case law. Debtors made a choice. Debtors had counsel to advise them on Chapter 11 issues.

42. The Court need only consider the compensation authorized for management services in these cases to come to conclude that Debtors' management is unavailable at bargain discount rates. The Movants' personal relations and leadership capacity were important to maintaining operating entities to reorganize. Those qualities were put to good use. There was no breakdown in the quality of care at a time when all employees and service providers faced the unknown and, often, personal fears or concerns which could undermine even a Chapter 11 debtor far less dependent on literally hands-on personal care and attention provided by debtors' employees. Debtors required the knowledge and connections to source vital supplies without which a medical care entity could not operate, at least not safely.

43. Movants note that professionals authorized by the Court to act in these cases are not willing to have their fees and expenses for post-petition services treated equally and in lock step with Movants administrative claims. The actions of the attorneys who are authorized to act for various parties by the Court and presumably have the bankruptcy related skill, ability, education, and experience to know what is prudent in the timing and collection of their administrative expense claims provide ample proof of prejudice to Movants. Movants waiting to get paid until some unknown date in the future is not a good decision. Movants understand that professionals may claim they cannot be expected to provide services

if they cannot get paid to meet their expenses. Movants say the same thing. Bankruptcy disdains claims that some members of a class of equals are "more equal" than other class members.

44. Movants are aware that some parties in interest in the case may fear the reaction of the State of New York if expenses of administration are paid to Movants. The State of New York is hardly a bankruptcy or Chapter 11 neophyte. It understands, or should if it does not, administrative expenses have priority and should be paid. Movants believe the State of New York knows far better than anyone else that there is a price to pay for appearing to reap the benefit of the Movants' efforts then attempt to avoid compensating Movants. Movants doubt that the State of New York is concerned about one-time administrative expense payments when professionals are incurring ongoing expenses at more than bargain basement discount rates every month.

45. Movants are aware that the creditors committee opposed the Fipps and Bowline request for payment in April 2026. The unsecured creditors in this case are out of the money in this case. Movants believe the Debtors' and Committee's concerns that the State of New York somehow will "pull the plug" on Debtors if administrative expenses are paid to Movants is incorrect. Movants believe the State of New York is concerned with providing adequate health services in the Debtors' service area, not penny pinching.

46. The failure or refusal to pay expenses of administration is inequitable.

**Movants Are Being Compelled To Extend Post-Petition Credit Without Adequate Protection**

47. Movants are being forced to take financial risks that some administrative expense creditors are not being compelled to bear. Movants are being compelled, essentially, to extend post-petition unsecured credit to Debtors in the form of unpaid severance benefits and, thus, benefit lower priority creditors represented by the Committee who are believed to be "out of the money." No one has suggested that Movants' claims are adequately protected. No one has suggested or provided proof in

admissible evidentiary form that Movants certainly will be paid at some time in the future. No one has suggested Movants will recover from the involuntary hardships that Movants have suffered. Movants understand that they may not be the only parties in the case with unpaid administrative expenses. There may be some creditors with §503(b)(9) claims who remain unpaid. There is a difference between commercial creditors who delivered goods within 20 days before the petition and Movants. Commercial creditors know (or should know) that they risk non-payment or delayed payment if their customer files a Chapter 11 case. Non-payment or delayed payment is a risk of business for which a seller can prepare in advance. The creditor can sell on COD terms. They can diversify their customer base. They can stop selling if credit analysis of the customer warrants that action.

48. Movants were on a different footing. They could not work for multiple employers to diversify their risk of sudden termination by one of them.. See the employment agreements at ¶1(c). The Debtors and their creditors undoubtedly wanted Movants to devote their whole being to their duties to save Debtors from financial failure, if possible. Debtors did not want Movants to attempt to secure their personal employment interests against Chapter 11 risks and only then turn their attention to Debtors' welfare. Movants had nothing to fall back on when discharged, while commercial creditors are not in the same position. The Bethlehem Steel ruling recognizes the special hardship imposed on employees. There is no sign that the Second Circuit expected severance pay to be delayed to some point in the future when the hardship was immediate and real at the time of termination.

49. The Movants' administrative expenses claims should be paid immediately.

**Demand For Payment to Ms. Zysk Of $3,145.00 Held In Her Flexible Savings Account ("FSA")**

50. Before Debtor discharged Ms. Zysk she had Debtors deduct a net amount of $3,145.00.

51. Ms. Zysk has incurred expenses which are eligible for reimbursement from her FSA account.

52. Debtor's benefits administrator has advised Ms. Zysk that she cannot receive any of the funds in her FSA fund without Debtor's specific approval. Debtors allegedly have refused consent. The benefits administrator has advised Ms. Zysk that the funds in her FSA account will be forfeited to Debtor on December 31, 2026.

