# EXHIBIT A

**Fill in this information to identify the case:**

Debtor 1 North Star Health Alliance, Inc., Jointly Administered

Debtor 2 (Spouse, if filing) ______

United States Bankruptcy Court for the: Northern District of New York

Case number 26-60099; 26-30078; 26-30079; 26-60100

FILED

MAY 2 3 2026

By Omni Agent Solutions. Claims Agent
For U.S. Bankruptcy Court
Northern District of New York

Official Form 410

# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1: Identify the Claim

**1. Who is the current creditor?**

Rachel Zysk
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor ______

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? ______

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Name: Lacy Katzen LLP | Name: Lacy Katzen LLP |
| Number Street: 600 Bausch & Lomb Place | Number Street: 600 Bausch & Lomb Place |
| City: Rochester State: NY ZIP Code: 14604 | City: Rochester State: NY ZIP Code: 14604 |
| Contact phone: (585) 454-5650 | Contact phone: (585) 454-5650 |
| Contact email: Dmacknight@lacykatzen.com | Contact email: Dmacknight@lacykatzen.com |

Uniform claim identifier (if you use one): ______

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) ______ Filed on ______ MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? ______

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☐ No
☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$ 88,850.57. **Does this amount include interest or other charges?**
☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Prepetition deferred salary, Frozen paid time off, Retention incentive,
Salary increase not paid (see attached schedule)

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: ______________________

**Basis for perfection:** ______________________
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $__________
**Amount of the claim that is secured:** $__________
**Amount of the claim that is unsecured:** $__________ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $__________

**Annual Interest Rate** (when case was filed)______%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $__________

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: ______________________

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No
☑ Yes. *Check one:*

**Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). $______

☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). $______

☑ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). $ 17,150.00

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). $______

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). $______

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. $______

* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 05/19/2026
MM / DD / YYYY

[signature]
Signature

**Print the name of the person who is completing and signing this claim:**

Name: David D. MacKnight, Esq. (First name / Middle name / Last name)

Title: Attorneys for Rachel Zysk

Company: Lacy Katzen LLP
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address: 600 Bausch & Lomb Place (Number Street)
Rochester (City) NY (State) 14604 (ZIP Code)

Contact phone: (585) 454-5650 Email: DMacknight@lacykatzen.com

Print | Save As... | Add Attachment | Reset


[079486-00000178849620/1]

Zysk Claim Schedule

| | | |
|---|---|---|
| 1. | Paid Time Off (benefits confirmation) | $ 54,062.03 |
| 2. | Retention Incentive (Employment Contract ¶3 (v) for 2023, 2024, and 2025 at $5,000/year | $ 15,000.00 |
| | Gains lost (estimated at gain on S&P 500 from 7/1/2024 to 2/1/2026 on $15,000) [increase of 25.4%] | $ 3,881.82 |
| 3. | Deferred salary | $ 14,935.88 |
| 4. | Salary increase of 1% per annum for six months (Employment Contract ¶ 2(b)) | $ 970.84 |
| Total | | $88,850.57 |

Priority amount:

| | | |
|---|---|---|
| 1. | Deferred Salary | $ 14,935.88 |
| 2. | Unpaid salary increase | $ 970.84 |
| 3. | Retention incentive 2025 | $ 5,000.00 |
| | | $ 20,905.88 |
| (Capped at) | | ($17,150.00) |

[079646-000001/6902498/1]

# EMPLOYMENT AGREEMENT

THIS AGREEMENT is effective the first day of September 15th, 2022 by and between Carthage Area Hospital and its affiliate corporations (hereinafter referred to as "CAH"), and Rachel May Zysk (hereinafter "Executive").

WHEREAS, CAH desires to employ Ms. Zysk as General Counsel;

WHEREAS, Executive desires to work as General Counsel; and

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and promises set forth below and for such other good and valuable consideration, the receipt and adequacy of which is acknowledged by all parties, the parties agree as follows:

1. Employment.

(a) Term. CAH shall employ Executive and Executive shall serve as CAH's GC in accordance with the terms and conditions contained in this Agreement for an initial term commencing on the effective date of this Agreement continuing through December 31, 2024 and continuing thereafter for successive terms of twelve (12) months unless, at least one hundred twenty (120) days prior to the expiration of any term, one party provides written notice to the other of its intention not to renew this Agreement. Notwithstanding the foregoing, this Agreement may also be terminated in accordance with the provisions of paragraph 6 below.

