**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**
**SYRACUSE DIVISION**

**Hearing Date/Time: December 9, 2026, 2:00 p.m.**
**Hearing Location: Syracuse, NY**
**Opposition Due: December 2, 2026**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| NORTH STAR HEALTH ALLIANCE, INC., *et al*,[1] | : | Case No. 26-60099-5-wak |
| | : | Main Case |
| Debtors. | : | Jointly Administered |
| | : | Case No. 26-30078 |
| | : | Case No. 26-30079 |
| | : | Case No. 26-60100 |

**DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING SETTLEMENT AND COMPROMISE BETWEEN DEBTORS AND CHART RISK RETENTION GROUP PURSUANT TO BANKRUPTCY RULE 9019**

North Star Health Alliance, Inc. ("North Star"), Carthage Area Hospital, Inc. ("Carthage" or "CAH"), Claxton-Hepburn Medical Center, Inc. ("Claxton" or "CHMC"), and Meadowbrook Terrace, Inc. ("Meadowbrook"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby submit this *Motion for Entry of Order Approving Settlement Between Debtors and CHART Risk Retention Group* (the "Motion"), seeking the entry of an order, pursuant to sections Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving the settlement between the Debtors and CHART Risk Retention Group ("CHART" and, together with the Debtors, the "Parties"). In support thereof, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. Consideration of this matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).

Bankruptcy Rule 7008, the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution. Venue of this proceeding is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicate for the relief requested herein is Bankruptcy Rule 9019.

## BACKGROUND

### A. The Chapter 11 Cases

3. On February 10, 2026 (the "Petition Date"), the Debtors commenced these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing in possession of their properties and are operating and managing their businesses, as debtors-in-possession, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases. An Official Committee of Unsecured Creditors (the "Committee") was appointed on March 4, 2026. A Patient Care Ombudsman, Suzanne Koenig (the "PCO"), was appointed on March 12, 2026.

5. By Order dated June 24, 2026 [Docket No. 417], the Court approved on a final basis the debtor-in-possession loan (the "DIP Loan") from the Dormitory Authority of the State of New York ("DASNY") to the Debtors in the total amount of up to $45 million, collateralized by, among other things, liens on substantially all assets of the Debtors.

6. On August 6, 2026, the Debtors executed a Letter of Intent with Rochester Regional Health ("RRH") as the proposed long-term strategic partner for the core hospital and behavioral health operations of the North Star system (the "RRH LOI"). The Debtors are currently pursuing

a Safety Net Transformation Program ("SNTP") application and related restructuring in conjunction with RRH, the New York State Department of Health ("DOH"), and the Public Health and Health Planning Council ("PHHPC").

7. Since the Petition Date, the Debtors continue to fulfill their charitable mission by operating their facilities to deliver quality health care in their communities, supported by a local and loyal workforce.

**B. The Debtors' Operations**

8. Each of the Debtors are New York not-for-profit corporations. Debtor North Star is the umbrella passive parent that oversees the North Star system. The North Star system is a critical safety-net healthcare provider in the North Country region of New York State, serving the residents of Jefferson, St. Lawrence, and Lewis Counties. The system's facilities provide emergency care, ambulatory surgery, clinical laboratory services, diagnostic imaging, rehabilitation, cancer treatment, renal dialysis, women's health, pediatrics, musculoskeletal and orthopedic care, mental health services, wound care, school-based health centers, and a network of community-based access points.

9. The Debtors' operations currently consist of Debtor Carthage's two 25-bed Critical Access Hospitals at its Carthage campus (1001 West Street, Carthage, NY 13619) and its Ogdensburg campus and a network of provider-based clinics under its Article 28 operating certificate, Debtor Claxton's standalone Article 31 inpatient psychiatric hospital and Debtor Meadowbrook's 60-bed assisted living facility. Collectively, the North Star system employs approximately 991 individuals.

## C. <u>The Debtor North Star's Insurance Relationship with CHART</u>

10. CHART operates as an insurance reciprocal which is a member-owned insurance structure where the subscribers are also policy holders under traditional insurance policies and CHART collects premiums to provide medical malpractice and general liability insurance coverage for each subscriber's risks.

11. To become a member of CHART, each member enters into a Subscriber Agreement and Application for Insurance Coverage and Power of Attorney (the "<u>Subscriber Agreement</u>"). Claxton became a member of CHART in February 2011 and by Amendment in March 2018, NSHA succeeded to Claxton's subscriber status.