53. Debtor's human resources department confirmed that it would not authorize her application for reimbursements from her FSA.

54. Counsel for Debtor and Ms. Zysk have conferred in an effort to resolve this dispute. This dispute seems likely to be consensually resolved. Ms. Zysk files this demand to comply with the bar date set by the Court.

**Movants' Priority Wage Claims Should Be Voluntarily Liquidated And Paid As Agreed**

55. Attorneys for Movants and Debtors entered into discussion concerning the amounts and payment of all the amounts and claims discussed in this motion. Movants' attorneys drafted this motion seeking allowance and payment of Movants' priority wage and benefit claims. Debtors' counsel advised he would propose a resolution to Debtors' management and advise Movants' counsel of Debtors response on Monday, September 28, 2026. On September 28th Debtors' counsel advised that between counsels' last discussion and September 28th Debtors management asks its counsel to seek an extension of the bar date and expanded authority to address the allowance and payment or priority claims, including Movants' priority claims. Debtors counsel advised motion papers to obtain the proposed extension would be filed by September 30th. Debtors' anticipated motion, if granted, is likely to permit a voluntarily resolution of Movants' motion in respect to their priority claims. Movants requested a protective order to assure against any impairment of their rights should Debtor's anticipated motion be denied or granted on terms prejudicial to Movants' rights.

Wherefore, Movants request this Court allow Movants administrative expense severance claims in the sums agreed between Movants and Debtors, direct Debtors to forthwith pay the allowed expenses of administration in cash in full, direct the Debtors to forthwith pay the portions of Movants' priority wage and benefit claims, direct Debtors to take such action to permit Ms. Zysk to access funds in her FSA account, and grant Movants such other and further relief as to the Court seems just and proper.

Dated: September 29, 2026

Lacy Katzen LLP
David D. MacKnight, Esq of counsel
Attorneys for Employees
600 Bausch & Lomb Place
Rochester, New York 14604
Tele: 585-454-5650
Bar No. 601792

**AFFIDAVIT**

STATE OF NEW YORK
COUNTY OF Jefferson

I, William R. Fipps, being duly sworn, depose and say:

1. I am one of the Movants. I make this affidavit on personal knowledge.
2. I have read the above motion.
3. The actual statements applicable to me and concerning my relationship to the Debtors and Debtors operations are true and correct.

Wherefore, I request the Court grant the relief demanded above.

Dated: September 18, 2026

William R. Fipps

Sworn to before me this
18 day of September, 2026.

Notary Public

[7584-[illegible]738380/1]
Certificate of Service

CARALEE HANDSCHUH
Notary Public, State of New York
Reg. No. 01HA6188654
Qualified in JEFFERSON County
Commission Expires AUGUST 11, 2028

# AFFIDAVIT

STATE OF FLORIDA
COUNTY OF Hillsborough

I, Rachel Zysk, being duly sworn, depose and say:

1. I am one of the Movants. I make this affidavit on personal knowledge.
2. I have read the above motion.
3. The actual statements applicable to me and concerning my relationship to the Debtors and Debtors operations are true and correct.

Wherefore, I request the Court grant the relief demanded above.

Dated: September 18th, 2026

Rachel Rose May Zysk

Rachel Zysk

Sworn to before me this
18th day of September, 2026.

Martha Rivera

Notary Public

MARTHA RIVERA
Notary Public - State of Florida
Commission # HH 363109
My Comm. Expires Feb 24, 2027

{S8472-000008-5738380/1}
Certificate of Service

**AFFIDAVIT**

STATE OF NEW YORK
COUNTY OF Jefferson

I, Brandon Bowline, being duly sworn, depose and say:

1. I am one of the Movants. I make this affidavit on personal knowledge.

2. I have read the above motion.

3. The actual statements applicable to me and concerning my relationship to the Debtors and Debtors operations are true and correct.

Wherefore, I request the Court grant the relief demanded above.

Dated: September 25th, 2026

Brandon Bowline
Brandon Bowline

Notary Public, State of Texas
County of Montgomery
Sworn to before me this
25th day of September, 2026.

Jade Collins
Notary Public Jade Collins

NOTARY PUBLIC STATE OF TEXAS
Jade Collins
ID NUMBER
135131444
COMMISSION EXPIRES
October 15, 2028

135131444 10/15/2028

Electronically signed and notarized online using the Proof platform.