(b) Duties. As GC of CAH, Executive shall perform those duties and responsibilities normally commensurate with such position, subject to the control of CAH's CEO and Board of Directors ("Board").

(c) In addition, Executive shall perform all such other duties and responsibilities as may be assigned to her from time-to-time by the CEO, not inconsistent with any statutory and regulatory requirements governing the operation of CAH and not materially inconsistent with his position as GC. Executive shall devote her best efforts to satisfying the duties and responsibilities under this Agreement, shall serve faithfully and to the best of her abilities. Executive shall not, during the term of this Agreement, be employed by or engaged in any other activity that would in any way directly interfere with her ability to fully perform and satisfy her duties and responsibilities under this Agreement or which would constitute a conflict of interest to CAH.

2. Compensation and Benefits.

(a) Base Salary. Executive shall be paid a base salary at an annualized rate of Two Hundred and Ninety-Four Thousand Dollars ($294,000) ("Base Salary"). Executive's Base Salary shall be paid in accordance with CAH's regular payroll practices for Executive employees.

(b) Increase in Base Salary. Commencing with October 1, 2022 and once annually thereafter, CAH's CEO will review and, if appropriate in its reasonable determination, increase Executive's Base Salary; provided that each annual increase in Base Salary shall be at least one percent (1%) of the base salary of the immediately prior term during years two and three of this Agreement. Notwithstanding the preceding, Executive shall be entitled to any Board approved global or cost of living salary increases afforded the management group.

(c) Benefit Plans. Executive shall be eligible to participate in any CAH maintained employee pension or benefit plans (including, but not limited to, any applicable retirement plan, group life insurance plan, medical plan, dental plan, long-term disability plan, vacation plan, sick time plan, and other fringe benefit plans, Board approved policies, compensation plans, or programs maintained by CAH for the benefit of its Executive employees). Executive's participation in any such Board approved benefit plans, programs, and policies shall be based on, and subject to, satisfaction of the eligibility requirements and other conditions of such Board approved plans, programs, and policies.

(d) Business Expenses. Executive shall be reimbursed for all ordinary, necessary, and reasonable business expenses she incurs in the performance of her duties under this Agreement, in accordance with any written policies or practices adopted by CAH and upon supplying CAH with documentation in a form and manner reasonably satisfactory to CAH.

(e) Professional Development Expenses. CAH shall reimburse Executive the reasonable costs directly associated with Executive's professional development courses, seminars, programs, classes, executive training, and coaching that have been previously approved by the CEO.

(f) Professional Memberships. CAH encourages GC to participate in activities which provide for the personal and professional growth of Executive and/or bring recognition to CAH. CAH will reimburse GC's cost and expenses in connection with GC's membership in professional associations that GC desires to maintain during the term of this Agreement, not to exceed Two Thousand and Five Hundred Dollars ($2,500) per year. CAH further agrees to reimburse GC for all reasonable expenses associated with GC attending one national conference each calendar year (for which GC shall provide reasonable notice to the CEO). The parties acknowledge and agree that such conferences and activities are distinct from conferences and activities to be attended by GC in connection with her duties as GC of CAH.

(g) Insurance and Indemnification. Executive shall be provided officer's liability insurance coverage on such terms as the parties may agree. To the fullest extent permitted by law, CAH also agrees to defend, indemnify and hold harmless the Executive, whether during the term of this Agreement or thereafter, from any cost or expense Executive may incur including, but not limited to, attorneys' fees and expenses, arising out of or relating to Executive's employment by CAH. This paragraph shall survive the termination of this Agreement.

3. Other Benefits. During the term of Executive's employment, Executive shall also be entitled to receive the following benefits:

(i) Notwithstanding paragraph 2(c) above, paid time off for any use, such as illness, vacation, and personal time of five (5) weeks during each calendar year (prorated for partial years). Before taking such time off, Executive shall provide the CEO with reasonable notice of at least (2) weeks of any intended time off.