12. Effective January 1, 2025, NSHA withdrew as a member and terminated its Subscriber Agreement.

13. At the end of CHART's fiscal year 2025, the Debtor North Star had the following amounts in CHART Accounts: (i) $200,000.00 in its Paid Surplus Account; and (ii) $1,584,264.00 in its Surplus Capital Account, which amount was thereafter reduced by $110,936.25 as a result of the actuarial adjustment approved pursuant to the Interim Order. The total amount in the Debtor's Accounts being held by CHART is currently $1,673,309.75. No interest is payable on these amounts.

14. CHART is permitted to hold the capital accounts of a departed subscriber for up to five years prior to distribution of the capital account balance to the departed member. As Debtor departed CHART membership effective January 1, 2025, CHART currently holds the Debtor's Accounts on Debtor's behalf pending the date(s) of distribution pursuant to CHART's governing standards. Debtor has requested that amounts in its accounts held by CHART be disbursed early. According to CHART, permitting early withdrawal without an appropriate discount is highly



51729972.2

unusual and unprecedented, encouraging other departed or departing subscribers to seek premature distributions, to the detriment of CHART and its members.

15. To date, Debtor owes CHART $243,109.20 for unpaid premiums, penalties, and other charges. CHART's Rules and Regulations ("CHART's Rules") provide the right of offset.

16. On February 25, 2026 CHART filed a motion for relief from the automatic stay (ECF Doc. No. 76 (the "Stay Motion"). seeking authority for CHART to offset the Debtor's liabilities against the Debtor's capital account held by CHART, as well as a comfort order confirming that CHART may make actuarially required annual adjustments to members' internal accounts, including the Debtor's. The Stay Motion was granted, in part, on consent, by Interim Order entered March 12, 2026 (ECF Doc. No. 148) (the "Interim Order") providing for CHART to make actuarially required annual adjustments to members' internal accounts, including the Debtor's. The balance of CHART's Stay Motion -- the disposition of the request to offset the Debtor's liabilities against the Debtor's capital account held by CHART -- remains pending before the Court.

17. The instant Motion resolves this remaining portion of the Stay Motion.

**THE SETTLEMENT**

18. Debtor and CHART have engaged in extensive good-faith, arm's length negotiations in an effort to resolve the Stay Motion consensually.

19. Subject only to the Court's approval of this Motion, the Parties have settled and resolved the amounts claimed owing and any and all other claims between them, as more fully described in the Stipulation of Settlement attached hereto as Exhibit 1 (the "Settlement"). The material terms of the Settlement are as follows:

a. In full and final satisfaction of all amounts due and owing, CHART shall liquidate Debtor's Accounts and from the proceeds shall

disburse to Debtor $680,000.00 (the "Settlement Amount"). Debtor shall have no further right to any distribution from Debtor's Accounts, and that the amount of any actual future charges to, or adjustments of, Debtor's Accounts shall not increase or reduce the Settlement Amount.

b. CHART shall retain, free and clear of any claim by Debtor or its estate, the difference between the Net Account Balance and the Settlement Amount (the "Retained Amount"), representing an all-inclusive accommodation for (a) projected charges; (b) the risk that actual charges to, and actuarial adjustments of, Debtor's accounts through the end of the hold period would exceed the Projected Charges; (c) the present-value discount attributable to disbursing funds approximately three years before they would otherwise be payable; and (d) premature withdrawal of capital. The amount of any actual future charges to, or adjustments of, Debtor's Accounts shall not increase or reduce the Retained Amount

c. Within three (3) business days of payment of the Settlement Amount, CHART shall file a withdrawal with prejudice of its Stay Relief Motion.

d. The Parties will agree to various mutual releases, as set forth more fully in the Settlement.

## RELIEF SOUGHT

20. By this Motion, the Debtors request entry of an order, substantially in the form of attached hereto as Exhibit 2, (i) authorizing Debtors to enter into the Settlement Agreement, (ii) approving the Settlement Agreement and authorizing the Debtors to take all actions necessary to effectuate the terms thereof, and (iii) granting related relief.