(ii) Notwithstanding paragraph 2(c) above, CAH shall pay all premiums associated with Executive's medical, health, vision and dental plans.

(iii) CAH shall provide Executive one (1) cellular smart phone every twenty-four (24) months and permit Executive to use said phone under CAH's cellular phone plan; and

(iv) CAH shall provide Executive one (1) personal laptop computer every twenty-four (24) months and permit Executive to use said computer under CAH's computer and/or technology plan.

(v) CAH shall provide an additional Five Thousand Dollars ($5,000) per year, as a retirement incentive benefit to be deposited by Executive in CAH's 457 Plan, or a retirement vehicle of Executive's choice.

4. Confidential Information. Executive will retain in confidence during the term of this Agreement and thereafter (except as required by applicable law or in connection with the performance of her duties and responsibilities hereunder) any and all CAH confidential information belonging to, licensed by, or in the possession of CAH which may come into her possession during Executive's employment by CAH. The phrase "CAH confidential information" includes, but is not limited to, any and all business information, products, programs, and other information not generally available to the public, provided, however, that CAH's confidential information does not include any information which has become part of the public domain by means other than Executive's nonobservance of her obligations hereunder. Executive will not, without the prior consent in writing of the Board, either during the term of her Agreement or thereafter, communicate CAH's confidential information for the benefit of Executive or for the benefit of any person or entity other than CAH or its affiliates. All such

confidential information shall remain the sole property of CAH and shall be returned to CAH upon termination of Executive's employment under this Agreement.

5. Notices. Any notice which may be given hereunder shall be sufficient if in writing and mailed by certified mail, return receipt requested, to Executive at her last known residence and to CAH at its main campus in CAH, New York or at such other addresses as either Executive or CAH may, by similar notice, designate.

6. Termination. Executive's employment by CAH shall be subject to termination as follows:

(a) Voluntary Termination. Executive may terminate this Agreement upon not less than one hundred twenty (120) days prior written notice delivered to CAH, in which event Executive shall be entitled only to the compensation and benefits Executive has earned or accrued through the date of termination (including any accrued paid time off and extended leave bank time, to the extent permitted by the applicable CAH policies). During said one hundred twenty (120) days, Executive shall continue to perform her duties to the best of her abilities as set forth in paragraph 1(b) of this Agreement or, in the alternative, CAH may discontinue Executive's employment at any time during said notice period, but it shall remain liable to continue Executive's compensation and benefits as stated herein for the remainder of the notice period.

(b) Termination Upon Death. This Agreement shall terminate upon Executive's death. In the event of the Executive's death during the term of this Agreement, any Base Salary, bonus and benefits earned or accrued by Executive but unpaid at the date of her death (including any accrued paid time off and extended leave bank time, to the extent permitted by the applicable CAH policies) shall be paid to Executive's estate or designated beneficiary, as appropriate.

(c) Termination Upon Disability. CAH may terminate this Agreement upon Executive's disability. For purposes of this Agreement, Executive's inability to perform all of Executive's duties hereunder by reason of physical or mental illness or injury (after taking into account any reasonable accommodations required by law) for a period of one hundred twenty (120) days in any one hundred eighty (180) day period (the "Disability Period") shall constitute disability. The determination of disability shall be made by a physician selected by CAH and a physician selected by Executive; provided, however, that if the two physicians so selected shall disagree, the determination of disability shall be submitted to arbitration in accordance with the rules of the American Arbitration Association and the decision of the arbitrator shall be binding and conclusive on Executive and CAH. Notwithstanding any such designation, Executive shall continue to receive her Base Salary in accordance with paragraph 2(a) and benefits in accordance with paragraph 2(c), to the extent permitted by the then current terms of the applicable benefit plans, until Executive becomes eligible for disability income benefits under CAH's disability plans. While receiving disability income payments under CAH's disability plans, Executive shall

continue to participate in CAH's benefits plans in accordance with paragraph 2(c) and the terms of such plans to the extent allowed to do so by the terms of said plans.