## BASIS FOR RELIEF

21. Approval of the Agreement is governed by Rule 9019(a) of the Bankruptcy Rules, which provides that "[o]n motion by the [Debtors] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bank. P. 9019(a). As such, Bankruptcy Rule 9019(a) "empowers the Bankruptcy Court to approve compromises and settlements if they are in

the best interests of the estate." *Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

22. In determining whether to approve a proposed settlement, a court must find that the settlement is fair and equitable, reasonable and in the best interests of the debtor's estate and creditors. *See Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968); Air Line Pilots Ass'n, Int'l. v. Am. Nat'l Bank & Tr. Co. of Chicago (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994). The decision to approve a particular compromise or settlement is within the sound discretion of the Bankruptcy Court. *Drexel Burnham*, 134 B.R. at 505. That "discretion should be exercised in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *see also Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("[T]he general rule [is] that settlements are favored and, in fact, encouraged by the approval process outlined above.").

23. A court need not decide the numerous issues of law and fact a settlement raises to approve the settlement under Bankruptcy Rule 9019; rather, it should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)); *In re Lynch*, No. 19-cv-3837(GRB), 2022 U.S. Dist. LEXIS 91195, at *8 (E.D.N.Y. May 20, 2022) (same); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) (in making the determination of reasonableness, the court need not conduct a "mini-trial" on the merits). Put another way, "[a]ll that [the proponent of the settlement] must do is establish . . . [that] it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly [the settlement] might be considerably less (or more) than were the case fought

to the bitter end." *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir. 1960) (citation omitted).

24. Courts in the Second Circuit apply the following factors in determining whether a settlement meets the requirements of Rule 9019:

a. the probability of success in litigation, with due consideration for the uncertainty in fact and law;

b. the difficulties of collecting any litigated judgment;

c. the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay;

d. the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement;

e. the competence and experience of counsel who support the settlement;

f. the relative benefits to be received by members of any affected class;

g. the extent to which the settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion; and the debtor's informed judgment that the settlement is fair and reasonable.

*In re Iridium Operating LLC, 478 F.3d 452 (2d Cir. 2007); In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 226 (Bankr. S.D.N.Y. 2007) (citing I*n re Texaco, Inc.*, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988)); *Purofied Down Prods.*, 150 B.R. at 522; *Drexel Burnham*, 134 B.R. at 506. Each of these factors supports approval of the Agreement here or is neutral.

25. First, the Settlement Agreement resolves numerous legal and factual issues among the Parties by settling the Stay Motion currently before the Court, the outcome of which would most likely be favorable to CHART, and the cost of which would erode funds available for distribution to the creditors under the Plan. Second, the Settlement Agreement is the product of significant good-faith and arm's-length negotiations. Debtors and CHART engaged in substantial back and forth regarding the alleged legal bases for the claims, Debtor North Star's defenses, and the applicable facts and circumstances prior to reaching a settlement. Third, the Settlement Agreement provides an overall benefit to the estates as Debtors will receive the sum of



51729972.2

$680,000.00. This amount represents a negotiated accommodation for: (a) the Projected Charges; (b) the risk that actual charges to and actuarial adjustments of Debtor North Star's Account through the end of the hold period would exceed the Projected Charges; (c) the present-value discount attributable to disbursing funds approximately three years before they would otherwise be payable; and (d) the premature withdrawal of capital. In Debtors' judgment, the Settlement Agreement is reasonable and in the best interest of the estates, creditors, and other parties in interest, and represents a fair resolution of the claims.

26. Approval of the Agreement will resolve finally a contingent claim against the Debtors' estate without further liability and expense to the estates. Additionally, the settlement will release substantial funds to the Debtors, enhancing the assets available for administration and distribution to the creditors. Accordingly, Debtors respectfully submit that the applicable factors governing approval of the request for relief are satisfied, the Settlement Agreement falls well within the lowest "range of reasonableness" and, therefore should be approved pursuant to Bankruptcy Rule 9019.

## NOTICE

27. Notice of this Motion has been provided to the (a) the Office of the United States Trustee for the Northern District of New York, (b) counsel for the Committee, Northern Credit Union, and the New York State Department of Health, (c) the Office of the Attorney General for the State of New York, (d) the Office of the U.S. Attorney General for the Northern of New York, and (e) those persons who have formally appeared and requested service in these Chapter 11 Cases pursuant to Rule 2002 (collectively, the "Notice Parties").[2]

[2] Contemporaneously with the filing of the Motion, the Debtors are moving to limit the scope of notice.

28. The Debtors respectfully submit that such notice is adequate and sufficient and that no further notice is necessary.

## NO PRIOR REQUEST

29. No prior request for the relief sought in the Motion has been made to this or any other court.

WHEREFORE, the Debtors request this Court enter an order granting this Motion and such other and further relief as the Court deems just and proper.