(d) Termination for Cause. CAH may terminate Executive's employment immediately and without prior notice for "cause" by written notice to Executive. For purposes of this Agreement, a termination shall be for "cause" if the termination results from any of the following events (other than by reason of a disability as described in paragraph 6(c)):

(i) Executive's willful failure to carry out her express duties and responsibilities under this Agreement, after written notice of same and a reasonable opportunity to perform;

(ii) actions or omissions by Executive that are criminal, fraudulent, or involve material dishonesty detrimental to CAH;

(iii) any material breach of this Agreement, after written notice of same and a reasonable opportunity to cure; or

(iv) Executive's conviction of any crime or offense relating to or involving Executive's employment with CAH.

Upon the termination of this Agreement for cause, Executive shall be entitled only to the Base Salary and benefits Executive has earned or accrued through the date of termination.

(e) Termination Without Cause. CAH, may terminate this Agreement at any time without cause and without prior notice to Executive. If CAH terminates this Agreement without cause under this paragraph 6(e), Executive shall be entitled to a severance package that shall include:

(i) six (6) months of Executive's Base Salary, to be paid in the same manner as Executive would have received if he continued employment in accordance with CAH's payroll practices; and

(ii) continued payment of Executive's health premiums for twelve (12) months at the same level of contribution made by CAH prior to Executive's termination; or, in the event such payments would result in a violation of the nondiscrimination requirements under Section 105(h) or any other Section of the Internal Revenue Code, then a lump sum payment to Executive in an amount equal to the cost of Consolidated Omnibus Budget Reconciliation Act of 1985 as amended ("COBRA") health continuation coverage for family coverage for said twelve (12) month period, to be paid within fifteen (15) days following the date Executive's employment as GC of CAH terminated.

Such severance is strictly conditioned upon Executive executing a General Release Agreement to be provided by CAH within ten (10) business days of Executive's termination without cause (such Release Agreement shall be provided by CAH to Employee within ten (10) business days after CAH terminates her employment without cause, shall not adversely affect her right to any CAH compensation or benefits that he is entitled to under this paragraph 5(e) or that he has earned through the date of her termination, and shall not impose any restrictions on her employment after leaving CAH that are inconsistent with the terms of this Agreement). Executive shall continue to be entitled, during the period he is receiving such severance, to participate in CAH's unemployment insurance (without opposition by CAH) and disability benefit plans to the extent allowed by the terms of such plans and by law. This section 6(e) shall not apply to a termination without cause addressed by section 6(f) below, except to the extent described therein.

7. <u>Change in Control</u>

(a) <u>Benefit.</u> In the event of either of the following, Executive shall be entitled to receive a payment (the "Change in Control Benefit") equal to the economic value of the Executive's Base Salary and benefits for the six (6) month period immediately prior to such event:

(i) Executive's employment is terminated "without cause" during the period from six (6) months prior to a Change in Control to twenty-four (24) months after the Change in Control (the "Change Period"); or

(ii) Executive voluntarily terminates her employment with CAH due to a Constructive Discharge that occurs during the Change Period.

(b) <u>Timing.</u> The Change in Control Benefit shall be paid within thirty (30) days of the termination or resignation set forth in 7(b)(i) or (ii) respectively.

(c) <u>Change in Control.</u> A "Change in Control" shall be deemed to have occurred upon:

(i) a sale or other disposition of all or substantially all of the assets of CAH, including, but not limited to, a transfer or disposition of such assets by way of merger, consolidation, or any other business combination.

(ii) a change in management of CAH by way of an agreement between CAH (or any successor entity) with a third party to provide management services.

(iii) a change in the composition of the Board (or any successor entity) in which more than fifty percent (50%) of the members of the Board are appointed

or controlled, directly or indirectly, by any person or organization not an affiliate of CAH as of the Effective Date; or

(iv) the creation or imposition on the Board (or any successor entity) of a parent organization or other entity, or board, to which the Board must report and/or advise.