Dated: November 18, 2026
New York, New York

**BARCLAY DAMON LLP**

By: */s/Janice B. Grubin*
Janice B. Grubin
Emilie D. Simone
1270 Avenue of the Americas, Suite 2310
New York, New York 10020
(212) 784-5800; jgrubin@barclaydamon.com
Emilie D. Simone
(212) 784-5833; esimone@barclaydamon.com
*Counsel to Debtors and Debtors-in-Possession*

# <u>EXHIBIT 1</u>

## Settlement and Mutual Release Agreement

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>NORTH STAR HEALTH ALLIANCE, INC. et al.,<br><br>Debtors[1]. | Chapter 11<br>Case No. 26-60099 (main case)<br>Jointly Administered<br><br>Case No. 26-30078<br>Case No. 26-30079<br>Case No. 26-60100 |

**STIPULATION OF SETTLEMENT**

This Stipulation of Settlement (the "Agreement") by and between CHART Risk Retention Group ("CHART") and debtor North Star Health Alliance, Inc. (the "Debtor"), dated as of October 21, 2026, providing as follows:

WHEREAS CHART is a member owned medical malpractice risk retention group headquartered in Pennsylvania but domiciled in and regulated under the laws of the State of Vermont; and

WHEREAS Debtor filed its Chapter 11 case in this Court on February 10, 2026; and

WHEREAS CHART filed a motion for relief from the automatic stay (ECF Doc. No. 76 (the "Motion"); and

WHEREAS the Motion was granted in part by Order entered March 12, 2026 (ECF Doc. No. 148) (the "Interim Order"); and

WHEREAS the balance of CHART's Motion remains pending before the Court; and

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).

WHEREAS to become a member of CHART, each member enters into a Subscriber Agreement and Application for Insurance Coverage and Power of Attorney (the "Subscriber Agreement"); and

WHEREAS Claxton Hepburn Health Systems, Inc. became a subscriber of CHART in February 2011 and by Amendment dated in March 2018, North Star Health Alliance, Inc., as successor-in-interest to Claxton Hepburn Health Systems, Inc. became the subscriber; and

WHEREAS effective as of January 1, 2025, North Star Health Alliance, Inc. withdrew as a subscriber;

WHEREAS CHART's Rules and Regulations of Community Hospital Alternative for Risk Transfer (A Reciprocal Risk Retention Group) (Amended as of May 4, 2024) ("CHART's Rules"), provide in pertinent part at Article II, Section 6 thereof for the right of offset; and

WHEREAS Article XI, §1 of CHART's Rules defines the various accounts that each subscriber has at CHART; and

WHEREAS CHART also has Standards and Formulas for Surplus Allocations and Distributions (as amended September 7, 2017) ("CHART's Standards") which set forth the standards for the handling of the subscriber capital accounts; and

WHEREAS at §1, CHART's Standards define the subscriber's various accounts which CHART maintains which, insofar as Debtor is concerned are: (i) a Paid in Surplus Account; (ii) a Surplus Capital Account); and (iii) a Subscriber's Savings Account (collectively "Debtor's Accounts"); and

WHEREAS as of the end of CHART's fiscal year 2025 (ending 12/31/25), the Debtor had the following amounts in CHART Accounts: (i) $200,000.00 in its Paid in Surplus Account; (ii) $1,584,246.00 in its Surplus Capital Account, which amount was thereafter reduced by

$110,936.25 as a result of the actuarial adjustment approved pursuant to the Interim Order; and (iii) $0 in its Subscriber Savings Account; and

WHEREAS the total in the Debtor's Accounts being held by CHART is now $1,673,309.75; and

WHEREAS CHART is permitted to hold the capital accounts of a departed subscriber for between three and five years (depending on the type of account) prior to distribution of the capital account balance to the departed member; and

WHEREAS as Debtor departed CHART membership effective January 1, 2025, CHART currently holds the Debtor's Accounts on Debtor's behalf pending the date(s) of distribution pursuant to CHART's governing standards; and

WHEREAS Pursuant to CHART's Rules, Article XI at §3(c) no interest is payable on these amounts; and

WHEREAS Debtor owes CHART $243,109.20 for unpaid premiums, penalties and other charges; and

WHEREAS pursuant to the Interim Order CHART was permitted to make adjustments to Debtor's accounts as required by actuarial review and, in fact, made such adjustments which adjustments are reflected in the total held in Debtor's Accounts; and