(d) Constructive Discharge. A "Constructive Discharge" shall be deemed to have occurred when, without the prior written consent of the Executive, and during the Change Period, any of the following events take place:

(i) a reduction in Executive's Base Salary;

(ii) a material reduction in Executive's authority or scope of responsibilities and/or duties, or a change in Executive's reporting relationships; or

(iii) a diminution of Executive's job title, which shall not be limited to the appointment of any individual at a position substantially equal or superior (for legal matters) to Executive's position as GC.

(e) General Release. Prior to receiving the Change in Control Benefit under this agreement, Executive agrees that she must sign and deliver to CAH a General Release Agreement in favor of CAH in a form reasonably satisfactory to CAH. Notwithstanding the foregoing, payment may not be delayed based on CAH's failure to timely present to Executive a General Release Agreement.

(f) Unfunded Promise. All payments pursuant to this Agreement shall be made from the general funds of CAH and no special or separate fund shall be established or other segregation of assets made to assure payment. Executive and her beneficiaries, heirs, successors and assigns shall have no legal or equitable rights, interests or claims in any property or assets of CAH or any other Affiliate. For purposes of the payment of benefits under this Agreement, CAH's assets shall be, remain, neither pledged nor restricted under or as a result of the Agreement. CAH's obligation under the Agreement shall be merely that of an unfunded and unsecured promise to pay money in the future.

8. Rules, Regulations and Policies. Executive shall use her best efforts to abide by and comply with all of the rules, regulations, and policies of CAH, as they may be implemented, interpreted and/or amended from time to time.

9. Dispute Resolution. In the event of a dispute or claim arising under or relating to the terms of this Agreement, the parties agree to refer such dispute and/or claim to arbitration in accordance with the rules of the American Arbitration Association. The Arbitrator, who shall be selected in accordance with the rules of the American Arbitration Association then in effect, shall have no power to add to, subtract from, or alter the terms of this Agreement. Any

arbitration shall be conducted in Syracuse, New York. The decision of the arbitrator shall be final and binding upon the parties (or their successors in interest), subject to the parties' right to seek judicial review of such award in any court of competent jurisdiction. The arbitrator may apportion the filing fees associated with commencing the arbitration among the parties upon the issuance of a final decision.

10. Non-Compete Agreement.

(a) Upon the termination of Executive's employment by CAH for cause or upon Executive's voluntary termination of employment with CAH, Executive shall not, for a period one (1) year, individually or as a partner, stockholder (except as a stockholder of less than 1% of any publicly held entity), member, officer, principal, agent, employee, supervisor, manager, consultant, guarantor, lender, co-endorser, or in any similar capacity, own, participate in the ownership of, manage, operate, exercise any control over, render services to, derive income from, or engage in any of the foregoing, for any Hospital located within a twenty-five (25) mile radius of CAH's primary administrative offices, located in Carthage, New York. As used in this Agreement, Hospital shall mean the following types of facilities or institutions which are engaged principally in providing services by or under the supervision of a physician for the prevention, diagnosis, or treatment of human disease, pain, injury, deformity, or physical condition: a general hospital, a public health center, a diagnostic center, a treatment center, a tuberculosis hospital, or a chronic disease hospital, as these terms are defined by Article 28 of the New York Public Health Law. Notwithstanding the foregoing, this paragraph 9 shall not apply to Executive in the event Executive voluntarily terminates her employment with CAH if: (i) CAH has entered into an affiliation as contemplated by paragraph 7 above; and (ii) the parties could not mutually agree to terms and conditions for a new employment contract for Executive.

(b) Reasonableness. It is expressly understood and agreed that, although the parties consider the restrictions contained herein reasonable as to protected business, duration, and geographic area, in the event any court of competent jurisdiction deems them to be unreasonable, then such restriction shall be applicable to the broadest business, longest period, and largest territory as may be considered reasonable by such court and this Agreement as so amended shall be enforced. As a further demonstration of the reasonableness of this paragraph 9, the parties expressly agree that the terms of this paragraph shall not apply in the event that the Executive is terminated without cause or in the event Executive's contract for employment is not renewed, nor shall it apply in the event Employee terminates this Agreement voluntarily, if such voluntary termination is based upon the Hospital's material breach of this Agreement.