WHEREAS §§s 5 and 6 of CHART's Standards govern when CHART must return amounts in its subscribers' capital accounts and, pursuant thereto, amounts in Debtor's Accounts need not be disbursed before 5 years from its termination as a subscriber; and

WHEREAS in its business judgment the Debtor has requested that amounts in its accounts held by CHART be disbursed early which request is highly unusual in the business of CHART; and

WHEREAS, after application of the $243,109.20 owed by Debtor to CHART, the net balance of Debtor's Accounts is $1,430,200.55 (the "Net Account Balance"), which, absent this Agreement, would not be payable to Debtor until on or about January 1, 2030, the fifth anniversary of Debtor's withdrawal as a subscriber, and then only net of any further charges and actuarial adjustments and subject to the approval of CHART's Vermont regulators; and

WHEREAS, Debtor's Accounts remain subject during the hold period to charges for deductibles, premiums, penalties, actuarial changes and other amounts attributable to coverage previously provided to Debtor (the "Projected Charges"); and

WHEREAS, the actual charges against Debtor's Accounts through January 1, 2023 could potentially increase, as a result of annual actuarial review under CHART's Standards, which review resulted in a reduction of $110,936.25 to Debtor's Surplus Capital Account for fiscal year 2025, and under §4 of CHART's Standards subscriber accounts may be further adjusted pro rata if actuarial confidence levels are not achieved; and

WHEREAS, no interest is payable on Debtor's Accounts, and because the Settlement Amount (as defined below) will be disbursed approximately three years before any distribution from Debtor's Accounts would otherwise be due, CHART will forgo the use and investment of such funds for the balance of the hold period; and

WHEREAS, CHART's Rules and CHART's Standards entitle CHART to hold a departed subscriber's capital for up to five years in order to protect CHART's capitalization and its remaining members, and permitting early withdrawal without an appropriate discount would encourage other departed or departing subscribers to seek premature distributions, to the detriment of CHART and its members; and

WHEREAS, Debtor and its affiliated debtors are cash-constrained health care providers furnishing essential services in two large and medically underserved counties, and receipt of the Settlement Amount in 2026, rather than an uncertain and reduced amount in or after 2030, will provide immediate liquidity to Debtor's estate; and

WHEREAS, Debtor and CHART have negotiated a settlement sum, which has been approved by CHART's and the Debtor's Boards of Directors and remains subject to approval by CHART's Vermont regulators and by this Court; and

WHEREAS, the parties have each concluded, in the exercise of their business judgment, that the compromise set forth in this Agreement is fair and reasonable, avoids the expense, delay and uncertainty of litigating the Motion and any objection thereto, and is in the best interests of Debtor's estate and its creditors and of CHART and its members; it is hereby agreed as follows:

1. **Bankruptcy Court Approval.** The parties' obligations under this Agreement including, but not limited to, payment by CHART of the Settlement Amount (as defined below) are expressly conditioned upon the prior approval of the terms set forth herein by the United States Bankruptcy Court, Northern District of New York.

2. **The Settlement Amount.** In full and final satisfaction of all amounts due and owing to Debtor under the Subscriber Agreement, CHART's Rules, CHART's Standards and any other agreements by and between CHART and Debtor and / or Debtor's predecessors in interest, CHART shall liquidate Debtor's Accounts and from the proceeds shall disburse to Debtor the sum of $680,000.00 (the "Settlement Amount").

3. **Basis for Settlement Amount.** The Parties acknowledge and agree that the difference between the Net Account Balance and the Settlement Amount (the "Retained Amount"), represents a negotiated, all-inclusive accommodation for: (a) the Projected Charges; (b) the risk that actual

charges to, and actuarial adjustments of, Debtor's Accounts through the end of the hold period would exceed the Projected Charges; (c) the present-value discount attributable to disbursing funds approximately three years before they would otherwise be payable, during which period no interest would accrue to Debtor; and (d) the premature withdrawal of capital that CHART's Rules and CHART's Standards would otherwise permit CHART to retain. The Parties further agree that CHART shall retain the Retained Amount free and clear of any claim by Debtor or its estate, that Debtor shall have no further right to any distribution from Debtor's Accounts, and that the amount of any actual future charges to, or adjustments of, Debtor's Accounts shall not increase or reduce the Settlement Amount or the Retained Amount.