(c) The foregoing restriction is a material and essential part of this agreement and is made for the purpose of inducing CAH to employee Executive. The protections and rights provided to CAH under this paragraph are in addition to and not in lieu of any protections and rights that may be afforded to CAH under the laws governing the enforcement and interpretation of this Agreement. The provision of this paragraph 9 shall remain in force after the termination of Executive's employment under this Agreement.

11. Construction and Severability. The invalidity of any one or more provisions of this Agreement or any part thereof, all of which are inserted conditionally upon their being valid in law, shall not affect the validity of any other provisions to this Agreement; and in the event that one or more provisions contained herein shall be invalid, as determined by a court of competent jurisdiction, this Agreement shall be construed as if such invalid provisions had not been inserted.

12. Governing Law. This Agreement was executed and delivered in New York and shall be construed and governed in accordance with the laws of the State of New York. Jurisdiction of any litigation arising out of or related to this Agreement shall be venued in the State of New York, County of Onondaga.

13. Assignability and Successors. This Agreement may not be assigned by Executive or CAH, except that this Agreement shall be binding upon and shall inure to the benefit of the successor of CAH through a consolidation with or merger into any other entity, reorganization, or a transfer of all or substantially all of its properties or assets to any other entity.

14. Miscellaneous.

(a) This Agreement constitutes the entire understanding and agreement between the parties with respect to the subject matter hereof and shall supersede all prior understandings and agreements.

(b) This Agreement cannot be amended, modified, or supplemented in any respect, except by a subsequent written agreement entered into by the parties hereto.

The foregoing is established by the following signatures of the parties.

CARTHAGE AREA HOSPITAL

By: ______________________
Richard Duvall

EXECUTIVE:

By: ______________________
Rachel May-Zysk

**AMENDMENT TO EXECUTIVE EMPLOYMENT AGREEMENT AND AGREEMENT TO PARTICIPATE IN PILOT PROGRAM**

This **AMENDMENT TO EXECUTIVE EMPLOYMENT AGREEMENT AND AGREEMENT TO PARTICIPATE IN PILOT PROGRAM** (this "Amendment") is made and entered into effective April 28, 2024 (the "Pilot Program Effective Date") by and between **CARTHAGE AREA HOSPITAL**, a not-for-profit corporation organized and existing pursuant to the laws of the State of New York and having a principal place of business at 1001 West Street, Carthage, NY 13619, along with its affiliates (the "Hospital"), and **RACHEL ZYSK,** an executive employee of the Hospital having an address of 4002 W Estrella Street, Tampa, FL 33629, ("Executive"), (each a "Party" and collectively the "Parties").

**WHEREAS**, Executive is an executive employee of the Hospital pursuant to the terms of the Parties' Executive Employment Agreement (the "Agreement");

**WHEREAS**, the Hospital operates with the philosophy that the well-being of its employees and their families has a direct correlation to employee creativity, engagement, work productivity, commitment to the Hospital, and retention;

**WHEREAS**, the Hospital continuously seeks opportunities to explore alternative and/or additional employee benefits that could increase the well-being of employees and their families;

**WHEREAS**, Hospital data reflects that executive employees tend to disproportionately underutilize annual paid time off and maximize their accrued paid time off (resulting in a loss of the benefit), and, even when on scheduled leave, remain responsive to the needs of the Hospital and communications from personnel;

**WHEREAS**, the Hospital is seeking to explore the impacts of an alternative policy of paid time off that more consistently aligns with current practices of executive employees;

**WHEREAS**, the Hospital has offered executive employees the option of participating in a one-year pilot program of unlimited paid time off in accordance with the terms and conditions set forth in this Amendment;

**WHEREAS**, Executive has elected to participate in the pilot program as set forth in this Amendment; and,

**WHEREAS**, the Parties intend that this Amendment be incorporated into the Agreement.

**NOW THEREFORE**, in consideration of the foregoing, the Parties agree as follows:

1. **Pilot Program**. By execution of this Amendment, Executive elects to participate in the Hospital's alternative employee benefit package pilot program as set forth herein (the "Pilot Program").

2. **No Guarantee of Continued Employment**. Executive acknowledges and understands that his/her participation in the Pilot Program in no manner guarantees or increases the likelihood of his/her continued employment by the Hospital.