4. **Payment of the Settlement Amount.** The Settlement Amount shall be transmitted by wire transfer to Debtor's Debtor in Possession Account held at M&T Bank, pursuant to wire instructions to be provided to CHART by Debtor. The Settlement Amount shall be transmitted only after the entry of a final and non-appealable order of the United States Bankruptcy Court approving this Stipulation pursuant to Fed. R. Bankr. P. 9019. If such an order is entered and has become final and non-appealable prior to November 30, 2026, CHART agrees to disburse the Settlement Amount not later than December 5, 2026.

5. **Release of CHART by Debtor.** Effective upon payment of the Settlement Amount, Debtor, on behalf of itself and its predecessors, predecessors-in-interest, successors, successors-in-interest, subsidiaries, , affiliates, officers, directors, employees, agents, members, principals, , attorneys and assigns, hereby releases, waives, and forever discharges CHART, together with its predecessors, predecessors-in-interest, successors, successors-in-interest, subsidiaries, parent companies, affiliates, officers, directors, employees, agents, members, principals, shareholders, attorneys and assigns, from any and all actions, allegations, assertions, causes of action, claims,

counterclaims, demands, accountings, liens, security interests, costs, expenses, damages, liabilities, penalties, obligations, awards, judgments, settlements, fines, deficiencies, debts, dues, payments, reimbursements, compensation, interest, attorneys' fees, consultants' fees, lost income, and losses, of every kind and character, whether asserted or unasserted, known or unknown, suspected or unsuspected, in law or in equity, for or by reason of any matter, cause, or thing whatsoever, from the beginning of the world to the date of this Agreement relating to Debtor's Accounts or otherwise relating to Debtor's participation in CHART.

6. **Release of Debtor by Chart.** Effective upon payment of the Settlement Amount CHART, on behalf of itself and its predecessors, predecessors-in-interest, successors, successors-in-interest, subsidiaries, parent companies, affiliates, officers, directors, employees, agents, members, principals, shareholders, attorneys and assigns, hereby release, waive, and forever discharges Debtor, together with its predecessors, predecessors-in-interest, successors, successors-in-interest, subsidiaries, , affiliates, officers, directors, employees, agents, members, principals, , attorneys and assigns, from any and all actions, allegations, assertions, causes of action, claims, counterclaims, demands, accountings, liens, security interests, costs, expenses, damages, liabilities, penalties, obligations, awards, judgments, settlements, fines, deficiencies, debts, dues, payments, reimbursements, compensation, interest, attorneys' fees, consultants' fees, lost income, and losses, of every kind and character, whether asserted or unasserted, known or unknown, suspected or unsuspected, in law or in equity, for or by reason of any matter, cause, or thing whatsoever, from the beginning of the world to the date of this Agreement; and CHART shall withdraw its proof of claim No. 122 filed with Omni Agent Solutions, Claims Agent, on September 17, 2026.

7. **Confidentiality.** Except as required to be disclosed as part of Debtor's bankruptcy case, this Agreement and its terms shall be treated as confidential information and shall not be disclosed to any third-party without the prior written consent of the Parties; provided, however, that disclosure may properly be made absent prior written authorization when disclosure is limited to only so much information as reasonably necessary under the circumstances and is made: (i) to financial advisors and legal counsel for the disclosing Party; (ii) to any government agency having appropriate jurisdiction over a Party, including taxing authorities, where such disclosure is necessary to avoid violation of law; (iii) pursuant to a valid subpoena or discovery request, provided that the disclosing Party shall provide reasonable notice to the other Party and shall disclose information under the protections of any applicable protective order; or (iv) in an action to enforce the terms of this Agreement.

8. **Withdrawal of Stay Relief Motion.** Within three (3) business days of Payment of the Settlement Amount, CHART shall file a withdrawal with prejudice of its Stay Relief Motion.

9. **Non-Disparagement.** The Parties agree to refrain from making any negative or disparaging statement or comment about the other to any person, entity, or organization, which statement or comment is designed or reasonably likely to damage the other Party, or say or do anything which could disparage, undermine or be reasonably interpreted to denigrate the capabilities, performance, integrity, or reputation of the other Party. Notwithstanding the above, this provision shall not prevent a Party from truthfully responding to requests pursuant to a federal, state, municipal, or regulatory investigation, proceeding, or action regarding any Party or stating to non-parties that their relationship has been terminated.