3. **Pilot Program Term and Termination**. This Amendment shall begin on the Pilot Program Effective Date and shall automatically terminate upon the expiration of one year (the "Pilot Program Term") and, unless otherwise agreed upon by the Parties, this Amendment shall have no effect upon termination.

4. **Paid Time Off**. During the Pilot Program Term, Executive shall be entitled to unlimited Paid Time Off ("PTO"), and subject to the following:

    a. Executive shall be afforded unlimited hours of paid time off so long as he/she fulfills his/her job duties and expectations consistent with current practices;

    b. Executive shall coordinate and seek preapproval for paid time off consistently with current practices and Hospital policies;

    c. Executive shall be entitled to seven (7) pre-approved "Blackout Days" during which Executive shall not be contacted and shall not be required to respond to the needs of the Hospital, other

than exigent circumstances (i.e. requiring Executive's immediate attention);

d. Absent exigent circumstances, the Hospital shall make every effort to ensure that Executive is not interrupted on his/her Blackout Days;

e. Other than on his/her Blackout Days, Executive shall be expected to respond to the needs of the Hospital in a timely and appropriate manner (by phone, email, or in-person as applicable to the circumstances) on a daily basis;

f. Executive shall select his/her Blackout Days in coordination with other executive team members, and obtain pre-approval from the Hospital Chief Executive Officer or the Chief Operating Officer; and,

g. Executive shall assign a Hospital employee to serve as his/her point of contact while taking Blackout Days, and shall ensure contact information for the delegated employee is appropriately published and available.

5. <u>Sick Leave</u>. Executive shall be afforded up to 56 hours of sick leave in accordance with the requirements of New York law and subject to existing Hospital policies and procedures, including minimum increments and subsequent verification.

6. <u>Existing Accrued Leave</u>. The current amount and value of Executive's accrued leave shall be frozen for future use as needed by Executive in accordance with Hospital policies.

7. <u>Governing Terms and Conditions</u>.

a. Except and only to the extent of a direct conflicting term in this Amendment, the Parties shall remain bound by the Agreement;

b. In the event of a direct conflict between a provision in the Agreement and a provision set forth in this Amendment, this Amendment shall prevail;

c. Upon expiration of the Pilot Program Term, the terms and conditions of this Amendment shall terminate; and,

d. Upon expiration of the Pilot Program Term, Executive shall have no obligation or right to maintain the benefits policy set forth in this Amendment, and shall return to his/her previous benefit structure unless otherwise agreed upon in a written instrument executed by the Parties.

8. <u>Compensation</u>.

a. <u>Election Incentive Adjustment to Annual Base Salary</u>: In consideration for Executive electing to participate in the Pilot Program, Executive shall be entitled an immediate upward adjustment to his/her annual base salary, which shall not be reduced due to the expiration of the Pilot Program Term, as follows:

i. Formula: Executive PTO converted to 256 hours and Annual Base Salary adjusted by 256 hours times hourly rate, and added to annual base salary (i.e. Current Salary + 4% + (256 x Adjusted Hourly Salary) = Annual Base Salary)

ii. Example using Current Salary (CS) of **$35,000; hourly $16.8269** (CS/2080 hours)

<u>**Formula for Adjusted Annual Base Salary**</u>
(1) CS $35K + 4% ($1,400) = $36,400;
(2) $36,400 / 2,080 hours = $17.50 Adjusted Hourly Rate (AHR)
(3) AHR $17.50 x 256 Converted PTO Hours = $4,480

TOTAL: CS $35K + 4% (i.e. $1,400) + $4,480 (i.e. 256 x $17.50) = **$40,880** Adjusted Annual Base Salary

b. <u>No Impact on Existing Compensation Adjustments</u>: Executive shall remain eligible for all

other bonuses and adjustments to his/her compensation consistent with current Hospital policies and procedures, including management group compensation adjustments, market adjustments, and guaranteed minimum annual adjustments.

**[END AMENDMENT]**

Except as expressly provided in this Amendment, all other terms and conditions of the Agreement shall remain in full force and effect.