10. **Voluntarily Entered.** The Parties represent and warrant that this Agreement is executed voluntarily by each of them, with full knowledge of the consequences and implications

of the obligations contained herein. The Parties further represent and warrant that they were each represented by counsel of their choosing throughout the negotiations that preceded the execution of this Agreement and in connection with the preparation and execution of this Agreement, that the Parties have mutually negotiated the Agreement, and that the Parties have each thoroughly reviewed the Agreement in its entirety. Each Party acknowledges and represents that they have read and understood all terms of this Agreement.

11. **No Assignment of Claims to Third Parties.** Each Party represents and warrants that it has not assigned or transferred, or purported to assign or transfer, to any person or entity any claim or cause of action released hereunder.

12. **No Admission.** Each Party acknowledges and agrees that this Agreement is a compromise of disputed claims, and neither this Agreement nor any consideration provided hereunder shall be taken or construed to be an admission or concession by any Party, of any kind whatsoever, with respect to any fact, liability, or fault.

13. **Entire Agreement.** This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and there are no inducements, representations, warranties or understandings that do not appear within the terms and provisions of this Agreement. Notwithstanding the foregoing, the Parties agree to cooperate reasonably and execute any documents or take any additional action that is consistent with the terms of this Agreement without any further payment or remuneration from the other Party, except as specifically set forth herein. Each Party acknowledges that the consideration provided for in this Agreement is sufficient and adequate consideration for all obligations and performance required hereunder.

14. **No Modification or Waiver.** No modification or waiver of any of the terms of this Agreement shall be valid unless in writing and signed by all Parties and then approved by a

subsequent order of the Bankruptcy Court. No waiver of any breach or default hereunder shall be deemed a waiver of any other or subsequent breach or default of the same, similar, or different nature.

15. **Further Assurances.** The Parties shall use commercially reasonable efforts to take all actions necessary or appropriate to consummate the actions contemplated by this Agreement and cause the fulfillment at the earliest practicable date of all each Party's obligations to contemplated by this Agreement, including the delivery of any and all consents, authorizations, documents, certificates, and/or agreements. In case at any time after the execution of this Agreement, any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will cooperate with the other and take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request to effectuate the terms of this Agreement.

16. **Authorization.** Each individual signing this Agreement represents and warrants that such individual has the full authority and is duly authorized and empowered to execute this Agreement on behalf of the Party for which the individual signs.

17. **Governing Law.** The Parties expressly agree that all the terms and provisions hereof shall be constructed under the internal laws of the State of New York without regard to such state's conflict of laws or choice of law rules and principles and, as applicable, the United States Bankruptcy Code.

18. **Venue.** All disputes, claims, and other controversies arising out of or relating to this Agreement, or a breach thereof, shall be resolved in the United States Bankruptcy Court, Northern District of New York.

19. **Severability and Construction.** If any provision of this Agreement is found by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect. This Agreement has been negotiated by the Parties and their respective counsel, and any rule of construction or interpretation that would construe ambiguous terms against the drafter shall not apply to this Agreement.

20. **Binding Effect.** This Agreement shall be binding on the Parties, their successors, successors-in-interest, and assigns, including any acquirer of all or substantially all of the assets of a Party.

21. **Notices.** All notices, demands, and other communications under this Agreement shall be in writing and shall be sent via Federal Express, UPS, or other similar carrier service, directed to each Party with a copy to each Party's respective counsel, with a copy by email, as follows:

To CHART:
Chad Cicconi, Esq.
General Counsel and Chief Claims Officer
Chart Risk Retention Group
2551 Washington Road
810 Summerfield Commons
Upper St. Clair, PA 15241
ccicconi@chartrrg.com

With a copy to:
Lemery Greisler LLC
ATTN: Paul A. Levine, Esq.
677 Broadway, 8th Floor
Albany, New York 12207
plevine@lemerygreisler.com

To Debtor:
Andrew Manzer
Interim CEO
North Star Health Alliance, Inc.
214 King Street, Suite C
Ogdensburg, NY 13669
amanzer@nshany.org

With a copy to:
Barclay Damon LLP
ATTN: Janice Grubin, Esq.
1270 Avenue of the Americas, Suite 2301
New York, NY 10020
jgrubin@barclaydamon.com

22. **Counterparts and Electronic Signatures.** This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy and all of which, when taken together, shall be deemed to constitute one and the same document. This Agreement may be executed and delivered by customary or other commercially acceptable electronic means

(including DocuSign or similar service, or any other electronic signature complying with the U.S. federal ESIGN Act of 2000, as the same may be amended, from time to time); a manual or electronic signature so affixed to this Agreement whose image shall have been transmitted via facsimile, email, or other customary electronic means shall have the same force and effect as original ink signature for all purposes.