**IN WITNESS WHEREOF,** the Parties agree to the foregoing as evidenced by their execution of this Amendment.

**HOSPITAL:**

**RICHARD A. DUVALL**
**Chief Executive Officer**

Date: 4/17/2024

**EXECUTIVE:**

**RACHEL ZYSK**
**General Counsel**

Date: 4/18/2024

NORTH STAR
Health Alliance

# Frozen Benefit Time

| | |
|---|---|
| Employee Name: | Rachel Zysk |
| Title: | Hospital General Counsel |
| Frozen as of: | 4/27/24 |
| Hourly Rate when time was frozen: | $157.45 |

| | |
|---|---|
| PTO Hours frozen: | 343.36 hours |
| PTO Value: | $54,062.03 |

By signing below you attest that the above referenced hours and value is correct. If you feel it is incorrect you are required to notify Human Resources.

X

Rachel Zysk Date

#08701 - Rachel R. Zysk
CAH/CARTHAGE/ADMIN/EXECUTIVE

Voucher #(80308)

Pay Date: 04/03/2026
Pay Period: 03/15/2026-03/28/2026

**Earnings**

| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| SALA | 186.70 | 80.00 | 14,935.88 | 103,811.76 |
| **Gross Pay** | | | **14,935.88** | **103,811.76** |
| Hours Paid | | 80.00 | | |

**Deductions**

| | Goal | Current | YTD |
|---|---|---|---|
| 401KLOAN | 61,459.13 | 480.15 | 3,361.05 |
| 401k | | | 1,000.00 [1] |
| BUYUPDNTL | | 33.43 | 234.01 [2] |
| CRILL | | 16.80 | 117.60 |
| DCFSA | | 76.92 | 538.44 [2] |
| FOUND | | 26.00 | 182.00 |
| FSA | | 130.76 | 915.32 [2] |
| ROTH | | | 885.00 |
| STD | | 74.77 | 523.39 |
| VIS1 | | 6.18 | 43.26 [2] |
| VLFE | | 27.25 | 190.75 |
| **Total** | | **872.26** | **7,990.82** |

**Taxes Withheld**

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 14,688.59 | 101,080.73 | 3,723.09 | 24,125.84 |
| FICA | 14,688.59 | 102,080.73 | 910.70 | 6,329.01 |
| MEDI | 14,688.59 | 102,080.73 | 212.98 | 1,480.17 |
| **Total** | | | **4,846.77** | **31,935.02** |

| | | Current | YTD |
|---|---|---|---|
| **Net Pay** | | **9,216.85** | **63,885.92** |
| | [redacted] (5786) | 9,216.85 | 63,885.92 |

**Company Paid Benefits** [3]

| | Current | YTD |
|---|---|---|
| MDCL-WELL | 1,197.94 | 5,989.70 [2] |

**Accruals**

| | Bal. | Available | Taken |
|---|---|---|---|
| NYS Sick | 85.25 | 56.00 | 0.00 |

1 Reduces your Federal & State Withholding Taxable Wage
2 Reduces your Federal Withholding, OASDI & Medicare Taxable Wage
3 For information purposes only. No effect on your net pay.

Carthage Area Hospital 1001 WEST ST, Carthage, NY 13619-9776
Business Phone #: 315-493-1000

1 of 1

**Carthage Area Hospital**
1001 WEST ST
Carthage, NY 13619-9776

| | |
|---|---|
| **Pay Date:** | **04/03/2026** |
| **Voucher #:** | **(80308)** |

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| Rachel R. Zysk | 1 | Checking | [redacted] | [redacted] | 9,216.85 |

CAH/CARTHAGE/ADMIN/EXECUTIVE 08701 04/03/2026 (80308)

**Rachel R. Zysk**
4002 W Estrella Street
Tampa, FL 33629

**Non-Negotiable - This Is Not A Check**

1
**Carthage Area Hospital**
1001 WEST ST
Carthage, NY 13619-9776

CAH/CARTHAGE/ADMIN/EXECUTIVE 08701
04/03/2026 (80308)

**Rachel R. Zysk**
4002 W Estrella Street
Tampa, FL 33629

**Personal & Confidential**