[Signature page to follow]

IN WITNESS WHEREOF, each of the Parties have executed this Agreement as of the date set forth above in the preamble and intend to be legally bound hereby.

CHART Risk Retention
Signed: ______________
By:
Title: General Counsel
Date: 23 October 2026

North Star Health Alliance, Inc.
Signed: ______________
By: Andrew Manzer
Title: Interim CEO
Date: ______________

LEMERY GREISLER LLC
______________
Paul A. Levine, Esq.
plevine@lemerygreisler.com
NDNY Bar Roll No. 103758
Attorneys for CHART Risk Retention Group
677 Broadway, 8th Floor
Albany, New York 12207
(518) 433-8800

BARCLAY DAMON LLP
______________
Janice B. Grubin, Esq.
jgrubin@barclaydamon.com
NDNY Bar Rol No. 516558
Attorneys for Debtor
1270 Avenue of the Americas, Suite 2310
New York, New York 10020
(212) 784-5800

IN WITNESS WHEREOF, each of the Parties have executed this Agreement as of the date set forth above in the preamble and intend to be legally bound hereby.

CHART Risk Retention
Signed: ____________________
By:
Title:
Date: ____________________

North Star Health Alliance, Inc.
Signed: ____________________
By: Andrew Manzer
Title: Interim CEO
Date: 10/22/2026

LEMERY GREISLER LLC

______________________________

Paul A. Levine, Esq.
plevine@lemerygreisler.com
NDNY Bar Roll No. 103758
Attorneys for CHART Risk Retention Group
677 Broadway, 8th Floor
Albany, New York 12207
(518) 433-8800

BARCLAY DAMON LLP
***/s/Janice B. Grubin***

Janice B. Grubin, Esq.
jgrubin@barclaydamon.com
NDNY Bar Rol No. 516558
Attorneys for Debtor
1270 Avenue of the Americas, Suite 2310
New York, New York 10020
(212) 784-5800

# <u>EXHIBIT 2</u>

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**
**SYRACUSE DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| NORTH STAR HEALTH ALLIANCE, INC., *et al*,[1] | : | Case No. 26-60099-5-wak |
| | : | Main Case |
| Debtors. | : | Jointly Administered |
| | : | Case No. 26-30078 |
| | : | Case No. 26-30079 |
| | : | Case No. 26-60100 |

**ORDER APPROVING SETTLEMENT AND COMPROMISE BETWEEN DEBTORS AND CHART RISK RETENTION GROUP PURSUANT TO BANKRUPTCY RULE 9019**

Upon the Motion, dated November 18, 2026 [Docket No. ___] (the "Motion")[2] of the above captioned debtors and debtors-in-possession (the "Debtors"), pursuant to Bankruptcy Rule 9019 approving the settlement between Debtors and CHART Risk Retention Group ("CHART" and, together with the Debtors, the "Parties"); and the Court having subject matter jurisdiction to consider and determine the Motion, and grant the requested relief in accordance with 28 U.S.C.

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Carthage Area Hospital, Inc. (2079); North Star Health Alliance, Inc. (9491); Claxton-Hepburn Medical Center, Inc. (9686); and Meadowbrook Terrace, Inc. (2458).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

§§ 157 and 1334; and consideration of the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and sufficient notice of the Motion has been given and upon the record of the hearing on the Motion and all of the proceedings had before this Court; and all objections to the Motion having been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, now, therefore, it is hereby

**ORDERED**, that the Motion is granted as set forth herein; and it is further

**ORDERED**, that the Agreement, which was attached as Exhibit 1 to the Motion, be and hereby is authorized and approved in its entirety in all respects; and it is further

**ORDERED**, that the Debtor is authorized to consummate the Agreement; and it is further

**ORDERED**, that all of the terms set forth in the Agreement, including the agreements, releases, terms and conditions of the Agreement, are deemed binding on the Parties thereto, without limitation, and that the within releases by the Parties to the Agreement are authorized and approved by the Court as set forth in the Agreement; and it is further

**ORDERED**, that the Parties are authorized to take all actions and execute all documents necessary to implement the Agreement; and it is further

**ORDERED**, that this Court shall maintain jurisdiction to interpret and enforce the provisions of the Agreement and this Order in all respects; and it is further

**ORDERED**, that, to the extent applicable, the stay provided for in Bankruptcy Rule 6004(h) is hereby waived and this Order shall be effective immediately upon its entry.

# # #